1

2

3

4                                    UNITED STATES DISTRICT COURT

5                                   NORTHERN DISTRICT OF CALIFORNIA

6

7    UNITED STATES OF AMERICA,                    Case No.  11-cr-00573-JSW-7-10

8                      Plaintiff,                 **ORDER DENYING MOTION TO**
                                                  **DISMISS INDICTMENT AND**
9              v.                                 **SETTING STATUS CONFERENCE**

10   PANGANG GROUP COMPANY, LTD.,                  Re: Dkt. No. 1193
     PANGANG GROUP STEEL VANADIUM
11   & TITANIUM COMPANY, LTD.;
     PANGANG GROUP TITANIUM
12   INDUSTRY, LTD; and PANGANG
     GROUP INTERNATIONAL ECONOMIC
13   & TRADING COMPANY,

14                    Defendants.

15

16          This matter comes before the Court on consideration of the motion to dismiss the Third

17   Superseding Indictment filed by Pangang Group Company, Ltd. ("Pangang Group"), Pangang

18   Group Steel Vanadium & Titanium Company, Ltd. ("PGSVTC"), Pangang Group Titanium

19   Industry, Ltd. ("Pangang Group Titanium"), and Pangang Group International Economic &

20   Trading Company ("PGIETC") (collectively "Pangang Defendants").  The Court has considered

21   the parties' papers, relevant legal authority, the record in this case, and it has had the benefit of

22   oral argument.  The Court HEREBY DENIES the Pangang Defendants' motion.

23                                            **BACKGROUND**

24          In April 2011, E.I. Dupont de Nemours and Company ("DuPont") filed a civil complaint

25   against Walter Liew, USA Performance Technology, Inc. ("USAPTI") and John Liu, alleging that

26   Liew and USAPTI misappropriated trade secrets relating to DuPont's chloride-route titanium

27   dioxide ("TiO2") pigment manufacturing process.  *See E.I. Dupont de Nemours and Company v.*

28   *U.S.A. Performance Technology, Inc.*, No. 11-cv-1665-JSW.

1    The Federal Bureau of Investigation opened a criminal investigation into alleged violations

2    of 18 U.S.C. section 1832, and on July 27, 2011, the Government filed a complaint against Walter

3    and Christina Liew (collectively the "Liews"), which charged them with witness tampering and

4    false statements.  (Dkt. No. 1.)  On August 23, 2011, the Liews were charged in an indictment

5    with witness tampering and false statements.  (Dkt. No. 16.)

6    On February 7, 2012, the Government filed a superseding indictment, in which Mr. Liew,

7    the Pangang Defendants, and others, were charged with, *inter alia*, violations of the Economic

8    Espionage Act ("EEA"), including conspiracy to commit economic espionage, in violation of 18

9    U.S.C. section 1831(a)(5), conspiracy to commit theft of trade secrets, in violation of 18 U.S.C.

10   section 1832(a)(5), and attempted economic espionage, in violation of 18 U.S.C. section

11   1831(a)(3)-(4).  (Dkt. No. 64.)[1]

12   On January 5, 2016, the Government filed the Third Superseding Indictment ("Third SI"),

13   which is the operative indictment, and charged the Pangang Defendants with one count of

14   conspiracy to commit economic espionage, in violation of 18 U.S.C. section 1831(a)(5), and one

15   count of attempted economic espionage, in violation of 18 U.S.C. section 1831(a)(1)-(4).  (Dkt.

16   No. 971.)

17   The Government alleges that Pangang Group is a state-owned enterprise controlled by the

18   State-Owned Assets Supervision and Administration Commission of the State Council

19   ("SASAC") of the Peoples Republic of China ("PRC").  (Third SI ¶ 4.)  According to the

20   Government, Pangang Group controls PGSVTC, and Pangang Group and PGSVTC own and

21   control Pangang Group Titanium and PIETC.  (*Id.* ¶ 5.)  In brief, the Government alleges that the

22   Pangang Defendants conspired with Walter Liew and others and attempted to obtain DuPont's

23   TiO2 technology.  (*See generally id.*)  The Government alleges the conspirators, including the

24   Pangang Defendants, acted to benefit the PRC and the Pangang Defendants.  The Government

25   alleges that the Pangang Defendants are "foreign instrumentalities" under the EEA.  (*Id.* ¶¶ 17.c,

26   56.c.)

27

28   [1]    On March 12, 2013, the Government filed a second superseding indictment, which did not
     alter the charges against the Pangang Defendants.  (Dkt. No. 269.)

United States District Court
Northern District of California

The Court will address additional facts as necessary in the analysis.

## ANALYSIS

**A.     Applicable Legal Standard.**

The Pangang Defendants move to dismiss the Third SI pursuant to Federal Rule of Criminal Procedure 12(b)(2), for lack of jurisdiction, and pursuant to 12(b)(3)(B)(v), for failure to state an offense.  "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue," and a "motion that the court lacks jurisdiction may be made at any time while the case is pending."  Fed. R. Crim. P. 12(b)(1)-(2).  "A pretrial motion is generally 'capable of determination' before trial if it involves questions of law rather than fact."  *United States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986).

