QUINN EMANUEL URQUHART & SULLIVAN, LLP
   John M. Potter (Bar Number 165843)
   johnpotter@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:    (415) 875-6600
Facsimile:    (415) 875-6700

   Robert P. Feldman (Bar Number 69602)
   bobfeldman@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:    (650) 801-5069
Facsimile:    (650) 801-5100

   Michael T. Packard (*pro hac vice*)
   michaelpackard@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, Massachusetts 02199
Telephone:    (617) 712-7118

Attorneys for Defendants Pangang Group
Company, Ltd., Pangang Group Steel
Vanadium & Titanium Company, Ltd.,
Pangang Group Titanium Industry Company,
Ltd., and Pangang Group International
Economic & Trading Company

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>      v.<br><br>PANGANG GROUP COMPANY, LTD.;<br>PANGANG GROUP STEEL VANADIUM &<br>TITANIUM COMPANY, LTD.; PANGANG<br>GROUP TITANIUM INDUSTRY<br>COMPANY, LTD; and PANGANG GROUP<br>INTERNATIONAL ECONOMIC &<br>TRADING COMPANY,<br><br>            Defendants. | CASE NO. 4:11-CR-0573-07-10 JSW<br><br>**PANGANG DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS INDICTMENT**<br><br>Date:        January 4, 2022<br>Time:        9:30 a.m.<br>Judge:      Hon. Jeffrey S. White<br>Courtroom:  5, 2nd Floor |

## NOTICE OF MOTION

NOTICE IS HEREBY GIVEN that Defendants Pangang Group Company, Ltd., Pangang Group Steel Vanadium & Titanium Company, Ltd., Pangang Group Titanium Industry Company, Ltd., and Pangang Group International Economic & Trading Company (collectively, "Defendants"), will and hereby do move the Court, on January 4, 2022 at 9:30 a.m., or as soon thereafter as counsel may be heard before the Honorable Jeffrey S. White, at the Oakland Courthouse, Courtroom 5, Second Floor, 1301 Clay Street, Oakland, California, 94612, to dismiss the Indictment pursuant to Federal Rule of Criminal Procedure 12.  This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the authorities cited therein, argument of counsel, the Declaration of Zi Chun Wang, the Declaration of Michael T. Packard, and any other matter that may be submitted at or prior to the hearing.

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ................................................................................................ i

INTRODUCTION .....................................................................................................1

BACKGROUND .......................................................................................................2

    A.   Defendants' Prior Motion To Dismiss For Lack Of Subject-Matter Jurisdiction ...................................................................................................2

    B.   The Appeal From The Court's Order Denying Defendants' Motion To Dismiss .........................................................................................................4

LEGAL STANDARD ...............................................................................................6

ARGUMENT ...........................................................................................................6

I.    A *PRIMA FACIE* CASE EXISTS THAT DEFENDANTS ARE INSTRUMENTALITIES OF THE PRC .................................................................6

    A.   A *Prima Facie* Case Exists That Defendant Pangang Group Was Wholly Owned By The PRC At The Time Of The Indictment ...............................7

    B.   The Government's Filings Establish A *Prima Facie* Case That Defendants Are Organs Of The PRC ..............................................................8

II.   DEFENDANTS, AS INSTRUMENTALITIES OF THE PRC, HAVE ABSOLUTE IMMUNITY FROM CRIMINAL PROSECUTION .........................................12

    A.   Defendants Are Immune Under The Common Law From Criminal Prosecution ......................................................................................................12

        1.   The Common Law Grants Foreign Instrumentalities Absolute Immunity From Criminal Prosecution ...................................................12

        2.   Foreign Instrumentalities' Common Law Immunity From Criminal Prosecution Is Not Subject To The Executive Branch's Prerogative ..........16

    B.   The FSIA Separately Immunizes Defendants From Criminal Prosecution .............17

        1.   The FSIA's Grant Of Immunity Applies To Criminal Prosecutions ...........17

        2.   The FSIA's Exceptions Do Not Apply To Criminal Prosecutions .............20

CONCLUSION ........................................................................................................23

# <u>TABLE OF AUTHORITIES</u>

**Page**

### Cases

*Abrams v. Société Nationale des Chemins de Fer Français*,
 332 F.3d 173 (2d Cir. 2003) ................................................................... 12-13

*Alperin v. Vatican Bank*,
 360 F. App'x 847 (9th Cir. 2009) ............................................................. 7, 8

*Argentine Republic v. Amerada Hess Shipping Corp.*,
 488 U.S. 428 (1989) ................................................................... 18, 19, 20

*Bergman v. DeSieyes*,
 71 F. Supp. 334 (S.D.N.Y. 1946) ............................................................ 15, 20

*Berizzi Bros. Co. v. Pesaro*,
 271 U.S. 562 (1926) ............................................................................ 13

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
 137 S. Ct. 1312 (2017) ...................................................................... 16, 22

*Bradford v. Dir. Gen. of Railroads of Mexico*,
 278 S.W. 251 (Tex. Civ. App. 1925) ......................................................... 10

*Cal. Dep't of Water Res. v. Powerex Corp.*,
 533 F.3d 1087 (9th Cir. 2008) ............................................................... 8, 9

*Clinton v. City of N.Y.*,
 524 U.S. 417 (1998) ............................................................................ 21

*Conn. Bank of Com. v. Republic of Congo*,
 309 F.3d 240 (5th Cir. 2002) ................................................................. 14

*Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*,
 89 F.3d 650 (9th Cir. 1996) .................................................................. 9

*Dale v. Colagiovanni*,
 337 F. Supp. 2d 825 (S.D. Miss. 2004), .................................................... 19

*Dow v. Johnson*,
 100 U.S. 158 (1879) ............................................................................ 12

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*,
 322 F.3d 635 (9th Cir. 2003) ................................................................. 8

*Et Ve Balik Kurumu v. B.N.S. Int'l Sales Corp.*,
 25 Misc. 2d 299 (N.Y. Sup. Ct. 1960) ...................................................... 9

*Ex parte Cabrera*,
 4 F. Cas. 964 (C.C.D. Pa. 1805) ............................................................ 12

*F. W. Stone Eng'g Co. v. Petroleos Mexicanos of Mexico, D. F.*,
 42 A.2d 57 (Pa. 1945) .......................................................................... 10

*Fox Television Stations, Inc v. Aereokiller, LLC*,
   851 F.3d 1002 (9th Cir. 2017) ............................................................................ 22

*Franchise Tax Bd. of Cal. v. Hyatt*,
   139 S. Ct. 1485 (2019) ...................................................................................... 13

*Gates v. Victor Fine Foods*,
   54 F.3d 1457 (9th Cir. 1995) ............................................................................... 9

*Gould, Inc. v. Mitsui Min. & Smelting Co.*,
   750 F. Supp. 838 (N.D. Ohio 1990) ............................................................. 14, 19

*Guar. Tr. Co. of N.Y. v. United States*,
   304 U.S. 126 (1938) .......................................................................................... 16

*Hannes v. Kingdom of Roumania Monopolies Inst.*,
   260 A.D. 189 (N.Y. App. Div. 1940) .................................................................... 9

*Holladay v. Islamic Republic of Iran*,
   523 F. Supp. 3d 100 (D.D.C. 2021) ...................................................................... 7

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2018 WL 659084 (N.D. Cal. Feb. 1, 2018) ........................................................... 7

*In re Grand Jury Investigation of Shipping Indus.*,
   1960 WL 98919 (D.D.C. June 14, 1960) ....................................................... 15, 17

*In re Grand Jury Subpoena*,
   912 F.3d 623 (D.C. Cir. 2019) ...................................................................... 18, 22

*In re Investigation of World Arrangements with Rel. to Prod., Transp., Ref. & Distrib. of Petroleum*,
   13 F.R.D. 280 (D.D.C. 1952) ...................................................... 9, 9-10, 15, 17, 20

*Isbrandtsen Co. v. Johnson*,
   343 U.S. 779 (1952) .................................................................................... 13, 21

*Keller v. Cent. Bank of Nigeria*,
   277 F.3d 811 (6th Cir. 2002) ............................................................................. 19

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
   213 F.3d 841 (5th Cir. 2000) ............................................................................... 7

*Lomax v. Ortiz-Marquez*,
   140 S. Ct. 1721 (2020) ...................................................................................... 18

*Murphy v. Korea Asset Mgmt. Corp.*,
   421 F. Supp. 2d 627 (S.D.N.Y. 2005) ................................................................... 7