A indictment must be a "plain, concise and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  "An indictment is sufficient if it contains 'the elements of the charged crime in adequate detail to inform the defendant of the charge and to enable him to plead double jeopardy.'"  *United States v. Awad*, 551 F.3d 930, 935 (9th Cir. 2009) (quoting *United States v. Alber*, 56 F.3d 1106, 1111 (9th Cir. 1995)).  "In ruling on a pre-trial motion to dismiss the indictment for failure to state an offense, the district court is bound by the four corners of the indictment . . . [and] must accept the truth of the allegations in the indictment in analyzing whether a cognizable offense has been charged."  *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002).  "The indictment should be read as a whole and construed according to common sense."  *Echavarria-Olarte v. Reno*, 35 F.3d 395, 397 (9th Cir. 1994); *accord Awad*, 551 F.3d at 936.

**B.     Jurisdiction and the Foreign Sovereign Immunities Act.**

The Pangang Defendants' primary argument is that the Court lacks jurisdiction over them, based on the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. sections 1330, 1602-1611.  The FSIA provides, in part, that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  The FSIA also provides that "district courts shall have original

United States District Court
Northern District of California

United States District Court
Northern District of California

1  jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign

2  state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to

3  which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or

4  under any applicable international agreement." 28 U.S.C. § 1330(a).

5        The FSIA "conflates the usually distinct questions of sovereign immunity, subject matter

6  jurisdiction, and personal jurisdiction" and "[j]urisdiction exists only if immunity does not."

7  *Corzo v. Banco Central del Reserva del Peru*, 243 F.3d 519, 522 (9th Cir. 2001). The Supreme

8  Court has explained that Sections 1604 and 1330(a) of the FSIA "work in tandem: [section] 1604

9  bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to

10 immunity, and [section] 1330(a) confers jurisdiction on district courts to hear suits brought by

11 United States citizens and by aliens when a foreign state is *not* entitled to immunity." *Argentine

12 Rep. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (emphasis in original)

13 ("*Amerada Hess*").

14       If the FSIA applies, it "is the 'sole basis for obtaining jurisdiction over a foreign state in

15 federal court.'" *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010) (quoting *Amerada Hess*, 488 U.S.

16 at 439); *see also Amerada Hess*, 488 U.S. at 434 ("[T]he text and structure of the FSIA

17 demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a

18 foreign state in our courts."); *accord Peterson v. Islamic Rep. of Iran*, 627 F.3d 1117, 1122 (9th

19 Cir. 2010).

20       According to the Pangang Defendants, the FSIA applies to criminal cases. They also

21 contend that the FSIA's exceptions to immunity are limited to civil cases. Finally, they argue the

22 provision which grants jurisdiction, Section 1330, is limited to civil cases. Therefore, they

23 contend the Court must dismiss the Third SI. The Government argues that the FSIA does not

24 apply in criminal cases. It contends the Court has subject matter jurisdiction over this matter

25 pursuant to 18 U.S.C. section 3231, which provides "[t]he district courts of the United States shall

26 have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of

27

28

4

the United States."[2]

The Court begins with an issue the parties did not address in their briefing, that is whether the Pangang Defendants are "foreign instrumentalities" as that term is defined in the FSIA. At the hearing, and in response to the Court's inquiry, the Pangang Defendants stated they are accepting as true for purposes of this motion the Government's allegation that they are "foreign instrumentalities." However, the Government's allegations refer to the EEA *not* to the FSIA. Under the EEA, the term "foreign instrumentality" means, *inter alia,* any "agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government[.]" 18 U.S.C. § 1839(1).

Under the FSIA, the term "foreign state" includes an "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). An "agency or instrumentality" of a foreign state is "any entity - (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country." *Id.* § 1603(b).

There are some differences between the EEA's and the FSIA's definitions of "foreign instrumentality." However, the Court concludes those differences are not material to the resolution of this aspect of the Pangang Defendants' motion. It shall, as they do, assume that they satisfy the definition of "foreign instrumentality" under the FSIA. The Court turns to the central issue: does the FSIA preclude the Court from exercising jurisdiction over the Pangang Defendants.[3]

"The few circuits to consider" whether the FSIA applies to criminal cases "have reached

---

[2]     The Pangang Defendants do not dispute that the charges against them are "offenses against the United States."

[3]     The parties also disputed who bears the burden on this motion. The Court will address this dispute in the context of whether an exception to immunity applies.

differing conclusions[.]" *In re Grand Jury Subpoena*, 912 F.3d 623, 627 (D.C. Cir. 2019) (citing cases). The Eleventh Circuit has stated, in dicta, that the FSIA does not address foreign sovereign immunity in the criminal context. *See United States v. Campa*, 529 F.3d 980, 1001 (11th Cir. 2008) (citing *United States v. Noriega*, 117 F.3d 1206, 1212 (11th Cir. 1997)).