*Murray v. Schooner Charming Betsy*,
   6 U.S. 64 (1804) ......................................................................................... 13, 22

*Naartex Consulting Corp. v. Watt*,
   722 F.2d 779 (D.C. Cir. 1983) ............................................................................. 7

*Nat'l City Bank of New York v. Republic of China*,
  348 U.S. 356 (1955) ............................................................................................ 17

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................ 21

*OBB Personenverkehr AG v. Sachs*,
  577 U.S. 27 (2015) .............................................................................................. 19

*Permanent Mission of India to United Nations v. City of N.Y.*,
  551 U.S. 193 (2007) ............................................................................................ 19

*Peterson v. Islamic Republic of Iran*,
  627 F.3d 1117 (9th Cir. 2010) ...................................................................... 6, 7, 12

*Republic of Argentina v. NML Capital, Ltd.*,
  573 U.S. 134 (2014) ............................................................................................ 18

*Republic of Austria v. Altmann*,
  541 U.S. 677 (2004) ....................................................................................... 18, 19

*Republic of Mexico v. Hoffman*,
  324 U.S. 30 (1945) .......................................................................................... 16-17

*Rubin v. Islamic Republic of Iran*,
  138 S. Ct. 816 (2018) .......................................................................................... 14

*Samantar v. Yousuf*,
  560 U.S. 305 (2010) ....................................................................................... 12, 19

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ............................................................................................ 19

*Shamoun v. Republic of Iraq*,
  441 F. Supp. 3d 976 (S.D. Cal. 2020) ................................................................... 7

*Southway v. Cent. Bank of Nigeria*,
  198 F.3d 1210 (10th Cir. 1999) ........................................................................... 19

*Schooner Exch. v. McFaddon*,
  11 U.S. 116 (1812) ................................................................................... 12, 13, 21

*United States v. Hendron*,
  813 F. Supp. 973 (E.D.N.Y. 1993) ...................................................................... 19

*United States v. Klein*,
  80 U.S. 128 (1871) .............................................................................................. 16

*United States v. Pangang Grp. Co., Ltd.*,
  6 F.4th 946 (9th Cir. 2021) ...................................................................... 1, 2, 5, 6, 7

*United States v. Pink*,
  315 U.S. 203 (1942) ............................................................................................ 22

*United States v. Shortt Accountancy Corp.*,
   785 F.2d 1448 (9th Cir. 1986) ........................................................................ 6

*United States v. Turkiye Halk Bankasi A.S.*,
   16 F.4th 336 (2d Cir. 2021) ............................................................. 14, 17, 23

*Verlinden B.V. v. Cent. Bank of Nigeria*,
   461 U.S. 480 (1983) ................................................................................ 14, 22

### Statutory Authorities

18 U.S.C. § 3231 .......................................................................... 13, 16, 19

28 U.S.C. § 1330(a) ...................................................................... 18, 19, 20

28 U.S.C. § 1350 ................................................................................... 19

28 U.S.C. § 1441(d) ............................................................................... 21

28 U.S.C. § 1602 .................................................................................... 2

28 U.S.C. § 1603(b) ........................................................................ 2, 6, 7

28 U.S.C. § 1604 ..................................................................... 18, 19, 20, 23

28 U.S.C. § 1605(a) ............................................................................... 22

28 U.S.C. § 1605A .................................................................................. 21

28 U.S.C. § 1605B .................................................................................. 21

### Legislative Materials

H.R. Rep. No. 94-1487 ................................................................... 14, 18, 21-22

*Immunities of Foreign States: Hearing on H.R. 3493 Before the Subcomm. on Claims and
   Gov't'l Relations of the H. Comm. on the Judiciary*, 93d Cong., 1st Sess. (1973) ............... 15, 17

### Rules and Regulations

Fed. R. Civ. P. 2 ................................................................................... 22

Fed. R. Crim. P. 12(b) ............................................................................. 6

N.D. Cal Civ. L.R. 7-9(b) ........................................................................ 20

### Additional Authorities

Andreas F. Lowenfeld, *Claims against Foreign States–A Proposal for Reform of
   United States Law*, 44 N.Y.U. L. Rev. 901 (1969) ................................................ 17

David P. Stewart, *The Foreign Sovereign Immunities Act:  A Guide for Judges, Second
   Edition*, Federal Judicial Center (2018) ..................................................... 19-20

Elizabeth Helen Franey, "Immunity from the Criminal Jurisdiction of National Courts,"
  *Research Handbook on Jurisdiction and Immunities in International Law* (2015).................... 14

Hazel Fox & Philippa Webb,
  *The Law of State Immunity* (3d ed. 2015) ..................................................... 14, 20-21, 22

Oral Arg. Recording, *United States v. Pangang Grp. Co., Ltd.*,
  Ninth Circuit, No. 19-10306 (Oct. 15, 2020) .................................................... 5, 12, 22

Ingrid Wuerth, *Foreign Official Immunity Determinations in U.S. Courts: The Case
  Against the State Department*, 51 Va. J. Int'l L. 915 (2011) ..................................... 16

Jack B. Tate, *Changed Policy Concerning the Granting of Sovereign Immunity to
  Foreign Governments*, 26 Dep't State Bull. 984 (May 19, 1952)........................................ 13, 17

Restatement (Second) of Foreign Relations Law (1965) ...................................................... 9, 15, 17

Restatement (Third) of Foreign Relations Law (1987) ......................................................... 13, 20

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**INTRODUCTION**

3      Several fundamental, threshold issues bearing on the question of foreign sovereign immunity

4  and the Court's subject-matter jurisdiction over this case remain undecided after the Ninth Circuit's

5  recent decision in this case, *United States v. Pangang Grp. Co., Ltd.*, 6 F.4th 946 (9th Cir. 2021).

6  This Motion is intended to address them comprehensively.  It is respectfully submitted that this is

7  the proper juncture to address these issues, rather than wait until trial when the Government is

8  expected to litter the record with efforts to prove involvement of the Chinese government.  It would

9  be unfortunate in the extreme to have these issues decided piecemeal after further lengthy

10  proceedings.

11      Although the Ninth Circuit has held that the allegations in the Third Superseding Indictment

12  (the "Indictment," Dkt. No. 971) alone do not make a *prima facie* case that any Defendant qualifies

13  as a foreign instrumentality based on majority-ownership by the People's Republic of China

14  ("PRC"), that narrow ruling did not consider whether a *prima facie* case of instrumentality status

15  may exist for other reasons.  Instrumentality status exists for two reasons:  *First*, Defendants have

16  submitted evidence in connection with this Motion that fills the gap that the Ninth Circuit identified

17  as to the PRC's majority-ownership of Defendant Pangang Group.  (*See* Part I.A *infra*.)  *Second*,

18  Defendants respectfully submit that, whether considered under the common law or the Foreign

19  Sovereign Immunities Act ("FSIA"), the Government's own submissions make a *prima facie*

20  showing that Defendants are *organs* of the PRC and thus qualify for sovereign immunity for that

21  distinct reason.  (*See* Part I.B *infra*.)

22      Moreover, since the proceedings in this Court on Defendants' initial motion to dismiss the

23  Indictment, the Government has stated that the common law of foreign sovereign immunity would

24  govern here if, as the Government maintains, the FSIA does not apply to criminal proceedings.  The

25  common law provides foreign sovereigns and their instrumentalities with absolute immunity from

26  criminal prosecution.  That common law immunity, which this Court has yet to address, requires

27  dismissal of the Indictment.  (*See* Part II.A *infra*.)  Additionally, the FSIA codifies this common law

28  rule and separately immunizes foreign states and their instrumentalities from criminal prosecution.

1  That interpretation follows from the plain statutory text, adheres to international law, and avoids

2  absurd, dangerous results.  (*See* Part II.B *infra*).

3       The Government has never prosecuted foreign states before.  Congress did not give it this

4  power when it enacted the FSIA.  And the Government has conceded that its interpretation of the

5  FSIA would permit thousands of local prosecutors to launch state-court prosecutions of foreign

6  states, without regard to the foreign policy implications.  It should be up to Congress, not

7  prosecutors, to decide whether to expose the United States to such risks.