In *United States v. Hendron*, the district court determined the FSIA does not apply in criminal case. 813 F. Supp. 3d 973, 974 (E.D.N.Y. 1993). In that case, the defendant, a Polish citizen and a director at a corporation wholly owned by the state of Poland, was charged with conspiracy, importing assault weapons into the United States, importing arms without a license, and transaction of business involving proceeds of unlawful activity. *Id.* The defendant moved to dismiss the indictment and argued he was immune from suit because "his actions were performed solely in his capacity as an employee of" the government-owned corporation. *Id.* The *Hendron* court examined the text of the FSIA and concluded "the Act contains a panoply of provisions that are consistent only with an application to civil cases and not to criminal proceedings. Other than the broad text of [section] 1604's declaration of immunity, nothing in the text of the Act suggests that it applies to criminal proceedings." *Id.* The court noted, for example, that the FSIA used the term "litigant" and referred to levies on property to satisfy judgments, which it reasoned generally refer to civil matters. The court also noted that some of the exceptions referred to money damages and arbitration agreements, matters it found "clearly refer to civil suits." *Id.*

The *Hendron* court also determined the legislative history of the FSIA supported its conclusion. *Id.* at 975-76. By way of example, it noted that a House Report used the term "lawsuit" and noted that the examples of lawsuits cited were all civil in nature. *Id.* at 975-76. The court also noted that the legislative history showed "the purpose of the bill was to make the judiciary, rather than the executive, the branch to determine claims of immunity," in order to "provide greater predictability in suits brought by American citizens against foreign governments." *Id.* at 976. According to the *Hendron* court, "[t]he legislative history gives no hint that Congress was concerned that a foreign defendant in a criminal proceeding would invoke the Act to avoid a federal court's jurisdiction." *Id.* Therefore, it denied the defendant's motion to

dismiss.[4]

In *Southway v. Central Bank of Nigeria*, the Tenth Circuit stated it was "unwilling to presume that Congress intended the FSIA to govern district court jurisdiction in criminal matters." 198 F.3d 1210, 1214 & n.4 (10th Cir. 1999). In that case, the defendants moved to dismiss and argued the district court did not have jurisdiction over claims brought under the civil provisions of the Racketeering Influenced and Corrupt Organizations Act ("RICO"). In order to state a civil RICO claim, a plaintiff must show a pattern of racketeering activity. RICO defines "racketeering activity" as, *inter alia*, acts which are "indictable" under specified criminal statutes. 18 U.S.C. § 1961(1)(B). The defendants argued that FSIA did not apply to criminal cases and, because they were not subject to prosecution, the predicate acts supporting the civil RICO claims were not "indictable." *Southway*, 198 F.3d at 1213.

The Tenth Circuit rejected the defendants' argument. It reasoned "[t]he FSIA's grant of jurisdiction to the district courts[,]" Section 1330(a), "addresses only civil actions." *Id.* It also cited to the Supreme Court's statement that "the FSIA 'contains a comprehensive set of legal standards governing claims of immunity in *every civil action* against a foreign state or its political subdivisions, agencies, or instrumentalities." *Id.* (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488 (1983)) (emphasis in *Southway*). Therefore, the court held that so long as one of the FSIA's exceptions applied, the FSIA did not preclude a civil RICO claim simply because the predicate acts involved criminal activity. *Id.* at 1214-16. The court also determined that the commercial activity exception to the FSIA applied, and it affirmed the district court's decision to deny the motion to dismiss. *Id.* at 1216-17.

The Sixth Circuit reached the opposite conclusion in *Keller v. Central Bank of Nigeria*, 277 F.3d 811, 818 (6th Cir. 2002), *abrogated on other grounds by Samantar*, 560 U.S. at 308 (holding that FSIA did not cover claims against foreign official acting in his official capacity). In *Keller*, the defendants argued that the FSIA did not apply in criminal cases and, like the

United States District Court
Northern District of California

---

[4]    *See also In re Grand Jury Proceeding Related to M/V Deltuva*, 752 F. Supp. 2d 173, 178-79 (D. Puerto Rico 2010) ("[T]he FSIA does not govern criminal actions against foreign sovereigns, their agents or instrumentalities.") (following *Hendron*, 813 F. Supp. at 975).

defendants in *Southway*, argued that because they could not be indicted, they were immune from a civil RICO suit. Although the Sixth Circuit agreed with the district court's conclusion that the commercial activity exception applied, it vacated the district court's decision denying the motion to dismiss. It reasoned that courts "have concluded that the illegality of an act does not necessarily negate its commercial character." *Id.* at 816 (citing *Adler v. Fed. Rep. of Nigeria*, 219 F.3d 869 (9th Cir. 2000) and *Southway*, 198 F.3d at 1217). However, the court agreed with the defendants that "the FSIA grants immunity to foreign sovereigns from criminal prosecution, absent an international agreement stating otherwise" and determined that because the defendant could not be indicted, the FSIA precluded the plaintiff's civil RICO claims. *Id.* at 820-21. In reaching its conclusion, the court noted that the FSIA's "jurisdictional grant … is silent on the subject of criminal actions[.]" *Id.* at 818 (citing 28 U.S.C. § 1330(a)). The *Keller* court considered *Southway* but instead relied on the reasoning set forth in an opinion from the Northern District of Ohio to determine that the defendants were immune under the FSIA. *Id.* at 819-20 (citing *Gould, Inc. v. Mitsui Mining & Smelting Co., Ltd.*, 750 F. Supp. 838, 844 (N.D. Ohio 1990)).