8       The Indictment should be dismissed.

9                                    **BACKGROUND**

10  **A.     Defendants' Prior Motion To Dismiss For Lack Of Subject-Matter Jurisdiction**

11       In July 2019, the four Pangang Defendants ("Defendants") moved to dismiss the Indictment

12  on the grounds that, *inter alia*, their alleged status as foreign instrumentalities of the PRC immunized

13  them from criminal prosecution in the United States under the FSIA, 28 U.S.C. § 1602, *et seq.*, and

14  the common law.  (*See* Dkt. No. 1193.)  To establish their "foreign instrumentality" status under the

15  FSIA, Defendants relied on the Indictment, which expressly alleged all Defendant were "foreign

16  instrumentalities" of the PRC.  (*See* Dkt. No. 971 at ¶¶17(c), 56(c).)

17       Defendants' motion thus presented a facial challenge, relying solely on the allegations in the

18  Indictment without any presentation of evidence of any Defendant's relationship to the Chinese

19  government.[1]  Under the FSIA, "instrumentality" status exists where an entity is an "organ of a

20  foreign state or political subdivision thereof" *or* where the "majority of [its] shares or other

21  ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b).

22  Because the Indictment does not specify whether its "foreign instrumentality" allegation rests on

23  Defendants' "organ" or "majority ownership" status, Defendants relied on the Indictment's express

24  "instrumentality" allegation without specifying the basis on which is was predicated.  (*See* Dkt. No.

25

26  _____

27       [1]  A motion to dismiss based on sovereign immunity can be "either a facial or factual challenge,"
   but only if the challenge is factual in nature would "the defendant … introduce testimony, affidavits,
28  or other evidence to dispute the truth of the allegations that, by themselves, would otherwise invoke
   federal jurisdiction."  *Pangang*, 6 F.4th at 954 (internal quotation marks omitted).

1193 at 1-2.)  This reliance was then confirmed by the Government's express representation to this Court that Defendants could be considered "instrumentalities" for purposes of the motion to dismiss. (*See* Dkt. No. 1201 at 1:5-7, 9:2-4 (brief); Dkt. No. 1220 at 4:21-24 (transcript).)  This confirmation was consistent with the Government's briefing on the motion, which referred to Defendants collectively as "an instrumentality of the PRC" (Dkt. No. 1201 at 1) and repeated the allegation in the Indictment that the Defendants were "controlled by or a part of the government of the People's Republic of China" (*id.*).  There was no reference in either party's briefing in this Court to Defendants' "organ" or "majority ownership" status.

Defendants' motion further argued that if the FSIA did not apply, immunity would obtain under federal common law because at common law foreign states enjoyed absolute immunity from criminal prosecution.  (*See* Dkt. No. 1205 at 6-7.)  In this Court, the Government took no position regarding the application of the common law.

In adjudicating the motion, this Court specifically inquired of both parties whether they disputed the Government's allegations that Defendants are foreign instrumentalities "as that term is defined in the FSIA."  (*See* Dkt. No. 1211 at 1:28-2:2 (pre-argument questions from the Court).)  At argument, Defendants accepted as true for purposes of the motion the allegations that they were foreign instrumentalities (*see* Dkt. No. 1220 at 4:18-20), and the Government had "no objection" to that position (*id.* at 4:25)  The Government stated that there was no "significant" difference for purposes of the motion to dismiss between the meaning of the term "foreign instrumentality" as used in the FSIA and in the EEA.  (*See id.* at 45:4-7 ("I don't think that for resolving the matters before the Court … that the language that is used in defining 'instrumentality' under the Economic Espionage Act and the FSIA is significant.").  In its opinion, this Court ruled that any "differences between the EEA's and the FSIA's definitions of 'foreign instrumentality'" were immaterial to the question of whether Defendants "satisfy the definition of 'foreign instrumentality' under the FSIA," Dkt. No. 1223 at 5:18-21, and accepted, as the parties agreed, that the Indictment's allegations were sufficient to establish Defendants' foreign instrumentality status.  (*See id.* at 11:6-7 ("[B]y relying on the allegations in the [Indictment], [Defendants] have met their burden to show that they are foreign instrumentalities.").)

With respect to the FSIA's applicability to the criminal context, the Court acknowledged that the law in this area was unsettled, but found it unnecessary to resolve that issue.  (*Id.* at 10:7-9.)  There was no need, the Court reasoned, to confront this issue because the FSIA's exceptions would also apply assuming *arguendo* that the statute was applicable to criminal cases.  (*Id.* at 10:9-11.)  Specifically, the Court determined that the FSIA's commercial activity and waiver exceptions both applied to this case.  The Court ruled that the challenged conduct was essentially commercial in nature—it was of the kind in which private parties could lawfully engage and was in connection with the construction and operation of a chemical production facility.  (*Id.* at 14-15.)  The "waiver" exception also applied based on Defendants' litigation conduct.  (*Id.* at 15-17.)

The Court's opinion denying the motion to dismiss made no findings of fact or legal holdings regarding the meaning (or implications for immunity) of being "state-owned" in the sense used by the Indictment's allegations.  Nor did the Court opine as to whether Defendants were "organs" of a foreign state sufficient to satisfy instrumentality status under the FSIA.  While Defendants had argued that federal common law and the historical immunity of foreign sovereigns were an alternative basis for immunity, the Court did not rule on that question.

**B.**     **The Appeal From The Court's Order Denying Defendants' Motion To Dismiss**

In their appeal of this Court's ruling, Defendants again relied on the Indictment's express allegations that they were "foreign instrumentalities," as well as the Government's concession in this Court of that fact.  (CA9 No. 19-10306, Dkt. No. 17 at 7.)  Aside from this reliance, Defendants attempted no further showing and did not address the separate "organ" or "majority ownership" approaches in the statute.  And, as below, Defendants repeated that the common law provides foreign states with absolute immunity from criminal prosecution.  (*Id.* at 26-27.)

The Government's position, however, changed radically on appeal.  Before the Ninth Circuit, for the very first time—flatly contrary to its admissions in this Court and the plain language of the Indictment—the Government took the position that Defendants' status as foreign instrumentalities was "was never admitted or established below."  (CA9 No. 19-10306, Dkt. No. 24 at 16.)  The Government abandoned its repeated representation in this Court and instead asserted that foreign instrumentality status was *not* satisfied under the FSIA by the Indictment's allegations

1    because the EEA and the FSIA are "different statute[s], with different definitional components."

2    (*Id.* at 17.)  This new position is precisely one the Government had disclaimed in this Court when

3    squarely asked.  On the other hand, the Government acknowledged for the first time at oral argument

4    that if FSIA immunity does not extend to criminal prosecutions, then the rules of immunity under

5    common law would apply.[2]

6        The Ninth Circuit declined to resolve whether FSIA immunity applies to criminal

7    prosecutions or whether any of the exceptions to immunity apply in this case; instead, the court held

8    only that Defendants "failed to carry their burden to make a prima facie showing that they are

9    instrumentalities of a foreign sovereign" by relying solely on the allegations of the Indictment.

10   *Pangang*, 6 F.4th at 950.  The Ninth Circuit found "inherent ambiguity" in the Indictment's

11   "colloquial," "unadorned" use of the phrased "'state-owned,'" which did not conclusively establish

12   "direct ownership of a majority of [any Defendant's] shares" by the PRC's State-Owned Assets

13   Supervision and Administration Commission of the State Council ("SASAC") or the PRC itself.  *Id.*

14   at 958.  Other than to say the Indictment was too imprecise to establish direct majority ownership,

15   the Ninth Circuit made no further ruling about any Defendants' "ownership" by the PRC.

16       The Ninth Circuit also noted that Defendants did not contend that "they are organs of a

17   foreign state or political subdivision thereof," *id.* at 955 (internal quotation marks and alteration

18   omitted), and thus its opinion does not address that issue.  In fact, Defendants had not addressed the

19   "organ" issue—and had no reason to do so because they sought to make a *prima facie* showing

20   based solely on the Indictment's allegations that Defendants were "instrumentalities" of the PRC

21   and the Government's consequent concession.  At no time did Defendants take a position as to, let

22   alone disclaim, whether they were organs of the PRC.

23   ───────────────

24       [2]   *See* CA9 No. 19-10306, Oral Arg. (Oct. 15, 2020), video recording *available at* www.ca9.uscourts.gov/media/video/?20201015/19-10306/ ("CA9 Oral Arg.") at 22:27-24:02

25   ("Judge Wardlaw:  Assuming that we were to hold that Foreign Sovereign Immunity Act does not apply to criminal proceedings, what principles would we adhere to in determining if Pangang Group

26   enjoys any sovereign immunity in this area?  Would we return to the pre-Tate Letter common law principles that reigned before FSIA was enacted?

27       Mr. Yelovich:  Yes, Your Honor, I think we would return to the common law that existed outside of the FSIA—that still exists outside the FSIA ….  If the FSIA doesn't apply … the common rules

28   of immunity that existed prior to the FSIA would still apply as they always have in this realm.")