In *Gould,* the plaintiff asserted civil RICO claims against a company owned by France and alleged the company was involved in theft of trade secrets. *Gould*, 750 F. Supp. at 840. Like the defendants in the *Keller* and *Southway* cases, the defendant moved to dismiss on the basis that foreign sovereigns are not subject to criminal prosecution, and, therefore, it could not be indicted for the predicate acts supporting the civil RICO claims. *Id.* at 843. Citing *Amerada Hess* for the proposition that the FSIA is the sole basis to obtain jurisdiction over a foreign state, the court determined that conclusion was not limited to civil cases. *Id.* at 844. The *Gould* court also noted that "in peacetime situations, this country does not bring criminal proceedings against other nations." *Id.* The court reasoned that because the FSIA was the sole basis to obtain jurisdiction over a foreign state and because Section 1330(a) referred only to civil actions, "there is no criminal jurisdiction over [the defendant], an agency of the French government." *Id.* The court therefore granted the motion to dismiss the civil RICO claims. *Id.*

In *In re Grand Jury Subpoena*, *supra*, the D.C. Circuit "[m]indful of [its] obligation to avoid sweeping more broadly than [it] must to decide the case in front of [it]," determined it "need

not weigh in on this dispute." *Id.* at 627. Instead, it concluded that if the FSIA applied in criminal proceedings, the corporation that had been subpoenaed lacked immunity because the commercial activity exception applied. *Id.* The court first looked to whether it had subject matter jurisdiction over the case. It determined the text of Section 3231 cut against the corporation's position that the FSI "eliminated all subject-matter jurisdiction over foreign sovereigns." *Id.* at 628. The court reasoned that Section 3231 grants jurisdiction "over 'all offenses against the laws of the United States.' It is hard to imagine a clearer textual grant of jurisdiction. 'All' means 'all'; the provision contains no carve-out for criminal process served on foreign defendants. And nothing in the Act's text expressly displaces section 3231's jurisdictional grant." *Id.* The court also discussed the manner in which the FSIA conflates "subject matter jurisdiction" with "immunity" from suit and determined that "granting a particular class of defendants 'immunity' from jurisdiction has no effect on the scope of the underlying jurisdiction[.]" *Id.*

The court also rejected the corporation's argument that 28 U.S.C. section 1330(a) "revoke[d] jurisdiction over any case not falling within its terms, including any criminal proceeding." *Id.* at 628. The court reasoned that "where the Act applies, an action must fall within one of the listed exceptions," and noted that "immunity and jurisdiction would rise and fall together." *Id.* at 629 (citing *Amerada Hess*, 488 U.S. at 434). The D.C. Circuit also noted that the Supreme Court "gave no hint at all that it intended to create a loophole where, in criminal cases clearly covered by an exception to immunity, a district court would nevertheless lack subject-matter jurisdiction." *Id.* Therefore, the court determined that if a criminal case falls within an exception to the FSIA, Section 3231 and the FSIA can "coexist peacefully" *Id.* at 629-31.

The court also rejected the corporation's argument that the FSIA's exceptions did not apply in criminal cases and reasoned "[t]he text [of Section 1605] easily resolves this issue in the government's favor" by referring to "any case." *Id.* at 632. "[A]s section 1330(a) demonstrates, Congress knows how to limit a provision to a 'civil action' when it wants to. Congress's choice to extend the section 1605(a) exceptions to 'any case,' instead of just 'civil actions,' tell us that they are available in criminal proceedings." *Id.* It also determined that "[t]he usual rule is that the showing necessary to find an exception applicable travels with the burden on the merits – for

United States District Court
Northern District of California

1   example, in a motion to dismiss where a defendant challenges only the 'legal sufficiency' of the

2   complaint, the exception must merely be plausibly pled." *Id.* at 632. The court found no reason to

3   depart from that general rule and concluded that the evidence presented by the Government

4   established a "reasonable probability" that the exception applied.[5] *Id.*

5         The Court finds the reasoning in the *Hendron* case regarding the applicability of the FSIA

6   in criminal cases more persuasive than the reasoning of the Courts that have determined it does

7   apply. However, the Court does not reach the issue and wade into those murky waters because it

8   also finds the reasoning regarding the interplay of Section 3231 and the FSIA, as set forth in *In re*

9   *Grand Jury Subpoena*, persuasive. *See* 912 F.3d at 627-31. Further, assuming the FSIA applies in

10   criminal cases, for the reasons set forth by the D.C. Circuit, the Court concludes its exceptions

11   apply as well. Accordingly, the Court examines whether any of the FSIA's exceptions apply.[6]

12   *Cf., Campa*, 529 F.3d at 1001 (declining to address availability of FSIA as defense in criminal

13   proceedings because defendant "waived any sovereign immunity").