1    The Ninth Circuit thus left many issues unresolved, including the ownership of Defendants

2    at the time of their original indictment in 2012, Defendants' immunity under the FSIA if they were

3    found to be an "organ" of the PRC, and the question of immunity under the common law.  At the

4    status conference following remand, in light of the "changed landscape," Defendants indicated that

5    they would pursue a renewed challenge to the Indictment, which this Court requested "sooner rather

6    than later," consistent with the Court's availability. Subsequently, the parties conferred and agreed

7    on a schedule for this motion.

8                                           **LEGAL STANDARD**

9    Federal Rule of Criminal Procedure 12(b) permits "any defense which is capable of

10   determination without the trial of the general issue to be raised by pretrial motion."  *See United*

11   *States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986) (internal quotation

12   omitted); *see* Fed. R. Crim. P. 12(b)(1) ("A party may raise by pretrial motion any defense,

13   objection, or request that the court can determine without a trial on the merits.").  Rule 12(b)(2)

14   states that "[a] motion that the court lacks jurisdiction may be made at any time while the case is

15   pending."  Fed. R. Crim. P. 12(b)(2).

16                                              **ARGUMENT**

17   The Indictment should be dismissed for lack of subject-matter jurisdiction because foreign

18   states and their instrumentalities are immune from criminal prosecutions in U.S. courts—both under

19   the common law and the FSIA.  And now is the appropriate time for these issues to be considered.

20   **I.    A  *PRIMA  FACIE*  CASE  EXISTS  THAT  DEFENDANTS  ARE**

21   **INSTRUMENTALITIES OF THE PRC**

22   To establish foreign instrumentality status, a defendant must "make a *prima facie* case that

23   it" is either an "organ" of a foreign state or that "a majority of [its] shares or other ownership interest

24   is owned by a foreign state or political subdivision thereof."  *Peterson v. Islamic Republic of Iran*,

25   627 F.3d 1117, 1124 (9th Cir. 2010); 28 U.S.C. § 1603(b)(2).  *See also Pangang*, 6 F.4th at 954.[3]

26

27        [3]  Since Defendants are "separate corporate persons and that they were organized under the laws

28   of the PRC," the requirements of § 1603(b)(1) and (b)(3) are satisfied.  *Pangang*, 6 F.4th at 955.

This *prima facie* burden is less than a preponderance of the evidence.[4]  To meet the *prima facie* burden, a defendant can rely on documentary evidence, as well as lay or expert declarations.[5]  Or it can meet this burden without such evidence, "if it is apparent from the pleadings or uncontested that the defendant is a foreign state." *Peterson*, 627 F.3d at 1125.  *See also Shamoun v. Republic of Iraq*, 441 F. Supp. 3d 976, 988-89 (S.D. Cal. 2020) (*prima facie* burden satisfied in part by complaint's allegations).  In a criminal case, a defendant's status as a foreign instrumentality "must be determined at the time it was first indicted." *Pangang*, 6 F.4th at 957.

As explained below, the record before the Court establishes a *prima facie* case that Defendant Pangang Group is majority-owned by the PRC and that *all* Defendants are organs of the PRC.

**A.     A *Prima Facie* Case Exists That Defendant Pangang Group Was Wholly Owned By The PRC At The Time Of The Indictment**

The Ninth Circuit held the Indictment was insufficient to establish a *prima facie* case that Defendant Pangang Group was a governmental instrumentality because the allegations did not specifically establish that a majority of Pangang Group's shares were owned by SASAC at the time of initial indictment in 2012.  *Pangang*, 6 F.4th at 957-58; *see* 28 U.S.C. § 1603(b)(2).  This

---

The only question for "foreign instrumentality" status under the FSIA is whether Defendants are "organs" of the PRC, or have a majority of their shares or other ownership interest owned by the PRC. *See id.*; 28 U.S.C. § 1603(b)(2).

[4]  *See, e.g.*, *Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 640 (S.D.N.Y. 2005), *aff'd*, 190 F. App'x 43 (2d Cir. 2006) ("[A] party claiming immunity need *not* initially establish by a preponderance of the evidence that it is an 'agent or instrumentality of a foreign state[,]' …; rather, the entity need initially only make a *prima facie* showing."); *Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 107 (D.D.C. 2021) (explaining that a *prima facie* showing is "lower than a 'preponderance of the evidence standard'") (quoting *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983).).

[5]  *See, e.g.*, *Alperin v. Vatican Bank*, 360 F. App'x 847, 849 (9th Cir. 2009) (*prima facie* burden satisfied by affidavit showing entity's "status, structure, and role under Vatican law"); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 847-49 (5th Cir. 2000) (affidavits and exhibits made *prima facie* case); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2018 WL 659084, at *4 (N.D. Cal. Feb. 1, 2018) (collecting cases and explaining that FSIA claims must be supported by "evidence evaluated under the same evidentiary standard that governs in the summary judgment context") (internal quotation marks omitted).

1   ownership is established by the accompanying declaration of Zi Chun Wang and exhibits thereto.

2   *See* Decl. of Zi Chun Wang, Nov. 29, 2021, and Exs. A–C ("Wang Decl.").   As the Wang

3   Declaration and its Exhibit C make clear, until January 12, 2014, SASAC owned 100% of Pangang

4   Group's shares.  *See* Wang Decl. ¶6.  This fact was not previously before this Court or the Ninth

5   Circuit because of the plain allegations in the Indictment and the Government's prior concession

6   regarding Pangang's "instrumentality" status.  (*See supra* at 2-4.)[6]

7       **B.**      **The Government's Filings Establish A *Prima Facie* Case That Defendants Are**

8               **Organs Of The PRC**

9           A *prima facie* case also exists as to all Defendants' status as "organs" of the PRC.  An entity

10  qualifies as an "organ" under the FSIA if it "engages in a public activity on behalf of the foreign

11  government," a determination made following a "holistic" assessment of factors that include:  "the

12  entity's creation, the purpose of its activities, its independence from the government, the level of

13  government financial support, its employment policies, and its obligations and privileges under state

14  law."  *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir. 2008) (internal

15  quotation marks omitted).  The Ninth Circuit recognizes that the FSIA "defines 'organ' 'broadly,'

16  mindful that [an] agency or instrumentality of a foreign state could assume a variety of forms,

17  including a state trading corporation, *a mining enterprise*, a transport organization such as a shipping

18  line or airline, a steel company, a central bank, an export association, a government procurement

19  agency or a department or ministry which acts and is suable in its own name."  *Id.* (emphasis added).

20  *See also EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 640 (9th Cir.

21  2003) (same).  Thus, an entity may be an organ of a foreign state "even if it has some autonomy

22  from the foreign government."  *EIE Guam*, 322 F.3d at 640; *see Alperin*, 360 F. App'x at 849-50

23  (holding that Vatican Bank was an "organ" even though it engaged in "commercial activities" and

24  had only "arms-length supervision by the Vatican").

25  _____

26      [6]   Although Anshan Iron and Steel Group ("Angang") announced in 2010 that it had received
    approval from SASAC to "bring Pangang Group under its fold" (Ex. 30 to Decl. of Andrew Z.
27  Szamosszegi, April 19, 2012, in Dkt. No. 127), the actual transfer of Pangang Group's shares to an
    Angang affiliate entity was not effectuated until 2014, as made clear in Exhibit C to the Wang
28  Declaration.

At common law too, a foreign corporation was entitled to sovereign immunity "on the same basis as an agency of the government if it acts in behalf of the government of the foreign state in the same manner as an agency of the foreign state."  Restatement (Second) of Foreign Relations Law § 66 cmt. d (1965).  *See, e.g.*, *In re Investigation of World Arrangements with Rel. to Prod., Transp., Ref. & Distrib. of Petroleum*, 13 F.R.D. 280, 290 (D.D.C. 1952) (looking to the corporation's "object and purpose"); *Et Ve Balik Kurumu v. B.N.S. Int'l Sales Corp.*, 25 Misc. 2d 299, 301 (N.Y. Sup. Ct. 1960) (at common law, "where the corporation functions as a public agency or instrumentality or where evidence of corporate separateness from the government was not strong, immunity has been granted"), *aff'd*, 17 A.D.2d 927 (N.Y. App. Div. 1962); *Hannes v. Kingdom of Roumania Monopolies Inst.*, 260 A.D. 189, 200 (N.Y. App. Div. 1940) (considering, at common law, whether "corporations are used as governmental agencies").