14         As noted above, the parties dispute who bears the burden to show the application of an

15   exception to the FSIA. In the Ninth Circuit, a party seeking to invoke the FSIA as an affirmative

16   defense bears the initial burden of showing that they are a foreign state or foreign instrumentality.

17   *See, e.g., Peterson,* 627 F.3d at 1125-27; *In re Rep. of Philippines,* 309 F.3d 1143, 1149 (9th

18   2002); *Phaneuf v. Rep. of Indonesia,* 106 F.3d 302, 306 (9th Cir. 1997).[7] The burden would then

19   shift to the party challenging immunity to show an exception applied. *Peterson,* 625 F.3d at 1125;

20   *In re Rep. of Philippines*, 309 F.3d at 1149. If that party offers evidence that an exception applies,

21   

22      [5]     The facts underlying the court's reasoning on this issue are redacted. *Id.*

23      [6]     The Court also notes that to adopt the Pangang Defendants' position suggests that "a
24   foreign-sovereign-owned, purely commercial enterprise operating within the United States could
    flagrantly violate criminal laws and the U.S. government would be powerless to respond save
25   through diplomatic pressure." *In re Grand Jury Subpoena*, 912 F.3d at 629-30. This Court
    "doubt[s] very much that Congress so dramatically gutted the government's crime-fighting
26   toolkit." *Id.* at 630; *cf. Southway*, 198 F.3d at 1215 ("If Congress intended defendants such as [the
    Central Bank of Nigeria and the Republic of Nigeria] to be immune from criminal indictment
    under the FSIA, Congress should amend the FSIA to expressly so state.").

27      [7]     The Ninth Circuit does not require the party invoking the FSIA to "prove a public act to
28   establish a prima facie case of immunity." *Phaneuf*, 106 F.3d at 306.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the party invoking immunity will bear the burden to show "by a preponderance of the evidence

2    that the exception does not apply."  *Joseph v. Office of the Consulate Gen. of Nigeria*, 830 F.2d

3    1018, 1021 (9th Cir. 1987).[8]

4          The Pangang Defendants invoke the FSIA as a defense to these charges, and the Court

5    concludes it is appropriate to apply the burden shifting approach set forth above.  The Court

6    concludes that by relying on the allegations in the Third SI, they have met their burden to show

7    they are foreign instrumentalities.  The Court now turns to the Government's alternative argument

8    that exceptions apply to deprive them of immunity.

9          **1.     Commercial Activity Exception.**

10         The Government's first argument is that the commercial activity applies.  The commercial

11   activity exception provides that "[a] foreign state shall not be immune from the jurisdiction of

12   courts of the United States … in which the action is based upon a commercial activity carried on

13   in the United States by the foreign state; or upon an act performed in the United States in

14   connection with a commercial activity of the foreign state elsewhere; or upon an act outside the

15   territory of the United States in connection with a commercial activity of the foreign state

16   elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).[9]

17         The phrase "based upon" is "read most naturally to mean those elements of a claim that, if

18   proven, would entitle a plaintiff to relief under [their] theory of the case."  *Saudi Arabia v. Nelson*,

19   507 U.S. 349, 357 (1993) ("*Nelson*").  The FSIA defines "commercial activity" as "either a regular

20   course of commercial conduct or a particular commercial transaction or act.  The commercial

21   character of an activity shall be determined by reference to the nature of the course of conduct or

22

23   _____

     [8]    *Compare Keller*, 277 F.3d at 815 (stating that "party claiming FSIA immunity bears the
24   initial burden of proof of establishing prima facie case that it satisfies the FSIA's definition of a
     foreign state; once this prima facie case is established, the burden of production shifts to the non-
25   movant to show than an exception applies" and noting that "party claiming FSIA immunity retains
     the ultimate burden of persuasion throughout"), *with In re Grand Jury Subpoena*, 912 F.3d at 632
26   (stating that normally corporation would bear the burden to show an exception to immunity does
     not apply but placing burden on government to show exception applied because government
27   presented *ex parte* evidence).

28   [9]    The Government contends that if the FSIA applies, the Pangang Defendants' activities
     would fall within each exception.

particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The Supreme Court has clarified that "a foreign state engages in commercial activity … where it acts 'in the manner of a private player within' the market." *Nelson*, 507 U.S. at 360 (quoting *Rep. of Argentina v. Weltover*, 504 U.S. 605, 614 (1992) ("*Weltover*")).

Thus, "commercial activity" encompasses actions and "powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Id.* "[T]he relevant question 'is whether the particular actions that the foreign state performs ... are the type of actions by which a private party engages in trade and traffic or commerce.'" *Embassy of the Arab Rep. of Egypt v. Lasheen*, 603 F.3d 1166, 1170 (9th Cir. 2010) ("*Lasheen*") (quoting *Weltover*, 504 U.S. at 614). The Court does not "consider whether the specific act was one that only a sovereign would actually perform" and, instead, "consider[s] whether the category of conduct is commercial in nature." *Lasheen*, 603 F.3d at 1170; *see also Park v. Shin*, 313 F.3d 1138, 1145 (9th Cir. 2002) ("Even if performed with a public purpose in mind, acts by governmental entities are considered commercial in nature if the role of the sovereign is one that could be played by a private actor.").