Here, the Indictment[7] and a declaration from the Government's expert, Andrew Z. Szamosszegi, filed earlier in this case,[8] establish a *prima facie* case that all Defendants are "organs" of the PRC for purposes of both the FSIA and the common law:  they are allegedly owned and controlled by the state and allegedly work to advance its interests.  *See, e.g.*, *Powerex*, 533 F.3d at 1099-1102 (corporation an organ under the FSIA when it was owned by a state agent, its board was selected by the state agent, and its work fulfilled a "mission" dictated by the state); *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996) (corporation an organ under the FSIA when it was owned by the state, controlled by state appointees, and worked to fulfill a state purpose); *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460-61 (9th Cir. 1995) (corporation an organ under the FSIA when its purpose was to advance the state's "interest in marketing Alberta hogs," and it acted pursuant to regulations established by the state); *Investigation of World Arrangements*, 13 F.R.D. at 290 (granting common-law immunity to oil company in part because "[t]he supplying of oil to insure the maintenance and operation of a naval

---

[7]   This discussion applies to both the first indictment to charge Defendants and the current Indictment.  (*See* Feb. 7, 2012 Superseding Indictment, Dkt. No. 64 ("2012 Indictment") (first indictment to charge Defendants); Third Superseding Indictment, Dkt. No. 971.)

[8]   (*See* Decl. of Andrew Z. Szamosszegi, April 19, 2012, Dkt. No. 124 ("Szamosszegi Decl.") and exhibits thereto.)

1  force—and in this day and age, an air force—is certainly a fundamental government function serving

2  a public purpose"); *F. W. Stone Eng'g Co. v. Petroleos Mexicanos of Mexico, D. F.*, 42 A.2d 57, 60

3  (Pa. 1945) (granting common-law immunity to Mexican oil company where "the enterprise was for

4  the development of the trade and commerce of the foreign government and to supply revenues for

5  its treasury[]—appropriate concerns of that government"); *Bradford v. Dir. Gen. of Railroads of*

6  *Mexico*, 278 S.W. 251, 252 (Tex. Civ. App. 1925) (extending common-law immunity to entity that

7  was "agent of the Mexican government in the management of its railroad").

8       Specifically, a *prima facie* showing of all Defendants' "organ" status is established by their

9  alleged connection to the SASAC of the PRC.  (*See, e.g.*, 2012 Indictment at ¶¶8-10; Indictment at

10  ¶¶3-5.)  SASAC is a "special government agency of the PRC," operating "under the direct control

11  of the State Council, the PRC's highest government authority."  (2012 Indictment at ¶8; Indictment

12  at ¶3.)  In fact, the PRC created the SASAC "to exercise ownership of state-owned enterprises on

13  the government's behalf" (Szamosszegi Decl. at ¶7), a task the SASAC achieves in various ways,

14  including:  (i) "appoint[ing] executives" for those enterprises (*id.* at ¶9), and (ii) "provid[ing them]

15  strategic guidance through five-year plans that are proposed[,] drafted[,] and approved" by the PRC

16  (*id.* at ¶¶10-11).

17       Focusing first on the Pangang Group, the Indictment alleges it is a "state-owned enterprise

18  controlled by SASAC."  (2012 Indictment at ¶9; Indictment at ¶4.)  Its alleged ownership structure

19  reflects that control:  since 2003, the SASAC has maintained 100% ownership of Pangang Group,

20  either directly or indirectly.  (Szamosszegi Decl. at ¶¶13-20.)[9]  Its leadership structure also reflects

21  this state control, as Pangang Group's "Chairman and certain other senior managers … were

22  officials of the Communist Party."  (2012 Indictment at ¶9; Indictment at ¶4.)  Further, according to

23  the Government, Pangang Group "belongs to two industries in which the [Chinese] state has

24  maintained a prominent role: steel production and non-ferrous metals production."  (Szamosszegi

25

26       [9]  Even if the Szamosszegi Declaration were correct that SASAC's ownership of Pangang Group
was indirect from 2010 onward (it incorrectly states that as of 2010 Pangang Group was "100 percent
27  owned by the Anshan Iron and Steel Group Corporation, which is 100 percent owned by the central
SASAC") (Szamosszegi Decl. ¶20), there is no suggestion in the text of the FSIA or any case that
28  direct share ownership is required for "organ" status.

Decl. at ¶14.)  As attested to by Mr. Szamosszegi, the PRC has maintained "a strong control position" in both of these "pillar industries."  (*Id.*)  Indeed, several of the PRC's five-year plans are alleged to have "identified the comprehensive exploitation of Panzhihua's vanadium and titanium resources as a National Key Project," and "other official documents indicate that the [PRC] promoted the production of chlorination process titanium dioxide."  (*Id.* at ¶11.)

The Indictment alleges that the Pangang Group works to advance the PRC's interests through operation of various subsidiaries, including the other Pangang Defendants—PGSVTC, Pangang Group Titanium, and PIETC—all of which are "control[ed]" by the Pangang Group and, *ipso facto*, the SASAC.  (2012 Indictment at ¶10; Indictment at ¶5.)  As alleged in the Indictment, the "[PRC] publicly identified the development of chloride-route titanium dioxide (TiO2) production technology as a scientific and economic priority" (2012 Indictment at ¶1; Indictment at ¶1), and then used the Pangang Group and its subsidiaries to advance this state interest (2012 Indictment at ¶¶2, 9-10; Indictment at ¶¶2, 4-5).  The interconnectivity of the Pangang Group's subsidiaries—and their common tie to the SASAC—is allegedly exhibited in various ways.  For example, Pangang Group shares its personnel with certain subsidiaries, including "senior management" at PGSVTC and executives at Pangang Titanium.  (2012 Indictment at ¶¶10(a), 11; Indictment at ¶¶5(a), 6-7.)  This sharing of key personnel is a practice "typical of the relationship between [state-owned enterprises] and their subsidiaries[,] and a means by which the [Communist] Party and SASAC control [state-owned enterprises]," like Pangang Group, "and their subsidiaries," like the other Pangang Defendants.  (Szamosszegi Decl. at ¶22.)

The Government also contends that the SASAC indirectly owned a majority of the Pangang Group's subsidiaries' shares through a combination of shares owned by (i) Pangang Group, (ii) its subsidiaries, and (iii) other state-owned enterprises under SASAC's dominion.  For example, Pangang Group and PGSVTC allegedly "owned and controlled" both Pangang Titanium and PIETC.  (2012 Indictment at ¶10(b)-(c); Indictment at ¶5(b)-(c).)  And although PGSVTC was spun out from Pangang Group in 1998 and listed on the Shenzhen Stock Exchange (Szamosszegi Decl. at ¶15), the PRC continues to own a majority of its shares through its state-owned enterprises and

1 subsidiaries that those enterprises control (*id.* at ¶¶19-20; *see also* 2012 Indictment at ¶10(c);

2 Indictment at ¶5(c)).

3       In sum, the required *prima facie* case is established by the Indictment and the Government's

4 own expert declaration—and the Government is not expected to contest these facts in opposition to

5 this motion and would surely attempt to prove this *prima facie* case at trial beyond a reasonable

6 doubt.

7 **II.    DEFENDANTS, AS INSTRUMENTALITIES OF THE PRC, HAVE ABSOLUTE**

8       **IMMUNITY FROM CRIMINAL PROSECUTION**

9      **A.    Defendants Are Immune Under The Common Law From Criminal Prosecution**

10       Since the proceedings in this Court on Defendants' initial motion to dismiss the Indictment,

11 the Government has stated that the common law of foreign sovereign immunity would govern here

12 if, as the Government maintains, the FSIA does not apply to criminal proceedings. *See* CA9 Oral

13 Arg. at 22:59-23:11; *Samantar v. Yousuf*, 560 U.S. 305, 324 (2010) ("Even if a suit is not governed

14 by the [FSIA], it may still be barred by foreign sovereign immunity under the common law."). As

15 explained below, the common law provides foreign sovereigns and their instrumentalities with

16 absolute immunity from criminal prosecution. Thus, even accepting *arguendo* the Government's

17 position that the FSIA does not apply to criminal proceedings, the Indictment should be dismissed.