The Pangang Defendants argue the "gravamen" of this case is economic espionage, and they argue that is not the type of act in which a private party engages in trade and traffic or commerce. Instead, they contend economic espionage is a sovereign act. In support of their argument, the Pangang Defendants rely on *Dem. Nat'l Comm. v. Russian Federation,* -- F. Supp. 3d --, 2019 WL 3423536 (S.D.N.Y. July 30, 2019) ("*DNC*"), *Broidy Capital Mgmt., LLC v. (State of) Qatar*, No. CV 18-2421-JFW (Ex), 2018 WL 6074570 (C.D. Cal. Aug. 8, 2018), and *Cicippio v. Islamic Rep. of Iran*, No. Civ. 92-2300, 1993 WL 730748 (D.D.C. Mar. 13, 1993), *aff'd* 30 F.3d 164 (D.C. Cir. 1994).

In the *DNC* case, the plaintiff filed suit against the Russian Federation and a number of individuals based on allegations that they "unlawfully hack[ed] into the DNC's computers in connection with the 2016 presidential election" and distributed materials stolen from the computers. 2019 WL 3243536, at *1. The Russian Federation did not appear but submitted a statement arguing that it was immune from suit under the FSIA. The DNC argued, *inter alia*, that the commercial activity exception applied. *Id.*, 2019 WL 3423536, at *8. The district court

United States District Court
Northern District of California

1  rejected that argument and concluded that "transnational cyberattacks not the 'type of actions by

2  which a private party engages in trade and traffic or commerce" and noted that the Second Circuit

3  also required that "a commercial activity must be one in which a private person can engage

4  lawfully." *Id.*, 2019 WL 3423536, at *10 (quoting *Weltover*, 504 U.S. at 614 and *Letelier v. Rep.*

5  *of Chile*, 748 F.2d 790, 797-98 (2d Cir. 1984)) (emphasis as in *DNC*).  Or, as the court stated, "a

6  country's planned military cyber-strike against a foreign nation's political party cannot be

7  considered genuinely a private party engage[d] in trade and traffic or commerce."  *Id.*

8     In the *Broidy* case, which the *DNC* court cited favorably, the plaintiffs, one of whom was a

9  "prominent critic of Qatar's policies," alleged that hackers used sophisticated techniques to

10  infiltrate their computers to steal a variety of information and distributed that material to

11  journalists in the United States who "wrote stories that largely exploited the private and

12  confidential information contained in the stolen documents."  2018 WL 6074570, at *1.

13  According to the Plaintiffs, Qatar was responsible for these attacks and filed suit alleging a variety

14  of claims, including violations of the Computer Fraud and Abuse Act, 18 U.S.C. sections

15  103(a)(2)(C) and (a)(5), violations of the Stored Communications Act, 18 U.S.C. sections 27012,

16  and misappropriation of trade secrets under federal and state law.  *Id.*, 2018 WL 6074570, at *1-

17  *2.

18     Qatar moved to dismiss and argued the FSIA deprived the Court of subject matter

19  jurisdiction.  Plaintiffs argued the commercial activity exception applied, but the court concluded

20  that "[c]yber-attacks are not the 'typical acts of market participants.'"  *Id.*, 2018 WL 6074570, at

21  *9 (quoting *Cicippio*, 30 F.3d at 168).  The court determined the plaintiffs' alleged Qatar had

22  engaged in an "aggressive information and government relations" campaign against a known critic

23  of its policies.  It concluded that "[n]either the broader information and government relations

24  campaign nor Qatar's specific 'black operation' is the type of action by which private, commercial

25  enterprises typically engage in trade or commerce" and, thus, was not "commercial activity that

26  would justify the lifting of foreign sovereign immunity."  *Id.*, 2018 WL 6074570, at *8.

27     In the *Cicippio* case, the plaintiffs were two U.S. citizens, who had been kidnapped and

28  held hostage in Lebanon, and the wife of one of the plaintiffs.  The plaintiffs alleged Iran was

13

United States District Court
Northern District of California

1    responsible and invoked the commercial activity exception to the FSIA. They argued Iran

2    "regard[ed] hostages as articles of commerce and that it offers," as it did with them, "to trade

3    captives seized by Iranian agents in Lebanon for more conventional commodities," including

4    military supplies and money. 1993 WL 730748, at *2. The court acknowledged that "private

5    'entrepreneurs,' as well as nations, can and do hold hostages for ransom," but it granted Iran's

6    motion to dismiss, reasoning that "state-supported kidnapping, hostage-taking, and similar

7    universally criminal ventures were simply not the sorts of proprietary enterprises within the

8    contemplation of Congress when it enacted the 'commercial activity' exception to" the FSIA. *Id.*

9         The D.C. Circuit affirmed and noted it could not consider Iran's motive to determine if the

10   case involved commercial activity. It asked "whether the hostage taking itself can be described as