18       **1.    The Common Law Grants Foreign Instrumentalities Absolute Immunity**

19            **From Criminal Prosecution**

20       The common law rule under which "foreign states were *absolutely* immune," *Peterson*, 627

21 F.3d at 1126 (emphasis added), from both "civil and criminal jurisdiction," *Dow v. Johnson*, 100

22 U.S. 158, 165 (1879), dates as far back as *Schooner Exch. v. McFaddon*, 11 U.S. 116 (1812), which

23 recognized that foreign sovereign immunity "*exempt[s]* [] the person of the sovereign from arrest

24 or detention within a foreign territory," *id.* at 137 (emphasis added). *See also Ex parte Cabrera*, 4

25 F. Cas. 964, 965 (C.C.D. Pa. 1805) (Washington, Circuit Justice) (An adjoint secretary of the

26 "Spanish legation … is under the protection of the law of nations; and is not amenable to the

27 tribunals of this country, upon a civil or criminal charge."). This immunity was absolute: there

28 were no "exceptions" to sovereign immunity at common law. *See, e.g., Abrams v. Société Nationale*

*des Chemins de Fer Français*, 332 F.3d 173, 177 (2d Cir. 2003) ("Under [the absolute] theory [of sovereign immunity], a sovereign cannot be sued in the courts of another state without that sovereign's consent, regardless of the nature of the activity giving rise to the action."), *judgment vacated on other grounds*, 542 U.S. 901 (2004); Restatement (Third) of Foreign Relations Law IV 5.A Intro. Note (1987) (under the "absolute theory," "a foreign state and its property are immune from the jurisdiction of the courts in all cases"); Packard Decl., Ex. 1 (Jack B. Tate, *Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments* ("Tate Letter"), 26 Dep't State Bull. 984, 984 (May 19, 1952) (letter from U.S. State Dep't Acting Legal Advisor to Acting Attorney General)) ("According to the classical or absolute theory of sovereign immunity, a sovereign cannot, without his consent, be made a respondent in the courts of another sovereign.").[10]

Before the FSIA's enactment, courts held that general jurisdictional statutes—like the general criminal jurisdiction statute, 18 U.S.C. § 3231, at issue here—incorporated this absolute common law immunity and thus did not permit actions against foreign states.  Sovereign immunity applied in U.S. courts because, as the Supreme Court explained, "general statutory provisions [] which are descriptive of the ordinary jurisdiction of the judicial tribunals … ought not … to be so construed as to give them jurisdiction" over foreign sovereigns.  *Schooner Exch.*, 11 U.S. at 146. *See also, e.g.*, *Berizzi Bros. Co. v. Pesaro*, 271 U.S. 562, 576 (1926) (same, for "the general words of section 24, cl. 3, of the Judicial Code (Comp. St. s 991), investing the District Courts with jurisdiction of 'all civil causes of admiralty and maritime jurisdiction'").  This was so because "international law" barred the United States from exercising jurisdiction over foreign states without their consent, *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1493 (2019), and statutes were "never to be construed to violate the law of nations if any other possible construction remains," *Murray v. Schooner Charming Betsy*, 6 U.S. 64, 118 (1804).  *See also Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) (statutes that "invade the common law" are "read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident").  Jurisdictional statutes thus *never* reached foreign sovereigns.

---

[10]  For the Court's convenience, those materials or authorities not readily available are submitted as Exhibits 1–5 to the concurrently-filed Declaration of Michael T. Packard ("Packard Decl.").

This rule of absolute immunity still applied to criminal proceedings at the time of the FSIA's enactment in 1976.  To be sure, the U.S. State Department in 1952 had adopted a restrictive theory of sovereign immunity for *civil actions*, pursuant to which "[i]mmunity typically was afforded in cases involving a foreign sovereign's public acts, but not in 'cases arising out of a foreign state's strictly commercial acts.'"  *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822 (2018) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 487 (1983)).  But this change "left untouched" the rule of absolute immunity "in criminal proceedings."  Packard Decl., Ex. 2 (Hazel Fox & Philippa Webb, *The Law of State Immunity* at 91 (3d ed. 2015)); *see id.* at 94 (The "adoption of a restrictive doctrine has not been treated as having any relevance in relation to the Absolute Immunity of the foreign State from criminal proceedings."); Packard Decl., Ex. 3 (Elizabeth Helen Franey, "Immunity from the Criminal Jurisdiction of National Courts," *Research Handbook on Jurisdiction and Immunities in International Law* at 207 (2015)) ("A state can be liable under civil law, but it cannot be prosecuted, whereas criminal liability is the liability of an individual for his own unlawful actions.") (footnote omitted).  Even after 1952, "this country [did] not bring criminal proceedings against other nations."  *Gould, Inc. v. Mitsui Min. & Smelting Co.*, 750 F. Supp. 838, 844 (N.D. Ohio 1990).  After all, there would have been no way to enforce criminal penalties against foreign states because foreign states had "complete immunity … from execution against their property" until the FSIA's enactment.  *Conn. Bank of Com. v. Republic of Congo*, 309 F.3d 240, 252 (5th Cir. 2002); *see* H.R. Rep. No. 94-1487, at 8, 27.[11]

At common law, instrumentalities of foreign states, including foreign corporations acting under a public purpose, have the same immunity from civil and criminal jurisdiction as the foreign states themselves.  "The traditional rule" of foreign sovereign immunity, the Attorney General and Secretary of State explained when they proposed the draft FSIA, "was that such agencies and instrumentalities of a foreign government were entitled to the same immunities as the government

---

[11]   The Second Circuit recently stated that "any foreign sovereign immunity at common law also had an exception for a foreign state's commercial activity," *United States v. Turkiye Halk Bankasi A.S.*, 16 F.4th 336, 351 (2d Cir. 2021), but failed to distinguish between the common law applicable to civil proceedings—which has a commercial activity exception—and the common law applicable to criminal proceedings—which does not.

-14-
Pangang Defendants' Notice of Motion and Motion to Dismiss Indictment
Case No. 4:11-CR-0573-07-10 JSW

itself especially if they engaged in clearly governmental activities."  *See* Packard Decl., Ex. 4 (*Immunities of Foreign States: Hearing on H.R. 3493 Before the Subcomm. on Claims and Gov't'l Relations of the H. Comm. on the Judiciary*, 93d Cong., 1st Sess. (1973) ("*1973 House Hearing*")) at 39 (Letter from Richard G. Kleindienst, Attorney Gen., and William P. Rogers, Sec. of State, to the Speaker of the House); *see also, e.g.*, Restatement (Second) of Foreign Relations Law § 66 cmt. d (1965) ("A governmental corporation of a foreign state may be entitled to immunity on the same basis as an agency of the government if it acts in behalf of the government of the foreign state in the same manner as an agency of the foreign state.").

Before the FSIA was enacted, it appears the U.S. Government had never even tried to prosecute a foreign state or instrumentality that had asserted an immunity defense.  A federal grand jury once issued a subpoena to the Anglo-Iranian Oil Company, but a district court quashed it because Anglo-Iranian was an instrumentality of Great Britain.  *Investigation of World Arrangements*, 13 F.R.D. at 290-91.  "The consequences of a successful prosecution of [the company] here," the court explained, "would in reality be to charge and find the British Government guilty of violating a law of the United States, which imposes criminal penalties."  *Id.* at 291; *cf. Bergman v. DeSieyes*, 71 F. Supp. 334, 341 (S.D.N.Y. 1946) (explaining that "a foreign minister is immune from the jurisdiction, *both criminal and civil*, of the courts in the country to which he is accredited, on the grounds that he is the representative, the alter ego, of his sovereign who is, of course, entitled to such immunity") (emphasis added).  Not long after *Investigation of World Arrangements*, the same court reserved decision on whether to quash a criminal subpoena issued to Philippine National Airlines until it gathered more evidence whether the company was a foreign instrumentality.  *See In re Grand Jury Investigation of Shipping Indus.*, 1960 WL 98919, at *23 (D.D.C. June 14, 1960).  It declined to defer to the State and Justice Departments' recommendation that the company *not* be granted immunity.  *See id.*  Other than the foregoing, there appears to have been no other criminal proceedings against foreign states or instrumentalities that asserted an immunity defense—and certainly no prosecutions of such entities.

1   Thus, under the common law, Defendants, as alleged instrumentalities of the PRC, have

2   absolute immunity from criminal prosecution.  The general criminal jurisdiction statute, 18 U.S.C.

3   § 3231, does not provide jurisdiction over this criminal proceeding against a foreign instrumentality.