11   a commercial activity[.]" 30 F.3d at 167. The court reasoned that it needed to examine the

12   context in which the acts alleged to qualify as commercial activity took place, and it held that "the

13   kidnapping *by itself* cannot be possibly described as an act typically performed by participants in

14   the market[.]" *Id.* at 168. The court also determined that if the point of the kidnapping was based

15   on Iran's efforts to extract concessions from the United States, that context suggested that the

16   kidnapping was not taken in connection with commercial activity. "When two governments deal

17   directly with each other as *governments*," even if they may relate to the commercial activities of

18   their citizens "or even the commercial activity conducted by government subsidiaries, those

19   dealings are not akin to that of participants in a marketplace." *Id.* (emphasis in original).

20        In *Adler, supra*, the Ninth Circuit recognized that "[n]ot all criminal activity falls within

21   the FSIA's commercial activity exception" but it also held that "an illegal contract constitutes

22   commercial activity under the FSIA." 219 F.3d at 871, 875. The court distinguished the *Cicippio*

23   case, and other cases in which criminal activity was found not to fall within the commercial

24   activity, on the basis that it and the other cases "involved illegal activity devoid of any commercial

25   component." *Id.* at 875.

26        In many cases it may be difficult to separate the motive behind an act or action from its

27   purpose. However, the Court concludes the Pangang Defendants' argument conflates motive with

28   the nature of the activities themselves. Thus, it does not find persuasive their argument that

14

United States District Court
Northern District of California

1  economic espionage cannot, as a matter of law, fall within the scope of the commercial activity

2  exception.  It also finds that the activities at issue in the *DNC* and *Broidy* case are distinguishable

3  on the basis that those activities, unlike the facts in *Adler* or the facts in this case, were devoid of a

4  commercial component.

5       The Government alleges the Pangang Defendants conspired to and attempted to

6  appropriate DuPont's trade secrets.  To effectuate the conspiracy, the Government alleges the

7  Pangang Defendants entered into and executed contracts with Mr. Liew and his company, for

8  projects that involved the production of TiO2.  (Third SI ¶ 20.)  The Pangang Defendants do not

9  contend that these contracts are not the type of contracts that private parties may enter.  The Third

10  SI also includes a number of other acts "performed in the United States," that can be construed to

11  be "in connection with" the commercial activity of manufacturing and operating a TiO2 facility,

12  including preparing designs for the TiO2 projects and meetings about those projects.  (*See id.* ¶¶

13  29, 42, 44, 51-53).  Again, the Pangang Defendants do not argue that building a TiO2 plant and

14  manufacturing TiO2 are activities that cannot be exercised by private citizens.

15       For these reasons, the Court concludes that the allegations in the Third SI demonstrate that

16  the Pangang Defendants' conduct could fall within at least the second clause of Section

17  1605(a)(2).

18       **2.  Waiver Exception.**

19       The Government also argues the Court should find that the Pangang Defendants impliedly

20  waived any immunity they might have under the FSIA.  *See* 28 U.S.C. § 1605(a)(1).  The Pangang

21  Defendants argue they filed their motion in accordance with the schedule set by the Court.

22  However, the Court set that schedule based on their request to file a motion for a bill of particulars

23  before challenging the indictment.  Although the motion to dismiss may have been timely, that

24  fact is not dispositive.

25       At the hearing, the Pangang Defendants cited additional authority that suggests the implied

26  waiver exception applies only when a foreign state or a foreign instrumentality: (1) agrees to

27  arbitration in another country; (2) has agreed that a contract is governed by the law of a particular

28  country; and (3) has filed a responsive pleading without invoking the defense.  *See In re Rep. of*

*Philippines*, 309 F.3d at 1151; *see also* Restatement (Fourth) of Foreign Relations Law § 453 (2018).  There is no suggestion that the Pangang Defendants have agreed to arbitrate elsewhere and, because this is a criminal case, they have not and will not file a "responsive pleading."  *See, e.g., In re Rep. of Philippines*, 309 F.3d at 1151 ("A motion to dismiss … is not a responsive pleading."); *see also* Fed. R. Civ. P. 7(a).  Neither party has addressed whether the contracts between Mr. Liew and the Pangang Defendants have a choice of law provision.  If the implied waiver exception is limited to those circumstances, it would not appear to apply.

However, there is authority to suggest that litigation conduct can result in a waiver of foreign sovereign immunity.  For example, in the *Campa* case, the court determined that it did not need to address the issue of whether the FSIA applied in criminal cases because the defendant "waived any sovereign immunity."  529 F.3d at 1001.  In reaching this conclusion, the court noted that the defendant did not raise the defense until the close of the government's case, two years after his initial appearance.  *Id.*  In the interim, the court found it significant that the defendant: filed other motions to dismiss, which did not raise the defense; responded to the government's motions; agreed to the trial date; and appeared at trial.  Recognizing that "district courts ordinarily have discretion to determine when the participation of a party in litigation is so extensive as to constitute a waiver," it concluded that the defendant's "long and active" participation "was so extensive by the time he first raised the defense" that he waived it as a matter of law.  *Id.* (internal quotations and citations omitted); *see also Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico*, 727 F.2d 274, 278 (2d Cir. 1984) (stating "that district courts have discretion to determine that the conduct of a party in litigation does constitute a waiver of foreign sovereign immunity in light of the circumstances of a particular case" but finding the district court's determination that defendant had not waived the defense was not clearly erroneous).