4   **2.    Foreign Instrumentalities' Common Law Immunity From Criminal**

5   **Prosecution Is Not Subject To The Executive Branch's Prerogative**

6   The Government may maintain, as it suggested in oral argument to the Ninth Circuit, that at

7   common law sovereign immunity determinations are the case-by-case prerogative of the Executive

8   Branch, but that position is demonstrably wrong.  Until the mid-twentieth century, U.S. courts did

9   not defer to the Executive Branch's view of sovereign immunity at all.  *See, e.g.*, *Guar. Tr. Co. of*

10  *N.Y. v. United States*, 304 U.S. 126, 138 (1938) (the Executive's decision to "recogniz[e] a foreign

11  government ... is conclusive on all domestic courts, which ... are free to draw for themselves its legal

12  consequences in litigations pending before them").  *See* Ingrid Wuerth, *Foreign Official Immunity*

13  *Determinations in U.S. Courts: The Case Against the State Department*, 51 Va. J. Int'l L. 915, 924-

14  25 (2011) ("Courts deferred to the executive on some questions, such as the existence of the

15  government in question, but did not view themselves as bound by the executive's suggestion of

16  immunity.  During this period, foreign sovereigns in national courts enjoyed a high level of

17  immunity and exceptions, if any, were not widely recognized.  An immunity doctrine that allows no

18  exceptions save for the consent of the sovereign is called the 'absolute' or 'classical' approach.").

19  In the mid-20th century, courts began relying "upon the advice of [the Executive] branch

20  when deciding just when and how [the] 'restrictive' sovereign immunity doctrine applied" in a civil

21  case, given the Executive Branch's "expertise" in international law.  *Bolivarian Republic of*

22  *Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1320 (2017).  But the Supreme

23  Court has never held that the Executive Branch can "prescribe a rule for the decision of a cause in

24  a particular way" and thus intrude on the judiciary's Article III powers.  *United States v. Klein*, 80

25  U.S. 128, 146 (1871).[12]  The State Department also repeatedly recognized that its views on sovereign

26

27      [12]   Justice Frankfurter once advocated absolute deference to the Executive Branch's position on

28  sovereign immunity, but this view garnered just one other vote, *see Republic of Mexico v. Hoffman*,

-16-
Pangang Defendants' Notice of Motion and Motion to Dismiss Indictment
Case No. 4:11-CR-0573-07-10 JSW

immunity "cannot control the courts."  Packard Decl., Ex. 1 (Tate Letter) at 985.[13]  And the American Law Institute agreed, explaining in 1965 that the Executive Branch's view on immunity was "not conclusive as to an issue of law or fact of a type normally determined by courts in litigation not involving foreign relations."  Restatement (Second) of Foreign Relations Law § 72 cmt. a (1965).

The absence of Executive prerogative over sovereign immunity was even more apparent in the criminal context during this time, with federal courts expressly *declining* to defer to the Executive Branch's views on criminal cases because the rule of absolute immunity continued to apply in criminal cases.  *See Investigation of World Arrangements*, 13 F.R.D. at 291 (quashing criminal subpoena); *Grand Jury Investigation*, 1960 WL 98919, at *23 (declining to defer to the State and Justice Department's recommendation that immunity not be granted).

Thus, for all these reasons, the Government's decision to pursue this prosecution has no effect on Defendants' entitlement to sovereign immunity at common law.[14]

**B.     The FSIA Separately Immunizes Defendants From Criminal Prosecution**

**1.     The FSIA's Grant Of Immunity Applies To Criminal Prosecutions**

Even if the common law is not dispositive of Defendants' immunity from criminal prosecution, the FSIA itself would require dismissal of the Indictment for lack of subject-matter

---

324 U.S. 30, 42 (1945) (Frankfurter, J., concurring), and he later revised his position, *see Nat'l City Bank of N.Y. v. Republic of China*, 348 U.S. 356, 360 (1955) (writing for majority that the Executive's views should be given only "significant weight").

[13]  *See* Packard Decl., Ex. 5 (Andreas F. Lowenfeld, *Claims against Foreign States--A Proposal for Reform of United States Law*, 44 N.Y.U. L. Rev. 901, 910 (1969)) (acknowledgement by State Department Deputy Legal Advisor from 1964-66 that "courts in the United States have split on the effect to be given to suggestions of immunity by the State Department or to the failure of the Department to suggest immunity"); Packard Decl., Ex. 4 (*1973 House Hearing*) at 34 (Attorney General and Secretary of State acknowledged in debates over the FSIA that although "courts normally defer" to the State Department's suggestion, they may "determine the question" of immunity themselves regardless of the government's wishes); *id.* at 51 (letter from the Acting Legal Adviser of the Department of State acknowledging cases where "sovereign immunity was recognized even though" the State Department did not suggest it).

[14]  In recently concluding otherwise as to the prosecution of a Turkish state-owned bank, the Second Circuit did not consider the history and authorities discussed in text.  *See Turkiye Halk Bankasi*, 16 F.4th at 351.

jurisdiction.  In its earlier order, the Court opted to assume without deciding that the FSIA applies to criminal proceedings.  For the reasons discussed below, it is respectfully submitted the Court should rule now that FSIA immunity extends to criminal proceedings.

In 1976, Congress enacted the FSIA, which "deal[s] comprehensively with the subject of foreign sovereign immunity." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 438 (1989); *see id.* at 437 (describing FSIA as a "comprehensive[] … statutory scheme"); H.R. Rep. No. 94-1487, at 12 (the FSIA "set[s] forth comprehensive rules governing sovereign immunity"). "The key word there—which goes a long way toward deciding this case—is *comprehensive*.  [The Supreme Court has] used that term often and advisedly to describe the Act's sweep: 'Congress established [in the FSIA] a comprehensive framework for resolving any claim of sovereign immunity.'"  *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 141 (2014) (quoting *Republic of Austria v. Altmann*, 541 U.S. 677, 699 (2004)).

By its plain text, this "comprehensive" statute governs foreign sovereign immunity in *all* actions—both civil and criminal.  Section 1604 provides that a foreign state "shall be immune from the jurisdiction of the courts of the United States and of the States," subject to exceptions contained in Sections 1605 to 1607.  28 U.S.C. § 1604.  Nothing in the text of Section 1604 suggests that its grant of immunity applies only in civil cases.  Congress "knows how to limit a provision to a 'civil action' when it wants to," as it did in other provisions of the FSIA, *In re Grand Jury Subpoena*, 912 F.3d 623, 632 (D.C. Cir. 2019) (per curiam), and Section 1604 is not so limited.  *See, e.g.*, *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020) (courts "may not narrow a provision's reach by inserting words Congress chose to omit").

The FSIA's lone jurisdictional grant in Section 1330(a) confirms that Defendants retain their immunity here, as it provides jurisdiction over foreign states and their instrumentalities *only* in "civil action[s]," not criminal ones.  28 U.S.C. § 1330(a) ("The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury *civil action* against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.") (emphasis added).  The Supreme Court made clear

in *Amerada Hess* that the FSIA is "the *sole basis* for obtaining jurisdiction over a foreign state" in United States courts.  488 U.S. at 434 (emphasis added).[15]  Indeed, there the Court rejected application of general jurisdictional provisions, such as the Alien Tort Statute, 28 U.S.C. § 1350, and the general admiralty and maritime jurisdiction statute, *id.* § 1333(1), in actions against foreign states, expressly holding that they were displaced "[i]n light of the comprehensiveness of the FSIA." *Amerada Hess*, 488 U.S. at 437; *see also id.* at 437-39 & n.5 (discussing same).  So too here:  18 U.S.C. § 3231 is not part of the FSIA and thus may not serve as a source of jurisdiction for criminal prosecution of a foreign sovereign or its alleged instrumentalities.