In this case, the Pangang Defendants filed three motions to quash the summons on the basis that service was improper under the Federal Rules of Criminal Procedure.  In those motions, they did not raise the FSIA as a basis to assert that the Court should quash the summons or as a basis to show the Court could not exercise jurisdiction over them.  After the Court denied the motions to quash, and after the Court of Appeals affirmed that ruling, the Pangang Defendants

appeared through counsel and agreed to a trial date and deadlines for pretrial motions. Prior to moving to dismiss, the Pangang Defendants moved for a bill of particulars, negotiated the terms of a protective order, obtained discovery, responded to motions relating to discovery disputes, and participated in hearings before Magistrate Judge Cousins regarding those discovery disputes. Although the defendant in the *Campa* case raised the issue at the close of the government's case, the Court concludes that the facts and circumstances of this case support a conclusion that the Pangang Defendants' "long and active participation" in these criminal proceedings amount to an implied waiver of sovereign immunity.

For all of the foregoing reasons, the Court DENIES the Pangang Defendants' motion to dismiss based on the FSIA.

**C.     The Third SI States an Offense Against the Pangang Defendants.**

In the alternative, the Pangang Defendants move to dismiss for failure to state an offense. The Pangang Defendants do not argue that the Third SI fails to comply with Rule 7. Rather, they argue that if the Court accepts the allegations that they are foreign instrumentalities as true, they cannot be prosecuted under Section 1831. They argue Section 1831 does not apply to the conduct of alleged foreign instrumentalities and argue the reference to foreign instrumentalities serves only to define the requisite scienter. The Government argues to the contrary. Neither party cites the Court to any case that has addressed this issue. Accordingly, the Court begins with the text of Section 1331.

Section 1331 provides that, "*[w]hoever*, intending or knowing that the offense will benefit any foreign government, foreign instrumentality, or foreign agent, knowingly, … attempts to commit any offense described in paragraphs (1) through (3); or … conspires with one or more other persons to commit any offense described in any of paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy, shall" be fined not more than the greater of $10,000,000 or 3 times the value of the stolen trade secret to the organization[.]"  18 U.S.C. §§ 1831(a)-(b) (emphasis added).

The Pangang Defendants argue that a "sovereign" or a "State" is not a person. *See, e.g., Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1306-07 (D.C. Cir. 2002). In *United States v.*

17

United States District Court
Northern District of California

1   *Singleton*, the Tenth Circuit analyzed whether a government prosecutor would fall within the

2   definition of "whoever" in 18 U.S.C. section 201(c)(2).  165 F.3d 1297, 1298-99 (10th Cir. 1999).

3   The court concluded the prosecutor was acting as the alter ego of the United States and noted

4   "[t]he word 'whoever' connotes a being. … The United States is an inanimate entity, not a being."

5   *Id.* at 1300.  Thus, the court concluded the prosecutor, as alter-ego of the United States, could not

6   be held liable under the statute.  The court also asked whether to apply "the statute to the

7   government would deprive the sovereign of a recognized or established prerogative, title, or

8   interest."  *Id.* at 1301.  The court concluded that there was a "longstanding practice of sanctioning

9   the testimony of accomplices against their confederates in exchange for leniency" and recognized

10  that authority could only be exercised by the United States.  The court determined that fact

11  undermined the defendant's interpretation of the statute.  *Id.* at 1301-02.

12          When a court must determine the "meaning of any act of Congress, unless the context

13  indicates otherwise - … the words 'person' and 'whoever' include corporations, companies,

14  associations, firms, partnerships, societies, and joint stock companies, as well as individuals[.]"  1

15  U.S.C. § 1.  It is undisputed that the Pangang Defendants are legal entities that would fall within

16  section 1's definitions of "person" and "whoever."  The only "prerogative, title, or interest" to

17  which they might be deprived if the Court applies Section 1831 to their activities, relates to their

18  purported right to sovereign immunity.  For the reasons set forth above, and assuming the FSIA

19  applies in criminal cases, the Court concludes that it would not diminish that sovereignty to apply

20  Section 1831 to foreign instrumentalities that fall within an exception to the FSIA.

21          Accordingly, the Court DENIES their motion to dismiss for failure to state an offense.

22  //

23  //

24  //

25  //

26  //

27  //

28  //

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**CONCLUSION**

For the foregoing reasons, the Court DENIES the Pangang Defendants' motion to dismiss. The parties shall appear for a further status conference on October 1, 2019 at 1:00 p.m. and shall file a status report by no later than September 24, 2019.

**IT IS SO ORDERED.**

Dated: August 26, 2019

_____
JEFFREY S. WHITE
United States District Judge