Other federal courts have concluded that the FSIA grants foreign states and their instrumentalities sovereign immunity in criminal cases.  In *Keller v. Cent. Bank of Nigeria*, 277 F.3d 811 (6th Cir. 2002), *abrogated on other grounds by Samantar*, 560 U.S. 305, for example, the Sixth Circuit held that "the FSIA grants immunity to foreign sovereigns from criminal prosecution," reasoning that the FSIA "does not limit [its] grant of immunity to civil cases." *Id.* at 820.  And in *Gould*, the court recognized in analyzing the FSIA that "no criminal jurisdiction exists in our courts over foreign sovereigns."  750 F. Supp. at 844.  *See also Dale v. Colagiovanni*, 337 F. Supp. 2d 825, 842 (S.D. Miss. 2004) ("Based on the provisions of 28 U.S.C. § 1330(a) and 28 U.S.C. § 1604, … the Vatican is not a 'chargeable' or 'indictable' entity."), *rev'd in part and aff'd in part on other grounds*, 443 F.3d 425 (5th Cir. 2006).[16]

This was also the longtime consensus view among scholars.  As a Reporter for the Restatement (Fourth) of Foreign Relations Law has explained, Section 1330(a)'s unambiguous "reference to 'civil actions' does not suggest … that states or their agencies or instrumentalities can be subject to criminal proceedings in U.S. courts; nothing in the text or legislative history [of the

---

[15]  *Accord OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 29 (2015); *Samantar*, 560 U.S. at 314; *Permanent Mission of India to United Nations v. City of N.Y.*, 551 U.S. 193, 197 (2007); *Altmann*, 541 U.S. at 699; *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

[16]  To be sure, other courts have reached a different conclusion, including the Tenth Circuit in *Southway v. Cent. Bank of Nigeria*, 198 F.3d 1210, 1214-16 (10th Cir. 1999), and a district court in *United States v. Hendron*, 813 F. Supp. 973, 975 (E.D.N.Y. 1993), but those decisions disregarded the text of Section 1604 and rested on the backwards presumption that jurisdiction over foreign states exists unless Congress expressly says otherwise.

FSIA] supports such a conclusion."  David P. Stewart, *The Foreign Sovereign Immunities Act: A Guide for Judges, Second Edition*, Federal Judicial Center at 1 n.2 (2018).  The American Law Institute agreed, explaining that a foreign state cannot "be prosecuted under normal criminal process applicable to individuals or juridical persons."  Restatement (Third) of Foreign Relations Law § 461 cmt. a (1987); *id.* cmt. c ("A state itself is generally not subject to the criminal process of another state ….").

Thus, Section 1604 and Section 1330(a) work "in tandem" to address every claim of foreign sovereign immunity in U.S. courts, *Amerada Hess*, 488 U.S. at 434, and thereby provide Defendants with at least presumptive immunity from criminal prosecution to the extent application of the common law does not compel dismissal of the Indictment.

### 2.  The FSIA's Exceptions Do Not Apply To Criminal Prosecutions

The FSIA's immunity from criminal prosecution is, moreover, not just presumptive, but absolute, because none of the exceptions in 28 U.S.C. § 1605 apply to criminal proceedings.  The Court previously resolved this issue in favor of the Government, ruling, first, that if the grant of immunity in Section 1604 applies to criminal prosecutions, then the Section 1605 exceptions apply to them as well, and, second, that the waiver and commercial activity exceptions apply on the facts of this case.  (Dkt. No. 1223 at 11-17.)  Defendants respectfully disagree with both of these rulings for the reasons explained in their prior motion to dismiss (Dkt. Nos. 1193, 1205), and they maintain that position here.  Because the Ninth Circuit did not address these issues on appeal, there are several additional arguments that the Court may wish to consider in deciding whether the exceptions apply.[17]

*First*, Government has yet to identify a single pre-FSIA case in which the United States prosecuted a foreign sovereign.  And for good reason:  as discussed above, foreign sovereigns have historically enjoyed immunity from criminal prosecution, and the criminal jurisdiction statute, like all statutes of general application, does not apply to foreign sovereigns.  *See, e.g.*, *Investigation of World Arrangements*, 13 F.R.D. at 291; *Bergman*, 71 F. Supp. at 341; Packard Decl., Ex. 2 (Fox &

---

[17]  Defendants respectfully submit that this Court's prior ruling on the applicability of the FSIA exceptions failed to consider dispositive legal arguments.  *Cf.* N.D. Cal. Civ. L.R. 7-9(b)(3).

Webb) at 91-92, 94; *Schooner Exch.*, 11 U.S. at 137.  Until this case, the Government has relied on other tools to counteract alleged foreign state misconduct, including sanctions and criminal prosecutions of individuals whose actions may benefit the foreign state—and, of course, the availability of civil remedies in situations to which the statutory exceptions might apply.[18]  Applying FSIA immunity but not its exceptions to criminal proceedings thus would simply adhere to the "'presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.'"  *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Isbrandtsen*, 343 U.S. at 783).

*Second*, the Government has yet to explain why Congress would have permitted criminal prosecution of foreign sovereigns' commercial activity but not far more serious and pernicious acts like "terrorism," "torture, extrajudicial killing, aircraft sabotage, [and] hostage taking," for which an exception is expressly limited to civil actions seeking money damages, *see* 28 U.S.C. §§ 1605A, 1605B.  It is far more likely that Congress intended to retain foreign sovereigns' absolute immunity from criminal prosecution, rather than create the absurd situation in which criminal prosecution is permitted for commercial crimes but not for acts of terrorism and torture.  *See, e.g.*, *Clinton v. City of N.Y.*, 524 U.S. 417, 429 (1998) (discussing presumption against statutory interpretation that leads to absurd results).

*Third*, the Government has failed to identify a solution to an enormous problem posed by its position that the exceptions in Section 1605 apply to criminal prosecutions:  any of the thousands of local prosecutors in the United States could prosecute foreign sovereigns to the extent an exception applies, without any provision that allows those cases to be removed to federal court.  *See* 28 U.S.C. § 1441(d) (FSIA's removal provision permits foreign sovereigns to remove only "civil action[s]" to federal court).   Given the calamitous foreign-relations implications of judicial proceedings against foreign sovereigns, it is inconceivable that Congress would have created a statutory framework in which foreign sovereigns could remove *civil actions* from state court to federal court but would be stuck in state court if prosecuted *criminally*.  *See, e.g.*, H.R. Rep. No. 94-

---

[18]   Neither the Government nor the alleged victim have filed a civil action against any of the Pangang Defendants.

1487, at 33 (FSIA removal provision was included "[i]n view of the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area"); *Verlinden*, 461 U.S. at 497 (recognizing Congress's intent "to channel cases against foreign sovereigns away from the state courts and into federal courts") (citing the legislative history, *id.* at 489); *cf. United States v. Pink*, 315 U.S. 203, 232 (1942) ("If state action could defeat or alter our foreign policy, serious consequences might ensue.  The nation as a whole would be held to answer if a State created difficulties with a foreign power.").

*Fourth*, the Government has never disputed that that "[t]he exercise of criminal jurisdiction directly over another State infringes international law's requirements of equality and non-intervention."  Packard Decl., Ex. 2 (Fox & Webb) at 91.  Criminal prosecution also invites reciprocal prosecutions and retaliation by foreign states.  *See, e.g.*, *Helmerich & Payne*, 137 S. Ct. at 1322 ("our grant of immunity to foreign sovereigns dovetails with our own interest in receiving similar treatment").  It follows that the FSIA should not be interpreted to allow for criminal jurisdiction over foreign states "if any other possible construction" is possible.  *Fox Television Stations, Inc v. Aereokiller, LLC*, 851 F.3d 1002, 1011 (9th Cir. 2017) (quoting *Charming Betsy*, 6 U.S. at 118).[19]

*Finally*, and perhaps most importantly, as Judge Collins observed during the Ninth Circuit oral argument, the commercial activity exception is limited to circumstances in which "the action" is based upon certain commercial activity.  *See* 28 U.S.C. § 1605(a)(2); CA9 Oral Arg. at 26:11-26:30.  "Action" is routinely and best understood as referring to civil actions, not to criminal prosecutions.  *See, e.g.*, Fed. R. Civ. P. 2 ("There is one form of action—the civil action.").  Thus,

---

[19]  Although the D.C. Circuit has expressed doubt that state-owned "corporations are universally understood to possess absolute immunity," *Grand Jury Subpoena*, 912 F.3d at 630, the FSIA's substantive provisions make no distinction between foreign states and state-owned corporations. The D.C. Circuit's interpretation of Section 1605 would thus permit criminal prosecution of both state-owned corporations *and* foreign states, which conflicts with customary international law.

the text of the statute renders at least the commercial activity exception inapplicable to criminal prosecutions.[20]

In sum, the Government's position ignores longstanding common law principles, plain statutory text, and international law, all to give the Executive a tool it has never used before, when doing so will invite retaliation by foreign states and allow thousands of local prosecutors to pursue criminal charges against foreign states.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Indictment should be dismissed.

Dated:  November 30, 2021

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:    */s/ John Mark Potter*
John Mark Potter
Robert P. Feldman
Michael T. Packard

*Attorneys for Pangang Defendants*

---

[20]   The Second Circuit did not consider this language in recently holding that, assuming Section 1604's grant of immunity applies to criminal proceedings, the commercial activity exception in Section 1605 would apply as well.  *See Turkiye Halk Bankasi*, 16 F.4th at 348 n.48.

-23-