QUINN EMANUEL URQUHART & SULLIVAN, LLP
  John M. Potter (Bar Number 165843)
  johnpotter@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111
Telephone:     (415) 875-6600
Facsimile:     (415) 875-6700

  Robert P. Feldman (Bar Number 69602)
  bobfeldman@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5069
Facsimile:     (650) 801-5100

  Michael T. Packard (*pro hac vice*)
  michaelpackard@quinnemanuel.com
111 Huntington Ave, Suite 520
Boston, Massachusetts 02199
Telephone:     (617) 712-7118

Attorneys for Defendants Pangang Group
Company, Ltd., Pangang Group Steel
Vanadium & Titanium Company, Ltd.,
Pangang Group Titanium Industry Company,
Ltd., and Pangang Group International
Economic & Trading Company

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>PANGANG GROUP COMPANY, LTD.;<br>PANGANG GROUP STEEL VANADIUM &<br>TITANIUM COMPANY, LTD.; PANGANG<br>GROUP TITANIUM INDUSTRY<br>COMPANY, LTD; and PANGANG GROUP<br>INTERNATIONAL ECONOMIC &<br>TRADING COMPANY,<br><br>　　　　Defendants. | CASE NO. 4:11-CR-0573-07-10 JSW<br><br>**DECLARATION OF MICHAEL T.<br>PACKARD IN SUPPORT OF<br>PANGANG DEFENDANTS' MOTION<br>TO DISMISS INDICTMENT**<br><br>Date:　　　　January 4, 2022<br>Time:　　　　9:30 a.m.<br>Judge:　　　Hon. Jeffrey S. White<br>Courtroom:　5, 2nd Floor |

1

## DECLARATION OF MICHAEL T. PACKARD

2    I, Michael T. Packard, declare as follows:

3    1.    I am an attorney licensed to practice in the Commonwealth of Massachusetts and

4    am admitted to practice before this Court *pro hac vice* in connection with this matter.  I am a

5    counsel at the law firm Quinn Emanuel Urquhart & Sullivan, LLP, counsel for the Pangang

6    Defendants.  I have personal knowledge of the matters set forth in this declaration, and if called as

7    a witness I would testify competently to those matters.

8    2.    Attached hereto as **Exhibit 1** is a true and correct copy of Jack B. Tate, *Changed*

9    *Policy Concerning the Granting of Sovereign Immunity to Foreign Governments*, 26 Dep't State

10   Bull. 984 (May 19, 1952).

11   3.    Attached hereto as **Exhibit 2** is a true and correct copy of "State Immunity and

12   Jurisdiction:  Immunity from the Civil and Criminal Jurisdiction of National Courts," by Hazel

13   Fox & Philippa Webb, Chapter 4 of *The Law of State Immunity* (3d ed. 2015).

14   4.    Attached hereto as **Exhibit 3** is a true and correct copy of "Immunity from the

15   criminal jurisdiction of national courts," by Elizabeth Helen Franey, Chapter 7 of *Research*

16   *Handbook on Jurisdiction and Immunities in International Law* (2015).

17   5.    Attached hereto as **Exhibit 4** is a true and correct copy of *Immunities of Foreign*

18   *States:  Hearing Before the Subcommittee on Claims and Governmental Relations of the*

19   *Committee on the Judiciary, House of Representatives*, Ninety-Third Congress, First Session on

20   H.R. 3493 (June 7, 1973).

21   6.    Attached hereto as **Exhibit 5** is a true and correct copy of Andreas F. Lowenfeld,

22   *Claims against Foreign States–A Proposal for Reform of United States Law*, 44 N.Y.U. L. Rev.

23   901 (1969).

24   I declare under penalty of perjury under the laws of the United States of America that the

25   foregoing is true and correct to the best of my knowledge, information, and belief.

26

Executed November 29, 2021, in Boston, Massachusetts   By:   /s/ *Michael T. Packard*

27                                                                 Michael T. Packard

28

# EXHIBIT 1

*The Department of State*



LIBRARY
Supreme Court, U.S.
JUL 8 1952
Doc. Coll.

# bulletin

Vol. XXVI, No. 678

June 23, 1952

SENATE CONSIDERS BONN AGREEMENTS AND NATO PROTOCOL: Testimony by Secretary Acheson, Under Secretary Bruce, and High Commissioner McCloy . . . . . . . . . . . . . 971

WHO ARE OUR NEW IMMIGRANTS? ● *by Frank L. Auerbach* . . . . . . . . . . . . . . 980

ADVANCEMENT OF WORLD GOOD WILL ● *by Perle Mesta* . . . . . . . . . . . . . . 986

CHANGE OF POLICY ON SOVEREIGN IMMUNITY OF FOREIGN GOVERNMENTS . . . . . . . 984

A REVIEW OF WORLD ECONOMIC EVENTS ● *by Isador Lubin* . . . . . . . . . . . . 989



*For index see back cover*

# *The Department of State* bulletin

VOL. XXVI, NO. 678 • PUBLICATION 4625

*June 23, 1952*

***The Department of State BULLETIN, a weekly publication compiled and edited in the Division of Publications, Office of Public Affairs, provides the public and interested agencies of the Government with information on developments in the field of foreign relations and on the work of the Department of State and the Foreign Service. The BULLETIN includes selected press releases on foreign policy issued by the White House and the Department, and statements and addresses made by the President and by the Secretary of State and other officers of the Department, as well as special articles on various phases of international affairs and the functions of the Department. Information is included concerning treaties and international agreements to which the United States is or may become a party and treaties of general international interest.***

***Publications of the Department, as well as legislative material in the field of international relations, are listed currently.***

For sale by the Superintendent of Documents
U.S. Government Printing Office
Washington 25, D.C.

PRICE:
52 issues, domestic $7.50, foreign $10.25
Single copy, 20 cents

The printing of this publication has been approved by the Director of the Bureau of the Budget (January 22, 1952).

*Note:* Contents of this publication are not copyrighted and items contained herein may be reprinted. Citation of the DEPARTMENT OF STATE BULLETIN as the source will be appreciated.

## Senate Begins Consideration of German Contractual Agreements and North Atlantic Treaty Protocol

### STATEMENT BY SECRETARY ACHESON [1]

Two documents are before the Senate for its advice and consent to ratification. One of these is the Convention on Relations between the Three Powers and the Federal Republic of Germany, to which is annexed the Charter of the Arbitration Tribunal.[2]

The other is a protocol to the North Atlantic Treaty.[3] A number of other documents have also been transmitted by the President for the information of the Senate, to fill out the series of related actions, of which these two are a part. These include three additional conventions with the Federal Republic, which will implement various aspects of the main convention before you;[4] the treaty constituting the European Defense Community (EDC); a declaration by the United States, together with the British and the French, at the time of the signing of this treaty;[5] and the Schuman Plan treaty for a European coal and steel community.

Taken together, these measures make it possible to strengthen the defenses of Western Europe, and to include Germany as a participant in, and as a contributor to, those defense arrangements.

The first document before you for advice and consent to ratification has to do with ending the Occupation of the German Republic and returning Germany to the community of free nations as an equal member.

Germany has been occupied for almost 7 years. In that time we have sought to assist the Germans in developing democratic institutions and institutions of self-government in the towns and cities, in states, and in the Federal Government. We have sought, and I think successfully, to conduct an enlightened Occupation that looked toward peaceful and harmonious relations in the future.

But at some point in any occupation, the law of diminishing returns must inevitably come into play. On our side, the negotiations have been carried forward largely by John J. McCloy, our High Commissioner in Germany, who deserves the gratitude of his countrymen for the statemanship and vision he has brought to bear on this task. Mr. McCloy is here with me today and is prepared to put himself at your disposal for a detailed discussion of any aspects of these arrangements.

On the German side these conventions were freely negotiated. They are not imposed arrangements. They have been painstakingly and voluntarily worked out to provide for the best interests of all parties and for our common interest in peace.

It has not been possible to conclude a treaty of peace with Germany because the Soviet Union has refused to agree to any terms for unifying Germany in conditions of freedom.

The convention before you will, however, establish approximately normal relations with the largest part of Germany. These agreements put an end to the Occupation in all of Germany not occupied by the Soviet Union. This does not apply to Berlin, where the special situation requires us to maintain our full rights as an Occupation power.

The independence of the Federal Republic of Germany is established by these agreements, subject only to certain reservations made necessary by the present state of international relations. These reservations concern the stationing and security of Allied forces in Germany, including the right to proclaim a state of emergency in certain extreme circumstances, and to matters deal-

---

[1] Made before the Senate Foreign Relations Committee on June 10 and released to the press on the same date.
[2] For summary of this convention and its annex, see BULLETIN of June 9, 1952, p. 888.
[3] For text, see *ibid.*, p. 896.
[4] For summaries of these additional conventions, see *ibid.*, pp. 890–894.
[5] *Ibid.*, p. 897.

ing with the ultimate unification of Germany and a peace settlement for Germany as a whole.

It remains our purpose to help bring about a free and united Germany, and nothing in the present arrangements will serve as a bar to the fulfillment of this aim.

The freedom and equality which the Federal Republic will enjoy under the contractual conventions are not all that could be provided or that would be desirable if it were possible to conclude a peace treaty with a unified Germany. But the new status which the Federal Republic will enjoy will grant her the greatest autonomy that is possible under present international conditions. Specifically, the Occupation regime will be terminated. This means that the Occupation Statute will be repealed, the High Commissioner's and Land Commissioners' Offices will be abolished, Allied Occupation Troops in Germany will become troops for the common defense, Western Germany will regain control of her domestic and foreign affairs, and normal diplomatic relations between the Federal Republic and the Three Powers will be established.

This convention on relations with the Federal Republic was not, and could not be, prepared as an isolated document, because it does not by itself meet the full problem confronting the free people of Germany and those of other free countries. In order to provide for the security of the Federal Republic, and to enable free Germany to participate in its own defense, without recreating those military institutions and traditions that have endangered all Europe in the past, arrangements have been worked out under which the Federal Republic is joining in a European Defense Community—the common defense organization of six continental European countries.

These include, in addition to the Federal Republic of Germany, France, Italy, Belgium, the Netherlands, and Luxembourg.

As a member of this community, the Federal Republic will be able to make a vital contribution to the common defense of Western Europe without the creation of a national German military establishment. The European Defense Community, with a common budget and common procurement of military equipment, common uniforms, and common training, is a very remarkable advance. It represents a voluntary merging of national power into a common structure of defense.

The principal immediate purpose of the European Defense Community is to give the people of Europe more adequate protection against the threat of aggression. In this sense, it is part of a broader effort undertaken by the entire North Atlantic community to create the defensive strength we need to assure peace and security.

The European Army created under these arrangements will serve under General Ridgway as Supreme Commander, alongside American and British forces and the forces of other North At-

lantic Treaty countries which are not members of the Europen Defense Community.

Five members of the new European Defense Community are also members of the North Atlantic Treaty Organization, but the Federal Republic is not. We have therefore joined with the other members of NATO in signing a protocol to the North Atlantic Treaty which is the other document requiring ratification. This protocol extends the guarantee of mutual assistance expressed in article V of the treaty [6] to the Federal Republic and to the forces of the community, by providing specifically that an attack on the territory of any member of the community, or on the community's forces, shall be considered an attack against all the parties to the North Atlantic Treaty.

The Federal Republic will join with the other members of the European Defense Community in extending a reciprocal guarantee to the members to NATO.

Because of this necessarily close relationship, it is evident that the United States, while not a party to the European Defense Community, has a direct and abiding interest in the success and effectiveness of these arrangements.

These arrangements bear upon the defense of Western Europe and the whole Atlantic community, which the President and the Congress have clearly indicated on many occasions is of vital interest to the security of the United States.

There must be no misunderstanding in any quarter about how we would regard any act which would affect the integrity or unity of the European Defense Community.

For this reason, we have joined with the Governments of Britain and France in a declaration which makes it clear that we would regard any such act as a threat to our own security, and that we would act in accordance with article IV of the North Atlantic Treaty.[7]

That article requires the parties to consult whenever any party so requests on the basis that

[6] Article V of the North Atlantic Treaty reads as follows:

"The Parties agree that an armed attack against one or more of them in Europe or North America shall be considered an attack against them all; and consequently they agree that, if such an armed attack occurs, each of them, in exercise of the right of individual or collective self-defense recognized by Article 51 of the Charter of the United Nations, will assist the Party or Parties so attacked by taking forthwith, individually and in concert with the other Parties, such action as it deems necessary, including the use of armed force, to restore and maintain the security of the North Atlantic area.

Any such armed attack and all measures taken as a result thereof shall immediately be reported to the Security Council. Such measures shall be terminated when the Security Council has taken the measures necessary to restore and maintain international peace and security."

[7] Article IV reads as follows:

"The Parties will consult together whenever, in the opinion of any of them, the territorial integrity, political independence or security of any of the Parties is threatened."

    *Department of State Bulletin*

the territorial integrity, political independence or security of any of them is threatened.

This committee, in its report on the North Atlantic Treaty, underlined the fact that such consultation could be requested only when the element of threat was present, and that the consultation would take place under circumstances of great gravity.

The President, in his message of transmittal of these documents,[8] stressed the great stake which the United States has acquired in the maintenance of the institutions and relationships now being established. He has emphasized that the United States would consider any act which affects the integrity or existence of the European Defense Community as a matter of concern to its own interests and security.

By their declaration, the Three Powers have given public notice of the fact that any action against the integrity or unity of the European Defense Community would be a threat against their own security, and as such, a proper matter for consultation.

Such a threat would be not only a matter of common concern but of individual concern to the countries involved. In this atmosphere they would meet together to consider the exact nature of the threat, its immediacy and its seriousness. The parties would then consider, subject to the constitutional requirements of each country, how best to concert their efforts in order to take the common action necessary to ward off the threatened danger.

In the Three Power Declaration, we have also expressed the determination previously affirmed by the Senate to station forces, as necessary and appropriate, on the Continent of Europe, including the territory of the German Republic.

Basically, this declaration, like all the other documents before you, expresses an awareness of realities imposed upon us by modern history—that common danger creates a common interest and requires common action.

I will not take your time at this point with a discussion of any further details of these arrangements. David Bruce, Under Secretary of State, who has an intimate familiarity with the arrangements for the European Defense Community, will be at your disposal to discuss any aspects of these arrangements of interest to you.

I wish to express only one further point: That is, the great importance of early ratification of these two documents by the United States. Taken together, these agreements greatly advance all that we have been trying to do since the end of the war, to build strength and unity among the free nations.

Prompt ratification by the United States will most certainly have the effect of encouraging all those nations who look to the United States for

leadership. I am confident that prompt and affirmative action by the United States on these matters will be followed by similar action on the part of our Allies.

## STATEMENT BY UNDER SECRETARY BRUCE [9]

"The Protocol to the North Atlantic Treaty on Guarantees given by the Parties to the North Atlantic Treaty to the Members of the EDC" is one of the documents which the President has transmitted to the Senate for its advice and consent to ratification. It is set forth on page 23 of the printed documents before the Committee.[10]

The essential concept of this document is to cover the EDC and its forces, vessels, and aircraft with a North Atlantic Treaty guaranty in the event of armed attack within the meaning of article V of the North Atlantic Treaty and in return to receive from the European Defense Community an equivalent guaranty to NATO members.

Obviously the new aspect here is a recognition that the German Federal Republic is an essential element of the European Defense Community and therefore should receive the same rights as the other EDC countries and in return should give to NATO the same assurances required of the other EDC members. The preamble to the protocol before you expressly recognizes that the European Defense Community will strengthen the defense of the North Atlantic area.

This committee is fully familiar with the geographic scope of article V of the North Atlantic Treaty as defined in article VI thereof.[11] You recently considered this anew in connection with the Greece–Turkey protocol.[12] The protocol before you now extends article VI to cover the territory of the German Federal Republic and the German contingents of EDC in the area covered by article VI as established by the Greece–Turkey protocol.

The protocol you are considering is expressly contingent on reciprocity. It will remain effective only so long as the parties to EDC grant equivalent guaranties to the parties of the North Atlantic Treaty as are extended to EDC countries

---

[8] Bulletin of June 16, 1952, p. 947.

[9] Made before the Senate Foreign Relations Committee on June 10 and released to the press on the same date.

[10] S. Executives Q and R, 82d Cong., 2d sess., June 2, 1952.

[11] Article VI of the North Atlantic Treaty reads as follows:

"For the purpose of Article 5 an armed attack on one or more of the Parties is deemed to include an armed attack on the territory of any of the Parties in Europe or North America, on the Algerian departments of France, on the occupation forces of any Party in Europe, on the islands under the jurisdiction of any Party in the North Atlantic area north of the Tropic of Cancer or on the vessels or aircraft in this area of any of the Parties."

[12] Bulletin of Oct. 22, 1951, p. 651.

by this protocol, and for so long as both the EDC Treaty and the NAT remain in force.

The protocol by which the EDC nations will extend guaranties to the NATO nations has been presented to you for information and appears on page 228 of the published documents before this committee.

This protocol says that EDC nations have the same obligations with respect to an armed attack on the territory of any party of the North Atlantic Treaty in the area covered by article VI (1) of the North Atlantic Treaty, or upon the forces, vessels, or aircraft of any NATO nation in the territory covered by article VI (2) of the North Atlantic Treaty as the obligations assumed by the NATO nations by the protocol under consideration. In effect, Germany has assumed the obligations of article V of the treaty with respect to NATO nations. Of course this protocol cannot run longer than the term of the North Atlantic Treaty itself and would likewise terminate if EDC were to be dissolved. This is clearly and expressly set forth in article III of the treaty.

Although the EDC protocol is not yet effective, article II of the NATO protocol expressly provides that the protocol before you for action at this time does not become effective until the EDC protocol is effective.

I do not believe I need to enlarge before this committee on the obligations created by this protocol. It is subject to all of the interpretation, definitions, and limitations governing article V of the North Atlantic Treaty with which this committee is so familiar.

We have all considered the North Atlantic Treaty one of our stoutest bulwarks against aggression and one of the greatest deterrents to aggression. Therein it serves the cause of peace. This protocol is intended to serve the cause of peace by recognizing the role of EDC as an organ for collective security integrated with NATO.

## STATEMENT BY HIGH COMMISSIONER McCLOY [13]

I would like to present to you the reasons that in my opinion justify approval by the Senate of the agreements signed at Bonn on May 26, 1952, between the United States, Great Britain, France, and the Federal Republic of Germany.

These agreements are the natural consequence of two facts: (1) since 1945 Western Germany has made steady and substantial progress toward democratic government, and (2) the integration of the Federal Republic with the Western Nations is essential to the peace, freedom, and security of the free peoples. I believe that this bold but calculated policy of partnership with Germany will widen the horizon on a new, constructive era in the history of Europe and of the Atlantic world.

The signing of the agreements at Bonn and of the European Defense Treaty at Paris was an act of historic importance. Up to now the people of this country have not had an opportunity to appreciate the full significance of these events. They mark not only an immediate turning point in postwar history. They begin a movement that may profoundly influence future history.

Seven years ago Germany was a physical, economic, and moral ruin. In and around Germany the deepest hatreds and the most tragic sorrows of our civilization had concentrated. Germany was potentially an open target for nihilism, for the revival of nazism, for communism. There was danger that 67,000,000 people in the strategic center of Europe might be harnessed to forces seeking the destruction of free government throughout the world.

In 1945 the Western Allies hoped that the Soviet Union would join them in the task of reconstruction of Germany on democratic foundations. It soon became apparent that the Soviets were seeking the complete domination of Germany on a totalitarian basis. With these Soviet intentions in mind, the Western Powers decided that at least in their zones of occupation and in the Western Sector of Berlin they would attempt to help the German people construct a democratic, peaceful society. This has been done.

Obviously, the Federal Republic is not yet a full-fledged democracy. It is only 3 years old. There are still clear traces of Nazi evils in Germany. There are men and women in the business and professional life of Germany who were once active Nazis. In one or two localities in the Federal Republic 10 percent of the people have voted for neo-Nazi platforms and leaders. There is also a Communist threat in Germany, though the Communist vote as such is less than 5 percent of the total vote and the party in the Federal Republic is one of the weakest in Europe. As long as such extremist groups exist, as long as certain traditionalist forces try to bar progress, there is danger, and danger should not be minimized.

The compelling fact, however, in the Federal Republic is that a great majority of the German people solidly support the parliamentary system of government and that democratic institutions and thought are growing in all parts of Germany. Moreover, as German integration with the West develops and a closer association with the free peoples of the West comes about, the extremist groups will lose much, if not all, of the minority following they now have.

[13] Made before the Senate Foreign Relations Committee on June 12 and released to the press on the same date. Mr. McCloy returned to Washington on June 3 for the purpose of testifying before congressional committees considering the German Agreements, the EDC Treaty, and the North Atlantic Treaty protocol.

## Promising Developments in Germany

Politically, a stable constitutional form of government is developing in the Federal Republic. From the local, county, and state up to the national level, firmly established representative governing bodies are in control. The German Bundestag, a freely elected parliament, carries on its business in freedom, without fear or suppression. Its debates are generally on a high level. The Bundestag has many achievements: It has passed the Schuman Plan and it has developed a whole system of progressive social legislation. Although, unfortunately, the Social Democrats, who are in opposition to the Government of Chancellor Adenauer, oppose many policies that advance the cause of peace and European integration, one must recognize that this party is firmly anti-Communist and pro-democratic.

Economically, the advances made by the Federal Republic are amazing. Stimulated by the aid of the United States the industrious German people have made large advances in repairing the devastation of war. The great cities of Western Germany, such as Frankfort, Stuttgart, Munich, Hamburg, and Düsseldorf, are being rebuilt. Production in the Federal Republic is over 140 percent of 1936. Exports are now beyond $4,000,000,000 a year and the dollar gap has been closing. While Germany, like other European countries, will certainly require some economic aid in order to make its full contribution to defense, economic aid has been on a diminishing scale as recovery proceeds.

In the day to day life of the nation there are promising developments. Citizens of all ages and groups are participating increasingly in community and national activities.

The youth of the Federal Republic are showing healthy attitudes. They are not eager to parade about in brown, red, or blue shirts. They do not want to march or to be in uniform any more than young Americans. I am certain, however, that in defense of their own freedom young Germans will perform their duty well and, if their present mood holds, they will do so without the fanfare and the slogans of the past.

German youth is patriotic, but not nationalistic. A large number of young Germans is European-minded. Those young people are seeking the wider horizons of the European–Atlantic community and they must not be disappointed in their search.

The women of Germany are playing a larger role than ever before. Women comprise more than half of the German electorate and among them are some of the bravest spirits in Germany. Women are forming many organizations and groups. They are speaking up on local and national issues. They serve as valuable members of city councils and state legislatures. Thirty-seven women sit in the German Parliament.

One thousand newspapers and the decentralized radio stations of the Federal Republic are free and speak out freely and actively on all issues. The Association of German Trade Unions, with more than 5,000,000 members, is in democratic hands.

These developments in German life do not appear to be sufficiently dramatic for headlines but they are responsible for the fact that after vigorous debate on all issues, after the political crises and controversies which are at least as natural in Germany as they are in this country, the Federal Republic has been taking the steps that associate it with the free peoples of the European–Atlantic community.

## Soviet Campaign of Terror and Conquest

There is one massive threat to this peaceful, progressive development in Germany. It comes from the Kremlin. The Communists are now engaged in a mighty campaign to prevent German ratification of the agreements and German participation in the growing European community.

The Communists are alternating blandishments of peace with threats of war to achieve their aims in Germany. Soviet propaganda uses all techniques and weapons. Soviet-controlled radio stations pour out threats and promises 24 hours each day. Soviet-controlled presses turn out millions of copies of newspapers, pamphlets, and books aimed at the German people. Communist films with poisonous propaganda aimed chiefly at the United States are widely distributed. You should see some of them to appreciate their violence. Messages from the Kremlin, maneuvers of the Soviet Army, youth demonstrations, street riots, proclamations of the Communist puppet government of East Germany are all tied into this mighty effort.

Few men and women who have not lived or worked in Germany nor maintained close contact with German developments can have any concept of the strength of Communist propaganda directed toward Germany or of the organization and infiltration tactics of the Communists. Only those who have to contend with it every day, repel it, and take the offensive against it can fully comprehend the imagination, energy, and the determination which go into this Soviet psychological campaign against the Federal Republic and the United States.

The Soviet propaganda campaign against the Federal Republic is not the only Communist threat and warning to the Germans and to the other free peoples. There are other moves in the Soviet plan of domination. In West Berlin the Soviets are re-commencing their harassing tactics; in the East zone of Germany the Soviets are building up the so-called "Volkspolizei—" People's Police—and the "Bereitschaften—" shock troops. This entire campaign of terror and conquest is directed against the 50,000,000 people of West

Germany and West Berlin. It is inconceivable that the free Germans could withstand the impact of these blows if the Western nations did not stand at their side.

What I have said will make clear, I hope, why agreements with the Federal Republic are necessary. First, the people of Western Germany have shown their maturity and earned their right to the freedom which the new agreements provide. Secondly, the agreements strengthen the movement towards the integration of the European–Atlantic community. Thirdly, it is both impossible and undesirable to try to keep Germany under occupation. Occupied peoples cannot be free peoples. Occupied peoples do not make lasting partners. In the interest of democracy, in the interest of European integration, in the interest of building up the defensive strength of the free world, these agreements are vital.

There is another reason for these agreements. It is unthinkable that the German people, a vigorous, active people, can remain neutral between the Communist-dominated world and the free world. They are not the type of people who stand aside. Moreover, postwar history has taught us that the Communists take over states which cannot protect themselves. The idea of a neutral, unarmed Germany is appealing but it bears no relationship to reality. Such a Germany would inevitably fall under Soviet control. Its resources and manpower would be geared to the Communist machine directed against the free peoples.

The leaders of the Federal Republic and a majority of the German people know that such neutrality would be a phantom and that it would quickly lead to slavery.

The negotiations which were carried on in Bonn and in Paris took full cognizance of all these factors and forces. The negotiations were successful because all parties to the conventions recognized the urgent need for agreement.

In Bonn, I was the responsible U.S. representative at the negotiations. I am happy to state that on all sides, British, French, and German, the negotiations were carried on in a friendly, though serious manner. We had to liquidate a tragic venture and solve many complex problems. Yet we were all determined to avoid the aftermath of previous peace conferences when the victor set forth the terms and the vanquished signed. Certain programs and policies started by the Western Powers after the war were recognized by the Germans as necessary to the development of a progressive German community. Provision had to be made for them as well as for the continued stationing of large non-German forces in the Federal Republic.

There were crises, there were long hours of debate over important political, financial, and defense problems. There were compromises. All in all, however, the nations at the conference table had a great vision before them—the vision of a united, strong, freedom-loving, and freedom-defending European and Atlantic community. The agreements signed at Bonn, and at Paris, were born of reason and hope. They were not dictated by revenge or resentment. Throughout our meetings the sustained statesmanship and determination of the German Chancellor were great contributions to the success of the negotiations.

The President has already submitted for the consideration of the Senate a copy of the Convention on Relations between the United States, Great Britain, France, and the Federal Republic of Germany, with an annex containing the Charter of the Arbitration Tribunal. Other documents signed at Bonn which are in the nature of implementing or administrative agreements have been transmitted for your information. Also you have summaries of all documents.

*Convention on Relations Between the Three Powers and the Federal Republic of Germany*

I shall now cover briefly the most important points in the Convention on Relations between the Three Powers and the Federal Republic and the main provisions of the Charter of the Arbitration Tribunal.

This convention is the political agreement establishing the basic principles which will govern the new relationships with the Federal Republic. It grants the Federal Republic widest authority over its internal and external affairs; it defines the rights retained by the Three Powers; it sets forth the objectives of a common policy for all. The granting of freedom to the Federal Republic is achieved in the following way:

The Occupation Statute is repealed;
The Allied High Commission and the Land Commissions are abolished;
Henceforth the Three Powers will conduct their relations with the Federal Republic through ambassadors;
The foreign armed forces stationed in the Federal territory are no longer occupation forces, their sole mission now being to secure the defense of the free world;
The Federal Republic, released from all control, will thus be able, on its own responsibility, to develop its democratic and federal institutions within the framework of its basic law.

The rights retained by the Allies derive from the fact that Germany is divided and that it is impossible, in the current international situation, to conclude a peace treaty. The rights retained by the Three Powers relate to (1) the stationing of armed forces in Germany and the protection of their security; (2) Berlin; and (3) questions relating to Germany as a whole, including the problems of unification and the peace settlement.

The convention places obligations on each party to preserve these rights. Thus, while the Federal Republic must abstain from any action prejudicing these rights and agrees to facilitate their exercise by the Three Powers, the latter, in return, undertake to consult the Federal Republic in respect of their implementation.

Likewise, although the Three Powers have the power, in certain circumstances endangering the security of the forces, to declare a state of emergency over all or part of the Federal territory, they can do so only if the Federal Republic and Epc are unable to meet the emergency. In such circumstances they will utilize to the greatest possible extent the assistance of the Federal Government and the other German authorities. Furthermore, the measures they may take during this exceptional period are restricted to the minimum necessary to restore the situation.

As regards Berlin, the Federal Republic promises to furnish its utmost cooperation for the political, cultural, economic, and financial reconstruction of the city.

The convention clarifies the new status of the Federal Republic and it outlines the framework of a common policy. The immediate objective is to integrate the Federal Republic, on the basis of equality, in the European community now being shaped, which is itself a part of the community of free nations. This is why the Federal Republic agrees to conduct its affairs in conformity with the principles stated in the Charter of the United Nations and with the objectives defined by the Statute of the Council of Europe; asserts its intention to become a member of the international organizations of the free world; and freely undertakes to participate in the European Defense Community.

A second objective is the reunification by peaceful means of a free Germany. Thus, the four signatory states are resolved that the peace settlement for the whole of Germany shall be freely negotiated by all the parties; they also agree that they will extend to a unified Germany the rights conferred on the Federal Republic by the new agreements and treaties contributing to the creation of an integrated European community upon the assumption by such a unified Germany of the obligations of the Federal Republic under those agreements and treaties.

The Convention on Relations contains an important revision clause which also applies to all the related conventions. Under this clause, the terms of the conventions shall be reviewed at the request of one of the four states in the event of German unification, the creation of a European federation or any other occurrence which the four states jointly recognize to be of fundamental significance. The parties will then open negotiations with a view to modifying the conventions to the extent necessary to take into account the changes that have occurred in the situation.

*Summary of the Charter of the Arbitration Tribunal*

The Convention on Relations creates an arbitration tribunal which is particularly characteristic of the new contractual relationship between Germany and the Allies. The composition and machinery of the Tribunal are set out in a charter annexed to the convention. The Tribunal is designed to secure and maintain actual equality of treatment between the Three Allied Powers and the Federal Republic. The Tribunal will be composed of nine members, three from the Federal Republic, one each from the United States, the United Kingdom, and France, and three other "neutral members" appointed by agreement between the Three Powers and the Federal Republic.

The Tribunal has jurisdiction over all disputes arising between the Allies and the Germans over application of the contractual agreements which the parties have been unable to settle by negotiation. The only disputes excluded are those connected with the special Allied rights regarding Berlin, all-German matters, and the stationing and security of Allied troops in Germany. The powers of the Tribunal are extensive and its judgments are final.

In general, the subsidiary conventions are detailed agreements which carry out the termination of the Occupation which is the basic purpose of the general convention. We are adopting the precedent set in the Japanese treaty whereby the administrative agreements are treated as executive agreements.

*Convention on the Settlement of Matters Arising Out of the War and Occupation*

This convention is concerned with the liquidation in an orderly fashion of the Occupation. Much of this convention will cease to have meaning when the Germans fulfill certain obligations which they take under it. It governs the status of Allied legislation in relation to German law. It provides for the carrying out of certain Allied policies as yet uncompleted, and the temporary availability of property for ambassadorial use under the new status.

*Convention on the Rights and Obligations of Foreign Forces and Their Members in the Federal Republic of Germany*

These arrangements include matters of jurisdiction, capacity of the forces to enforce their own discipline, administration, and support—their freedom from taxation and their cooperation with German authorities in the matter of customs laws and regulations.

*Financial Convention*

This agreement, in the main, implements the decision of Germany to make a financial contribu-

tion to the defense of Europe in accordance with the informal determination of the so-called three wise men as to her capacity. It also specifies those facilities and services which are to be given the forces free of charge in Germany, and the basis for payment of others. It regulates the matter and method of fixing and paying damages, public and private, for the future.

The Bonn agreements, the Schuman Plan, the European Defense Treaty are parts of a whole. Together they can comprise one of the greatest achievements in modern statesmanship. A few years ago it would have seemed fantastic to believe that the steel and coal industries of France, Germany, and of the other Western European countries would come under one authority. The idea of a common European defense force was remote; partnership between France and Germany unthinkable. Though barriers are still in the way, despite the crises that are bound to arise, the great start has been made.

In a year or so the young people of Western Europe—French, Germans, Belgians, Netherlanders, Italians, and others—will be trained according to the same standards; they will be commanded by officers going through the same schools; they may be wearing the same uniform and marching under the same banner. Political institutions on a European-wide basis must necessarily follow.

Here is a vista for Europe, for the Atlantic community, and the world. The submersion of inter-European rivalries, the lowering of European barriers is of deep significance. It will put the free peoples of the West in a better position to take care of their own needs and make them stronger in the defense of their own freedom. As Europe grows stronger in the defense of freedom, we shall all grow stronger. And though our partnership must become tighter, Europe's need for our resources will gradually diminish.

Such are the great goals. The German statesmen, as well as the others sitting around the Bonn and Paris tables, were convinced of the need to reach out for these objectives. There was no attempt by the Western Allies to purchase German support and no such attempt would have been successful. The decision of the Germans to enter the community was a decision based on their own political philosophy and on their own estimate of Germany's best interests.

Moreover, and it is most essential to emphasize this fact, the agreements signed at Bonn and Paris are not a threat to anybody. They are completely defensive in character. They are deliberately designed to assure that no nation can leave the community to start an aggressive adventure of its own. It would not have the supplies, the equipment, or the support system to make such an attempt. Nor is the organization as a whole capable of aggressive action. By their nature the agreements signed at Bonn and Paris are peaceful, but they are de-

signed to guarantee that totalitarian aggressors will not be able to overrun and dominate the free peoples of Europe and of the Western World. These agreements are provocative only in the sense that it is provoking to close the door in front of an intruder. Once established, the new European community, in association with the Atlantic community, would be in firm position to approach a long-range settlement of our difficulties with the Russians.

The question now arises whether or not the German Bundestag will ratify the agreements. A great ratification debate has been going on in the Federal Republic for some time. This debate is being carried on in the shadow of Soviet threats. It is affected by the understandable desire of the German people for unification of their country and the fear of taking steps that would make the present split of the country permanent.

The Adenauer Cabinet has recommended ratification. The center parties that form the coalition government are in favor of ratification, though not all members of the coalition are pleased with all provisions of all the agreements. The major opposition comes from the strong Social Democratic party which is using every device to try to defeat ratification and in its opposition frequently finds itself alined with the Communist and Neo-Nazi fringe parties which are also opposed to the agreements.

The Chancellor, I am advised, is seeking ratification this summer. The decision will be made by a free Bundestag which in turn will be affected by a free German public opinion. It is my belief that unless some unforeseen development occurs the Bundestag will ratify the agreements. They cannot come into effect, however, until they have been ratified by all countries involved in the Bonn agreements and in the European Defense Community. I hope that such ratification will take place by autumn. It is obvious that the Soviet will take advantage of any delays in this country or in Germany and France to try to prevent ratification. For that reason speed is important.

With ratification we shall no longer be in occupation in Germany. All troops stationed in the Federal Republic will be defense troops. The French, British, Americans, Belgians, Germans and others will be partners in the common defense. This will require considerable readjustment in methods and attitudes, but such a development is already under way.

How soon German contingents in the European army can be formed depends on the speed of ratification. Should ratification by all countries concerned take place by November it is likely that the first German contingents will be in uniform in 1953.

**Final Questions**

Final questions arise in connection with the agreements. Will the Germans be reliable? Will

they carry out these conventions? Can they be trusted?

First, some question has developed over the attitude of the Social Democratic opposition toward the agreements. There is, as I have said, strong opposition from certain quarters to the agreements. There is reason to believe, however, that even if the Socialists were to come into power as a result of the elections in the summer of 1953, they would not repudiate agreements entered into by a freely elected government and approved by a freely elected parliament. In my judgment there are too many true democrats in the Socialist party to support such a position. The Neo-Nazis would have no hesitation in trying to tear up agreements but not the Social Democrats. I have no doubt that the Socialists would attempt revision, but I should doubt that they would try repudiation.

Second, there is the question of the general trustworthiness of the German people and their leaders. Inside Germany the basic attachment to the democratic order, the recognition that Germany's fate is tied to that of the free peoples, the fear of Communist domination of Western Germany combine to give a positive answer to the question. In my opinion the Germans will be trustworthy if they attain equal partnership within the European–Atlantic community, if the other nations take all possible peaceful measures to bring about the unification of Germany on a basis of freedom. I believe the Germans will be prepared to share the burdens as well as to accept the rewards of partnership.

Seen in perspective these agreements are historic. They incorporate the fundamental aspirations of mankind—to live in unity, peace, and freedom. The rival nations of Europe are giving up some of their sovereignty in order to achieve union. They have drawn up the conventions which will enable them to sit together, work together, defend together, live together.

The United States can take pride in the role it has played in recent years to help bring together the peoples of Europe. Our contributions and our participation have been crucial. In our own interests we must continue, I believe, to be associated in this great joint endeavor.

The agreements at Bonn and Paris were a major defeat for the Communists. They are a victory for the free people of Europe and those who want to be free.

## Reparations Clause of German Contractual Agreements

*[Released to the press June 11]*

The United States and the United Kingdom Governments declare that they have not asserted, and do not intend to assert, any claim for reparations out of current production. They have consistently opposed and intend to oppose the exaction of such reparations by any other power.

The French Government takes note of the situation of fact and therefore associates itself with article 1 of chapter VI of the Convention on Settlement of Matters Arising Out of Foreign Occupation.[1]

## Missions Raised to Embassy Rank

### *Vietnam*

The Governments of the United States and of Vietnam announced June 6 the establishment of a Vietnamese Embassy at Washington and the elevation of the American Legation at Saïgon to the rank of Embassy. This diplomatic development, designed to strengthen the ties between the young state of Vietnam and the United States, will become effective as soon as the Vietnamese Ambassador Designate, Tran Van Kha, has presented his credentials to the President of the United States, and the American Ambassador Designate, Donald R. Heath, currently American Minister to the Associated States, has received confirmation of his new appointment by the U.S. Senate.

Thus, further formal recognition is given to the progress achieved in the past 3 years during which Vietnam has taken its place among the independent nations of the free world. A member of the French Union, of which Cambodia and Laos, the other two Associated States, are also a part, Vietnam has assumed its full responsibilities as an active participant in the struggle to maintain freedom against Communist aggression.

———

### *Cambodia*

On the same date the Governments of the United States and of Cambodia announced officially the elevation to Embassy status of their respective diplomatic missions at Washington and Phnom Penh. This diplomatic development symbolizes the strengthening of the ties between the two Governments and will become effective as soon as the Cambodian Ambassador Designate, Nong Kimny, has presented his credentials as Ambassador to the President of the United States and as soon as the American Ambassador Designate, Mr. Heath, has had his nomination confirmed by the U.S. Senate. A member of the French Union, Cambodia is a constitutional monarchy under the young and progressive King Norodom Sihanouk.

---

[1] For text of chapter VI of the convention, see Senate Executives Q and R, 82d Cong., 2d sess., p. 59. For a summary of this chapter, see BULLETIN of June 9, 1952, p. 890.

# Who Are Our New Immigrants?

*by Frank L. Auerbach* [1]

You have asked me to discuss with you the topic: "Who Are Our New Immigrants?" This is a particularly pertinent problem for the National Council on Naturalization and Citizenship and the council's member organizations. Since you all are concerned with the integration of the immigrant into the American community, it is, of course, essential for you to have the very best understanding of who the immigrants are you want to help, not only as individuals but as a group, and where your services will most be needed.

I should like to examine with you today two questions which have an important bearing on the broad subject "Who Are Our New Immigrants?" I should like to examine whether we can anticipate from which countries our immigrants are likely to come in the near future, and further, whether the regional distribution of our immigrants in the United States has been influenced in the past and will be influenced in the future by the operation of our immigration laws.

Of course, it is impossible to predict with any degree of accuracy who our new immigrants will be. But we get some indication of our future immigration under the regular immigration laws if we examine data collected by the Visa Division of the Department of State on the number of persons who have registered for immigration under oversubscribed quotas with the various American consular offices abroad.

The most recent available compilation shows that on November 1, 1951, 773,465 aliens were registered with American consulates as intending immigrants under oversubscribed quotas. Of these 773,465 aliens, 13,760 are classified as qualified immigrants, that is aliens who had already been examined by American consular officers and were ready for visa issuance except for the availability of quota numbers. By far the largest number,

759,705, are listed as unqualified immigrants, that is, they have not been examined yet by American consular officers but have signified their interest in coming to this country as immigrants by submitting registration forms.

## Quota Nationalities

Let us examine these intending immigrants by their quota nationality, that is the quota to which they are chargeable under existing laws. By far the largest group of these prospective immigrants, 262,680, are chargeable to the German quota. The next largest group, 138,125, are chargeable to the Polish quota; 36,866 to the quota of the Netherlands; 29,692 to the quota of Rumania; 28,999 to the quota of Yugoslavia; 24,201 to the quota of Italy; and 22,352 to the quota of Austria. Aliens registered on other quota waiting lists are all below the 20,000 mark for each quota nationality.

These figures must be evaluated with care. Many of those registered, it must be expected, will never come to this country; some may have registered on a sudden impulse and may have long since given up their plan to come to this country; others may be discouraged by long waiting periods; and still others may not be able to meet the requirements of our immigration laws. In evaluating the significance of these quota waiting lists in relation to our future immigration, we must, of course, also take into account the annual quotas established for these various countries. Even if all the 262,680 aliens registered for immigration to the United States under the German quota would wait until their turn is reached and if they all could meet the requirements of our immigration laws, it would take much more than 10 years for them to come to this country. The German quota is 25,957 annually. Portions of the annual quota will be absorbed by immigrants with first and second preference-quota status. Immigration from other countries will be curtailed for years to come by the so-called "mortgaging" of these quotas under the Displaced Persons Act of

---

[1] Excerpts from an address made before the National Council of Naturalization and Citizenship, National Council of Social Work, at Chicago, Ill., on May 27 and released to the press on the same date. Mr. Auerbach is a foreign affairs officer in the Visa Division.

1948, as amended. If you take, for example, Poland with an annual quota of 6,524, you have to realize that through the admission of displaced persons 25 percent of this quota is already used until the fiscal year of 1954, and 50 percent of it is used from the year 1954 to the year 2,000.

## Volume of Future Immigration

The extent to which the volume of future immigration will be affected by the admission of displaced persons is shown by the following data which list the annual quota of each country and the fiscal year through which annual quotas have in part been absorbed—25 percent through 1954 and 50 percent through the year as indicated—by visas issued to displaced persons:

| Country | Annual Quota | Year |
|---|---|---|
| Albania | 100 | 1956 |
| Austria | 1,413 | 1955 |
| Bulgaria | 100 | 1963 |
| China | 100 | 1964 |
| Czechoslovakia | 2,874 | 1958 |
| Danzig | 100 | 1962 |
| Estonia | 116 | 2146 |
| Germany | 25,957 | 1953 |
| Greece | 310 | 2013 |
| Hungary | 869 | 1989 |
| Iran | 100 | 1956 |
| Latvia | 236 | 2274 |
| Lithuania | 386 | 2090 |
| Poland | 6,524 | 2000 |
| Rumania | 291 | 2019 |
| Trieste | 100 | 1958 |
| Turkey | 226 | 1964 |
| U.S.S.R. | 2,798 | 1980 |
| Yugoslavia | 938 | 2114 |

The significance of the data which I have given you, however, is not to predict the waiting period for immigrants under any given quota, but rather to show under which quotas we have heavy registrations and thus can anticipate a full use of these quotas for years to come.

You have to consider another aspect and that is that immigrants chargeable to open quotas do not appear on the State Department's list of aliens registered as intending immigrants under oversubscribed quotas. The immigration from some of these countries is not negligible. From Great Britain—with an annual quota of 65,721–131,592 aliens have entered the United States as immigrants during the last 10 years; and from Ireland— with an annual quota of 17,853—25,377 have come during the same period. From the nonquota countries of the Western Hemisphere, some 300,000 immigrants have come between 1941 and 1950. In other words, we see that we may anticipate a continued pressure on our quotas from the countries of central and southern Europe, a moderate immigration from countries with open quotas, and a significant number of immigrants coming as nonquota immigrants from the Americas.

## Regional Concentration of Immigrants

Many studies have been made on the cultural and ethnic background of immigrants who have come to the United States, their occupations, age, and sex composition, and their place of settlement. Little, if any, attention has been given, however, to the question of the extent to which the operation of the existing immigration laws is responsible for the concentration of our immigrants in a very few States of this country. New York, California, Texas, Michigan, New Jersey, and Massachusetts have always been the States with the largest alien population. According to data prepared by the Immigration and Naturalization Service, of the 2,260,984 aliens who submitted annual address reports in January 1951, 24 percent lived in New York State, 14 percent in California, 7 percent in Texas, 6 percent in Massachusetts, and 5 percent in New Jersey and Michigan. All other States had a registered alien population of one percent or less with the exception of Illinois, Ohio, Pennsylvania, Florida, Arizona, and Washington, which had between one and five percent aliens. Mr. Mackey, the Commissioner of Immigration and Naturalization, told you at your recent annual meeting at New York that of recently naturalized aliens three-fifths lived in just four States: New York, Massachusetts, Michigan, and California. Fifty-nine percent resided in large cities of 100,000 inhabitants or more. Twenty-seven percent resided in urban areas with populations of 25,000 to 100,000.

Let me now examine whether this continued regional concentration of our immigrants is at least in part due to the operations of our immigration laws. There are three important provisions in our immigration laws which, I believe, tend to perpetuate the geographical trend of our immigrant settlement.

## Pertinent Provisions of Immigration Laws

The first important provision, a very sound and commendable one which, however, encourages the geographical concentration of immigrants, is based on the principle of reuniting families. This principle has found its expression particularly in those provisions of our immigration laws which give nonquota status to children and wives of American citizens and to husbands of American citizens, by marriage, before January 1, 1948, and preference-quota status to parents of American citizens, husbands of American citizens, by marriage, since January 1, 1948, and to children and wives of permanent resident aliens. We must realize that if a sufficiently large demand exists from these preference-quota categories, the entire quota of a country may be absorbed by these preference groups. The only group of immigrants which enjoys a quota preference without

belonging to the relative groups are skilled agriculturists in quotas of over three hundred; but as you know, there has been in recent years little demand for preference status by qualified agriculturists.

Thus, we see that, particularly in countries with small quotas, the entire quota in a given year may consist of fireside relatives of American citizens and permanent resident aliens. It is not surprising that these immigrants will move in with their families in this country and so further increase the urban trend in immigration settlement.

There are two other important provisions in our immigration laws which, I believe, tend to concentrate new immigrants in the areas of existing settlements of foreign-born. First of all, our immigration laws require an immigrant to prove that he is not likely to become a public charge. In most cases, aliens prove this by submitting affidavits of support with which you all are very much familiar. American consular officers normally will accept such affidavits of support as evidence only if the affiant can show that he has some legal or convincing moral obligation to support the prospective immigrant. Thus, this affiant will usually be a relative or a very close friend. Again, it is likely that the new immigrant, once he comes to this country, will move in with his affiant, or at least will move into the same community in which his affiant lives since he expects, as a rule, help from the affiant in making a start in this country.

The contract-labor clause of our immigration laws is the third provision which, in my opinion, at least indirectly, prevents a wider geographical distribution of our new immigrants. As you know, this law, with some exceptions, makes an alien inadmissible if a job involving predominantly manual labor is promised to him in this country. Thus, employment opportunities in this country which may exist away from the traditional areas of immigrant settlement, under existing law, cannot be offered to our new immigrants before their arrival and first settlement in this country.

**Departures From General Trend**

Due to special legislation, two significant departures from this general trend which I just described have taken place in recent years. The first is the wartime legislation facilitating the immigration of war brides of American soldiers. This group of new immigrants, who are now rapidly becoming our new citizens, has spread throughout the country more widely than any other group of immigrants in recent years. This obviously is due to the fact that our soldiers who married abroad have come from all parts of the country and thus took their brides back home to practically all the States of the Union.

The other important departure from the traditional trend of immigrant settlement is the settlement of displaced persons who have come under the Displaced Persons Act of 1948, as amended. Although no final statistics are available at this time, preliminary data indicate that these immigrants spread more widely throughout the country than other immigrants who have come under our regular immigration laws. You will remember that in the case of these displaced persons, the three provisions of our law which I believe are at least in part responsible for the continued pattern of our immigrant settlement, as a rule, did not apply. They were not only exempt from the contract-labor law but they were required to have assurances of employment, housing, and against becoming a public charge. These assurances took the place of the affidavit of support, so that the sponsors of these displaced persons, in most instances, were prospective employers, and not necessarily relatives or close friends. And finally the admission of these displaced persons was not predicated on nonquota or preference-quota status on the basis of relationship.

What can we learn from this experience for the future? Immigration under existing law, I believe, will continue to follow the same pattern, geographically speaking, as past immigration has followed. Should, however, any of the now pending omnibus immigration bills be enacted, we may see a significant change in this pattern, a change which potentially could be of great importance to your future work.

All omnibus immigration bills introduced in Congress during the second session of the Eighty-second Congress, contain identical provisions which would give a preference of 50 percent of each quota "to qualified quota immigrants whose services are determined by the Attorney General to be needed urgently in the United States because of the high education, technical training, specialized experience, or exceptional ability of such immigrants and to be substantially beneficial prospectively to the national economy, cultural interests, or welfare of the United States," and to the spouses and children of these skilled aliens. As I said before, this provision is identically provided in the House-passed Walter Omnibus Bill, H. R. 5678; the McCarran Bill, S. 2550; and in the so-called Humphrey-Lehman Bill, S. 2842. Aliens qualified for these preferences will be attracted to come to this country by employment, not by relationship. Their skills may be needed in any part of our country whether there may or may not be a large foreign-born population. Whatever is left in the omnibus bills of the contract-labor law, and very little is left of it, does not apply to these skilled aliens who are entitled to a 50 percent quota preference. This provision of the omnibus bills will open the doors of our country to new seed immigrants, persons who do not come attracted by family ties but come on the merit of their skills and their usefulness to

our country. Questions have been raised during the consideration of the omnibus bills whether they would be prohibitive of new seed immigration. I believe these fears were not only unfounded but it seems that the proposed legislation would permit much more new seed immigration than our immigration laws do now.

I have no doubt that sooner or later a provision providing for this so-called selective immigration of aliens needed in this country will become law. Such legislation, it appears, will bring immigrants to many communities which never have had experience with newcomers and which are thus not prepared to assist them with the manifold problems of integration and adjustment. The organizations you represent which have accumulated years of valuable experience in this field of immigrant adjustment will then be called upon either to expand their activities or to share their experience with family service and other community organizations throughout the country.

I am particularly glad that I have had the privilege to lay this problem before you today, a problem which, I know, will challenge the imagination of all of us and which you will tackle as successfully as you have tackled similar problems in the past.

## Japanese Ambassador Araki Presents Letter of Credence

[*Released to the press June 12*]

*Text of Ambassador's Remarks*

Mr. PRESIDENT: I have the honor to present to you the Letter of Credence which accredits me as the Ambassador Extraordinary and Plenipotentiary of Japan to the Government of the United States of America.

I feel great responsibility for my appointment as the first Japanese Ambassador to the United States since her restoration of sovereignty and independence, and regaining of an honorable place among the family of nations. I take it as a great honor and privilege to represent Japan in a country which proved, with untiring efforts and farsighted leadership, to be the prime mover of events that had brought this status to my country.

On this occasion I wish to assure you, Mr. President, that I shall do my utmost to create ever deeper and friendlier relations between our two countries in full cooperation with the United States which is not only a leading country among those having the common causes of peace, justice, and freedom, but happens to be Japan's neighbor facing the same ocean.

In concluding may I avail myself of this opportunity, on behalf of the Emperor of Japan, the Government of Japan, and the people of Japan, to extend to you, Mr. President, their sincere wishes for your well-being and for the continued happiness and prosperity of the Government and the people of the United States of America.

*Text of the President's Reply*

Mr. AMBASSADOR: I am happy to accept your Letter of Credence as Ambassador Extraordinary and Plenipotentiary of Japan to the United States.

The coming into force of the Treaty of Peace has brought to our two countries the opportunity to re-establish and to strengthen the close and friendly relationships of neighbor peoples. I welcome Japan's resumption of an honorable place among the family of nations and am glad of the part which the United States has been able to play in bringing this about.

Just as our causes are common—peace, justice, freedom—so must be the endeavor to achieve their fulfillment. On the basis of common purpose and the principles of democracy to which our two countries adhere, we can proceed to solve the problems which confront us.

Japan re-enters the family of nations at a time when aggression and the threat of aggression prevail. I am confident that Japan and the United States, in concert with the other nations of the free world, will be able to meet these dangers with courage, determination, and understanding.

I would appreciate it if you would extend to the Emperor my cordial wishes for his continued well-being, and to the Government and people of Japan my sincere desire for their progressive happiness and prosperity.

## Letters of Credence

*Brazil*

The newly appointed Ambassador of Brazil, Walther Moreira Salles, presented his credentials to the President on June 12. For the text of the Ambassador's remarks and for the text of the President's reply, see Department of State press release 460 of June 12.

*Thailand*

The newly appointed Ambassador of Thailand, Phot Sarasin, presented his credentials to the President on June 12. For the text of the Ambassador's remarks and for the text of the President's reply, see Department of State press release 459 of June 12.

## U. S. Recognizes New Bolivian Government

[*Released to the press June 2*]

The U.S. Chargé d'Affaires, Thomas J. Maleady, at La Paz on June 2 informed the Foreign Minister of Bolivia, Walter Guevara Arce, of the recognition by the U.S. Government of the new Government in Bolivia.

## Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments

*Following is the text of a letter addressed to Act-
ing Attorney General Philip B. Perlman by
the Department's Acting Legal Adviser, Jack B.
Tate:*

MAY 19, 1952.

MY DEAR MR. ATTORNEY GENERAL:

The Department of State has for some time
had under consideration the question whether the
practice of the Government in granting immunity
from suit to foreign governments made parties
defendant in the courts of the United States with-
out their consent should not be changed. The De-
partment has now reached the conclusion that such
immunity should no longer be granted in certain
types of cases. In view of the obvious interest of
your Department in this matter I should like to
point out briefly some of the facts which influenced
the Department's decision.

A study of the law of sovereign immunity re-
veals the existence of two conflicting concepts of
sovereign immunity, each widely held and firmly
established. According to the classical or absolute
theory of sovereign immunity, a sovereign cannot,
without his consent, be made a respondent in the
courts of another sovereign. According to the
newer or restrictive theory of sovereign immunity,
the immunity of the sovereign is recognized with
regard to sovereign or public acts (*jure imperii*)
of a state, but not with respect to private acts
(*jure gestionis*). There is agreement by propo-
nents of both theories, supported by practice, that
sovereign immunity should not be claimed or
granted in actions with respect to real property
(diplomatic and perhaps consular property ex-
cepted) or with respect to the disposition of the
property of a deceased person even though a for-
eign sovereign is the beneficiary.

The classical or virtually absolute theory of sov-
ereign immunity has generally been followed by
the courts of the United States, the British Com-
monwealth, Czechoslovakia, Estonia, and probably
Poland.

The decisions of the courts of Brazil, Chile,
China, Hungary, Japan, Luxembourg, Norway,
and Portugal may be deemed to support the clas-
sical theory of immunity if one or at most two
old decisions anterior to the development of the
restrictive theory may be considered sufficient on
which to base a conclusion.

The position of the Netherlands, Sweden, and
Argentina is less clear since although immunity
has been granted in recent cases coming before the
courts of those countries, the facts were such that
immunity would have been granted under either
the absolute or restrictive theory. However, con-
stant references by the courts of these three coun-
tries to the distinction between public and private
acts of the state, even though the distinction was
not involved in the result of the case, may indicate
an intention to leave the way open for a possible
application of the restrictive theory of immunity
if and when the occasion presents itself.

A trend to the restrictive theory is already evi-
dent in the Netherlands where the lower courts
have started to apply that theory following a
Supreme Court decision to the effect that immunity
would have been applicable in the case under con-
sideration under either theory.

The German courts, after a period of hesitation
at the end of the nineteenth century have held to
the classical theory, but it should be noted that the
refusal of the Supreme Court in 1921 to yield to
pressure by the lower courts for the newer theory
was based on the view that that theory had not
yet developed sufficiently to justify a change. In
view of the growth of the restrictive theory since
that time the German courts might take a differ-
ent view today.

The newer or restrictive theory of sovereign im-
munity has always been supported by the courts of
Belgium and Italy. It was adopted in turn by
the courts of Egypt and of Switzerland. In addi-
tion, the courts of France, Austria, and Greece,
which were traditionally supporters of the classi-
cal theory, reversed their position in the 20's to
embrace the restrictive theory. Rumania, Peru,
and possibly Denmark also appear to follow this
theory.

Furthermore, it should be observed that in most
of the countries still following the classical theory
there is a school of influential writers favoring

the restrictive theory and the views of writers, at least in civil law countries, are a major factor in the development of the law. Moreover, the leanings of the lower courts in civil law countries are more significant in shaping the law than they are in common law countries where the rule of precedent prevails and the trend in these lower courts is to the restrictive theory.

Of related interest to this question is the fact that ten of the thirteen countries which have been classified above as supporters of the classical theory have ratified the Brussels Convention of 1926 under which immunity for government owned merchant vessels is waived. In addition the United States, which is not a party to the Convention, some years ago announced and has since followed, a policy of not claiming immunity for its public owned or operated merchant vessels. Keeping in mind the importance played by cases involving public vessels in the field of sovereign immunity, it is thus noteworthy that these ten countries (Brazil, Chile, Estonia, Germany, Hungary, Netherlands, Norway, Poland, Portugal, Sweden) and the United States have already relinquished by treaty or in practice an important part of the immunity which they claim under the classical theory.

It is thus evident that with the possible exception of the United Kingdom little support has been found except on the part of the Soviet Union and its satellites for continued full acceptance of the absolute theory of sovereign immunity. There are evidences that British authorities are aware of its deficiencies and ready for a change. The reasons which obviously motivate state trading countries in adhering to the theory with perhaps increasing rigidity are most persuasive that the United States should change its policy. Furthermore, the granting of sovereign immunity to foreign governments in the courts of the United States is most inconsistent with the action of the Government of the United States in subjecting itself to suit in these same courts in both contract and tort and with its long established policy of not claiming immunity in foreign jurisdictions for its merchant vessels. Finally, the Department feels that the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts. For these reasons it will hereafter be the Department's policy to follow the restrictive theory of sovereign immunity in the consideration of re-

quests of foreign governments for a grant of sovereign immunity.

It is realized that a shift in policy by the executive cannot control the courts but it is felt that the courts are less likely to allow a plea of sovereign immunity where the executive has declined to do so. There have been indications that at least some Justices of the Supreme Court feel that in this matter courts should follow the branch of the Government charged with responsibility for the conduct of foreign relations.

In order that your Department, which is charged with representing the interests of the Government before the courts, may be adequately informed it will be the Department's practice to advise you of all requests by foreign governments for the grant of immunity from suit and of the Department's action thereon.

Sincerely yours,

For the Secretary of State:
JACK B. TATE
*Acting Legal Adviser*


# U.S., Mexico Extend Migrant Labor Agreement

*[Released to the press June 12]*

The United States and Mexico exchanged diplomatic notes on June 12 extending the Migrant Labor Agreement of August 11, 1951. The agreement, which was due to expire on June 30, 1952, has been extended for a period of time not beyond December 31, 1953, unless terminated sooner by not less than 30 days' notice in writing by either of the two countries.

The Migrant Labor Agreement of 1951 was negotiated pursuant to Public Law 78 of the Eighty-second Congress which authorized the Secretary of Labor to recruit agricultural workers from Mexico in order to assist in the harvesting of crops in the United States.

In extending the present agreement, certain important amendments and additions have been made which are consistent with the interests of both countries. (Copies of the Migrant Labor Agreement of 1951, as amended, are available in the Department of Labor press room.)

## Advancement of Good Will Throughout the World

*by Perle Mesta*
*Minister to Luxembourg* [1]

Luxembourg is just a small country; but it is an important country.

It is, for one thing, the seventh greatest steel-producing country in the world. In this industrial age, steel is always important. Today, in the free world's struggle to maintain its freedom, it is all-important.

A lot of people will tell you that Europeans do not like Americans. Don't you believe it. Some may not, of course, but the people—the great masses—do.

The ones that do not make a great deal of noise. We hear that noise. We are too apt to judge all Europe by it.

We can't, however, ignore these noisemakers. The unity of all the free peoples is, today, our only hope of preserving our freedom. That unity must be real and solid.

We can depend upon our friends. We must do something about the others.

The leaders of the Soviets take care of opposition very effectively. They liquidate it. They kill, torture the leaders. The lesser peoples are sent off to die in slave-labor camps. We can't do that. We would not if we could. Our way is to change un-friends into friends.

### Advertising U. S. to the Rest of the World

The first step, as I see it, is to find out why these people do not like us. Recently, I picked up a book which dealt with this problem. It was *Is Anybody Listening?* by William Whyte, Jr., one of the editors of *Fortune*. No doubt you have seen it.

Mr. Whyte devotes a chapter in his book to a discussion of why America is not popular with some Europeans.

He feels it is our fault. He says, for one thing, that we Americans have done a poor job of "selling" ourselves—advertising ourselves—to the rest of the world.

He says in his book that one day it might very well be written that the free world destroyed itself because of a myth. It would not be the Big Lie of the Russians; only fools believe that. It would be something more—the myth that for all our bathtubs and our cars and our skyscrapers, we were without moral purpose; that we are all money and no spirit; that we are, in short, a country without a soul.

I disagree with Mr. Whyte when he brushes off the Big Lie of the Russian Communists. That Big Lie is important. I'll come back to it later.

But he is very right when he speaks of this myth that we are a country without a soul. That myth exists. It does us much harm.

Mr. Whyte thinks—and again he is very right—that we have failed in making the moral basis of our national philosophy clear to the world.

He finds this inexcusable. We know better ourselves. But we have never bothered enough to make other peoples understand. We even paint ourselves very frequently as material-minded.

But that, you and I both know, isn't all of America.

Recently, I picked up another book. A travel book by an American writer. The author devoted two or three chapters to French plumbing and just two lines to Notre Dame Cathedral. And a line and a half of that was a lament over the lack of central heating in Notre Dame.

I know, of course, that hundreds of travel books do full justice to Notre Dame. Thousands and thousands have done justice to its beauty, its grandeur. I don't think for a moment that the writer, himself, failed to appreciate Notre Dame.

---

[1] Excerpts from an address made before the forty-eighth annual convention of the Advertising Federation of America at New York on June 8 and released to the press on the same date.

He had eyes; I assume a heart. No, it was just that he was sold on this picture of a material-minded America. He thought his fellow Americans would not understand how he felt. He assumed that his book would sell better on those chapters on plumbing.

Let us go back to that Big Lie of the Russian Communists. Mr. Whyte rather brushed it off. I can't. Some of their lies, yes. But the Russian Communists are very clever with their Big Lies. And it isn't just fools who swallow them.

The Communists, for example, make much of the charge that Americans are military-minded. That we are heading the world straight for World War III.

War is a living memory to the Europeans. Twice within the lifetime of many of them they have suffered the horrors of war. Their cities still bear the scars of World War I. They are just emerging from the rubble of World War II. They have known the shame and the terror of occupation. The Russian Communists rub in every tragic memory. They point to the military build-up in the United States. To our efforts to help other nations to arm.

We know it is for defense. The Europeans know, too, but they have their moments of doubt. They forget how rapidly in 1945 we demobilized our armies. Remember—"get the boys out of uniform"—"sell the war supplies"—"get back to peacetime production"!

All of us felt that way in 1945. And we did it. We know now we made a mistake. We were sincere in our determination to put war out of our minds. And we are still hoping and working for an everlasting peace.

Many Europeans understand exactly what we are doing. We must make the purpose of the defense program crystal clear. A recent Danish visitor writing for his magazine had this to say:

In America almost every uniformed person looks like a disguised civilian. Is there any better guarantee that the Americans do not threaten a troubled world with an aggressive war, than just this helplessness to convince you of their military vanity?

The same Dane felt we were remiss in not giving other peoples a better picture of our home life. He wrote:

And what was the question asked by other Danes after my return to my own country? Is there any home life in the United States? Are they not running around all the time, afraid of not earning money, or spending it in fancy, crazy ways?

This particular visitor traveled all over the United States. He made a point of seeing something of our home life for himself. He was enchanted with it.

We need to give the world a picture of this America. How?

Well, you all know something of the Voice of America program and that today it is being broadcast in some 46 languages. Radio Free Europe

and the Armed Forces Network are also doing a magnificent job of bringing true facts to the people.

State Department press materials with straight and honest news, periodicals, and pamphlets are available to millions of readers.

Last year, our Government films, covering every aspect of American life, business, education, recreation, home life, etc., gave their audiences throughout the world a better understanding of the American way of life. In the past year nearly eight thousand students, teachers, professors, and civic leaders came to this country from abroad under the educational exchange program. Six thousand of these came to the United States and returned or will return to tell America's story to the home folks.

The response to these programs has been very good. It will be increasingly better as stories of what has been seen, heard, and read are spread. But the Voice of America is more than just the State Department. It is all of us. It is our businessmen, newspapers, magazines, the films Hollywood sends overseas. It is our tourists abroad. It is you, the advertising people of America. Think of this sometimes when you are writing your ads. You are selling your goods. You are, also, selling America. Those ads of yours are read abroad. You can't imagine how eagerly. The people love them.

I would like to see the advertising people participate more fully in both the Government's programs and those of private organizations. You can bring a knowledge of "selling" to these programs that would be of inestimable value.

You know people. Use that knowledge in putting these programs over. You say "how?" There are many ways.

There is, for example, the educational exchange program. I think we could do a lot more than we do with these "exchanges." They are our best salesmen when they return. We should make sure that they see the real America. That they understand the meaning behind all these cars of ours, our bathtubs, telephones, et cetera. You advertising people should put your minds to that problem.

There are dozens of ways in which you could help.

**Selective Literature Needed**

Mr. Whyte was greatly disturbed over the lack of information overseas on American literature. I, personally, have been distressed over some of our books most widely read. *The Grapes of Wrath* is not a true picture of American life today and yet it is one book that can be found almost invariably in the bookstores of Paris, London, Rome, and Berlin.

I have often thought of what I would think of America if I were a European and *The Grapes*

*of Wrath* were the only story of American life I found available. Even John Steinbeck in an interview in Spain not too long ago said he would not have written *The Grapes of Wrath* today.

The Russians, you may be sure, are not missing any opportunities of getting their books into Europe—and certain ones of ours.

USIE libraries springing up at our posts everywhere are helping to ease this lack of American literature abroad.

It would be wonderful if you advertising people could inspire American publishers to fill the bookstores of Europe with books that present a full view of American life.

I should like to see American private enterprise providing funds for textbooks and other equipment for schools in areas where formal education is still new for the masses. We must make every effort to counter the Soviet Big Lie for they have poured slanted texts into schools wherever the opportunity arose.

I should like to see something done about the type of films Hollywood sends to Europe. We produce good pictures. You rarely see them, however, along the boulevards.

These are a few of the spots where I think advertising people can be useful.

We cannot depend, however, upon just telling the other peoples of the world what nice people we are. It is 10 percent what we do. We talk an awful lot about cooperation between the free peoples. We ask them to cooperate with us. And at the same time we raise barriers against the only hope of making free-world unity work. I am talking, of course, of the increasing tendency to shut out foreign goods from our markets.

## Prosperity Dependent on International Trade

We talk about the beauties of free enterprise. And then we put shackles on theirs. This is hurting us overseas. And I don't think it is doing us any good at home.

I am not going to put my finger on any particular products. You know what they are.

Luxembourg has not been particularly hurt by the "shut-outs." But Luxembourg is hurt when its neighbors suffer. It is a part of Europe. Its prosperity depends upon the prosperity of the whole.

In this country we are too apt to think of international trade as a matter of concern only to the traders themselves. We fail to see its part in the complete picture.

I am not talking about flooding American markets with foreign goods. But what is a small percentage to us is often of tremendous importance to other countries.

This growing tendency in America to close the doors to imports is having a most unhappy repercussion abroad. It is also a situation which the Soviets are quick to exploit. It has created fear in the hearts of all those who are working to build a solid economic foundation to the political and military unity of the free world. It is difficult for a European manufacturer who is having an increasingly hard time selling his products in the United States to resist offers made by Soviets—and many haven't.

I honestly do not believe, for example, that the American housewives buy less American cheese because, occasionally, they like to pick up a half pound or so of Swiss, Dutch, or Italian cheese. They like a variety. The American way to meet this situation would be to increase our over-all cheese appetite. I said I would not mention any particular products. I apologize for bringing in cheese. But it is a good example of what I mean.

The objective of what we Americans are trying to do in the world is clear. We want peace. We want social and economic progress as a basis for that peace—the only possible basis if that peace is to endure.

I suggest that you advertisers can influence American thinking greatly. Look what you have done with—well, I could name a dozen products. You have done a marvelous job in improving the American way of life—in adding to our enjoyment of life.

You can make an equally substantial contribution to the big job before us now.

## CORRECTION

In the BULLETIN of May 26, 1952, p. 816, the subsection entitled "Recent Significant Developments" should begin at the top of page 814.

# A Review of World Economic Events and Defense Adjustment Problems

*by Isador Lubin*
*U. S. Representative in the U.N. Economic and Social Council* [1]

More than a year has passed since the Council, at its twelfth session, last undertook a full-scale review of the world economic situation. When we met in February 1951, the vast defense effort was still in the early stages. It was painfully evident that large amounts of the free world's resources would have to be diverted to rearmament. But all of us who represented free peoples agreed that there was no other answer to the challenge of aggression.

The theme of the Santiago session centered around the question: What effect will the defense effort have on economic development?

In the debates of the Council, representatives of the underdeveloped countries expressed the fear that economic development would be neglected during the emergency period. They predicted that capital goods would not be available. Rising prices, they said, would reduce the purchasing power of their earnings and reserves before the supply situation would be eased and equipment would once more be obtainable. The requirements of defense, they contended, would dry up the sources of grants and loans from abroad.

Other fears were expressed by the representatives of the industrialized countries on this Council. They saw in the stepped-up defense effort the danger of raw material shortages, curtailment of civilian production, inadequate supplies of consumer goods, new balance of payment difficulties, and renewed inflation.

I believe it would be useful to review world economic events since the Santiago meeting in the light of the genuine concerns expressed at that time.

Broadly speaking, the task of governments in the economic field, during the interval, has been to maintain or adopt policies that would increase production while holding inflation in check. Not all countries have been equally successful in their efforts. Their collective record, however, is impressive. It provides, I believe, a basis for facing the future with more confidence than most Council members were able to muster a year ago.

The economy of the free world has adjusted to the heavy burdens of defense with far fewer adverse consequences during the transition period than most people deemed possible. The free world, through an outpouring of production, has not only been able to provide large amounts of defense materials but has also been able to increase the supply of goods available to the civilian economy. As the Secretary-General points out in his comprehensive report on the world economic situation, more goods were produced by the world as a whole in 1951 than in any previous year in history. Improvements occurred in both the developed and the underdeveloped countries. The greatest improvements, however, took place in the countries which had already achieved the highest levels of production.

Hand in hand with this expanded production went an increase in the supplies of capital goods to the underdeveloped countries. The Secretary-General's World Economic Report tells us that:

> The fears of the underdeveloped countries that they would be unable to procure capital goods from industrialized countries because of the demands of rearmament programs did not materialize during 1951. There were instances of supply difficulties and of a lengthening of delivery periods, but not of such a scale as to reduce imports. Imports of capital goods by underdeveloped countries were, in fact, substantially larger in 1951 than in 1950.

And may I refer particularly to what appears to me to be a highly significant aspect of the capital goods situation in 1951, as brought out by the Secretary-General's report? He states that imports

---

[1] Statement made before the Council on June 3 and released to the press by the U. S. Mission to the U.N. on the same date.

of goods of this type "could have been even higher, but for the fact that some underdeveloped countries were not prepared with enough development projects to enable them to absorb more capital goods."

## Balance of International Transactions

At Santiago, also, the underdeveloped countries expressed the fear that rises in the prices of their own exports would soon be outstripped by even larger increases in the prices of their imports. But thanks in part to price controls applied by countries such as the United States, the fact is that in 1951 the underdeveloped countries were able to finance a substantially larger quantity of imports from all sources than in 1950. At the same time, they were able to increase their foreign exchange reserves enough to more than maintain the purchasing power of those reserves.

With regard to financial assistance to underdeveloped countries, those of you who were at Santiago may recall the question raised by one of the most respected delegates, the representative of India, who wondered whether the policy of positive assistance to economic development abroad would not demand heavier sacrifices from the people of the industrial nations, and particularly the people of the United States, than they would be prepared to make. This was a sincere and perfectly reasonable question. The answer is found in the events of the past 14 months. The records show that in 1951, notwithstanding the heavy burdens of defense, an increasing volume of grants and loans has been made available to the underdeveloped parts of the world. The Colombo Plan has been unfolding in Southeast Asia through the cooperative efforts of the members of the British Commonwealth and other friendly governments. The generous Norwegian people have recently established a public fund for aiding underdeveloped countries. U.S. assistance has been continued on an increasing scale.

As to fears of the industrialized countries that shortages of raw materials would cripple production and that civilian standards of living would consequently deteriorate, what do the facts reveal? With the exception of coal and steel in the European area, material shortages have proved to be less of a handicap to production than was anticipated. According to the most recent *Quarterly Bulletin* of the Economic Commission for Europe, the European industrial production index was 12 percent higher in 1951 than in 1950.

Meanwhile, the terms of trade, which had turned sharply against the countries of Western Europe, have tended to improve. This has been particularly true since the middle of 1951. To that extent the problem of balancing their international transactions has eased. It must be noted, however, that during this same period, the United Kingdom and France experienced in-

creased deficits in their trade balances—as distinct from their terms of trade.

I have merely made a very brief contrast of the fears as expressed at our twelfth session with what has actually happened. In the light of developments in World War II, these fears were understandable. The experience of 1951, as revealed by the excellent report of the Secretariat, shows, however, that the situation in this period of building for defense is so different that lessons of World War II have not, to any large extent, been relevant.

There are still problems of great urgency before us. It is our duty at these meetings to appraise them as best we can. To that task I now turn.

It remains as true now, as it was at our twelfth session, that the world economic situation is dominated by the world political situation. Long strides have been taken toward strengthening the defenses of the free world against aggression. But international relations continue tense. We need only to mention the fighting against the U. N. Forces in Korea, the fighting in Indochina, Burma, and Malaya. Yugoslavia is still threatened. No agreement has been possible on a treaty to end the Occupation of Austria. Tension mounts in Berlin. Military preparations continue to burden both the free countries and the totalitarian countries.

Until certain governments join in a program of disarmament and peaceful economic cooperation within the spirit and framework of the Charter, men and women who value their freedom, nations which value their independence, have no alternative but to continue to shoulder the unwelcome burden of building up their strength to deter and, if necessary, to resist and defeat further aggression and subversion.

Since Korea, as I have already said, increased production has provided not only expanding amounts of defense materials but also increased supplies of civilian goods in the countries of the free world. This increased production, along with anti-inflationary measures, has largely eliminated the scare buying which had been pushing prices upward. As a result, the general price level in most countries has been fairly stable in recent months and the prospects for keeping inflation under control are brighter.

## The Inflation Danger

This does not mean, however, that the danger of inflation has disappeared. The free world still faces a period of expanding defense activities. This will involve a steady growth in government demand for goods and services which would otherwise be available to the civilian economy. With the peak of the defense effort still before us, the factors making for inflation will continue to be present in many countries.

In these circumstances, constant watchfulness

will be necessary if we are to maintain economic stability. But mere watchfulness in itself will not be enough. If we are to contain these pressures, we must be prepared to keep in effect or to put quickly into effect anti-inflationary programs.

In contrast with the general expansion of the world economy during 1951 has been the emergence of pockets of unemployment and of excess capacity in certain sectors. One of these is textiles, in which there has been a world-wide recession since the latter part of 1951.

This recession is in part a reaction from the speculative excesses and the accumulation of inventories which followed the outbreak of the Korean war, and in part a reflection of overcapacity in terms of effective world demand.

Capacity to produce cotton goods has been expanded in recent years both in the large industrialized countries and in a number of underdeveloped countries as well. Production increased especially rapidly in 1950 and early 1951 as a result of expectations of greatly expanded demand after Korea. In this period, output of textiles exceeded prewar levels in most countries except Czechoslovakia and some of the nations of the Far East. The first consequence of this rather sharp increase, so well described in the World Economic Report and the Economic Survey of Europe in 1951, was accumulation of stocks in the face of smaller demand than had been anticipated. Next followed cuts in production, with consequent unemployment. Currently, prices of fibers and fabrics are down to lower levels, and demand has shown a tendency to increase a bit. There are evidences that the momentum of the decline of the last 8 months may have spent itself.

But we must not overlook the fact that there are persistent and fundamental problems facing the textile industries. The development of synthetic fibers is bringing a technological revolution which will affect cotton producers and wool growers all over the world. To the extent that these fibers may require new types of spindles and looms, and to the extent that they may outwear natural fibers and reduce the replacement demand, they will affect the manufacturers and sellers of textiles and the workers in their plants.

In order to use textile manufacturing capacity, ways must be found to reduce costs through improved productivity and efficiency so that the vast potential markets where incomes are low may be tapped. These markets are not only in Asia and the Far East, where less cotton per capita is used now than before the war, but in industrialized countries as well. We must reinforce our efforts to raise the purchasing power of the people of these areas, through improved productivity of the items they are best equipped to produce, so that they will be able to buy more textiles and other things they need.

I think you will all agree that the time has come when the countries of the world must re-assess their real potentialities as textile producers. We should certainly examine alternative uses of capital and labor before devoting them to uneconomic textile facilities.

**The Food Situation**

While the world as a whole appears to have been devoting increasing effort to the production of textiles, it has failed to devote sufficient attention to expanding food output to nourish its growing population. This is indeed ironical.

The current food and nutrition problem is discussed in extremely illuminating fashion in the report of the Secretary-General entitled "The World Social Situation." It shows that the per capita output of food for the world as a whole in 1951, 6 years after the close of World War II, remained below the prewar level. In all except a few countries, the calorie intake is below the nutritional standard set by the Food and Agriculture Organization. In India it is 25 percent below that level.

Yet in many countries, manpower is moving out of agriculture while the productivity of those who remain in agriculture fails to increase. Agriculture in Eastern Europe, traditionally a major exporter of grain and foodstuffs, is likewise lagging. The Economic Commission for Europe (Ece) economic survey for 1951 pierces the blackout of economic information from that area to reveal that "the substantial rise in the output of certain industrial crops in some Eastern European countries does not vitiate the conclusion that Eastern European agricultural production is still well below prewar."

When we consider the social costs of lagging food production—and the prospect of rising food prices which accompany short supplies—it is clear that nothing in the economic and social field is more urgent than increasing the world's food supply.

Moreover, world food supplies can be increased. This means for one thing the utilization of all possible means to reclaim land for arable uses. But even where the additional land reclaimable for this purpose is limited, the possibilities of stepping up yields on the land that is already in use are very great. One could cite many examples of rapid increases in agricultural production in very short periods of time and over large areas in many parts of the world.

In my own country, between the prewar years and 1950, while we were increasing our industrial output by 76 percent, food production also rose, by 40 percent. This rise in farm output involved a very small increase in land under cultivation. It took place during a period when the number of people working on farms was declining. The agricultural output per worker increased about 65 percent.

Nor were these increases entirely attributable

to the use of modern machinery. Other factors have been the use of new hybrid strains of seed, improved fertilizers, and new weed and insect sprays.

There is convincing evidence that with relatively little capital, but with a diligent application of the techniques and practices already well known, the world could within a short space of years produce an adequate food supply. It has often been said that to replace the sickle with the scythe, the flail with the most primitive thresher, the wooden plow with the steel plow, the wooden hoe with the steel hoe, would mean the difference between famine and plenty. The various technical-assistance programs, United Nations and bilateral, are already making important contributions in this direction. The really great contributions, however, will come from the farmers of the world themselves, as they make increasing use of the constantly growing wealth of scientific knowledge. By bringing this knowledge and these techniques to farmers, through schools and extension work, and by carrying forward broad land-reform programs, governments can play a decisive part in the betterment of the world food situation.

The Food and Agriculture Organization, at its 1951 Conference, passed some emphatic resolutions on this subject. The Conference placed on record its belief that in the years immediately ahead, it is reasonable to hope for a well-balanced increase in world production of basic foods and other essential agricultural products that will exceed the rate of population growth by 1 to 2 percent per annum. This, the Conference said, "is the minimum necessary to achieve some improvement in nutritional standards." It recommended "that all member countries should cooperate in the effort to achieve this over-all objective by preparing and carrying forward agricultural development plans suited to their own circumstances and conditions, covering the next five years, and designed to provide and contribute to the achievement of this objective."

The goal is an adequate diet for everyone. Surely it is a modest enough goal, even with a rising world population. Is it unreasonable to ask that every country speed its efforts to attain it?

**Future of U.S. Economy**

Thus far, I have discussed economic developments during the immediate past and the prospects for the future in global terms. In the remainder of my statement, I should like to address myself to a discussion of the current and prospective position of the U.S. economy, particularly as it affects the situation of the world as a whole.

In the United States, the past 15 months have been characterized by a sustained high level of economic activity, a subsiding of the severe inflationary pressures which followed the outbreak of the war in Korea, and considerable stability in the price level.

Expanded production in the heavy industries was offset by declines in activity in the consumer goods industries, with the result that, since last spring, industrial production and employment, taken as a whole, have fluctuated within a narrow range at near-record levels. Unemployment has been especially small, varying seasonally under 2 million or less than 3 percent of the labor force.

In the civilian sector, food production has remained stable and at high levels, but output of textiles and apparel, leather and shoes, and, more recently, household equipment and other consumer durable goods, has declined, partly as a reaction from the unusually large production in the last half of 1950, and partly from smaller-than-expected civilian demand. As demand fell off, prices of these goods also came down.

Some unemployment followed in the soft-goods lines. Steps were then taken to alleviate the situation by placing Government defense contracts in localities affected. Aside from this there has been little unemployment, except briefly, in some of the metal-using civilian industries where world-wide shortages of critical materials and necessary allocations to defense industries brought cuts in production and some unemployment in 1951. In Detroit, for example, unemployment was estimated last winter at about 100,000. By this spring, however, the situation had greatly improved and unemployment had fallen below 70,000. It is still declining.

Thus, at the present moment, this phase of downward readjustment appears to be about over in the United States. It can be said that we have taken this period of realignment of the economy for defense production in our stride, and, by and large, it has been accomplished with remarkably few dislocations of the economy.

The comparative stability in the general level of prices in the United States within the last year is in contrast to the marked increases in the first 8 months after Korea. As compared with a rise of 16 percent in the first 8 months after Korea, wholesale prices as a whole declined 4 percent from March 1951 to April of 1952. Retail prices for consumers' goods and services, which typically lag behind industrial prices, have remained relatively stable. During the past year, they rose by only 2 percent, as compared with a rise of 8 percent in the previous 8 months.

Various factors contributed to this general abatement of inflationary pressures. As I have already noted, there were ample stocks in the hands of business and consumers. This fact, plus a confidence that goods would continue to be available at controlled prices, led to a decrease in consumer and business buying, and a rise in the savings of the population. At the same time, due to expanded industrial capacity, the supply of certain scarce materials such as steel has been in-

creased. Beyond this, there were the various governmental actions—allocation and production controls, price and wage controls, selective credit controls, and general credit measures—all of which contributed to stabilizing the situation. Simultaneously, very substantial increases in taxes absorbed large amounts of purchasing power. Thus, a combination of factors—the behavior of business and private consumers as well as effective governmental policies—have played a part in keeping inflationary pressures under control.

This does not in any sense mean that we in the United States need no longer be concerned over the course of our price level during the immediate future. A change in any of the factors I have just mentioned could lead to a renewal of inflationary pressures. For one thing, the prospect of a deficit of some magnitude in the Federal budget due to further increases in defense expenditures may lead to a net expansion in demand. It is because of this, as well as of other possibilities, that the U.S. Government retains on a stand-by basis certain anti-intlationary controls that have been suspended because they are not needed at the moment.

Some of the forces that led to the reduction in inflationary pressures in the United States also affected our economic relations with the rest of the world. They have had a special bearing upon the course of our imports and exports.

## U.S. Imports and Exports

The movement in the quantity of U.S. imports generally does not depart for very long from the trends in domestic production. With the attack on South Korea and our decision to expand our defenses come a marked increase in our imports, part of it representing speculative buying. As compared with the year preceding Korea, the first quarter of 1951 shows an increase of physical imports of 27 percent. The fact of the matter is that our imports outran the expansion of our domestic output. These imports were one of the factors in the inventory accumulations that I have already referred to.

Then followed a drop in import demand. The decline was sharp. As compared to the index for the first quarter of 1951, imports in the third quarter were down to 101, the level of late 1949.

As this sharp decline was taking place, it appeared ominous to many observers. Events, however, have shown that it was temporary. Since the middle of 1951, imports have again resumed their upward trend. In the fourth quarter of 1951 they were above the third quarter. The record for the first 3 months of 1952 is still better, with the index of physical volume back to 17 percent above the pre-Korean level and within 10 points of the post-Korean high.

Our production of goods and services should continue to expand. Since our inventories of imported materials were drawn down during 1951,

we have reason to expect that with expanded production there will come a further increase in our demand for imports.

Just as the accumulation of inventories had had an effect on the level of our imports, so did our increase in the output of certain scarce materials, such as steel, have an effect upon our ability to supply capital goods to the underdeveloped countries.

Despite the fact that our supplies were not sufficient to meet all of our domestic needs, the value of U.S. exports of the major categories of capital goods to the underdeveloped countries in the last 6 months of 1951 was over 51 percent higher than in the 6 months before the attack on South Korea. The dollar value increased from 690 million dollars to 1,013 million dollars. Nor was the bulk of this expansion accounted for by increased prices. It was for the most part the result of a larger physical quantity of exports. The 51-percent rise in dollar values of these goods was accompanied by a rise of only 12 percent in U.S. export prices of what we call "finished manufactures," which is the index that best measures changes in the cost of developmental goods.

Despite the fears that were expressed at our twelfth session, every major underdeveloped area of the free world—Africa, Asia, and Latin America—received more capital goods from the United States in 1951 than it did not only before Korea but in 1950. Under the heading "capital goods," I include electrical machinery, turbines, construction machinery, machine tools, agricultural implements, trucks, and other similar developmental goods.

During the last half of 1951, the value of such goods shipped to Latin America increased by 64 percent as compared with the first 6 months of the preceding year. Our shipments to Africa were 34 percent greater in value. Notwithstanding the fact that we have cut off our exports to Communist China, in accordance with General Assembly Resolution 500 of May 18, 1951, and those to Hong Kong have been greatly reduced, our exports of capital goods to the countries in Asia as a whole were at a rate 26 percent higher in value than before Korea.

I should like to point out, also, that the latest figures available, those for January and February of the current year, show that, with the exception of Latin America, this trend has been continuing.

The great bulk of these goods received by the underdeveloped countries were paid for by their exports. Part of them, however, were financed by grants and loans made available by the American people. Through their government alone in the fiscal year 1951, such grants and loans totaled 690 million dollars. This was an increase of 170 million dollars over the year before. While these amounts are not as large as some had hoped, they are not negligible sums. Effectively used, grants and loans of this magnitude—they have averaged more than half a billion per annum during the

past 3 years—can have a real impact on economic development.

In brief, the dire predictions made by Council delegates at the twelfth Ecosoc session proved untrue as far as the United States is concerned. The United States has not allowed the economic development of underdeveloped areas to become a casualty of the defense program. Our exports of developmental goods have increased, not declined. The prices of such goods have been stabilized, they have not soared upward. Grant and loan assistance has not been curtailed but has been augmented so that underdeveloped countries can import more than their current earnings permit.

**Deterioration of U.S. Terms of Trade**

These events, incidentally, have occurred during a period when the U.S. terms of trade were deteriorating. As the report of the Secretary-General shows on page 19 of chapter 4, the index of our terms of trade during the last half of 1951 was 14 percent worse than in the 6 months before Korea. This means, in effect, that every dollar we received for our exports was able to buy only 86 percent as much in imports as formerly.

These figures relate to the total trade of the United States with the rest of the world. The Secretary-General's report does not break them down by geographic areas. But the available data on raw material prices show that for 1950 and a part of 1951 the underdeveloped countries as a group derived great benefit from the deteriorating terms of trade of the United States. The prices of our imported raw materials as a whole—and a large part of them came from these countries—were 60 percent higher in the last half of 1951 than in the base period used in the Secretary-General's report. In contrast, as I have already stated, the average price of finished manufactures exported from the United States rose by 12 percent.

I am aware, of course, that the prices of certain of the products exported by the underdeveloped countries, especially rubber, tin, wool, and jute, have recently fallen substantially from their speculative post-Korean peaks. It appears, nevertheless, that the underdeveloped countries' terms of trade still remain more favorable than before Korea.

**Future Production and Employment**

Turning now from the past to the future, I should like to discuss a matter which I know is of concern not only to the members of this Council but also to many Americans here at home. I refer to the prospect for maintaining high levels of production and employment in the United States after defense expenditures level off to the rates required for continuing national security.

Let me say at the outset that the Government

of the United States is acutely aware not only of the domestic but also of the international impact of changes in the level of our economic activity. We know that fluctuations which may have a minor impact in this country may have more important effects in other parts of the world.

You will recall, I am sure, that in the years immediately following World War II, the adjustment of the American economy to a peacetime basis was remarkably smooth, to the surprise of many people—and, I might remind you again, the disappointment of some others—who had forecast substantial unemployment. Now, the question is asked, inside as well as outside the United States, whether we can make the adjustment to a reduced level of defense expenditures as smoothly as we made the adjustment to the reduction of war expenditures after World War II.

As one looks at the two situations he becomes aware of major differences between them. Some of the differences will tend to make the coming problem more difficult. Some will make it less so.

The first factor which may make the problem more difficult is that the backlog of deferred needs for both consumers' and producers' goods is likely to be much smaller than it was after World War II. During the war, production of a great variety of consumers' goods for civilian purposes was prohibited. Many durable goods were worn out, new demands went unsatisfied, and inventories were depleted. In contrast, restrictions in the current defense period have been less extensive and have been in effect for a shorter time. Consequently, the backlog of deferred demand will be substantially smaller.

The second factor in this same connection is that, even though the total dollar volume of liquid assets in the hands of consumers and of business is higher now than it was at the end of the war, the purchasing power of these assets, due to price increases, will not be as great as it was at that time. Moreover, the gold and dollar reserves of some of the major trading nations are substantially lower now than they were then and their purchasing power is smaller.

Third, our employment problem will be of a different nature. At the end of World War II, many people who had patriotically entered the labor force had no desire to remain after the fighting ceased. In contrast, when defense spending declines, it is probable that most of those no longer needed in defense activities will want other work.

But these three factors constitute only one side of the picture. There are very powerful considerations on the other side.

**Favorable Factors**

Among these favorable considerations, the most striking difference between the World War II situation and the one that we expect to face after defense expenditures reach their peak is that the

reduction in defense expenditures will be only a fraction of the cut that was made after World War II. In terms of 1951 prices, defense expenditures in 1946 were 119 billion dollars less than in 1944. This decline should be compared with a probable annual reduction of from 15 to 25 billion dollars, in terms of 1951 prices, when we shift from the peak of the expansion phase of the present defense program to the maintenance level. The decline in expenditures, in other words, will be at most one-fifth as big as the World War II cut.

The relative importance of these cuts, in terms of their effect upon the national income, becomes evident when we note their relationship to the national gross product. The 119-billion-dollar curtailment of spending was related to a full employment gross national product of about 275 billion dollars in 1951 prices. The probable cut of from 15 to 25 billion dollars should be related to a current prospective full employment gross national product of about 350 billion dollars.

A second important difference simplifying the adjustment is the fact that after World War II, the size of the Armed Forces was reduced by 10 million during a 2-year period. The total strength of our Armed Forces at the peak of the present defense program will be only 3.7 million. This obviously makes impossible any reduction as drastic as that which occurred at the end of the war. We regret that the international political situation does not at this moment appear to permit any significant reduction in the size of our Armed Forces. We trust, however, that the proposals now being considered in the Disarmament Commission will soon make possible a radical reduction in this burden.

These comparisons give a basis for concluding that the coming adjustment problem should be much smaller than the one we handled successfully after World War II. Moreover, there are other factors in this situation which lead us to believe that we are in a much better position to deal with adjustment problems than we have been in the past.

### The Structure of U.S. Economy

Fundamental changes have been taking place in the structure of our economy, changes that we think have permanently moved up our level of demand to new heights. Among the most important of these modifications has been a radical change in what our consumers regard as a normal standard of living. Amenities like electricity in rural areas—a rarity 20 years ago—are now widely available and regarded as essential. We have added approximately 20 million new consumers to our economy. There is an increased demand for new construction as a result of the dispersion of dwellings and business from the centers of our great cities to the suburbs. Of particular importance is the fact that income in the

United States is more evenly distributed. We have a much stronger organization of labor with the result that the position of workers in our society is more secure and their purchasing power more stable. These structural changes will, in themselves, assure a level of effective demand sufficient to maintain high levels of production of consumers' goods.

In addition to the increased demand for consumers' goods, there are many urgent public needs which stem from some of these same structural changes. As a result of the growth in population and the geographical shift in population, the need for certain public projects has been increasing. Construction of this type has been curtailed by defense restrictions and will have to be resumed at the first opportunity.

Moreover, the restrictions made necessary by the defense program have also prevented the satisfaction of normal private demand in some areas of the economy. Residential construction has been limited. The same is true of certain types of private business construction, as well as of equipment which uses steel, copper, aluminum, the metals which have been in short supply and the uses of which have been restricted. Expenditures for these purposes can be expected to increase when restrictions are removed. While such expenditures are not likely to be as great as after World War II, they will not be negligible.

Weight must also be given to the effect of the successful operation of our economy in the past 6 years upon the psychology of the American private investors. The manner in which our economy has operated has been progressively altering their outlook. More and more, they are focusing their attention on the requirements of an economy operating at expanding levels and are discarding the concept of a limited market.

This inclination of American investors to base their plans upon an expectation of long-term growth has a solid foundation, not only in the structural changes in the economy that I have already mentioned but also in other changes that make for greater stability than we had before the war. There are now in existence certain devices which automatically come into play as stabilizing factors, should economic conditions change. For example, the coverage of our social security program has been extended and the benefits have been increased. Our tax structure provides a better cushion against recessionary forces. Agricultural incomes are protected against sudden and severe declines through a system of farm price supports. Bank deposit insurance has been increased to $10,000 for every covered depositor. Through Federal guaranties of mortgages, we have better safeguarded the savings which more than half of the American families have invested in the homes they live in.

We are not in a position to evaluate all of these considerations quantitatively. Therefore, we can-

not say at this time to what extent these structural and stabilizing factors would moderate a possible downward swing in U.S. economic activity. However, if it should prove necessary, there are a variety of measures available to the Government to counteract recessionary tendencies. I shall only mention a few of these measures.

First, the removal of any direct restrictions which may then exist on business investment and consumer and mortgage credit.

Second, the traditional easing of general credit and banking policy. In this connection, the provision of additional Government-guaranteed mortgage credit at moderate rates could serve as a stimulus to the construction industry in the event that stimulation were needed.

Third, taxes are at very high levels. As a result, the possibilities of freeing purchasing power by tax reductions are very great.

Fourth, public-works construction can be accelerated. There is general agreement among the American people that we must expand our efforts to prevent national disasters such as we have recently suffered from floods in the Missouri Valley.

**Summary**

In summary, then, the weight of the evidence leads to the conclusion that the coming adjustment problem will be much smaller than the one we handled successfully after World War II. There is no denying that there will be a problem. But there should be no reason for alarm about our ability to meet it. We have the tools for coping with any necessary readjustment when we have reached the peak of our defense expenditures.

The people of the United States are determined to maintain high levels of demand and to continue to trade their products on a large scale with the people of other peace-loving countries. They are determined to have an expanding economy, not only at home but also abroad. They know that only an expanding economy can provide reasonable over-all stability and individual economic security within a framework of genuine democracy and freedom.

That is why the development of underdeveloped countries will continue to be a cardinal point in our foreign policy. As President Truman said in his State of the Union message last January: [2] "There is nothing of greater importance in all our foreign policy. There is nothing that shows more clearly what we stand for and what we want to achieve." "What we can do now," said the President on another recent occasion, "is sharply limited by the cost of maintaining defenses to prevent aggression and war. If that cost could be reduced—if the burden of armaments could be lessened, new energies and resources would be lib-

erated for greatly enlarged programs of reconstruction and development."

Mr. President and members of the Council, the American people will lend every effort to speed the day when the threat of aggression will have subsided and men and women everywhere shall be able to devote all of their energies and resources to raising their standards of living and to the full realization of their rich potentialities.

## Committee for the Movement of Migrants From Europe

*[Released to the press June 2]*

The United States will act as host for the third session of the Provisional Intergovernmental Committee for the Movement of Migrants from Europe at Washington on June 10, 1952. All meetings will be held in the Department's International Conference Suite at 1778 Pennsylvania Avenue, NW. The Committee will have as main items of business the election of a director for the organization, a review of operations to date, and consideration of the program for the remainder of 1952. The United States proposes to nominate former Ambassador Hugh Gibson for the post of director. Mr. Gibson, in the U.S. diplomatic service from 1908 to 1938, has represented the United States on numerous international bodies and served as U.S. Ambassador to Belgium in 1927–33 and 1937–38, and as Ambassador to Brazil, 1933–37. Mr. Gibson recently terminated a business connection with Doubleday and Company of New York.

The United States took the initiative in October 1951 in inviting the Belgian Government to convene a Conference on Migration at Brussels in November 1951 to consider a U.S. proposal for international migration. At the Conference, 16 governments established the new Committee and adopted plans to move 116,000 persons who would not otherwise be moved out of Europe in 1952, under an over-all budget of $36,954,000. The Committee established headquarters at Geneva, and began operations on February 1, 1952. In the period February 1–April 30, 1952, 32,000 migrants and refugees were moved overseas under the auspices of the new organization.

The action of the United States in proposing a migration conference carried out the intent of the Congress expressed in title I of the Mutual Security Act of 1951 which made $10,000,000 available to facilitate the movement of surplus manpower from Europe to other countries where such manpower could be utilized as proposed in the Economic Cooperation Act of 1948, as amended. It has been estimated that some 750,000 persons whose services could not be used in Europe should mi-

---

[2] BULLETIN of Jan. 21, 1952, p. 79.

grate annually for the next 5 years in order to achieve further economic balance and stability in Europe. It has been further estimated that approximately 350,000 persons are leaving Europe annually. The new Committee proposes to move those persons who would not otherwise be moved without some form of organized international assistance.

An important factor in the decision to establish the Committee was the pending termination in late 1951 of the International Refugee Organization (IRO) which had moved over a million refugees out of Europe during its existence. Upon its termination, 10 ships already reconverted for this type of movement, at substantial expense to international funds, would be relinquished and diverted to other transport purposes. After thoroughly exploring the question, the Committee reached the conclusion that the former IRO ships would be required to accomplish the purposed additional movement of migrants and refugees.

After the first session of the Committee, which immediately followed the Conference on Migration at Brussels, the Committee met at Geneva in February for further consideration of its program. As a result of encouraging developments which occurred between the two sessions, the Committee felt justified in increasing the quota of persons to be moved during 1952 to 137,000 and its budget to $41,350,660. The budget is divided into two parts, administrative and operational. Contributions to the administrative expenditures of $2,359,060 are obligatory upon member governments in accordance with an agreed percentage scale. Contributions to the operational expenditures are voluntary. The U.S. contribution for the calendar year 1952 is $10,000,000. The costs of transport for a substantial number of the persons to be moved will be reimbursed to the Committee, other movements will be partially reimbursed, and the balance of movement will take place at the expense of the Committee's funds. All the costs of processing migrants are borne by the emigration countries and the costs of receiving them by receiving countries. The costs of processing and reception borne by governments directly will be credited to the respective governments as contribution to the budget of the Committee.

At the present time, 19 governments are members of the Committee and it is expected that other governments will join shortly. The member governments include Australia, Austria, Belgium, Bolivia, Brazil, Canada, Chile, Denmark, France, Germany, Greece, Italy, Israel, Luxembourg, the Netherlands, Paraguay, Switzerland, the United States, and Venezuela.

The projected movement of 137,000 persons during 1952 represents the emigration of 67,000 persons from Germany, 35,000 from Italy and Trieste, 16,000 from Austria, 15,000 from the Netherlands, and 4,000 from Greece. The Committee's program envisages the settlement of 40,000 of these emigrants in Canada, 25,000 in Australia, 31,000 in Latin America, and 3,000 in New Zealand. The United States will receive 38,000 persons, mostly ethnic Germans, entering under provisions of the U. S. Displaced Persons Act of 1948, as amended.

———

On June 9 the Department of State announced that the U.S. delegation to the third session of the Provisional Intergovernmental Committee for the Movement of Migrants from Europe, will be as follows:

*U.S. Representative*

George L. Warren, Adviser on Refugees and Displaced Persons, Department of State

*Alternate U.S. Representatives*

Pat McCarran, U.S. Senate
Francis E. Walter, U.S. House of Representatives

# Meeting of Tonnage Measurement Experts

*[Released to the press June 4]*

An international meeting of tonnage measurement experts convened at The Hague, Netherlands, on June 4. The U.S. Government is represented by an observer delegate, Henry E. Sweet, chief of the Division of Marine Administration, Bureau of Customs, under whose immediate supervision the ship-measurement laws and regulations of the United States are administered. Mr. Sweet's alternate is John W. Mann, an attaché at the American Embassy at London, who was formerly on the Shipping Policy Staff of the Department of State and who headed the U.S. observer delegations to the three previous conferences of this series.

The United States, although not a party to the Oslo convention of 1947 on ship-measurement rules, which provides for biennial meetings of experts, recognizes the advantages to be derived from international uniformity in the tonnage measurement of ships in terms of safety; of the methods of determining charges for port facilities, harbor dues, and canal tolls; and of efficiency and simplicity in ship design and construction. The United States has therefore sent technical observers to the previous measurement conferences held at Oslo in 1947 and 1948 and at Stockholm in 1950. The experts at the above-mentioned meeting will study in detail a number of highly technical questions concerning the application and interpretation of existing rules and regulations under the Oslo convention.

# Report of U.N. Command Operations in Korea

## FORTIETH REPORT:  FOR THE PERIOD FEBRUARY 16–29, 1952[1]

U.N. doc. S/2619
Transmitted April 29, 1952

I herewith submit report number 40 of the United Nations Command Operations in Korea for the period 16–29 February, inclusive. United Nations Command communiqués numbers 1176–1189 provide detailed accounts of these operations.

Discussions continued at the staff officer level on agenda item three although little progress was made. The Communists refused to accept the six port of entry complexes on each side, proposed by the United Nations Command, as areas in which the neutral nations inspection teams are to operate. Furthermore, the Communists were adamant in their insistence on having the Soviet Union participate in the neutral nation inspection teams. On 21 February the senior United Nations Command staff officer made the following statement: "Your side has said many times that we have no reason and cannot give any reason for objecting to the nomination of the Soviet Union as one of the neutral nations. We have carefully considered these statements made by you. The United Nations Command does have reasons for rejecting the Soviet Union as one of the nations to participate in the supervisory commission. The reasons are clear, cogent and irrefutable. I should like to point out, however, that neither side is obligated to state reasons for the acceptance or rejection of any particular nation. The principle simply and clearly states that both sides agree to invite neutral nations acceptable to both sides. The acceptability or non-acceptability of any given nation, therefore, is a unilateral matter beyond the purview of these discussions. In the furtherance of understanding, however, and so that our position may be unmistakably clear to you, we will give our reasons for stating, unequivocally, that the Soviet Union is not acceptable to our side. The United Nations Command holds that it is in the interest of all concerned that members of the supervisory commission should be drawn from those nations not in close proximity to Korea and without a record of past participation in the Korean question. This is not the introduction of a new principle. It is our rightful and unilateral application of logic to the problem of selecting nations acceptable to both sides. I repeat, the Soviet Union is not acceptable to our side."

On 25 February in a further sincere effort to break the deadlock on this issue, the United Nations Command representatives proposed that the number of neutral nations be reduced to four, namely, Sweden, Switzerland, Poland and Czechoslovakia. The Communists have rejected this proposal so far.

After receiving from the Communists a proposed new text for armistice agenda item four, dealing with prisoners of war, the United Nations Command delegation made a careful study of its provisions in an effort to insure that the areas of agreement could be expanded to the maximum. It was pointed out forcefully to the Communist representatives that the United Nations Command approach was made in the light of earnestness and sincerity and that our sole objective was the securing of a just and honourable arrangement by which our prisoners could be exchanged with despatch. The proposed draft submitted by the Communists showed mutual agreement on many clauses and only minor differences on others, but the stand which they took on the subject of voluntary repatriation was entirely unacceptable. On 20 February, after many differences in wording and phraseology had been resolved, the Communists presented a revised wording of their initial proposal, but retained the intent of forced repatriation to which we strongly objected.

On 22 February the United Nations Command submitted a complete draft of armistice wording on item four which reflected all changes to date. The Communists maintained their insistent opposition to voluntary repatriation and on the basis that the subjects were closely allied, rejected the proposals for parole and a sixty-day time limit in which to exchange prisoners, despite the fact that they had previously concurred in the principle.

The inconsistency of the Communist stand was clearly defined in a carefully prepared presentation in which the United Nations Command reminded the Communists that last December they explained away the fact that they had only a few thousand prisoners by saying that some captured personnel were released at the front shortly after capture, while others, if they so desired, were allowed to join the Communist Forces. By this act the Communists applied the principle of voluntary repatriation and took great credit for such action as an indication of how sin-

---

[1] Transmitted to the Security Council by Ambassador Warren R. Austin, U. S. representative in the Security Council, on Apr. 29. Texts of the 30th, 31st, and 32d reports appear in the BULLETIN of Feb. 18, 1952, p. 266; the 33d report, *ibid.*, Mar. 10, 1952, p. 395; the 34th report, *ibid.*, Mar. 17, 1952, p. 430; the 35th report, *ibid.*, Mar. 31, 1952, p. 512; the 36th and 37th reports, *ibid.*, Apr. 14, 1952, p. 594; the 38th report, *ibid.*, May 5, 1952, p. 715; and the 39th report, *ibid.*, May 19, 1952, p. 788.

cerely they adopted humanitarian policies. The proposal submitted by the United Nations Command that prisoners of war should be able to choose the side to which they wished to go and should not be subjected to the barbarous treatment of delivery by force was identical with the principle the Communists claim they have previously applied on their side. Further, in order to insure that the implementation of release policies proposed by United Nations Command was to be carried out in detail, the Communists would have their own Red Cross representative at our prisoner of war camps as well as at the point of exchange.

Continued protracted discussion indicated only that the Communist delegation refused to adopt any realistic approach to this basic, fundamental principle as supported by the United Nations Command. Having accomplished all that could be done at the staff officer level, and having successfully removed many areas of disagreement, the United Nations Command agreed to move discussions from staff officer level and on 29 February the sub-delegation for item four was reconvened, with the one remaining issue of voluntary repatriation to be resolved.

A riot believed to have been Communist planned and led, among Korean civilian internees in a compound on the island of Koje-Do on 18 February was put down by United Nations Command security troops who, in the course of their duties, had been suddenly attacked by over 1,500 inmates of the compound. The remaining 3,500 inmates did not join in the disturbances. Order was restored only after severe fighting. One American soldier and sixty-nine inmates were killed. One American soldier was injured, twenty-two suffered minor hurts and 142 inmates were wounded. No prisoners of war were involved.

The clash followed entrance of the troops into the compound at 0530. Their mission was to maintain order while United Nations personnel interviewed the internees to determine which individuals desired transfer to other compounds. Interviews were to be accomplished privately to encourage free expression of desires. Any internees requesting transfer would be moved to non-Communist compounds. It was evident that Red compound leaders were determined and prepared to block this procedure. Weapons known to have been used against the troops in the demonstration, which obviously had been planned and organized, include steel pickets, spiked wooden clubs, barbed wire flails, blackjacks, metal tentpole spines, iron pipes, rocks and knives.

The United Nations Command ordered an official investigation immediately. The situation was brought under control and peace restored. Unrest had not spread to other compounds. The senior delegate of the International Committee of the Red Cross, stationed in Japan, was notified promptly. He dispatched two of his assistants immediately to Koje-Do for an independent investigation.

As was expected, the Communists attempted to use this incident to bolster their stand on forced repatriation, claiming that the United Nations Command had been responsible for the uprising and that the participants were only demonstrating their desire to return to Communist control. The United Nations Command delegation replied calmly and factually, pointing out the absurdity of the Communists' comments and emphasizing that this incident was an internal affair of no interest to the Communists. The civilian internees in United Nations Command custody are not military personnel belonging to the Communist side. They are Nationals of the Republic of Korea. The United Nations Command position is fully sanctioned by the Laws of Nations. The Communists have no authority, sanction or precedent in international law to support their stand that this matter did concern them.

On the question of joint Red Cross Teams to assist in the prisoners of war exchange, agreement with the Communists on the composition of such teams was obtained on 19 February. This agreement provides for three teams composed of equal membership from the National

Red Cross Societies of both sides. One team would operate in North Korea with a total membership of sixty-thirty from each side. A second team would operate in South Korea with the same number. The third team consisting of twenty members would perform its duties in the demilitarized zone.

To insure that the United Nations Command is prepared to implement the agreement on the Red Cross Teams, immediate steps were taken to contact, through the American Red Cross, the National Red Cross Societies to be invited to send representatives. Denmark was included in this group because of the urgent need for medical doctors on each team. These Red Cross doctors are readily available on the Danish Hospital ship "Jutlandia".

In addition, relief supplies for United Nations Command prisoners of war furnished by the American and British Red Cross Societies and now stored in Japan, are being carefully checked and readied for immediate use. If needed, supplemental food packages and medical kits will be supplied by the United States Army. All these supplies can be airshipped to Korea on short notice in case of an armistice agreement.

The International Committee of the Red Cross, Geneva, indicated agreement with the plan for the Red Cross Societies of both sides to assist in the exchange of prisoners of war in Korea.

In plenary session of 16 February 1952, the Communist delegation made the following statement in presenting their new proposal for agenda item five:

"In order to reach speedily a fair and reasonable settlement on agenda item five, recommendations to the governments of the countries concerned on both sides, our side, the delegation of the Korean Peoples Army and the Chinese Peoples Volunteers, now submits a revised draft of the principle.

"The revised draft of the principle proposed by the delegation of the Korean Peoples Army and the Chinese Peoples Volunteers on agenda item five, recommendations to the governments of the countries concerned on both sides, is as follows:

"In order to ensure the peaceful settlement of the Korean question, the military commanders of both sides hereby recommend to the governments of the countries concerned on both sides that, within three months, after the armistice agreement is signed and becomes effective, a political conference of a higher level of both sides be held by representatives appointed respectively to settle through negotiation the questions of the withdrawal of all foreign forces from Korea, the peaceful settlement of the Korean question, et cetera.

"On 17 February 1952 the United Nations Command delegation accepted the Communist proposal on agenda item five with the following statement:

"We have carefully considered your revision of the principle proposed by you as the solution of item five of the agenda. In order to give you concrete evidence of the sincerity of the United Nations Command delegation and to eliminate entirely any pretexts for further delay on your part in reaching agreement on unresolved issues in items three and four, the United Nations Command delegation accepts your proposal of 16 February as the solution of this item of the agenda, subject to the following remarks:

"So that there may be no question regarding the understanding of the United Nations Command delegation as to the meaning of your proposal, we deem it advisable to make certain explanations at this time. First, we desire to point out that this recommendation will be made by the Commander in Chief, United Nations Command, to the United Nations as well as to the Republic of Korea. Second, in accepting the term Foreign Forces, we are doing so on the basis for your statement that this term means non-Korean Forces. And third, we wish it clearly understood that we do not construe the word et cetera to relate to matters outside of Korea."

In reply, on 19 February 1952, the senior Communist delegate said the following:

"The draft of the principles submitted by our side on the item five of the agenda is very clear in itself. There can be no misunderstanding whatsoever. By the governments of the countries concerned on both sides in our draft of principles is naturally meant the governments of the countries concerned on the side of the Korean Peoples Army and Chinese Peoples Volunteers and the governments of the countries concerned on the side of the United Nations Command. By Foreign Forces in our draft of principles is naturally meant non-Korean Forces. And the meaning of questions, et cetera in our draft of principles is also very clear. It neither binds the forthcoming political conference to the discussion of certain specific questions nor excludes the possibility of the discussion of other questions by this political conference."

The Communists then proposed to turn over the work of drafting the details of the articles in the fifth item of the agenda to Staff Officers. The senior United Nations Command delegate then stated: "We have already told you that we don't consider that your draft proposal requires rewriting. We have accepted it as you drafted it for inclusion in the armistice agreement. We agree to recess with the understanding that item five is to be turned over to the Staff Officers to complete any necessary mechanical details. Our Staff Officers will not be authorized to change the agreed wording." To date the Communists have not asked for a Staff Officer's meeting on this agenda item.

Despite frequent periods of unfavourable winter weather, a United Nations Command carrier force operating in the Sea of Japan continued to direct its major effort against the enemy's supply routes. Attention was again centered on the vulnerable East coast rail network north and south of Wonsan where bridges, by-passes, locomotives and rail cars, as well as the rail lines themselves, were brought under attack.

In the Yellow Sea, United Nations Command carriers continued air operations on the West coast of Korea, supporting the blockade and providing air-spot and cover for surface units on anti-invasion stations in support of the friendly held islands.

Shore-based aircraft participated in all phases of the United Nations Command Air operations except air to air combat, with the major effort being placed on interdiction and close support missions in that order of priority.

Patrol aircraft operated day and night in all sea areas adjacent to Korea and Japan, providing reconnaissance and shipping surveillance as well as regular weather flights.

The appearance of an increased number of enemy sampans and small craft, attempting to run the tight coastal blockade, furnished lucrative targets for bombardment by United Nations Command ships and planes. During the week of 18-24 February, 175 of these craft were sunk or damaged. Contributing heavily to this total was an enemy attempt to invade a friendly-held island. This assault was shattered by a combination of Naval gunfire and alert beach fighting, and the invasion force, estimated at approximately 300 men, was routed with heavy personnel losses.

Surface vessels continued to support the United Nations Command operations by bombarding suitable targets along the East coast. 16 February marked the first anniversary of the siege of Wonsan which has seriously disrupted the flow of Communist traffic through this vital hub. Fire support vessels conducted fire missions for United Nations Command ground forces, utilizing air spot and directions from the forces supported, to destroy the enemy's forward installations and to inflict heavy personnel casualties. Further north, the targets included harbor facilities, industrial areas, and lines of communications. Daylight travel along the coastal routes was effectively impeded and night travel was subjected to indirect interdiction fire.

Enemy shore batteries on both coasts intensified their fire against United Nations Command blockading ships. Counter battery fire silenced many of the enemy's guns, destroyed or damaged several ammunition and supply

dumps, and caused many personnel casualties. The enemy's fire resulted in damage to two United Nations Command ships and injuries to eleven crew members. Temporary repairs, where necessary, permitted the ships to return to action.

Although severe icing conditions were experienced along portions of the West coast, surface units maintained their anti-invasion patrols, and illuminated and fired on enemy positions on the mainland. When enemy activity indicated a potential danger of attack on friendly islands, surface units fired on the enemy and dispersed his boat and troop concentrations.

Minesweepers swept the important sea lanes on both coasts for all types of mines and made check sweeps of previously cleared areas despite heavy seas, low visibility, and rain and snow. Blockading surface units provided prompt counter-battery and suppression fire on several occasions when enemy shore batteries took the minesweepers under fire, thus preventing damage or casualties to United Nations Command forces.

Naval auxiliary, Military Sea Transport Service and merchant vessels under contract provided logistic support for all components of the United Nations Command forces in Japan and Korea.

United Nations Command Air Forces continued their full scale air operations throughout the Central and Northwest sectors of North Korea. Day counter-air sweeps, day and night interdiction of the main Communist supply routes, and airlift of high priority supplies accounted for the greater part of the sorties flown in support of the Korean operations. The continued inactivity of the enemy forces on the ground and in the air over the line of contact again resulted in reduced requirement for air defense and close air support sorties.

The weather was affected by the normal seasonal north to south fluctuation of the polar front, accompanied by the normal west to east flow of low pressure cells across Korea. This resulted in intermittent bad weather throughout the area which caused a decline in the sortie rates and greatly increased the problem of location and destruction of targets on the ground.

Jet fighters of the Communist Air Defence system were consistently more active than during any previous period. No fundamental changes in their tactics were observed however. MIG-15's, usually flying in large formations, were seen over North Korea on all but three days. It is estimated that an aggregate of 1,900 MIG-15 sorties were observed, and that of this number, 200 engaged in combat with United Nations Command aircraft. These air to air encounters resulted in the loss to the enemy of twelve aircraft destroyed and twelve damaged, while the United Nations Command suffered no losses and only one aircraft damaged. Typical of the increased enemy air activity was the sighting of 389 MIGs by United Nations Command pilots on 19 February. This represented a new high in the daily sightings of enemy aircraft.

The principal targets for United Nations Command fighter bombers and night flying light bombers were enemy supply installations, rail lines, rolling stock and motor vehicle traffic. These operations were successful in hampering the movement of supplies and personnel by the enemy, especially along the western and central rail lines from Sonchon and Kanggye south to the battle area. In view of the increased enemy air activity, it was necessary to provide a combat air patrol of F-86 for the fighter bombers. These operations were so well co-ordinated that no United Nations Command fighter bombers were lost to enemy air activity.

United Nations Command medium bombers continued in support of the Korean operations. The main targets for these missions continued to be the destruction of key railroad bridges, which the enemy labour forces repair with great rapidity. In addition, the B-29's performed close air support and leaflet missions each night as well as a number of reconnaissance missions.

The United Nations Command Forces operating in support of the Korean operations continued to require the

movement of high priority supplies and matériel by air. Combat cargo aircraft maintained their operations on a daily basis despite the adverse weather conditions encountered at their bases and en route. The movement of personnel again constituted a large portion of these operations, especially on East-bound flights which permitted the evacuation of combat casualties to hospitals in Japan.

The Communist air power based north of the Yalu River still constitutes a strong threat to the United Nations Command Air, Ground and Naval operations in Korea, but no major commitment of this force has yet been made. United Nations Command Forces and installations in friendly territory suffered no casualties or damage, although five unidentified aircraft were reported over friendly territory.

Minor clashes continued to typify the action along the Korean battle front as both sides maintained their defensive positions. Most of these small-scale engagements resulted from raids and patrols conducted by United Nations Command elements. Although these actions did not involve any major forces, they often culminated in sharp fire fights, usually involving numerically superior hostile defenders. With one exception, enemy-initiated action consisted of widely scattered and sporadic probing efforts utilizing units of squad and platoon strength. The most aggressive enemy action occurred on the central front where a six-day contest terminated with the enemy in possession of a disputed forward position. Enemy capabilities, troop dispositions, and front lines were unaltered during the period.

Except for stubborn resistance to United Nations Command raids and patrols, enemy activity on the western front was limited to small ineffective probes, usually during the hours of darkness. United Nations Command-conducted raids constituted the most noteworthy action. A United Nations Command raid of a position in the Punji area on 16 February encountered a successful hostile defence. A later raid in the same area on 20 February, however, caused the enemy to evacuate a forward position. Enemy elements in the Chudong area on 16 February and in the Mabang area on 20 February tenaciously retained their positions against the action of United Nations Command raiding elements. United Nations Command elements conducted raids against two hostile positions in the Sagimak area on 16 February. One of these terminated with a withdrawal of the small defending unit while the other resulted in the return of the United Nations Command elements.

Although local in nature, the severest conflict along the battle line took place in the Talchon area of the central front. The contest began on 14 February, when United Nations Command elements were forced to withdraw from an outpost position four and one-half miles southeast of Talchon as a result of two enemy attacks. The position was restored by immediate counteraction on 15 February. An enemy daylight attack against this same position on the following day was unsuccessful. Employing an increased strength of two companies supported by artillery and mortar fire, the enemy retook the position on 17 February. The following day United Nations Command Forces, in a day-long attack successfully drove the enemy back despite heavy resistance. On 19 February, however, the enemy again forced United Nations Command elements to relinquish the position. With the exception of this action, enemy aggressiveness on the central front consisted of a small number of ineffective probes. However, the enemy displayed his usual determination in defensive operations against United Nations Command patrols and raids. Of the raids conducted by United Nations Command elements in Tuchon, Kumsong and Talchon areas, only one in the Tuchon area, resulted in an enemy withdrawal.

There was no deviation from the pattern of numerous patrol contacts and small-scale enemy probes on the eastern front. The majority of such activity occurred in the Mulguji and Tupo area. In the former area United Nations Command elements were forced to relinquish two

outposts to small enemy units on 19 February. However, these positions were quickly retaken following strong artillery preparation. On 21 February versatile United Nations Command helicopters were employed to extricate and return a United Nations Command patrol which had been ambushed by hostile elements. As elsewhere, there were no significant changes in enemy troop dispositions on the eastern front.

The capabilities of hostile forces in Korea were not materially diminished during the period. Available information does not reveal any deficiencies which would adversely affect enemy military operations. Both the enemy forces and the United Nations Command forces are at a peak of combat effectiveness. Although occasional vague references to a future Communist offensive have been received, the majority of the indications fail to lend any credence to an early departure from the enemy's presently defensive attitude.

A major concern of United Nations Command leaflets and radio broadcasts was the reaffirmation of Korean unification as a cardinal objective of the United Nations. These media reviewed the long history of United Nations efforts to assist the Korean people in achieving this goal by peaceful means. Emphasis was placed on the unprincipled Communist obstruction of those efforts from 1945 on, and the similarity between these obstructions and the prolonged stalling of Communist delegates in the Armistice negotiations. The cost of these tactics, in terms of Korean lives and property, was continually stressed in leaflets and radio broadcasts to enemy soldiers and to Civilian residents of areas now under enemy occupation.

A General Staff Section for civil affairs (G–5) has been activated in Headquarters, United Nations Command. The function of this section is the supervision and coordination of civil affairs activities in the United Nations Command. The primary mission concerns the United Nations Command programme for civil assistance and economic aid to Korea.

The conferences between representatives of the United Nations Command and the Republic of Korea on economic affairs were recessed from 18 February until early in March. Although some progress has been made in these discussions, the most difficult problems, involving financial matters and inflation, remain unsolved.

# U.S. Delegations to International Conferences

## International Labor Organization

The Department of State on June 5 announced that the U.S. delegation to the thirty-fifth session of the International Labor Conference which convened at Geneva on June 3, is as follows:

REPRESENTING THE GOVERNMENT OF THE UNITED STATES

*Delegates*

Philip M. Kaiser, Assistant Secretary of Labor
James E. Murray, U.S. Senate

*Alternate Delegates*

Wayne Morse, U.S. Senate
Roy V. Peel, Director, Bureau of the Census, Department of Commerce
Frances Perkins, Commissioner, U.S. Civil Service Commission

*Coordinator*

Arnold L. Zempel, Executive Director, Office of International Labor Affairs, Department of Labor

*Advisers*

John J. Babé, Assistant Solicitor, Department of Labor
B. Harper Barnes, Assistant Solicitor, Department of Labor
Robert M. Barnett, Economic Officer (Labor), American Legation, Bern, Switzerland (Resident at Geneva)
Clara M. Beyer, Associate Director, Bureau of Labor Standards, Department of Labor
Frieda S. Miller, Director, Women's Bureau, Department of Labor
Otis E. Mulliken, Officer in Charge of United Nations Social Affairs, Department of State
Robert J. Myers, Chief Actuary, Social Security Administration, Federal Security Agency
Edward B. Persons, Chief, ILO Division, Office of International Labor Affairs, Department of Labor

REPRESENTING THE EMPLOYERS OF THE UNITED STATES

*Delegate*

Charles P. McCormick, President, McCormick and Company, Inc., Baltimore, Md.

*Advisers*

William B. Barton, Director, Employer-Employee Relations, U.S. Chamber of Commerce, Washington, D.C.
Leonard Calhoun, Harter and Calhoun, Washington, D.C.
Carroll E. French, Director, Industrial Relations Counselors, Inc., Rockefeller Center, New York, N.Y.
Paul C. Graham, President, Graham Brothers, Inc., Del Monte, Calif.
Donald Knowlton, Hill and Knowlton, Cleveland, Ohio
William L. McGrath, President, Williamson Heater Company, Cincinnati, Ohio
John V. Newman, Manager, Utt Development Company, Oxnard, Calif.
Charles E. Shaw, Director, Employee Relations Overseas, Standard Oil Company (N.J.), New York, N.Y.

REPRESENTING THE WORKERS OF THE UNITED STATES

*Delegate*

George P. Delaney, International Representative, A.F.L., Washington, D.C.

*Advisers*

Joseph D. Keenan, Secretary-Treasurer, Building Trades Department, A.F.L., Washington, D.C.
Thomas R. Owens, Legislative Representative, United Rubber Workers of America, C.I.O., Washington, D.C.
Paul K. Reed, International Representative, United Mine Workers of America, Washington, D.C.
George J. Richardson, Secretary-Treasurer, International Association of Fire-Fighters, A.F.L., Washington, D.C.
Frank Rosenblum, Secretary-Treasurer, Amalgamated Clothing Workers of America, New York, N.Y.
Michael Ross, Director, International Affairs Department, C.I.O., Washington, D.C.
Stanley Ruttenberg, Director, Education and Research, C.I.O., Washington, D.C.
James C. Turner, President and Business Manager, International Union of Operating Engineers, Washington, D.C.

*Secretary of Delegation:*

Walter W. Sohl, Division of International Conferences, Department of State

*Administrative Secretary:*

Mason A. LaSelle, Assistant Conference Attaché, American Legation, Bern, Switzerland. (Resident at Geneva)

The International Labor Conference, which convenes annually, is the legislative body of the International Labor Organization (ILO), a specialized agency of the United Nations with a membership of 65 nations. The other principal ILO organs are the Governing Body, which is an executive council, and the International Labor Office, which provides the secretariat of the organization.

The ILO seeks through international action to improve labor conditions, raise living standards, and promote economic and social stability. In recent years, with strong U.S. support, the organization has extended its operational activities, including technical assistance and direct advice to governments and employers and workers' groups on labor and social matters.

In connection with proposed international regulations for the protection of workers in places of employment, the Conference will examine an office report which sets forth the relevant law and practices concerning industrial safety and health in the different countries and indicates the principal questions bearing on the proposed international regulations which require the Conference's attention.

The Conference will also discuss the possibility of establishing international standards for the regulation of the employment of young persons in underground work in coal mines, a question initially raised at the twenty-seventh (1945) session of the Conference and under study since that time by the ILO Office and Coal Mines Committee.

Other agenda items are the annual report of ILO's Director General, which affords an opportunity for the consideration of some general problems in the social field; the question of the revision in whole of the maternity protection convention of 1919; financial and budgetary problems; and reports on the application of ILO conventions and recommendations. The Conference will also resume discussion, undertaken initially at its June 1951 session, of questions relating to objectives and standards of social security, to holidays with pay in agriculture, and to cooperation between public authorities and employers' and workers' organizations.

## Council of Food and Agriculture (FAO)

The Department of State on June 9 announced that the fifteenth session of the Council of the Food and Agriculture Organization of the United Nations (FAO) will convene that day in the new FAO headquarters at Rome. The U.S. delegation is as follows:

*U.S. Member*

Knox T. Hutchinson,
    Assistant Secretary of Agriculture

*Alternate U.S. Member*

Fred J. Rossiter, Associate Director, Office of Foreign Agricultural Relations, Department of Agriculture

*Advisers*

Howard R. Cottam, Counselor, American Embassy, Rome
L. Wendell Hayes, Attaché for FAO Liaison, American Embassy, Rome
Francis A. Linville, Chief, Agricultural Products Staff, Office of International Materials Policy, Department of State
Robert B. Schwenger, Chief, Regional Investigations Branch, Office of Foreign Agricultural Relations, Department of Agriculture
Robert C. Tetro, Agricultural Attaché, American Embassy, Rome

*Adviser and Secretary*

Thomas E. Street, Secretary, U.S.–FAO Interagency Committee, Office of Foreign Agricultural Relations, Department of Agriculture

The Council, composed of representatives of 18 governments which are members of FAO, was established in 1947 by the FAO Conference to act for the Conference between its biennial sessions and to keep the world's food and agriculture situation, including national conditions and policies, under constant review.

This session of the Council will consider several questions of major significance, including a progress report on plans for increasing food and agriculture production, a program to which the United States attaches the greatest importance. The Council will also review reports on reform of agrarian structures, expanded technical-assistance programs, commodity problems, and locust control.

In aiding member governments in the development and further improvement, at the farm level, of the extension of advisory services for improving the productivity and standard of living of rural people, FAO is faced with very specific problems, including the most effective use of its limited funds and personnel and the coordination of its work in the field with similar work being done by other international organizations or by governments. FAO's minimum objective in this field is to keep production in each country increasing at a rate of 1 to 2 percent faster than population growth.

FAO proposes to continue its work on land tenure and agrarian reform through general studies, field studies of particular situations, regional seminars, and demonstration projects, as a basis for advice and assistance to member governments under the United Nations expanded technical-assistance program. The United States, believing that FAO's aid and assistance should be oriented toward enhancing desirable types and terms of tenure and toward the creation of opportunities for those working the land to achieve a better living through reasonable returns for their labors, has taken the lead in encouraging FAO and other U.N. agencies to take an interest in the program for reform of agrarian structures in its broadest sense.

During the past year, the U.N. General Assembly, and the U.N. Economic and Social Council

have all given consideration to the problem of dealing with emergency food shortages. One of the subjects for discussion by the Council will be FAO's potential role in meeting emergency famine situations.

According to a recent FAO report which the Council will review, the desert locust plague is rapidly spreading throughout the Near East, so that the agricultural productivity of the entire Near East, India, Pakistan, Afghanistan, and eventually all of northern Africa will be seriously threatened unless locust breeding is effectively controlled. The United States is working with countries in the Near East and with FAO through the Point Four Program in a coordinated attack on this destructive pest. FAO has recently promised, in addition, to provide technical aid and equipment in the amount of $500,000 for a 2-year period for use in the region affected by this locust plague and is coordinating the efforts being made by all governments providing assistance for locust control in the region.

Other items on the agenda, in addition to the annual review of the world food and agriculture situation, are related to administration, finance, and procedure, including the form and content of reports submitted to FAO by member governments; a possible increase in the number of seats on the Council, since the membership of FAO has increased from 54 to 67; and the procedures for Council elections if new members are to be added.

# Current Legislation on Foreign Policy

Authorizing the President of the United States to Proclaim Olympic Week. H. Rept. 1851, 82d Cong., 2d sess. [To accompany H. J. Res. 445] 2 pp.

Mutual Security Act of 1952. Report of the Committee on Foreign Affairs on H. R. 7005, A Bill to Amend the Mutual Security Act of 1951. H. Rept. 1922, 82d Cong., 2d sess. 108 pp.

Providing Transportation on Canadian Vessels Between Skagway, Alaska, and Other Points in Alaska, Between Haines, Alaska, and Other Points in Alaska, and Between Hyder, Alaska, and Other Points in Alaska, or the Continental United States, Either Directly or via a Foreign Port, or for any Part of the Transportation. H. Rept. 2000, 82d Cong., 2d sess. [To accompany S. 2721] 3 pp.

Amending Section 32 (A) (2) of the Trading With the Enemy Act. Conference Report. H. Rept. 2003, 82d Cong., 2d sess. [To accompany S. 302] 2 pp.

The Mutual Security Act of 1952. Report of the Committee on Foreign Relations on S. 3086, A Bill to Amend the Mutual Security Act of 1951 and for Other Purposes. S. Rept. 1490, 82d Cong., 2d sess. 66 pp.

Permitting Free Entry of Articles Imported from Foreign Countries for the Purpose of Exhibition at the Washington State-Far East International Trade Fair, Seattle, Wash. S. Rept. 1497, 82d Cong., 2d sess. [To accompany H. J. Res. 422] 2 pp.

Imposition of Duties on Tuna-Fish. S. Rept. 1515, 82d Cong., 2d sess. [To accompany H. R. 5693] 7 pp.

Authorizing the President of the United States to Proclaim Olympic Week. S. Rept. 1566, 82d Cong., 2d sess. [To accompany S. J. Res. 152] 2 pp.

**Agriculture**
FAO Council, 15th session, to convene, U.S. delegation . . . . . . . . . . . . . 1002

**American Principles**
Advancement of good will throughout the world (Mesta) . . . . . . . . . . . . . 986

**American Republics**
BOLIVIA: New government recognized . . . 983
BRAZIL: Ambassador Salles presents credentials . . . . . . . . . . . . . . 983
MEXICO: Migrant labor agreement with U.S. extended . . . . . . . . . . . . . 985

**Asia**
CAMBODIA: Mission raised to Embassy status . 979
JAPAN: Ambassador presents letter of credence (remarks by Truman and Araki) . . . . 983
KOREA: U.N. Command operations, 40th report . 998
THAILAND: Ambassador Sarasin presents credentials . . . . . . . . . . . . . 983
VIETNAM: Mission raised to Embassy status . . 979

**Congress**
Current legislation on foreign policy . . . . 1003
Statements re German Contractual Agreements and NAT protocol (Acheson, Bruce, McCloy) . 971

**Europe**
GERMANY:
Reparations clause of Contractual Agreements . . . . . . . . . . . . . 979
Statements before Congress re German Contractual Agreements and NAT protocol (Acheson, Bruce, McCloy) . . . . . . . 971

**Foreign Service**
Missions to Vietnam and Cambodia raised to Embassy status . . . . . . . . . . 979

**International Meetings**
Committee for the Movement of Migrants from Europe, 3d session . . . . . . . . . 996
Ship tonnage measurements experts . . . . 997
U.S. DELEGATIONS:
International Labor Conference (ILO), 35th session . . . . . . . . . . . . . 1001
Council of Food and Agriculture . . . . . 1002
Movement of Migrants from Europe . . . 996

**Labor**
International Labor Conference (ILO), 35th session, U.S. delegation . . . . . . . 1001
U.S., Mexico extend migrant labor agreement . . 985

**Refugees and Displaced Persons**
Committee for the Movement of Migrants from Europe, 3d session . . . . . . . . . 996
Immigration, discussion of (Auerbach) . . . 980

**State, Department of**
Changed policy concerning the granting of sovereign immunity to foreign governments . 984

**Treaty Information**
Migrant labor agreement with Mexico extended . 985
Reparations clause of German Contractual Agreements . . . . . . . . . . . . 979

**United Nations**
Command operations in Korea, 40th report . . 998
FAO Council, 15th session, to convene . . . 1002
International Labor Conference (ILO), 35th session, U.S. delegation . . . . . . . 1001
World economic events and defense adjustment problems, review of (Lubin) . . . . . . 989

**Check List of Department of State Press Releases: June 9–13, 1952**

Releases may be obtained from the Office of the Special Assistant for Press Relations, Department of State, Washington 25, D. C. Items marked (*) are not printed in the BULLETIN; items marked (†) will appear in a future issue.

| No. | Date | Subject |
|---|---|---|
| 408 | 5/23 | Auerbach: New immigrants |
| 430 | 6/2 | New Bolivian Government recognized |
| 434 | 6/2 | Meeting on migrants |
| 438 | 6/4 | Tonnage measurement meeting |
| 440 | 6/4 | Mesta: Advertising world good will |
| 442 | 6/5 | ILO conference |
| 444 | 6/6 | Vietnam raised to Embassy rank |
| 445 | 6/6 | Cambodia raised to Embassy rank |
| 447 | 6/9 | FAO Convention |
| *448 | 6/9 | Exchange of persons |
| 449 | 6/9 | Movement of migrants from Europe (combined with No. 434) |
| 450 | 6/10 | Acheson: German agreements |
| 451 | 6/10 | Bruce: German agreements |
| 452 | 6/12 | McCloy: German agreements |
| *453 | 6/10 | "Day of Portugal" |
| †454 | 6/10 | India: Development program |
| 455 | 6/11 | German reparation clause |
| *456 | 6/11 | Berry: Ambassador to Iraq |
| *457 | 6/11 | Moose: Ambassador to Syria |
| *458 | 6/11 | Visitors to U.S. |
| 459 | 6/12 | Thailand: Letter of credence (rewrite) |
| 460 | 6/12 | Brazil: Letter of credence (rewrite) |
| 461 | 6/12 | Japan: Letter of credence |
| †462 | 6/12 | Fellowships for U.S. students |
| 463 | 6/12 | Mexican labor agreement extended |
| †464 | 6/12 | Nichols: Pt. 4 director (rewrite) |
| *465 | 6/13 | Exchange of persons |
| †466 | 6/13 | Saudi Arabian monetary agency |
| †467 | 6/13 | Tibetan trade concessions suspended |

*Name Index*

| | |
|---|---|
| Acheson, Secretary | 971 |
| Araki, Ambassador | 983 |
| Auerbach, Frank L. | 980 |
| Bruce, David K. E. | 971 |
| Heath, Donald R. | 979 |
| Hutchinson, Knox T. | 1002 |
| Kaiser, Philip M. | 1001 |
| Kha, Tran Van | 979 |
| Kimny, Nong | 979 |
| Lubin, Isador | 989 |
| Mann, John W. | 997 |
| McCarran, Pat | 996 |
| McCloy, John J. | 971 |
| Mesta, Perle | 986 |
| Morse, Wayne | 1001 |
| Murray, James E. | 1001 |
| Peel, Roy V. | 1001 |
| Perkins, Frances | 1001 |
| Rossiter, Fred J. | 1002 |
| Salles, Walther Moreira | 983 |
| Sarasin, Phot | 983 |
| Sweet, Henry E. | 997 |
| Tate, Jack B. | 984 |
| Truman, President | 983 |
| Walter, Francis E. | 996 |
| Warren, George L. | 996 |

# EXHIBIT 2

# Oxford Public International Law

**Part I General Concepts, 4 State Immunity and Jurisdiction: Immunity from the Civil and Criminal Jurisdiction of National Courts**

**Hazel Fox, Philippa Webb**

From: The Law of State Immunity (Revised and Updated 3rd Edition)
Hazel Fox, QC, Philippa Webb

**Content type:** Book content
**Product:** Oxford Scholarly Authorities on International Law [OSAIL]
**Series:** Oxford International Law Library
**Published in print:** 27 August 2015
**ISBN:** 9780198744412

**Subject(s):**

Immunity from jurisdiction, ratione materiae — Immunity from jurisdiction, states — Non-justiciability — Sovereignty — Customary international law — Judicial decisions — Jurisdiction of states, conflicts — Jurisdiction of states, domestic — Jurisdiction of states, enforcement — Jurisdiction of states, extra-territorial — Jurisdiction of states, nationality principle — Jurisdiction of states, prescriptive — Jurisdiction of states, territoriality principle — Jurisdiction of states, universality principle

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

# (p. 75) 4  State Immunity and Jurisdiction

## Immunity from the Civil and Criminal Jurisdiction of National Courts

## Introduction

International law recognizes the capacity and authority of the State as an international person to exercise power and the State exercises such power by means of jurisdiction. This jurisdiction concerns 'essentially the extent of each state's right to regulate conduct or the consequences of events';[1] this right being limited by the equal rights and sovereignty of other States.[2] Brownlie describes jurisdiction as 'an aspect of sovereignty [which] refers to judicial, legislative and administrative competence'.[3] Steinberger elaborates that:

> jurisdiction means the comprehensive governmental power of a State, including, in particular its legislative, judicial and administrative powers…. In relation to State immunity its main practical importance consists in the power of the territorial State to adjudicate, to determine questions of law and of fact, to administer justice, and in such other executive and administrative powers as are normally exercised by the judicial and administrative authorities of the territorial State.[4]

The ambit of this governmental power of the State can be divided into jurisdiction to prescribe rules ('legislative' or 'prescriptive' jurisdiction), jurisdiction for establishing procedures for identifying breaches of the rules and the precise consequences thereof ('adjudicative' jurisdiction), and jurisdiction to impose consequences for breaches or, pending adjudication, alleged breaches of the rules ('enforcement' jurisdiction).[5] These divisions are not rigid. 'Adjudicative' jurisdiction, which is essentially the jurisdiction in respect of which State immunity is invoked, may illustrate both 'legislative' and 'enforcement' jurisdiction, in that the courts may both prescribe rules and apply them.

The exercise of such jurisdiction by States may be analysed by reference to four bases: territory, nationality, protection of a State's interests, and universality. An act which takes place across boundaries may attract the territorial jurisdiction of two States by reason of the place where the act was begun and the place where it takes effect. Nationality as a basis may be active or passive; the first relates to jurisdiction based on acts performed by the nationals of a State and the second to acts suffered as victims by nationals of a State; in both cases the acts may be performed abroad. The protective principle allows a State to exercise jurisdiction over foreigners outside its territory to protect its own governmental functions.[6] The protective basis of jurisdiction may be used, for example, to prosecute those engaged in counterfeiting (p. 76) currency, submitting false statements to officials, or attacking diplomats.[7] Universal jurisdiction allows every State to exercise jurisdiction irrespective of the *situs* of the offence and the nationalities of the alleged perpetrator and the victim.[8] The classic example is jurisdiction over piracy on the high seas.[9]

A claim to immunity by a State or some emanation of it primarily challenges jurisdiction on the basis of personality, of which nationality is one form. But the restrictive doctrine uses the location of the act with or the connection by nationality etc of an individual with the forum State as elements in defining the scope of exceptions to immunity, as the employment exception restricted to performance of the employment within the forum or at least the making of the contract relating to it; and the personal injuries exception is restricted to acts causing such injuries within the forum. In addition, the forum State's obligations under

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

human rights conventions may extend its jurisdiction (see 'extraterritorial jurisdiction' below).

The exercise of jurisdiction over the acts of a foreign State itself, which gives rise to a claim of immunity, will most usually be based on their commission within the forum State's territory or extraterritorial areas under its effective control, given that beyond its own territory the foreign State's competing claim to jurisdiction—at any rate in respect of its public acts—may be equal or stronger than that of the forum State.

## The exercise of territorial jurisdiction

As the European Court of Human Rights (ECtHR) in *Bankovic* stated: 'While international law does not exclude a State's exercise of jurisdiction extra-territorially, the suggested bases of such jurisdiction (including nationality, flag, diplomatic and consular relations, effect, protection, passive personality and universality) are, as a general rule, defined and limited by the sovereign territorial rights of the other relevant States'.[10] The utility of the territoriality principle lies in its allocation of jurisdictions and avoidance of concurrent jurisdiction. With some 193 Member States of the UN and a few others (eg the Vatican) making up the international community, it provides a principle of reciprocal exclusion whereby legal order can be maintained by means of the territorial sovereignty of the States' authority, and enforcement powers are allocated to and exercised by the multiplicity of territorial units that make up modern States. State immunity provides a procedural plea to assist national courts to give effect to this legal order and the principle of reciprocal exclusion. As noted by Judge Huber in the *Island of Palmas* case:

> Sovereignty in the relations between States signifies independence. Independence in regard to a portion of the globe is the right to exercise therein to the exclusion of any other State, the functions of a State. The development of the national organisation of States during the last few centuries and, as a corollary, the development of international law, have established this principle of the exclusive competence of the State in regard to its own territory in such a way as to make it the point of departure in settling most questions.[11]

Under the common law, 'jurisdiction' is strongly based on the exercise of this territorial jurisdiction and where extended beyond the forum State's territory continues to be closely (p. 77) associated with the State's imperium, or the extent to which its power can effectively be enforced.

Courts in civil law systems do not claim or exercise inherent jurisdiction in the same way as common law courts do. 'Jurisdiction' to them is a neutral term describing the extent of a State's powers by reference to external criteria set by international law and the State's constitution or legislation made thereunder; the term 'competence' indicates the court to which that jurisdiction is allocated. The difference in meaning is particularly apparent in the distinction generally made by civil law and carried over into the law of State immunity between adjudication and enforcement, the latter often being carried out by State authorities independent of the civil courts. Further, the extent of jurisdiction may vary according to the manner of its exercise; enforcement jurisdiction depends directly on the coercive power, and the ability to enforce it, of the State and has a narrower ambit than adjudicative jurisdiction, which relies more on respect for law, reputation, and a dislike of participation in transactions tainted with illegality.

Municipal courts give effect to the territorial principle in a number of ways. First, they operate rules of definition which explain the types of acts of persons and property coming within that jurisdiction. Secondly, they acknowledge rules of restraint in the exercise of territorial jurisdiction developed through private international law rules and principles of comity and reciprocity. Finally, there are rules of exclusion imposed by international law and obliging the court to refuse jurisdiction; exclusion rules may operate beyond the

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

territorial State's own jurisdiction in the requirement of non-intervention in the domestic affairs of another State; or even within its territorial jurisdiction by the operation of the rule requiring the exhaustion of local remedies, and the rule of immunity, which is our particular area of concern: that is, the exclusion of the exercise of territorial jurisdiction over another State, its property, and representatives, in particular members of the diplomatic mission or of a visiting armed force. Rules of restraint leading to a declaration of no competence or recognition of another State's jurisdiction may achieve similar results to rules of exclusion which prevent the exercise of any territorial jurisdiction over a particular legal person.

## The competing principle of sovereign territoriality

In the nineteenth century, it was the presence of the personal sovereign or his diplomatic representative or of the State's property—particularly its warships—within the territory of the forum State which both grounded the claim that they came within that State's power to prescribe, adjudicate, and enforce its law and led the courts to avoid the consequences of such exercise by recognizing that their foreign external status entitled them to immunity. The principle of territorial jurisdiction is thus clearly the primary condition which gives rise to the law of State immunity, given that beyond its own territory, the foreign State's competing claim, at any rate in respect of its acts of a public nature, may be equal or stronger than that of the forum State.

The expansion of extraterritorial jurisdiction to protect human rights—discussed below in the context of recent ECtHR case-law—may affect the relationship between immunity and jurisdiction in two ways. First, the extension of legal obligations beyond a State's territorial borders necessarily broadens the scope of that State's liability and increases the potential for disputes involving questions of the immunity of that State and its organs or officials. Secondly, extraterritorial jurisdiction recalibrates the competing claims between the foreign State and the forum State because the fact that an act occurred outside of the forum State's territory no longer deprives the State of responsibility and hence would seem to permit some degree of a right to conduct judicial proceedings over the consequences of such an act.

(p. 78) In its 2012 *Jurisdictional Immunities* judgment[12] the International Court of Justice (ICJ), in discussing the procedural nature of the plea of state immunity addressed the two principles of sovereign equality and sovereign territoriality and 'the departures' from one principle that the other principle's application required:

> …the rule of State immunity occupies an important place in international law and international relations. It derives from the principle of sovereign equality of States, which, as Article 2, paragraph 1, of the Charter of the United Nations makes clear, is one of the fundamental principles of the international legal order. This principle has to be viewed together with the principle that each State possesses sovereignty over its own territory and that there flows from that sovereignty the jurisdiction of the State over events and persons within that territory. Exceptions to the immunity of the State represent a departure from the principle of sovereign equality. Immunity may represent a departure from the principle of territorial sovereignty and the jurisdiction which flows from it. (para 57)

In this paragraph the ICJ would seem to recognize the significance of a territorial link with the forum State's jurisdiction and relevance to any setting aside of a foreign State's immunity and support for a claim arising from acts of a foreign State committed in the forum State territory. The Court's ruling in this case was confined to confirming that State immunity continued to apply to acts of the armed forces of a foreign State committed in another State's territory in time of international armed conflict but its reference to the competing principle of territorial sovereignty, read together with Judge Gaja's dissenting opinion, may pave the way for some future recognition and extension of the forum State's

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

jurisdiction, beyond claims based on contract, to delictual acts of a foreign State committed in peace time, at least where they are committed within the territory of the forum State (see further under the exercise of civil jurisdiction over a foreign State and Chapter 15).

## The extraterritorial extension of the State's jurisdiction

Territorial jurisdiction, which Warbrick describes as 'the area of activity which is not regulated by international law',[13] represents the internal expression of a State's sovereignty, and its domestic jurisdiction over the matters 'which by international law are solely within the domestic jurisdiction' of a State (League of Nations Covenant, Article 15(8)) or 'which are essentially within the domestic jurisdiction of any State' (UN Charter, Article 2(7)). Domestic jurisdiction, however, varies over time, and in general is contracting in scope by reason of the increasing international obligations undertaken by the State. Indeed, as Warbrick points out, it is today misleading to equate 'internal' or 'domestic' jurisdiction with a spatial idea of regulation of acts performed within a State's territory; it would seem more appropriate in this 'unbundling of territoriality'[14] to speak of 'a bundle of competences'.[15] International law acknowledges the exclusive competence of a State to recognize other States and to establish diplomatic relations, the grant of adjudicative immunities, and powers which affect activities and persons both within and outside the forum State.

Physical presence within the territory is not the only basis for the exercise of territorial jurisdiction. Immunity is extended to the artificial legal person of the State and its departments (p. 79) and State agencies located and making decisions outside the territory of the forum State; it covers the consequences of acts and transactions concluded and largely performed outside the forum State. The term 'territorial connection' or 'territorial jurisdiction' can be used to link acts or persons remote from the territorial State merely by reason of some effect or element identified as occurring within the State, as with offences committed outside the territory where subsequent 'entry to or presence within' the territory suffices as a territorial link. Regulation of a branch of an undertaking may be said to be territorial in that the branch is located within the territory of the prescribing State but the regulation is applied to the parent company located elsewhere.

This state of affairs is well summed up by Rigaux who, as Special Rapporteur to the Committee on Extraterritorial Jurisdiction of the Institut de droit international, notes that '*compétence, territorialité, extraterritorialité sont des concepts flous*' and that conflicts in exercise of jurisdiction between States take place in a '*zone grise*' where the classificatory concepts themselves overlap.[16]

As regards the protection of human rights, the extraterritorial jurisdiction of States as construed by international and national courts has become increasingly broad. Both the European Convention on Human Rights (ECHR) and the International Covenant on Civil and Political Rights (ICCPR) contain a general jurisdiction clause by which the States Parties undertake to 'secure to everyone within their jurisdiction' (ECHR, Article 1) or 'to respect and to ensure to all individuals within its territory and subject to its jurisdiction' (ICCPR, Article 2) the rights set out and further defined in these conventions. The ICJ has taken the view that the provisions of the International Convention on the Elimination of all Forms of Racial Discrimination (CERD), particularly Articles 2 and 5, 'generally appear to apply, like other provisions of instruments of that nature, to the actions of a State party when it acts beyond its territory'.[17] As Milanovic demonstrates,[18] the universality of application which forms the underlying purpose of human rights conventions has led to an ever-widening scope given to the obligations undertaken by States Parties. In order to provide a remedy to victims of breach of human rights, the area of and persons subject to the State Party's

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

jurisdiction to provide for their protection is enlarged beyond the boundaries of its territory and to persons other than employees, agents, or persons in other recognized relations.

The case-law of the ECtHR has shown a progressive development in *Bankovic,* in rejecting claims brought by the relatives of people who had been killed in a missile attack from a NATO aircraft on a television centre in Belgrade the Grand Chamber reasserted the basic territorial nature of a State's jurisdiction. It acknowledged that the jurisdiction of the State for purposes of human rights protection extended beyond territorial limits but held inadmissible a claim made against Member States of NATO for violation of Articles 2, 10, and 13 (the rights to life, freedom of expression, and an effective remedy) of the Convention, declaring the exercise of extraterritorial jurisdiction by a contracting State to be exceptional.[19]

The Grand Chamber's reliance in *Bankovic* on the presence of two further requirements—first, of the State Party's capacity as regards the alleged breach of the Convention to apply the whole of the human rights regime, and secondly the exclusion of jurisdiction by definition of (p. 80) the '*espace juridique*' concept as the area of application of the ECHR—have been progressively abandoned in subsequent decisions. Both these requirements were applied by the House of Lords in its 2007 *Al-Skeini* judgment in respect of the killing of certain individuals by members of the British armed forces in the course of their duties carried out in the occupation of Iraq. In that case the majority of the House of Lords (Lord Rodger of Earlsferry, Baroness Hale of Richmond, Lord Carswell and Lord Brown of Eaton-under-Heywood)—with Lord Bingham of Cornhill in dissent, holding that the Human Rights Act had no extraterritorial application—ruled that the UK was solely under obligation to exercise jurisdiction pursuant to the Convention as regards the sixth claimant in respect of the human rights of his son, Baha Mousa, who died in a military prison in Iraq while in British custody, including the obligation as to conduct of an inquiry over the prison where Mousa was held. In respect of the five other incidents occurring during armed conflict, the House of Lords held that the UK had no such obligations under the Convention. In so ruling, Lord Brown (with whom the others agreed), emphasized that ECHR Article 1 sought to reflect an 'essentially territorial notion of jurisdiction' with 'other bases of jurisdiction being exceptional' and likened the detention in a prison to such a territorial notion of jurisdiction.[20] But the Lords' judgment followed *Bankovic* in applying the requirement of the State Party's capacity to apply the whole of the human rights regime, and the definition of the 'espace juridique' concept to justify the exclusion of jurisdiction as regards the armed conflicts incidents.

In 2010, however, the Grand Chamber of the ECtHR differed from the House of Lords' decision in *Al-Skeini* so far as its finding on the five armed conflict incidents and held jurisdiction within the meaning of Article 1 of the Convention to be established as regards the violation of the procedural obligation under Article 2 to carry out an adequate and effective investigation into the deaths occurring in those incidents during security operations carried out by British military forces.[21] In doing so, it abandoned the restraints on the finding of jurisdiction that had applied in *Bankovic*. So far as the all-or-nothing approach to the ability of the State Party to apply the human rights regime, the Grand Chamber in *Al-Skeini* stated:[22]

> ...the Court's case-law demonstrates that, in certain circumstances, the use of force by a State's agents operating outside its territory may bring the individual thereby brought under the control of the State's authorities into the State's Article 1 jurisdiction. This principle has been applied where an individual is taken into the custody of State agents abroad. The Court does not consider that jurisdiction in the above cases arose solely from the control exercised by the Contracting State over

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

the buildings, aircraft or ship in which the individuals were held. What is decisive in such cases is the exercise of physical power and control over the person in question.

Citing the facts in the cases of *Öcalan, Issa, Saadoon*, and in *Medvedyev*[23] the Grand Chamber continued:

> It is clear that, whenever the State through its agents exercises control and authority over an individual, and thus jurisdiction, the State is under an obligation under Article 1 to secure to that individual the rights and freedoms under Section 1 of the Convention that are relevant to the situation of that individual. In this sense, therefore, the Convention rights can be 'divided and tailored' (compare *Banković*, § 75).

(p. 81) Further, as regards the Convention legal space ('espace juridique') objection to an extension of the jurisdiction provided in the ECHR, the Strasbourg Court noted first that:[24]

> The Convention is a constitutional instrument of European public order (see *Loizidou v Turkey* (preliminary objections), cited above, § 75). It does not govern the actions of States not Parties to it, nor does it purport to be a means of requiring the Contracting States to impose Convention standards on other States (see *Soering*, cited above, § 86).

The Court continued by qualifying its limitation in *Bankovic* to the area covered by the territory of the States parties as follows:[25]

> The Court has emphasised that, where the territory of one Convention State is occupied by the armed forces of another, the occupying State should in principle be held accountable under the Convention for breaches of human rights within the occupied territory, because to hold otherwise would be to deprive the population of that territory of the rights and freedoms hitherto enjoyed and would result in a 'vacuum' of protection within the 'Convention legal space'…. However, the importance of establishing the occupying State's jurisdiction in such cases does not imply, *a contrario*, that jurisdiction under Article 1 of the Convention can never exist outside the territory covered by the Council of Europe Member States. The Court has not in its case-law applied any such restriction…

Both a spatial criterion—the area of effective control regardless of territorial limits—and a personal criterion—the extent of control over the conduct of individuals, particularly by the State's own organs or agents—are present in this formulation of effective control as the definition of jurisdiction for the purposes of human rights conventions.[26]

Accordingly, the Grand Chamber's conclusion as regards the jurisdiction exercisable by the UK under the ECHR in *Al-Skeini* was:[27]

> …following the removal from power of the Ba'ath regime and until the accession of the Interim Government, the United Kingdom (together with the United States) assumed in Iraq the exercise of some of the public powers normally to be exercised by a sovereign government. In particular, the United Kingdom assumed authority and responsibility for the maintenance of security in South East Iraq. In these exceptional circumstances, the Court considers that the United Kingdom, through its soldiers engaged in security operations in Basrah during the period in question, exercised authority and control over individuals killed in the course of such security

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

operations, so as to establish a jurisdictional link between the deceased and the United Kingdom for the purposes of Article 1 of the Convention.[28]

(p. 82) Although the rulings in *Al-Skeini* and *Bankovic* are confined to the extraterritorial reach in the application of the regional ECHR, those decisions and subsequent case-law applying the ECHR may well in the long run change the classic territorial model of jurisdiction found in general international law. Whilst it may be increasingly difficult to treat jurisdiction exercised extraterritorially as exceptional, subject to further developments, its relevance currently should be confined to the application of human rights conventions based on universality. Without such obligations and the entitlement which they grant to the beneficiaries of human rights obligations, the accepted position in general international law remains that the territory of the State is the basis of jurisdiction. An exception to this principle is to be found in the extraterritorial jurisdiction exercised by US courts pursuant to ATS (now modified by *Kiobel*) and the Anti-Terrorism and Effective Death Penalty Act 1996, which removes the jurisdictional nexus requirement allowing proceedings wherever committed for specified offences causing death or personal injuries by acts of terrorism to designated foreign States (see Ch 8 'US FSIA' and Ch 15 'Territorial Tort Exception' and amendments to the Canadian SIA 2012 follow the US model of designating 'State sponsors of terrorism').

Despite this specific North American legislative providing for extraterritorial jurisdiction and consequent court practice granting reparation for acts of terrorism, the territory of the State would seem to continue as the strongest basis of jurisdiction in any challenge of a claim to entitlement of immunity by another State. This has recently been confirmed in the 2013 *Kiobel* decision, in which the Supreme Court has held that claims will generally not be allowed under the ATS if they concern conduct occurring in the territory of a foreign sovereign; and stated further that even 'where the claims touch and concern the territory of the US, they must do so with sufficient force to displace the presumption against extraterritorial application'.[29] The Supreme Court unanimously dismissed the lawsuit alleging human rights violations by a Dutch company (Shell) committed by Nigerian soldiers against Nigerian citizens in Nigeria.[30] The majority cited 'the danger of unwarranted judicial interference in the context of foreign policy'.[31]

Under international law the independent sovereign status of the foreign State and its own jurisdiction based on that sovereignty validates its presence and acts; non-justiciability not disregard of immunity of the foreign State would seem the more appropriate plea where confronted with the foreign State's rival claim to such jurisdiction. Spatial and personal criteria employed by the ECtHR for ensuring the protection of human rights by the territorial State as a party to human rights conventions would seem to have little application in determining the scope of State immunity and the exceptions thereto in relation to another sovereign State to justify the extension of a State's jurisdiction.[32] Any act of a foreign State committed beyond UK territory but to which the UK extraterritorial jurisdiction extends by reason of loss caused to an individual entitled to the protection of English law, particularly remedies such as *habeas corpus* or discovery of evidence, may conflict with the exercise of a competing jurisdiction of such a foreign State. In such a situation Act of State, foreign or Crown, may also be a relevant plea.[33]

# (p. 83) Universal jurisdiction

Whilst a State's jurisdiction may no longer be limited solely over acts performed within its territory, it nonetheless remains correct that proceedings based solely on the nature of the prohibited act wherever and by whom committed require some identification of a spatial, personal or other element to bring it within the 'jurisdiction' of a State and to link it to its exercise of public powers. Universal jurisdiction is not the same as the principle *aut dedere aut judicare*,[34] whereby parties agree to extradite or prosecute an alleged offender found

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

on their territory; the obligation to extradite or prosecute is not restricted to situations where the underlying jurisdiction is universal.[35]

The restraints on the scope of universal jurisdiction by the competing jurisdiction of other States is still a matter to be worked out. Although the national legislation of many States provides for the exercise of universal jurisdiction over certain crimes, very few States have actually invoked universal jurisdiction since the Second World War.[36] Decisions in national courts show an unwillingness to exercise universal jurisdiction based solely on the gravity of the international crime committed unless there is some further connecting link, such as nationality, residence, or presence.[37] The absence of State practice on this matter is supported by the recent distinction made by the ICJ in the *Belgium v Senegal* case in accepting jurisdiction at the instance of a State Party to the 1984 UN Torture Convention to adjudicate the extent of the Convention's obligation to prosecute but rejecting any such jurisdiction based on customary international law.[38] Useful (p. 84) guidance for a court debating whether to exercise universal jurisdiction may be found in the Princeton Principles of Universal Jurisdiction 2001 which provide in principle 8:

> Where more than one state has or may assert jurisdiction over a person and where the state that has custody of the person has no basis for jurisdiction other than the principle of universality, that state or its judicial organs shall, in deciding whether to prosecute or extradite, base their decision on an aggregate balance of the following criteria:
>
> (a)  multilateral or bilateral treaty obligations;
>
> (b)  the place of commission of the crime;
>
> (c)  the nationality connection of the alleged perpetrator to the requesting state;
>
> (d)  the nationality connection of the victim to the requesting state;
>
> (e)  any other connection between the requesting state and the alleged perpetrator, the crime, or the victim;
>
> (f)  the likelihood, good faith, and effectiveness of the prosecution in the requesting state;
>
> (g)  the fairness and impartiality of the proceedings in the requesting state;
>
> (h)  convenience to the parties and witnesses, as well as the availability of evidence in the requesting state; and
>
> (i)  the interests of justice.

These principles are relevant both in determining the proper scope of a State's jurisdiction over acts committed outside its territory and of the range of acts of a foreign State which a plea of immunity may properly exclude from adjudication by the national courts of another State.[39]

## The relationship of immunity to jurisdiction

A perennial issue in the doctrine of State immunity is the irreconcilable conflict of jurisdiction between two States: the forum and the foreign State. Immunity comports freedom or exemption from territorial jurisdiction. It bars the bringing of proceedings in the courts of the territorial State (the forum State) against another State. It says nothing about the underlying liability which the claimant alleges. Immunity does not confer impunity; the underlying accountability or substantive responsibility for the matters alleged in a claim remain; immunity merely bars the adjudication of that claim in a particular court. Whilst the relationship between immunity and impunity is therefore reasonably clear, that between

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

immunity and jurisdiction is more difficult to state with accuracy. Two formulations are possible: first, immunity may be treated as an element in the definition of a specific jurisdiction omitting the person or act enjoying immunity from its ambit; or secondly, it may be treated as an exception to a predefined jurisdiction to adjudicate.

As a matter of logic the determination of jurisdiction precedes the consideration of immunity.[40] As Judge Rezek in the *Arrest Warrant* case notes, immunity does not exist in abstract but is conditioned by the court before which it is invoked; thus an immunity pleadable before an internal domestic court may not be pleadable before the domestic court of another State or before an international tribunal.[41] But whether it is merely an exception to jurisdiction or a principle of law in its own right, so forming part of, rather than an exception to, jurisdiction, remains uncertain. This basic difference of approach surfaces in the treatment of State immunity.

(p. 85) Thus, Brownlie formulated the plea of State immunity as an exception to national jurisdiction; he wrote in terms of a 'licence' by which 'the agents of one State may enter the territory of another and there act in their official capacity'; the licence is terminable in respect of 'activities which are in excess of the licence conferred or are otherwise in breach of international law'.[42] This approach is also adopted by Dominicé. Introducing an account of the Swiss law of immunity, he writes '*En vertu de l'immunité de juridiction, l'État étranger est exempté de la assujétissement au pouvoir des tribunaux et autres organes juridictionnels étatiques*'. This notion of non-subjection of one State to the jurisdiction of another as the basis of State immunity is also to be found in the 8th edition of *Oppenheim*.[43]

State immunity described as a grant of a licence by the forum State is in line with national courts treating the conferment or declining of competence as a matter of the municipal law of the forum State, but it disguises the fact that the constraints on national courts derive from international law's shared values and requirement of reciprocity.

The second view of immunity as a principle which is independent and which defines jurisdiction takes account of this requirement to comply with international law. It perceives the rule of immunity of a State as a rule of international law which is directly derived from the independence and equality of States. Thus its scope is only partially dependent on the consent of the territorial State. This approach is illustrated by the judgment of the French Cour de Cassation in *Spanish Government v Casaux (Lambege and Pujot)*, where the court states that 'the right of jurisdiction…arising out of its own orders is inherent in its sovereign authority and cannot be arrogated by another Government…'.[44]

Debate on this difference of viewpoint also arose in the formulation of a general principle of immunity by the ILC when preparing its articles on State immunity[45] and is also reflected in the civil law's distinction between *incompétence d'attribution* and *immunité de juridiction*. The municipal court first considers whether it has jurisdiction, and may treat the international personality of the State or the public nature of its activities as rendering it incompetent (*incompétence d'attribution ratione personae* or *ratione materiae*); alternatively, and the distinction is not always clearly drawn, a court may declare itself competent but then acknowledge an exception as regards a foreign State (*immunité de juridiction*).

This uncertainty as to the relationship between a plea of immunity by one State as opposed to the jurisdiction of the national court of another State is reflected in the inconsistent treatment of the jurisdictional links to the forum territory required for proceedings allowing exceptions to immunity provided in the UNCSI. See below under 'Additional jurisdictional link in civil proceedings against a State', and Chapter 9.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

The ICJ has also addressed the relationship between immunity and jurisdiction in international law in three cases, *Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v Rwanda)*, Judgment of 2005, *Arrest Warrant of 11 April 2000*, Judgment of 2002, and *Jurisdictional Immunities of States (Germany v Italy, Greece intervening)*, Judgment of 2012. In all three cases, however, the Court's approach to that relationship has been predetermined by the dependency of its jurisdiction on the consent of the (p. 86) parties to the proceedings. In the *Armed Activities* judgment the Court accepted Rwanda's exclusion of the compulsory dispute settlement clause in the Genocide Convention, declaring that 'the fact that a rule has the status of *jus cogens* does not confer upon the Court a jurisdiction which it would not otherwise possess'.[46] A strong Joint Separate Opinion of Judges Higgins, Kooijmans, Elaraby, Owada, and Simma stated:

> It is a matter for serious concern that at the beginning of the twenty-first century it is still for States to choose whether they consent to the Court adjudicating claims that they have committed genocide. It must be regarded as a very grave matter that a State should be in a position to shield from international judicial scrutiny any claim that might be made against it concerning genocide (para 25).[47]

In the *Arrest Warrant* judgment the Court did not decide on the first issue of universal jurisdiction over foreign nationals for acts committed abroad: it was withdrawn by both parties, set aside by the majority of ten judges, either for reasons of policy, as applauded by Judge Oda in his dissent, or on account of the law on the issue being unripe or still open. Judges Higgins, Kooijmans, and Buergenthal in their Joint Separate Opinion were more positive: 'We regret the suggestion that the battle against impunity is "made over" to international treaties and tribunals with national courts having no competence' (para 51). They agreed that the notion of 'immunity' depends conceptually upon a pre-existing jurisdiction, and that a distinct corpus of law applied to each, but they disagreed with the Court in its giving the impression 'that immunity is a free-standing topic of international law'. It is not. 'Immunity' and 'jurisdiction' are inextricably linked. 'Whether there is immunity in any given instance will depend not only upon the status of Mr Yerodia but also upon what type of jurisdiction, and on what basis, the Belgian authorities were seeking to assert it'.[48]

The Court's judgment confined itself to the second issue of immunity declaring: 'It should be noted that the rules governing the jurisdiction of national courts must be carefully distinguished from those governing jurisdictional immunities: jurisdiction does not imply absence of immunity, while absence of immunity does not imply jurisdiction'.

It was not until 2012 in the *Jurisdictional Immunities* judgment that the Court openly declared the totality of the exclusionary effect of immunity in respect of jurisdiction over substantive responsibility regardless of an admission by the defendant State of responsibility for a breach of international law, of the *jus cogens* nature of the impugned act, and of the absence of any alternative legal remedy. As the Court held in the earlier Order on Counter Claims, Germany had not consented to the Court's jurisdiction with regard to this aspect of the Italian claim.[49]

In view of the limitation of the ICJ's jurisdiction by the requirement of consent of all parties to the proceedings, the States themselves assume the role of monitors of each other's compliance with international law.[50] It would seem open for State practice, independently of the (p. 87) International Court, to develop its own accommodation of immunity to jurisdiction and to do so by taking into account the mutual obligations undertaken by the two States arising from treaty or international custom. Such an independent development

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

would seem to find support in the dissent and uneasiness expressed by individual judges in all the three cases referred to above.

Taking the broader view, the Joint Separate Opinion in the *Arrest Warrant* case looks beyond the manner in which procedures of municipal law apply immunities required by international law to restrain a national court from assuming jurisdiction; it looks to the substantive rules of international law which formulate the limits of both jurisdiction and immunity. Even the ICJ in the *Jurisdictional Immunities* judgment declared that 'the competing principle of territoriality of the forum state' has also to be viewed alongside the principle of sovereign equality from which State immunity is derived and that 'departures' from the application of each of such principles might be required.

## The distinction into civil and criminal jurisdiction

With regard to the exercise of jurisdiction over another State, a distinction has to be made in respect of civil and criminal jurisdiction. The principles of international law which have been discussed with regard to the four bases of jurisdiction are usually stated in relation to the exercise of criminal jurisdiction, that is the direct prosecution by the State authorities of a claim against an individual. Different principles relating to jurisdiction over the public acts of another entity are generally invoked where one State seeks to entertain proceedings against another State. In some respects any jurisdiction exercised in respect of another State imports the exercise of criminal jurisdiction, particularly with regard to enforcement of judgments; such elements of coercion bring into play principles of international law relating to the exercise of criminal law. Civil jurisdiction can thus in the last resort, and even with the special rules relating to satisfaction of judgments against State property introduced by the restrictive doctrine of immunity, be regarded as based on criminal jurisdiction.[51] This aspect of jurisdiction is further examined below under the exercise of criminal jurisdiction.

## The exercise of civil jurisdiction over a foreign State

In other respects, proceedings relating to the State's activities in its own territory concern its reserved domain of domestic jurisdiction, one where it performs public acts as legislator and administrator for which international law requires respect and restraint. If the proceedings are thus treated as ultimately concerning a conflict of the jurisdiction to prescribe between the forum and the foreign State, the problem may be equated as the exercise of civil jurisdiction, governed by principles of conflict of laws, and treated as one of choice of forum and law and the application of the Act of State doctrine and non-justiciability (see Chapter 3).[52]

Yet again, according to the restrictive doctrine of immunity, the State is made subject to municipal law by reason of its conducting a transaction in the same form and manner as a private individual. This would suggest that the principles of jurisdiction relating to civil (p. 88) proceedings are the relevant ones for application. The last approach seems to be the one generally adopted by courts in declaring immunity to be no bar to their jurisdiction.

### *The jurisdictional link for the exercise of such civil jurisdiction*

There is, however, a surprising lack of certainty about the limitations which international law imposes on the exercise of jurisdiction by municipal courts in relation to civil proceedings; an uncertainty which exists with regard to the limits of civil jurisdiction over private parties, as well as over States.[53] There is no general agreement as to the requirements of public international law with regard to the bases for the exercise of civil jurisdiction over private parties by States, although it seems likely that a court may not exercise jurisdiction where there is no significant connection with the forum;[54] a presumption against extraterritoriality (pursuant to which domestic laws are assumed not

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

to apply to conduct abroad) was endorsed by the US Supreme Court in the 2013 *Kiobel* decision.[55]

In most cases the allocation of civil jurisdiction is left largely to the parties by choice of forum clauses, the forum court law, and by reference to private international law rules. These vary from legal system to system, and although considerable efforts have been made to coordinate them by means of the 1968 Brussels and 1988 Lugano Conventions on Jurisdiction and Judgments,[56] they are not universal and have proved difficult to apply in some respects. The failure of negotiations under the auspices of the Hague Conference on Private International Law for a universal draft Convention on Jurisdiction and Foreign Judgments in Civil and Commercial Matters acceptable to both the US and the European States demonstrates the difficulties in reaching an agreement.

To bridge the gap between the negotiating parties tentative agreement was reached to adopt the US approach identifying approved bases of jurisdiction in the Convention as the 'white' list, prohibited bases as the 'black' list, and bases of jurisdiction that fall outside the Convention as the 'grey' list.[57]

But the rigid set of jurisdictional rules which the European States sought posed difficulties for US business interests requiring a more extensive reach for their national courts over (p. 89) transactions carried on abroad. As Mr Kovar, Assistant Legal Adviser to the State Department, explained in testimony to Congress in July 2000:

> Because the due process clause puts limits on the extension of jurisdiction over defendants without substantial link to the forum, the United States is unable to accept certain grounds of jurisdiction as they are applied in Europe under the Brussels and Lugano Conventions. For example, we cannot consistent with the Constitution accept tort jurisdiction based on the place of injury or contract jurisdiction based solely on the place of performance stated in the contract. At the same time civil law attorneys and their clients are profoundly uncomfortable with jurisdiction based on doing business or minimum contacts, which they find vague and unpredictable.[58]

In 2001, it was decided to postpone work on the draft Convention.[59] Work continued on specific issues, resulting in the 2005 Hague Choice of Court Agreements Convention, which applies in business-to-business cases. This Convention—even with its much more modest scope—has attracted only one ratification.[60]

The unsuccessful outcome of negotiations on the Hague Judgments Convention is not directly relevant to questions of exercise of jurisdiction by the national court of one State over another State as the draft Convention was expressly confined to civil and commercial matters between private parties, but its failure does indicate the difficulties in finding some universal common ground. There was, however, some tentative recognition that some assertions of jurisdiction are unacceptable.[61]

## Additional jurisdictional links in civil proceedings against a State

It is by no means certain that a national court's exercise of civil jurisdiction in respect of proceedings where a foreign State is a party is governed by the same principles as those which operate between private litigants. Had a Hague Judgments Convention been adopted and specified certain jurisdictional links identified as acceptable criteria for allocation of jurisdiction in private party disputes, would it have worked for disputes between a State and a private party or been acceptable to States? Even if it be accepted that international law requires a jurisdictional link before a court may exercise jurisdiction in respect of a civil

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

proceeding involving a private party, would it follow that similar jurisdictional links are required for civil proceedings against a foreign State? Or should they be stricter?[62]

State practice under the ECSI, the US and UK legislation, and the case-law of civil law countries discloses no international consensus as to what jurisdictional connections additional to those applicable to proceedings between private parties are required to render lawful under (p. 90) international law the exercise of jurisdiction by the forum State over claims brought against a foreign State. Thus, the provisions relating to a requirement for a jurisdictional connection in respect of the national court of the State determining whether to accord immunity to a foreign State are variously treated in ECSI (see Chapter 5), as a nexus requirement in the US FSIA (see Chapter 8), and in most of the exceptions to immunity in the UK SIA but not in the exceptions relating to commercial transactions, arbitration agreements and seagoing ships used for commercial purposes (see Chapter 7).

The express inclusion of jurisdictional connections in both the ECSI and the FSIA may in part have been explained by reasons extraneous to the concept of immunity. Thus, the ECSI incorporates connecting links, for all the States Parties to the European Community and the 1962 Brussels Convention on Jurisdiction and Judgments, designed 'to prevent proceedings being instituted against a State in the courts of another State where the dispute is not sufficiently closely related to the territory of the forum State to justify the exercise of jurisdiction by a court in that State'.[63] In the ECSI these links were necessary to the Convention because it was designed as a component in a general scheme for the enforcement within the European Community of civil and commercial judgments against both private parties and sovereign States; proceedings coming within the exceptions required the satisfaction of the specified jurisdictional links in order to ensure that the jurisdiction of the forum court was properly established in giving the judgment with which the foreign State had undertaken to comply. Similarly, in legislating for the introduction of a restrictive doctrine of immunity in the US, the FSIA introduced jurisdictional requirements into the enacted exceptions to State immunity which were more rigorous than those required to confer jurisdiction on US courts in proceedings brought against foreign private parties. These nexus requirements have been the source of much litigation, particularly the three-limb requirements of the commercial transaction exception under section 1605(a)(2) (discussed in Chapter 8) and the plaintiff's inability to comply with them frequently results in dismissal of his suit. With regard to the US law, as with the ECSI, there was a reason specific to US law. As Trooboff explains in an analysis of US case-law, given the breadth of jurisdiction permitted in respect of private party litigation applying the due process clause and 'doing business', a nexus test was needed to avoid having cases against foreign States brought in the US which would create significant controversy in view of foreign States' attenuated relationship with the US.[64]

As will be discussed in Chapter 9, UNCSI is drafted broadly on the assumption that general matters relating to the exercise of jurisdiction in respect of a foreign State will be determined in accordance with the rules applicable to private parties, but then, as a result of discussions in the ILC, it largely followed the UK approach of providing additional jurisdictional requirements for the exceptions to State immunity, save for exceptions relating to commercial transactions, arbitration agreements, and seagoing ships used for commercial purposes.

### Conclusion as regards the exercise of civil jurisdiction in relation to another State

This absence of international consensus as to what, if any, additional connection with the forum State court is required before it may disregard immunity of a foreign State suggests that, as with the exercise of civil jurisdiction over private parties, the minimum position

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

prevails: a court may not exercise jurisdiction where there is no significant connection in respect of the subject matter of the proceedings or the defendant state within the forum.

(p. 91) Clearly, it is a task of the first importance for both public and private international lawyers to establish agreed bases for the exercise of jurisdiction and criteria as to which basis has primacy. Should a consensus finally emerge, the agreed bases of jurisdiction might of themselves serve as the filter and sorting device to ensure the proper adjudication of disputes brought against States. However, while such a competition of jurisdictions continues between States, State immunity, whether with or without its own special jurisdictional requirements, remains an indispensable legal technique to reduce and avoid conflict between States.

## The exercise of criminal jurisdiction over a foreign State

The exercise of criminal jurisdiction directly over another State infringes international law's requirements of equality and non-intervention. To apply public law with penalties to another State contravenes international law in two ways. First, it seeks to make another State subject to penal codes based on moral guilt; and, secondly, it seeks to apply its criminal law to regulate the public governmental activity of the foreign State.

International law sets limits on the legislative jurisdiction of States. One of those limits seems to prevent the application of the penal code of one State to another State. If one defines criminal conduct as the contravention of the public law of the State, one immediately sees that the imposition of criminal liability would purport to extend the legislative jurisdiction of the territorial State on public law matters to the foreign State.[65]

Developments in the last 50 years or so in relation to civil proceedings from an absolute to a restrictive doctrine of State immunity left untouched the position in criminal proceedings.[66] The increasing recognition of the international responsibility of States for the commission of international crimes by acts which are attributable to them has not so far led to any change in this position. However, in the same way as unwillingness to afford impunity for commission of international crimes by individuals is leading to the attenuation of their immunities in respect of acts performed by them on the State's behalf, so it is possible to envisage that the recognition of a State's responsibility at the international level may weaken the immunity which it currently enjoys in respect of such conduct in criminal proceedings in municipal courts.

UNCSI contains no express exclusion in respect of criminal proceedings (for an explanation of this position see Chapter 9). State immunity until the 1990s was universally considered as a procedural bar relevant to civil proceedings where, much more than in a criminal prosecution, there was equality of arms between applicant and respondent and hence, without international law's requirement of immunity, a foreign State could be exposed to all the hazards of a local forum and litigious claimants. In common law countries, the rule which prohibits the bringing of criminal proceedings against a foreign State continues to be based on common (p. 92) law, not statute. Without exception, the legislation in common law countries introducing the restrictive approach of immunity in civil proceedings excludes its application to criminal proceedings. The UK SIA is expressly stated 'not to apply to criminal proceedings' (section 16(4)), an exclusion which is followed in the legislation of Singapore, Pakistan, South Africa, and Canada.[67] The US FSIA expressly limits jurisdiction to 'any non jury civil actions'.[68]

This absence of legislation in common law countries relating to criminal, as opposed to civil, proceedings does not, however, apply to diplomatic law where the international rule of

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

immunity from criminal proceedings of the diplomat has been enacted into national legislation in both common and civil law countries.

The discussion of the exercise of criminal jurisdiction against a State must be preceded by the larger questions of whether States have the capacity in law to commit crimes and are answerable for criminal conduct. Further questions arise as to the attributability to the State of the acts of their officials or agents performed on behalf and/or on the orders of the State and the consequent answerability of State officials before municipal courts for such conduct. The general nature of imputability to the State of the acts of the official or agent is briefly mentioned here, while the extent of the consequent application of State immunity to the representatives of the State is examined in Part IV.

The position of the State with regard to the exercise of criminal jurisdiction goes well beyond immunity and involves wide-ranging issues relating to responsibility and attribution. Do wider considerations of international law and the nature of a sovereign State prohibit the application of criminal liability under municipal law? Whilst the rules of immunity are designed to prevent the application of municipal civil jurisdiction over the governmental acts of a foreign State,[69] more fundamental objections based on the structure of the international community and the core purposes of international law may operate to exclude any move to a restrictive doctrine of immunity from criminal proceedings based on an analogy with civil proceedings. It would be wrong to assume that the rules relating to immunity are necessarily relevant to or decisive of these larger issues, a point stressed by the European Court of Justice in stating that the determination of the non-contractual liability of the Community for damage caused by its servants in the performance of its duties was not necessarily dependent on the characterization of an act as official for the purposes of immunity under the European Communities Protocol on Privileges and Immunities.[70]

### (p. 93) Capacity of the State to commit a crime under international law

International jurists have long discussed whether the State has capacity in international law to commit a crime and the nature of the sanctions for such conduct[71] (would they amount to anything more than a decision and adoption of measures by the UN Security Council under Chapter VII of the Charter?). In its 1998 Report on State Responsibility, the ILC noted that there was no consensus.[72]

The Special Rapporteur concluded that there was general agreement that 'the law of international responsibility is neither civil nor criminal, and that it is purely and simply international' and accordingly excised Article 19 establishing international crimes of a State from the 2000 Draft Articles on State responsibility, leaving only an Article spelling out the consequences of 'serious breaches of obligations under peremptory norms of general international law'.[73]

In the *Bosnia Genocide* judgment, relying on the UN General Assembly Resolutions declaring that 'genocide is an international crime entailing national and international responsibility on the part of individuals and States' and its interpretation of the object and purpose of the Genocide Convention, the ICJ ruled that Article I of the Convention provided not only an obligation on Contracting States to prevent genocide but also a prohibition placed directly on them not to commit genocide.[74] In the Court's view:

> It would be paradoxical if States were thus under an obligation to prevent, so far as within their power, commission of genocide by persons over whom they have a certain influence, but were not forbidden to commit such acts through their own organs, or persons over whom they have such firm control that their conduct is attributable to the State concerned under international law. In short, the obligation

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

to prevent genocide necessarily implies the prohibition of the commission of genocide.[75]

The Court held that Article IX of the Convention, by referring to the responsibility of the Contracting States for genocide, confirmed the duality of this direct responsibility.[76] It stated that 'the responsibilities of States that would arise from breach of such obligations, are obligations and responsibilities under international law. They are not of a criminal nature'.[77]

This distinctive character of the international system of State responsibility is borne out by the reasoning of the ICTY Appeals Chamber in declaring that it had no authority to address a *subpoena*, in the sense of an order with the threat of a penalty for non-compliance, to a State or to a State official in his official capacity.[78]

(p. 94) International law has moved forward and now recognizes a capacity on the part of States to commit crimes attributable to them by the acts of their organs; it formulates this responsibility as a system of responsibility in international law, not as criminal liability, with that responsibility derived from obligations undertaken by States under international conventions or less certainly from customary international law. To what extent this system is exclusively one of restitution and reparation remains uncertain; certainly a punitive element can be seen to exist in the sanctions which under the UN Charter the Security Council may impose under Chapter VII upon a State without its consent. Unresolved is the question whether the recognition of international responsibility for the commission of certain crimes can in any way result in criminal liability being imposed upon one State in the municipal law and in the national courts of another State. Given the highly political consequences of any unilateral forcible action taken against another State, such a scenario seems highly unlikely. The commission of State crimes usually involves the defence, security, or police forces of a country, all of which fall within the exercise of sovereign authority and remain immune even under the restrictive doctrine. So the position remains that one State has no jurisdiction under international law to refer the question of the responsibility of another State for conduct of a criminal character to the decision of its courts. But it may be asked whether the adoption of a restrictive doctrine of immunity in any way changes that position.

### Capacity of the State to commit a crime under municipal law

The adoption of a restrictive doctrine has not been treated as having any relevance in relation to the Absolute Immunity of the foreign State from criminal proceedings: as discussed later in Chapters 7 and 8 both US and UK law have treated immunity of the State from criminal proceedings as more a matter of substantive incapacity and the inapplicability of the penal code of one State in respect of the acts of another State, rather than attributable to a procedural defect.[79] A French court has held that a State agency exercising administrative duties is equally immune from criminal jurisdiction.[80] Yet the essence of the restrictive doctrine is to treat a State which engages in commercial or private law matters as on the same footing as any other artificial person or corporation. This leads one to ask whether the nature of the criminal process is wholly determinative if and when its purpose is essentially to achieve the same goals as civil laws? Is the broad definition of criminal conduct as relating exclusively to matters *de jure imperii* workable today when much of criminal law is employed to ensure the observance of standards of health, safety, and other social concerns, matters in which the private litigant has as much to lose as the enforcing State? Further, if the source of the prohibition of the conduct is international law, and if the conduct qualifies by its nature as commercial or private law

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

character, is there any obstacle to the exercise of local jurisdiction by way of criminal proceedings rather than civil process?

Although the widespread adoption of a restrictive doctrine of immunity in civil proceedings has not directly affected the position relating to criminal proceedings, it is to be noted that the subjection of foreign States to local courts' jurisdiction in respect of transactions of a private law or commercial nature has been based on a general assumption of the applicability, (p. 95) subject to some modification, of municipal law to foreign States. To allow civil proceedings to be brought within the now acknowledged exceptions to immunity required acceptance by forum State courts that there was no juridical obstacle to holding liable the artificial person of a foreign State for activities *de jure gestionis*. In such proceedings the courts accepted that the foreign State was a legal person capable of liability under municipal law, that forum State provisions of private law were applicable to a foreign State, and consequently that a foreign State could be found to be in breach of civil law duties and awards of compensation made. In making such assumptions, certain restrictions based on respect for the equal and independent status of the foreign State were still observed. The remedies available in respect of such civil proceedings were restricted; thus the remedies of injunction prohibiting conduct or specific performance ordering conduct, which are usually available in civil proceedings, were excluded, as well as the imposition of any penalty. In effect, in adopting a restrictive approach municipal law imitated the international law of State responsibility by making the remedy one of reparation, not punishment.

These developments in civil jurisdiction might indirectly point the way, should occasion so require, to the fashioning of an exception to immunity from criminal proceedings. If the alleged act took place within the forum State's territory,[81] if the proceedings are based on infringements of a commercial or private law nature, and the infringements constitute municipal crimes but are capable of generating civil duties of reparation and the remedy is restricted to such reparation, is there any objection to introducing an exception to the immunity for the consequences of such crimes on the same lines as for civil proceedings? Of course, it might be said that, so limited, the proceedings would in essence be of a civil nature. Practically, civil proceedings may be equally, if not more, effective in providing a remedy. A judgment for damages by way of civil proceedings can broadly achieve reparation to the victim of a criminal act and there is a greater likelihood of a foreign State's voluntary compliance with a civil judgment which has none of the moral obloquy of a criminal conviction and the imposition of a fine. One crucial area of distinction may relate to the possibility in criminal proceedings of confiscation or forfeiture of the proceeds of crime deposited by a foreign State in the forum State.[82]

The problems of application of municipal law distinctions to proceedings to which States are a party arises in other contexts and is discussed in this book in Chapter 3 under Non-justiciability and Chapter 13 as to whether administrative law issues can be brought within the commerciality or private law criterion of the restrictive doctrine. The distinctions which municipal law makes between different branches of law—criminal, civil and commercial, public and administrative constitutional—are not always readily applied to proceedings in which States are a party.

So far as the exercise of criminal jurisdiction against a State is concerned, our conclusion in this section is that, while it is highly improbable that municipal courts will directly prosecute foreign States for conduct which constitutes a crime under municipal law, it is to be expected that the application of the restrictive doctrine will permit claims for compensation where a foreign State has committed in the forum State or authorized the commission there of acts of a criminal nature.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

pe of this p pe

### (p. 96) Position of the official: non-answerability in municipal law

As discussed above, no State may exercise the criminal jurisdiction of its courts over another State. State responsibility is the traditional method by which one State may seek reparation for the commission of acts of a criminal nature by another State. A consequence of this rule has been the non-answerability of the individual official who performed the act for which reparation is sought. This classic rule is under pressure from efforts to remove immunity in cases of grave violations of human rights, which are discussed briefly below and examined in Chapter 18. The ICJ carefully inserted a caveat in its *Jurisdictional Immunities* judgment that it was only addressing the immunity of the State and not the immunity from criminal proceedings of State officials.[83]

The classic rule was acknowledged in diplomatic exchanges between the UK and the US in *Macleod's* case, which arose out of the seizure in 1837 of the American ship, the *Caroline*, which had been giving aid to Canadian rebels and attacking British ships, by a British force which sent the US ship over the Niagara Falls causing loss of life. The Law Officers stated their opinion that:

> The principle of international law that an individual doing a hostile act authorized and ratified by the government of which he is a member cannot be held individually answerable as a private trespasser or malefactor but that the act becomes one for which the State to which he belongs is in such a case alone responsible is a principle too well established to be now controverted…

Mr Webster, the US representative, had confirmed in identical terms the above principle also adding:

> [W]hether the process be criminal or civil, the fact of having acted under public authority and in obedience to the orders of lawful superiors, must be regarded as a valid defence, otherwise individuals would be held responsible for injuries resulting from the acts of government, and even from the operations of public war.[84]

This classic rule was applied largely unquestioned for the next 150 years or so and received confirmation in the *Blaskic* case, ICTY Appeals Chamber, in its ruling that a subpoena could not be served on a State official:

> The Appeals Chamber dismisses the possibility of the International Tribunal addressing subpoenas to State officials acting in their official capacity. 'Such officials cannot suffer the consequence of wrongful acts which are not attributable to them personally but to the State on whose behalf they act: they enjoy so-called "functional immunity." This is a well established rule of customary international law going back to the eighteenth and nineteenth centuries, restated many times since.'[85]

Although criminal prosecution was barred by immunity in the foreign State, the effect of this rule on the State official by no means left his acts without consequence. As acts of a governmental nature they fall within his home State's jurisdiction. As such, they are not necessarily innocent: the home State may exercise disciplinary powers or prosecute him under home laws; or it may characterize the act as non-official or, acknowledging its official nature, waive any immunity and allow criminal proceedings to be brought against the official in the forum State's courts. Finally, in the event of not adopting any of these courses, the home State may acknowledge that responsibility at international law, as a matter of State responsibility between the two States.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

(p. 97) It was in respect of the extent of this responsibility and its consequence for the individual State wrongdoer's criminal liability that change came about in the latter part of the twentieth century. Such change was brought sharply to the general public's attention by the House of Lords decision in *Pinochet* in 1999. For further discussion on this case and its limited impact on the development of a human rights exception to immunity, see Chapter 18.

Although the condemnation of *jus cogens* violations is widespread, the jurisdiction to prosecute them in national courts is uncertain and dependent on other factors such as the jurisdictional connection of the act, or the individual offender or the victim with the prosecuting State and that State's obligations to exercise extraterritorial jurisdiction where the alleged crime has been committed outside its territory.[86]

There is, however, a line of cases where State practice allows the territorial jurisdiction of the forum State to pre-empt the State immunity of the foreign State and allows prosecution despite the commission of the offending acts in the course of official functions where they are committed within the forum State's territory without its consent. It has generally been accepted that in time of peace acts of espionage, sabotage, kidnapping committed by a State official in the territory of another State, without that State's consent to the act or presence of the official, constitute a violation of international law and that the victim State is entitled in international law to prosecute the individual spies. The ILC's Special Rapporteur, Kolodkin, in his Second Report acknowledges such an exception stating that 'the question whether immunity *ratione materiae* is absent where a crime [by a foreign State official] is perpetrated in the territory of the State which exercises jurisdiction stands apart'; he refers to instances of espionage, acts of sabotage, kidnapping, and notes that 'in judicial proceedings concerning cases of this kind, immunity has either been asserted but not accepted, nor even asserted'.[87]

The ILC Secretariat's memorandum had suggested that in determining the loss of immunity in such cases 'the crucial consideration would be whether or not the territorial State has consented to the discharge in its territory of official functions by a foreign State organ'.[88] Whilst in respect of an official, even where the consent given is limited to the presence of such official in the territory of the forum State, Kolodkin would retain immunity *ratione materiae* as committed 'in connexion with his official activity' (hence supporting the UK's action in expelling but not asserting criminal jurisdiction over a Libyan official in the shooting of PC Fletcher in 1984 from diplomatic premises). But in the situation where the accused official without the consent of the forum State is both present in that State's territory and commits a serious criminal offence, Kolodkin would allow an exception, and further noted that any such exception might extend to one not necessarily amounting to a grave international crime.[89] He was thus prepared, so far as the facts in the Greek and Italian cases of *Distomo* and *Ferrini*, respectively, concerned illegal activity within the territory of those countries, to treat them as coming within the exception and to deprive the German military officials of any immunity *ratione materiae* for such activity.[90] Some support for such a territorial exception is found in the decision of an English court that the immunity *ratione materiae* of a senior (p. 98) security officer, Khurts Bat, of the Mongolian government provided no bar to the execution of a European arrest warrant requested by the federal German court in respect of the abduction and serious bodily injury of another Mongolian national committed by Mr Bat in France and Germany.[91]

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

## Conclusion

The continuing tension in the law of State immunity is well described in the Joint Separate Opinion of Judges Higgins, Kooijmans, and Buergenthal who, after discerning a gradual movement towards bases of jurisdiction other than territoriality, continue:[92]

> This slow but steady shifting to a more extensive application of extraterritorial jurisdiction by States reflects the emergence of values which enjoy an ever-increasing recognition in international society. One such value is the importance of the punishment of the perpetrators of international crimes...

> Now it is generally recognized that in the case of such crimes, which are committed by high officials who make use of power invested in the State, immunity is never substantive and thus cannot exculpate the offender from personal responsibility. It has also given rise to a tendency, in the case of international crimes, to grant procedural immunity from jurisdiction only so long as the suspected State official is in office.

## Footnotes:

[1] Jennings and Watts (eds), *Oppenheim's International Law* (9th edn, 1992), 456, C Staker, 'Jurisdiction' in Evans (ed), *International Law* (2014, 4th edn), Chapter 4.

[2] Milanovic, *Extraterritorial Application of Human Right Treaties: Law, Principles, and Policy* (2011), 26 citing Mann, 'The Doctrine of International Jurisdiction Revisited after Twenty Years' (1984-III) 186 Hague Recueil 9 at 20.

[3] Brownlie, *Principles of Public International Law* (6th edn, 2003), 297. Staker, 'Jurisdiction' in Evans (ed) *International Law* (2014, 4th edn), Chapter 4.

[4] Bernhardt (ed), *Encyclopaedia of Public International Law* (2nd edn, 1992).

[5] Oxman, 'Jurisdiction of States' (2011) MPEPIL, para 3.

[6] Oxman, 'Jurisdiction of States', para 27.

[7] See eg Art 3(1)(c) Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, Including Diplomatic Agents, 1973.

[8] O'Keefe, 'Universal Jurisdiction: Clarifying the Basic Concept' (2004) 2 J Int'l Crim Just 735 and *The Princeton Principles on Universal Jurisdiction* produced by the Princeton University Program in Law and Public Affairs (2001).

[9] *In Re Piracy Jure Gentium* [1934] AC 586.

[10] *Bankovic and Ors v Belgium and Ors* App No 52207/99, [2001] ECHR 89, 123 ILR 94.

[11] *Island of Palmas (Or Miangas)* case (*Netherlands v USA*) RIAA II 829 at 838 (1928).

[12] See the Index for references to where this case is discussed.

[13] Warbrick, 'The Principle of Sovereign Equality' in Lowe and Warbrick (eds), *United Nations and the Principles of International Law: Essays in Memory of Michael Akehurst* (1998), 204.

[14] Ruggie, *Constructing the World Polity: Essays in International Institutionalisation* (1998), 195.

[15] 'As ownership is described as a bundle of rights, sovereignty may be described as a bundle of competences': Blix, *Sovereignty, Aggression and Neutrality* (1970), 11.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

**16**  ADI vol 68–1 (1999) 372–3.

**17**  *Application of the International Convention on the Elimination of all Forms of Racial Discrimination (Georgia v Russian Federation), Provisional Measures, Order of 15 October 2008*, ICJ Reports 2008, para 109. The Court did not revisit the question of the territorial application of CERD, which was raised by Russia as a preliminary objection, in its judgment because it decided it had no jurisdiction on different grounds: Judgment, Preliminary Objections, ICJ Reports 2011.

**18**  Milanovic, *Extraterritorial Application of Human Right Treaties: Law, Principle and Policy* (2011), 55.

**19**  *Bankovic and Ors v Belgium and Ors*, App No 52207/99, IRIS 2002-1:3/2, paras 59–60.

**20**  *Secretary of State for Defence v Al-Skeini and Ors* [2007] UKHL, [2008] 1 AC 153.

**21**  *Al-Skeini and Ors v United Kingdom*, App No 55721/07, [2011] ECHR 1093 (7 July 2011).

**22**  *Al-Skeini and Ors v United Kingdom*, paras 136–7.

**23**  *Öcalan v Turkey* [GC], App No 46221/99, § 91, ECHR 2005 IV; *Issa and Ors v Turkey*, App No 31821/96, 16 November 2004; *Saadoon and Mufdhi v United Kingdom* (dec), App No 61498/08, §§ 86–9, 30 June 2009; and in *Medvedyev and Ors v France* [GC], App No 3394/03, § 67, ECHR 2010.

**24**  *Al-Skeini and Ors v United Kingdom*, App No 55721/07, [2011] ECHR 1093 (7 July 2011), para 141.

**25**  *Al-Skeini and Ors v United Kingdom*, para 142.

**26**  See Milanovic, 'Al-Skeini and Al-Jedda in Strasbourg' (2010) 22 EJIL 121 at 123–39. In *Amnesty International Canada and British Columbia Association for Liberties v Civil Chief of Defence Staff for the Canadian Forces, Ministry of National Defence and Attorney General of Canada,* Canadian Federal Court, 12 March 2008, Mactavish J held that while detainees in the custody of Canadian forces in Afghanistan have rights accorded to them under international law, international humanitarian law, and the Afghan Constitution, they do not have rights under the Canadian Charter of Rights and Freedoms and that the Charter is inapplicable and has no extraterritorial application to the conduct in the case. The court, applying *R v Hape* (2007) 46 ILM 813, ruled that the extraterritorial application of the Canadian Charter is subject to two requirements: that the conduct of which complaint is made be that of a State actor; and the application of the Charter to extraterritorial activities of the Canadian State actor be justified by an exception to the principle of sovereignty. The English decision of *Al-Skeini* was distinguished on the ground that Canada was not an occupying power of Afghanistan.

**27**  *Al-Skeini and Ors v United Kingdom*, para 143.

**28**  The Grand Chamber also issued a judgment in *Al-Jedda v UK*, App No 27021/08, judgment of 7 July 2011, holding the UK to be in effective control during the period of security operations prior to Iraq's assumption of powers to discharge its obligations under the ECHR and that '…neither Resolution 1546 nor any other United Nations Security Council Resolution explicitly or implicitly required the United Kingdom to place an individual whom its authorities considered to constitute a risk to the security of Iraq into indefinite detention without charge. In these circumstances, in the absence of a binding obligation to use internment, there was no conflict between the United Kingdom's obligations under the Charter of the United Nations and its obligations under Article 5 § 1 of the Convention….' (109); cf *Sirdar Mohammed v MOD* [2014] EWHC 1369 (QB), Leggatt J.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

**29**  *Kiobel v Royal Dutch Petroleum Co*, No 10-1491, slip op, USSC, 17 April 2013, at 14.

**30**  *Kiobel v Royal Dutch Petroleum Co*. The plaintiffs were US citizens by the time the case was heard, having been granted asylum. See further Ch 8.

**31**  *Kiobel v Royal Dutch Petroleum Co*, at 5.

**32**  The relevance, as discussed below, of a jurisdictional link to the territory of the forum State to support a national court's exercise over a foreign State is to be seen as an additional restriction, rather than an extension of, the forum State's territorial jurisdiction.

**33**  *Shergill v Khaira* [2014] UKSC 33; [2015] AC 359, para 43.

**34**  The ICJ considered this principle in the case *Questions relating to the Obligation to Prosecute or Extradite (Belgium v Senegal)* ICJ Reports 2012. After Senegal refused to extradite Hissène Habré, former dictator of Chad, to Belgium, Belgium requested Senegal to prosecute Habré for crimes against humanity and torture. The Court confirmed that Senegal was under an obligation to extradite or prosecute Habré without undue delay. See also the work of the ILC on 'The obligation to extradite or prosecute (*aut dedere aut judicare*)', especially the 4th Report of the Special Rapporteur, Z Galicki, A/CN.4/648.

**35**  International treaties, with the exception of the grave breaches provisions of the 1949 Geneva Conventions, tend to place the obligation to establish universal jurisdiction and the obligation *aut dedere aut judicare* in separate articles. See eg Torture Convention, Art 5(2); Convention for the Suppression of Unlawful Seizure of Aircraft, Art 4(2), 16 December 1970, 860 UNTS 105; Convention for the Suppression of Unlawful Acts Against the Safety of Civilian Aircraft, Art 5(2), 23 September 1971, 974 UNTS 177; Convention Against the Taking of Hostages, Art 5(2), 17 December 1979, 1316 UNTS 205. See *Obligation to Prosecute or Extradite (Belgium v Senegal)* ICJ Judgment 20 July 2012, para 122 where the Court found it had jurisdiction with regard to the obligation to prosecute under the 1984 UN Convention on Torture but none in respect of a violation of universal jurisdiction under customary international law. See O'Keefe, 'The Grave Breaches Regime and Universal Jurisdiction' (2009) 7(4) J Int'l Crim Just 811, 826–8 and van Steenberghe, 'The Obligation to Extradite or Prosecute' (2011) 9 JICJ 1089.

**36**  A study on universal jurisdiction by Amnesty International published in 2011 shows that 84 per cent of States have incorporated universal jurisdiction into their domestic system, but only Argentina, Austria, Australia, Belgium, Canada, Denmark, Finland, France, Germany, Israel, Netherlands, Norway, Paraguay, Senegal, Spain, Sweden, Switzerland, the UK, and the US have invoked this jurisdiction. The study cites only one instance (*Extradición Ricardo Miguel Cavallo, Suprema Corte de Justicia de la Nación* (Mexico), *Amparo en Revisión 140/2002,* 10 June 2003) in which an individual has been extradited to a State prosecuting pursuant to universal jurisdiction. Amnesty International, *Universal Jurisdiction: A Preliminary Survey of Legislation Around the World* (October 2011), 1, 10.

**37**  *Kiobel v Royal Dutch Petroleum Co*, No 10-1491, slip op, USSC, 17 April 2013. See ILA 2012 Sofia Guidelines on Best Practices for International Civil Litigation for Human Rights Violations, Art 2.1 proposing, as regards a private party defendant, that the State of the permanent residence of an individual defendant or statutory seat, central administration, or place of business shall be entitled to exercise jurisdiction in civil proceedings seeking 'to redress conduct constituting a human rights violation, in view of the nature of the norm allegedly violated or the gross or systematic nature of the breach alleged'. *Akpan v Royal Dutch Shell*, 30 January 2013, Hague District Court (Shell Nigeria liable to pay compensation to Nigerian resident applying for tort of negligence by failing to take sufficient measures to prevent sabotage by third persons to Shell Nigeria's submerged pipelines); *El-Hojouj v Unnamed Libyan Officials*, Hague District Court, 21 March 2012,

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

Case No 400882/HA ZA 11-2252 (awarding damages to a Palestinian doctor tortured by Libyan state agents).

**38**  *Belgium v Senegal* ICJ Reports 2012, para 122 (i) and (ii). See also Judge Abraham Separate Opinion. The absence of authoritative guidance as to the customary international law has resulted in the UNGA Resolution 66/103 of 2011 setting up a Working Group of the Sixth Committee to undertake a thorough discussion of the scope and application of universal jurisdiction. In the *Peruvian Genocide Case* (20 May 2003), 42 ILM 1200, 141 ILR 720 Spain, Supreme Ct Crim Div, the Spanish court possessed universal jurisdiction only on a subsidiary basis. Jurisdiction was primarily a matter for the courts of a country where the acts were committed in that territory or by nationals of that country.

**39**  See the Institut de Droit international 2005 Resolution on 'Universal Jurisdiction with regard to the crime of Genocide, Crimes against humanity and War Crimes' where Art 3(c) suggests preference be given to trial by the State where the offence was committed or the State of the nationality of the offender if willing and able to do so.

**40**  *Arrest Warrant of 11 April 2000*, para 46.

**41**  *Arrest Warrant of 11 April 2000*, para 2.

**42**  Brownlie, *Principles of Public International Law* (4th edn, 1990), 322.

**43**  Lauterpacht (ed), *Oppenheim's International Law* (8th edn, 1955).

**44**  *Spanish Government v Casaux (Lambege and Pujot)*, French Cour de Cassation 22 January 1849, Sirey 1830 I, 81 at 93; Dalloz, 1848 I, 5.

**45**  YBILC (1981) Vol II, Pt 2, 156, para 215; see also YBILC (1982) Vol II, Pt 1, 205, paras 20–1. Any attempt to resolve the issue by use of the shifting of the burden of proof from foreign State to forum State and back has been shown to be 'artificial and ultimately a *petitio princeps*'. Giegerich, 'Do Damages arising from *Jus Cogens* violations Override State Immunity from the Jurisidiction of Foreign Courts?' in Tomuschat and Thouvenin (eds), *The Fundamental Rules of the Legal Order: Jus Cogens and Erga Omnes* (2006).

**46**  At paras 64 and 125; also cited in para 94 of the *Jurisdictional Immunities* judgment.

**47**  Cf the Dissenting Opinion of Judge ad hoc Gaja in *Jurisdictional Immunities* concluding, as regards the territorial tort exception, 'one has to reach the conclusion that the nature of the obligation under international law which is at the origin of the claim does not per se provide sufficient evidence that jurisdiction may be exercised over foreign States in case of a claim for reparation for the breach of an obligation under a peremptory norm wherever committed. On the other hand, one cannot infer from this practice that the nature of the obligation breached negatively affects the applicability of the "tort exception". It would indeed be extraordinary if a claim could be entertained on the basis of the "tort exception" when the obligation breached is of a minor character while this exception would not apply to claims relating to breaches of obligations under peremptory norm'. (para 11)

**48**  *Arrest Warrant*, para 43. Joint Separate Opinion, para 3c.

**49**  *Jurisdictional Immunities*, ICJ Order, Italy's Counterclaim, 6 July 2010.

**50**  See this view advanced in the Joint Separate Opinion in the *Armed Activities* case, para 27.

**51**  This conclusion is supported by Professor Brownlie's view that the exercise of civil and criminal jurisdiction over private individuals is ultimately based on the same principles: 'Indeed, as civil jurisdiction is ultimately reinforced by procedures of enforcement involving criminal sanctions, there is no great difference in principle between the problems created by assertion of civil and criminal jurisdiction over aliens. In either case the prescriptive jurisdiction is involved': Brownlie, *Principles of Public International Law* (4th edn, 1990),

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

303. See also Crawford, 'A Foreign State Immunities Act for Australia?' (1983) 8 Aust YB Int Law 71 at 90.

[52]  Singer, 'Abandoning Restrictive Sovereign Immunity: An Analysis in Terms of Jurisdiction to Prescribe' (1985) 1 Harv Intl LJ 26 at 30–59.

[53]  Reydams, *Universal Jurisdiction: International and Municipal Legal Perspectives* (2003), 5; Donovan and Roberts, 'The Emerging Recognition of Universal Civil Jurisdiction' (2006) 100 AJIL 142, 144, note that universal jurisdiction allows a State to both 'proscribe extraterritorial conduct with which it has no connection, and to empower its courts to adjudicate such conduct'. See the unanimous rejection of universal civil jurisdiction in *Kiobel v Royal Dutch Petroleum Co*, No 10-1491, slip op, USSC, 17 April 2013 (discussion in Ch 7).

[54]  Crawford, 'Execution of Judgments and Foreign Sovereign Immunity' (1981) 75 AJIL 821 at 856, citing Akehurst (1972–3) 46 BYIL 145 at 170–7.

[55]  *Kiobel v Royal Dutch Petroleum Co*, No 10-1491, slip op, USSC, 17 April 2013, at 6.

[56]  Brussels Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters, 27 September 1968 as amended 1990 OJ (C 189) 1 now transformed into EC Council Regulation 44/2001, 20 December 2000 on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters 1997 OJ (L 12) <http://europa.eu.int/eur-lex/>; Lugano Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters, 16 September 1988, 1988 OJ (L 319) 9. In 2010, the European Commission proposed to recast Regulation (EC) No 44/2001 by, *inter alia*, abolishing, for most judgments, the intermediate procedure for the enforcement of judgments between Member States (*exequatur*), coupled with a significant reduction in the grounds for challenging recognition or enforcement, and extending the Regulation's rules of jurisdiction to defendants not domiciled in the EU. The recast Regulation (EU Regulation 1215/2012) came into force on 10 January 2015. The UK has opted into this recast Regulation, following a detailed consultation in 2010/2011. The need to obtain a court order for recognition of a foreign judgment is abolished with Article 36 providing that judgments given in a Member State shall be recognized in the other Member States without any special procedure being required; Article 45 of the Regulation, however, provides that the recognition of a judgment may be refused on the application of any interested party.

[57]  The idea was that where a court has jurisdiction on an approved basis, it can hear the case and the resulting judgment will be recognized and enforced in other Contracting States. Trevor Hartley and Masato Dogauchi, Explanatory Report to the Convention on 30 June 2005 on Choice of Court Agreements (HCCH, 2007), 16.

[58]  Jeffrey D Kovar, Assistant Legal Adviser US Dept of State, Prepared Statement for hearing before the Sub-Committee on Courts and Intellectual Property of the House Committee on Judiciary, 106th Congress, 4–9, 29 July 2000, cited in Murphy, 'Contemporary Practice of the United States: Negotiation of the Convention on Jurisdiction and Enforcement of Judgments' (2001) 95 AJIL 418 at 429.

[59]  Trevor Hartley and Masato Dogauchi, Explanatory Report to the Convention on 30 June 2005 on Choice of Court Agreements (HCCH, 2007), 16.

[60]  Mexico. The US and the European Union have signed but not ratified the Convention <http://www.hcch.net/index_en.php?act=conventions.status&cid=98>.

[61]  See Annex to ECSI. The US took the opportunity of enacting the FSIA to prohibit the acquisition of jurisdiction against a foreign State solely by attachment of a ship or other

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

property in its ownership (FSIA, s 1610 House Report) but Scottish law still seems to permit it: *Forth Tugs v Wilmington Trust Co* 1987 3 SLT 153; 107 ILR 641.

**62**  Alternatively, should it be more broadly based? There is a view that State commission of human rights violations should be subject to universal civil jurisdiction which generally would be considered as an exorbitant basis of jurisdiction for claims in tort: van Schaak, 'In Defense of Civil Redress: The Domestic Enforcement of Human Rights Norms in the Context of the Proposed Hague Judgments Convention' (2001) 42 Harv Intl LJ 141. See also Donovan and Roberts, 'The Emerging Recognition of Universal Civil Jurisdiction' (2006) 100 AJIL 142 (arguing for the disciplined exercise of universal civil jurisdiction for heinous conduct). See Chs 15 and 20.

**63**  ECSI Commentary General Comments, para 10(1). See Ch 5.

**64**  Trooboff, 'Foreign State Immunity: Emerging Consensus on Principles' (1986–V) 245 R de C 200 at 335–51.

**65**  This aspect was recognized by the Australian Law Reform Commission in its report when, in excluding criminal proceedings from a general statute relating to State immunity, it stated: 'The problems arising with regard to the application of penal or regulatory legislation to foreign states are also matters which do not directly affect civil rights, and which have to be resolved primarily between the relevant governments or agencies and the foreign state in question': Australian Law Reform Commission Report No 24, 'Foreign State Immunity' (1984), para 161, and see para 112. See also ADI (1977) Wiesbaden, 11 August 1977, Resolution on Public Law Claims instituted by a foreign authority: 'Public law claims instituted in legal proceedings by a foreign authority or a foreign public body should in principle be considered inadmissible in so far as from the viewpoint of the forum State the subject-matter of such claims is related to the exercise of governmental powers'.

**66**  Fox, 'Some Aspects of Immunity from Criminal Jurisdiction of the State and its Officials: The *Blaskic* case' in Vohrah and Pocar et al (eds), *'Man's Inhumanity to Man': Essays in International Law in Honour of Antonio Cassese* (2003), 297; Fox (ed), 'The International Court of Justice's Treatment of Acts of the State, and in particular the Attribution of Acts of Individuals to the State' in Ando, McWhinney, and Wolfrum (eds), *Liber Amicorum Judge Shigeru Oda* I (2000), 147.

**67**  The Singapore State Immunity Act 1979, s 19(2)(b), the Pakistan State Immunity Ordinance 1981, s 17(2)(b), the South Africa Foreign States Immunities Act 1981, s 2(3) (the provisions of this Act shall not be construed as subjecting any foreign State to the criminal jurisdiction of the courts of the Republic), the Canada SIA 1982, s 17 (this Act does not apply to criminal proceedings or proceedings in the nature of criminal proceedings); the Australian Foreign States Immunities Act 1985, s 3(1) defines a proceeding as not including 'a prosecution for an offence or an appeal or other proceeding in the nature of an appeal in relation to such a proceeding'.

**68**  United States Foreign Sovereign Immunities Act 1976, s 1303(a). There is no discussion of the limitation to civil proceedings in the House Report. US courts have, however, differed on whether the FSIA provides immunity from criminal indictment: compare *Southway v Central Bank of Nigeria* 198 F.3d 1210 at 1214–15 (1999) (10th Cir) (concluding the FSIA applies only to civil proceedings) with *Keller v Central Bank of Nigeria* 277 F.3d 811 at 818–20 (2002) (6th Cir) (saying Congress would have to amend the FSIA expressly to exclude immunity from criminal indictment).

**69**  At any rate as performed outside the forum State.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

**70**  In *Sayag v Le Duc* ECJ (1969) 329 a claim for compensation was brought against the European Community by insurers in respect of a motor vehicle accident, notwithstanding that the ECJ had held the driver, an EC official driving to work, was not performing an act in an official capacity (ECJ (1968), 395). The ECJ dismissed the claim on the ground that the non-contractual liability of the European Community under EC Art 188(1) for 'damage… caused by its servants in performance of its duties' did 'not, in principle, include the use by servants of the Community of their private cars in the course of their employment'. But in the course of its earlier judgment the Court emphasized that 'the designation of an act with regard to immunity from legal proceedings, and any decision taken by the competent institution with regard to waiver of the immunity, do not prejudge any liability on the part of the Community, this being governed by special rules' (ECJ (1968), 406).

**71**  Municipal law has equally found both theoretical and practical problems in enacting criminal corporate liability for intentionally causing death or serious physical injuries in its penal code. Only in 2007 has the UK enacted the Corporate Manslaughter and Homicide Act.

**72**  ILC Second Report on State Responsibility 1998.

**73**  ILC's Draft Articles on State Responsibility adopted by the International Law Commission, *Official Records of the General Assembly, Fifty-sixth Session*, Supplement No 10 (A/56/10), Ch IV. E.1 Art 40. Special Rapporteur's Fourth Report on State Responsibility, 31 March 2001 (A/CN.4/517), para 46.

**74**  *The Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v Serbia)*, Judgment, ICJ Reports 2007, para 167. See also Jørgensen, *The Responsibility of States for International Crimes* (2000), 272–82.

**75**  *The Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v Serbia)*, Judgment, para 166.

**76**  *The Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v Serbia)*, Judgment, para 167.

**77**  *The Application of the Convention on the Prevention and Punishment of the Crime of Genocide (Bosnia and Herzegovina v Serbia)*, Judgment, para 170. The French text is particularly clear on this point: '*La Cour fait observer que les obligations en cause en l'espèce telles qu'elles résultent des termes de la Convention et les responsabilités qui découleraient pour les États de la violation de telles obligations sont des obligations et des responsabilités relevant du droit international, et ne sont pas d'ordre pénal*'.

**78**  *Prosecutor v Blaskic (Subpoenae)* Case IT-95-14-PT, decision of 29 July, 12 August, and 29 October 1997 of the Appeals Chamber, 110 ILR 609 at 709–10.

**79**  Cf the UK Corporate Manslaughter and Homicide Act 2007. See also Art 121-2 of the French Code Pénal.

**80**  The *Erika* case, *Judicial Agent of the Treasury v Malta Maritime Authority* GP (2005) 1160: the Cour d'Appel de Paris held that Malta Maritime Authority was exercising elements of governmental authority in registering the ship and was an emanation of the State of Malta; it was therefore immune from criminal jurisdiction. See also the *Joola* case, 19 January 2010, Fr Cass crim RGDIP 115 (2011), where the Court of Cassation, Chambre Criminelle, held that the former prime minister and minister of defence of Senegal benefited from immunity from criminal jurisdiction in relation to their decisions regarding the certification of the *Joola*.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

**81** To discuss the extraterritorial exercise of the jurisdiction of the forum State over crimes would only complicate an already complicated subject. The number of crimes which a State may commit within another State's territory is not likely to be great (*pace* sponsored terrorism) and to consist in the main in infringements of health and safety or environmental regulations.

**82** See in this connection the novel powers of inquiry given in the Institut de Droit International's Resolution on the Immunities of Heads of State and of Governments, Art 4(2) and (3), ADI 69, (2001–1) 742. Fox, 'The Institute's Resolution on Immunities of Heads of State and of Heads of Government' (2002) 51 ICLQ 119.

**83** *Jurisdictional Immunities of the State (Germany v Italy, Greece Intervening)*, para 91.

**84** *Macleod*, 20 November 1854, FO 83; *McNair's Law Officers Opinions* II, 221–30; *B & F SP* Vol 29, 1139. See Jennings, 'The Caroline and McLeod Cases' (1938) 32 AJIL 82.

**85** *Prosecutor v Blaskic (Subpoenae)* Case IT-95-14-PT, decision of 29 July, 12 August, and 29 October 1997 of the Appeals Chamber; 110 ILR 607 at 707.

**86** See *The Princeton Principles on Universal Jurisdiction* produced by the Princeton University Program in Law and Public Affairs (2001).

**87** Kolodkin, Second Report, para 81. *Francis Gary Powers* case, Hearing before the Senate Committee on Foreign Relations, 86th Congress, 2nd Sess 175 (1960). See de Lupis, 'Foreign Warships and Immunity for Espionage' (1984) 78 AJIL 61 at 69. Also the *Rainbow Warrior (New Zealand v France)* France-New Zealand Arbitration Tribunal, 30 April 1990, 82 ILR 500, where although France considered the detention in New Zealand of the two agents was unjustified as France was ready to give an apology and pay compensation, the agents did not plead immunity to charges of manslaughter and wilful damage.

**88** Kolodkin, Second Report, para 163.

**89** Kolodkin, Second Report, paras 81 and 90.

**90** Though he expresses the view that 'crimes perpetrated during military conflict in the territory of a State would seem to be governed primarily by humanitarian law'.

**91** *Khurts Bat v Investigating Judge of the Federal Court of Germany* [2011] EWHC 2029 (Admin). See discussion in Ch 18 and analysis in Sanger, 'Immunity of State Officials from the Criminal Jurisdiction of a Foreign State' (2013) 62 ICLQ 193.

**92** *Arrest Warrant of 11 April 2000*, paras 73–4 of the Joint Separate Opinion.

From: Oxford Public International Law (http://opil.ouplaw.com). (c) Oxford University Press, 2021. All Rights Reserved.

# EXHIBIT 3

# 7. Immunity from the criminal jurisdiction of national courts

*Elizabeth Helen Franey*[*]

## 7.1 INTRODUCTION

International law recognizes that state immunity confers, upon certain individuals, immunity from the criminal jurisdiction of the domestic courts of states of which they are not nationals. Immunity from criminal jurisdiction means that a person cannot be prosecuted, cannot be summonsed and cannot be required to answer questions. Such a person, who is immune from criminal jurisdiction, is also inviolable, which means s/he cannot be arrested and a warrant cannot be issued for his/her arrest. There are two types of immunity from criminal jurisdiction of other states, immunity *ratione personae*, immunity conferred because of the position a person holds in a state; and immunity *ratione materiae*, immunity conferred because of conduct undertaken on behalf of a state.

State immunity is an aspect of the sovereignty of a state. It protects the rights and interests of the state. It belongs to the state, not the individual. A state entitled to immunity may waive the immunity of an individual and say that immunity will not apply. Such immunity is only accorded to officials who represent a sovereign state, not a constituent part of a state.[1]

State immunity from the criminal jurisdiction of foreign states is a matter of customary international law which is created largely by the consent of states. Customary international law is described as 'international custom, as evidence of a general practice accepted as law'.[2] This means that 'State practice, including that of States whose interests are specially affected, should be both extensive and virtually uniform', which

---

[*] This chapter is based on the author's thesis, and book, *Immunity, Individuals and International Law: Which Individuals are Immune from the Jurisdiction of National Courts under International Law?* (LAP Lambert Academic Publishing, 2011), available at theses.lse.sc.uk/309/1/Franey.

[1] See, for example, *R (on the application of Diepreye Solomon Peter Alamieyeseigha) v Crown Prosecution Service* [2005] EWHC 2740 (Admin), (2005) 145 ILR 619.

[2] Statute of the International Court of Justice, Art. 38(b).

practice has 'occurred in such a way as to show a general recognition that a rule of law or obligation is involved'[3] (this is known as *opinio juris*). In other words, the relevant questions are: How were the actions carried out? Does the practice of states show that the actions are considered to be legally binding? Is there a general consensus that the practice is a matter of law? Custom therefore is deduced from the practice and behaviour of states and state agents. It is an area of law which responds as states react to changes in international society. All states may take part in its formulation. If a state is not directly affected it may still take part in the formulation of the law, or try to change the law, by stating whether it agrees that a certain practice is lawful or not.

Customary international law is part of the common law of England and Wales and does not have to be incorporated by an Act of Parliament. English law accepts that customary international law changes as time changes.[4]

State immunity is upheld by both national courts and international tribunals. In 1999, when Spain requested the extradition of Senator Pinochet, the former head of state of Chile, for offences including torture, the House of Lords in *Pinochet (No. 3)*[5] confirmed that a serving head of state cannot be subjected to the criminal process of a foreign state for any purpose and could not be extradited for any offences and held that Senator Pinochet had continuing immunity for offences of murder and conspiracy to murder. In 2003, the International Court of Justice (ICJ) in the *Arrest Warrant* case[6] in considering the issue of a warrant of arrest for the incumbent Foreign Minister of the Democratic Republic of Congo for offences constituting grave breaches of the Geneva Conventions and crimes against humanity said that the immunity which protects high state officials, heads of state and heads of government, also extends to Foreign Ministers.

The International Law Commission (ILC) included the topic of immunity of state officials from foreign criminal jurisdiction in its

---

[3]    *North Sea Continental Shelf Cases* [1969] ICJ Rep. 3, para. 74.

[4]    *Re Piracy Jure Gentium* [1934] AC 586, per Lord Sankey LC at 592: 'International law was not crystallised in the seventeenth century, but is a living and expanding code'; *Trendtex Trading Corp. v Central Bank of Nigeria* [1977] QB 529, per Lord Denning at 554H: 'International Law knows no rule of stare decisis'.

[5]    *R v Bow Street Metropolitan Stipendiary Magistrate and others, ex parte Pinochet Ugarte (No. 3)* [2000] 1 AC 147.

[6]    *Case concerning the Arrest Warrant of 11 April 2000 (Democratic Republic of Congo v Belgium)* (2002) 128 ILR 1, ICJ, 14 February 2002.

programme of work in 2006 and in 2007 appointed Mr Roman A. Kolodkin as Special Rapporteur, who was replaced by Ms Concepcion Escobar Hernandez in 2012. In 2011, the General Assembly of the United Nations requested the ILC to give priority to this topic.[7] In 2013, the Drafting Committee of the ILC adopted three Draft Articles pertaining to the immunity of state officials from the criminal jurisdiction of another state.[8]

Immunity is an exception to a state's jurisdiction,[9] it is not a defence to a criminal charge. Immunity from criminal jurisdiction and individual responsibility are separate concepts. Jurisdictional immunity is procedural in nature, whereas criminal responsibility is a question of substantive law. Jurisdictional immunity may bar prosecution for a certain period or for certain offences but it does not exonerate the person to whom it applies from all criminal responsibility.[10]

Immunity from criminal prosecution exists and is a matter of importance to the international community but the extent of the protection afforded to individuals by immunity from criminal jurisdiction is not entirely clear.

## 7.2  WHY DOES STATE IMMUNITY EXTEND TO CRIMINAL JURISDICTION?

A state can be liable under civil law, but it cannot be prosecuted,[11] whereas criminal liability is the liability of an individual for his own unlawful actions. Why should anyone not be criminally responsible? What is the justification for immunity from prosecution? Immunity is criticized for promoting impunity and allowing a class of persons to be unaccountable for their actions,[12] so why do states uphold the concept? It

---

[7]  GAR 66/98 of 9 December 2011, para. 8.

[8]  A/cn.4/L.814.

[9]  *Arrest Warrant*, n. 6 above, para. 59.

[10]  *Ibid.* para. 60.

[11]  Robert Jennings and Arthur Watts (eds), 'Introduction' in *Oppenheim's International Law*, vol. 1, Peace (9th edn, 1992), Part 1 (pp. 533–4) provides that a state may bear criminal responsibility for egregious violations of international law and refers to (1976) 2 *ILC YB* 361. There is at present no international convention agreeing that states should be prosecuted for crimes. There is no law in England which provides a procedure whereby a state may be prosecuted.

[12]  Redress Trust, *Immunity v Accountability* (December 2005), available at www.redress.org/publications/StateImmunity.pdf. The Preamble to the Rome Statute for the International Criminal Court states that the states parties are

is only when the rationale for state immunity is clear, and its purpose understood, that intelligible arguments can be made regarding the extent of immunity.

The foundation for the principle is to be found in the concept of monarchy, and the idea of the sovereign. Historically, the head of state, usually a monarch, and the state were seen as synonymous; and the immunity of the state was that of the monarch;[13] the sovereign was the embodiment of the state.[14] As such he was above the law, as he was the person from whom the law emanated; his dignity was that of the state; an affront to the state was also an affront to the sovereign, and likewise an action which offended a sovereign caused offence to the state.[15] Such a head of state has always been immune from the jurisdiction of the domestic courts of other states.[16]

The judgment in *The Schooner Exchange v McFaddon*[17] in 1812 discusses the relationship between sovereigns, and their envoys, the predecessors of present day diplomats. It was held in this case (which is still cited) that:[18]

> One sovereign being in no respect amenable to another, and being bound by obligations of the highest character not to degrade the dignity of his nation, by placing himself or its sovereign rights within the jurisdiction of another, can be supposed to enter a foreign territory only under an express licence, or in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will

determined to put an end to impunity for the perpetrators of atrocities and thus contribute to the prevention of such crimes.

[13]   See Sir Arthur Watts, 'The Legal Position in International Law of Heads of State, Heads of Government and Foreign Ministers' (1994) 247 *Recueil des Cours de l'Academie de droit international de la Haye* 9, Part IV 'Protection, Privileges and Immunities', (1) General, where he discusses the relationship between a sovereign and his state. He says 'In many respects the state could almost be seen as the property of the ruler, and it was to a considerable degree the ruler's personal attributes of sovereignty which gave his state the quality of being a sovereign state, rather than the other way round'.

[14]   W.B. Lawrence (ed.), *Wheaton's Elements of International Law* (6th edn, 1855), p. 35: 'Wherever, indeed, the absolute or unlimited monarchical form of government prevails in any state, the person of the prince is necessarily identified with the state itself'.

[15]   Watts, n. 13 above, 35.

[16]   See Watts, n. 13 above, 54.

[17]   7 Cranch 116 (1812), US Supreme Court.

[18]   Lord Millett in *Pinochet (No. 3)*, n. 5 above, 271 described this as a seminal judgment. It is quoted in *Aziz v Aziz and others* [2007] EWCA Civ 712.

be extended to him. This perfect equality and absolute independence of sovereigns, and this common interest impelling them to mutual intercourse, and an interchange of good offices with each other, have given rise to a class of cases in which every sovereign is understood to waive the exercise of a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation.

Sovereigns had absolute jurisdiction over their territory, and needed to interact with each other for the purposes of trade, and to resolve disputes. Such interaction requires different rules; as sovereigns have to show respect for each other in their international dealings.

The concept of equal sovereigns, who have dignity[19] and must be treated with respect, has continued to the present, but with the emphasis upon dignity as an aspect of the sovereignty of the state rather than an attribute of monarchy.[20]

All states are equal in international law, they are equal members of the international community, and consequently no state can claim jurisdiction over another state. This is expressed in the rule, *par in parem non habet imperium*, an equal has no authority over an equal; that is, one sovereign state is not subject to the jurisdiction of another state. This is one of the basic principles of modern international law under which all states are considered equal.[21] Even though states are different they have equal rights and duties and are equal members of the international community. Sovereign equality includes the principle that one state shall not interfere with the internal matters of another state.[22]

Heads of state are granted special status and treatment, including immunity *ratione personae* because they represent the persona of independent equal sovereign states. The head of government is also granted immunity *ratione personae*, but this is not because he is a sovereign. He is representing a sovereign state which is the equal of other sovereign states.

The Foreign Minister is also granted immunity *ratione personae*. This immunity is granted not for personal benefit but to ensure the effective

---

[19] *Case concerning Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v France)* (2008) 148 ILR 1, ICJ.

[20] In *Aziz v Aziz*, n. 18 above, the publication of details of the personal life of the Sultan of Brunei was not an attack on his state's dignity.

[21] United Nations Charter, Art. 2.1 and further elaborated in the Declaration on Principles of International Law concerning Friendly Relations and Co-operation among States in accordance with the United Nations, GA Res. 2625 (XXV) (1970).

[22] United Nations Charter, Art. 2.

performance of functions on behalf of the state. In 2002, the ICJ in the *Arrest Warrant* case[23] decided that the immunity *ratione personae* accorded to a serving Minister for Foreign Affairs had to be determined on the basis of the functional justification for immunity. The court considered the role of the Foreign Minister: that he is in charge of the government's diplomatic activities and generally acts as its representative; ambassadors and other diplomatic agents carry out their duties under his/her authority; and he/she has full powers to act on behalf of the state[24] and that needed to be able to travel and communicate freely to be able to fulfil his/her role.

The court justified the immunity conferred upon the Foreign Minister by reference to his position, not just to ensure he could perform his functions. The immunity is justified by the special status of a Foreign Minister in international society, which is acknowledged in international law, and the power the Foreign Minister has. It is conferred to protect the Foreign Minister from the actions of other states, to enable him to perform his functions as one of the pre-eminent members of his state. It is about the power of a state and who represents that power; and the decision of the court was that a Foreign Minister is completely immune and inviolable from the criminal jurisdiction of other states.

This functional justification for immunity is that it enables officials to perform their duties. But this justification does not make sense when an official has left office as there are no functions to perform. In any event, how can it be the function of an official, whether or not he is entitled to immunity, to commit crimes?

Immunity *ratione materiae* prevents the immunity of a state being circumvented by taking action against the state's agents or officials. This principle has been articulated and developed in civil cases. Originally it was customary international law that a state could not be sued in the domestic courts of a foreign state. During the twentieth century states became involved in trade, entered into contracts and state officials began to use motor vehicles. Customary international law developed in response to these changes. State immunity changed and allowed a state to be sued in contract and tort for acts which a private individual could perform; that is for *acta jure gestionis*, acts of a private nature, whereas *acta jure imperii*, acts which are of a governmental or sovereign nature, continue to be immune. This is called the restrictive doctrine. These restrictions upon immunity for commercial matters, and for some torts, are now part

---

[23]   *Arrest Warrant*, n. 6 above, para. 54.
[24]   Vienna Convention on the Law of Treaties 1969, Art. 7(2)(a).

of conventional[25] and customary international law and have been incorporated into the law of the United Kingdom[26] and other states.[27] These are expressed in the form that states are immune, except as provided.

The principle that state agents cannot be sued if the state itself cannot be sued continues to apply to *acta jure imperii*. It is perceived to be unfair, and there have been a number of attempts to overturn the principle in order to sue individuals, but it has been consistently upheld in a number of jurisdictions in recent years, even for the most serious of allegations.[28] Neither a state nor state officials can be held civilly liable before the courts of foreign states, even for very serious criminal offences such as kidnapping and perverting the course of justice, or for breaches of peremptory norms such as torture, if such conduct is *acta jure imperii*. The state is immune, and that immunity cannot be circumvented by pursuing the state officials. The official is immune only if the state is immune, and this rationale means that the immunity continues to apply to officials after they have left office.

The reason given for this immunity is that the conduct itself carries the immunity, and the officials are not individually responsible for what they do. They are the agents or servants of the state and do what their state requires of them. They do their duty, and are therefore not responsible. The state is responsible, and to make the official responsible when the state is immune would be to circumvent that immunity. Conversely, it is the duty of the state to protect its officials who are acting in the interests of the state. This model of the responsibility of state officials portrays the state as an entity which is bigger than the individuals who make it up. On the international plane the state is responsible, but individuals are not.

This justification does not fit easily in relation to criminal proceedings, as criminal conduct is committed by individuals, and criminal responsibility is that of the individual who committed the criminal conduct. To

---

[25] European Convention on State Immunity 1972.

[26] State Immunity Act 1978 (UK).

[27] Foreign States Immunity Act 1976 (US) (1976) ILM 15 1388; State Immunity Act 1982 (Canada) (1982) ILM 21 798; Foreign States Immunities Act 1985 (Australia) (1986) ILM 25 715.

[28] *Church of Scientology* case (1978) 65 ILR 193 (Germany); *Herbage v Meese and others* [1990] ILR 101 (US); *Jaffe v Miller and others* [1994] ILR 556 (Canada); *Al-Adsani v Government of Kuwait and others* (1996) 107 ILR 536 (UK) and (2001) 34 EHRR 273 (ECHR); *Propend Finance Pty and others v Sing and others*, CA (Civ. Div.), 17 April 1997, *The Times*, 2 May 1997 (Transcript: Smith Bernal) (UK); *Jones v Ministry of the Interior England* [2005] QB 699, 129 ILR 629, HL (UK).

say that the conduct was committed in the exercise of duty would be mitigation, not a defence, in criminal courts.

In civil cases there can be only one liability, and one entitlement for compensation, and therefore if that state is immune, the responsible officials must also be immune. The same is not true of criminal proceedings. The fact that a state is civilly responsible does not relieve an individual of criminal responsibility, which has been recognized in international law since the affirmation of the Nuremberg Principles by the UN General Assembly in 1946.[29]

The justification for the continuing immunity is that to prosecute the functionary would be to question the conduct of the state, and thereby circumvent the sovereign immunity of a state. The immunity of the state would be illusory if an individual could be held responsible when a state cannot. This makes sense in civil proceedings as any liability would be that of the state. But criminal proceedings are different, a state cannot be prosecuted, and individuals are responsible for their own criminal conduct; that is why an act is classed as criminal. A state in proscribing certain conduct as criminal is stating that an individual is to be punished for such actions.[30]

Immunity is one of the mechanisms used by modern sovereign states to facilitate friendly relations between states, and to prevent disputes. States need to work together, and to do so they need to work through people such as ministers and diplomats. Such persons would be hampered in their functions if they could not feel safe in a foreign jurisdiction, or whilst travelling. Modern sovereign states are independent and equal. Their internal arrangements are not to be scrutinized by other states, and their policy and public administration are not subject to interference from foreign courts. The concept of the dignity of a state and of its agents is one of the ways in which states maintain appropriate standards in their dealings with each other. International law requires that

---

[29]   GAR 95(I).

[30]   In *Khurts Bat v Investigating Judge of the German Federal Court* [2011] EWHC 2029 (Admin), (2011) 147 ILR 633, Lord Justice Moses approves this distinction stating (at para. 74) 'As Dr Elizabeth Franey points out in *Immunity, Individuals and International Law* (LAP, Lambert, 2011) p. 204, there is an essential distinction between civil and criminal liability. It does not follow that because there is immunity from civil suit, an individual, acting as an official on behalf of his State, is immune from criminal liability'.

states settle their disputes by peaceful means, and to do this requires international mechanisms for the orderly management of disputes.[31]

Judges Higgins, Kooijmans and Buergenthal in their Joint Separate Opinion in the *Arrest Warrant* case made this point stating (at paragraph 75):

> immunities are granted to high State officials to guarantee the proper functioning of the network of mutual inter-State relations, which is of paramount importance for a well-ordered and harmonious international system.[32]

If one state considers that an official act by another state is illegal, that is an international dispute, which should be dealt with on the international plane. The municipal law of one state, which is created by that state, is not competent to adjudicate upon the official decisions of another state, as that state is equal to and independent from the first state. For the courts of one state to decide whether another state's official acts are illegal or not is to introduce international politics into national courts. One function of international law is to manage disputes in an orderly manner, and state immunity assists by removing some disputes from the national to the international plane.

The justifications for immunity *ratione personae* and immunity *ratione materiae* are not identical. A person who is entitled to immunity *ratione personae* is completely immune during the time he is in office. This is to protect his person, as a representative of his state, and to enable him to perform his functions, whilst he is in office. Immunity *ratione personae* protects the state by protecting individual high state officials whilst in office. Immunity *ratione materiae* protects a state by protecting conduct performed on behalf of a state from interference from, and the scrutiny of, another state. Any protection thereby afforded to an individual is incidental. The purpose of immunity *ratione materiae* is to protect a state and state business from interference by other states. It protects state sovereignty and sovereign acts by preventing them being examined and questioned in the courts of other states. The different justifications for the

---

[31] 'The object of international law, in this as in other matters, is not to work injustice, not to prevent the enforcement of a just demand, but to substitute negotiations between governments, though they may be dilatory and the issue distant and uncertain, for the ordinary use of courts of justice in cases where such use would lessen the dignity or embarrass the functions of the representatives of a foreign state.' *The Charkieh (No. 1)* (1873) LR 4 A&E 59 at 97.

[32] *Arrest Warrant*, n. 6 above, Joint Separate Opinion of Judges Higgins, Kooijmans and Buergenthal.

two kinds of immunity results in the immunity conferred on individuals being different.


## 7.3   IMMUNITY *RATIONE PERSONAE*

Immunity *ratione personae*, which is also called status immunity, is immunity from the jurisdiction of other states conferred on an individual because of the position the person holds in a state. Immunity *ratione personae* is absolute whilst the person is in office but ends when the office ends. The person entitled to immunity *ratione personae* is completely immune from the jurisdiction of other states, both civil and criminal for actions which are performed in an official capacity, and for those performed in a private capacity, including actions which amount to international crimes, regardless of whether the actions concerned were performed before the person concerned assumed office or when in office.[33]

Immunity *ratione personae* is accorded to those persons holding the highest positions within a state. There are three office holders who are entitled to immunity *ratione personae*: the head of state, the head of government and the Foreign Minister. The immunity of heads of state and heads of government is a long accepted principle of customary international law, but the position of Foreign Ministers was not so certain. Despite the fact that the Foreign Minister is obviously at the heart of diplomatic and international relations, there was doubt about his immunity *ratione personae*, which was resolved by the ICJ in the *Arrest Warrant* case in 2002.[34] The Court held (at paragraph 51 of its judgment): 'the Court would observe at the outset that in international law it is firmly established that … certain holders of high-ranking office in a State, such as the Head of State, Head of Government and Minister for Foreign Affairs, enjoy immunities from jurisdiction in other States, both civil and criminal'. This crystallized customary international law and from this time the immunity *ratione personae* of the Foreign Minister, alongside that of the head of state and head of government, has been clear.

These three office holders hold full powers and need no further accreditation to represent a state for the purposes of adopting or authenticating the text of a treaty.[35] Statements made by these office

---

[33]   *Arrest Wa*rrant, n. 6 above, para. 55.
[34]   *Ibid*.
[35]   See Vienna Convention on the Law of Treaties 1969, Art. 7.

holders, on behalf of their government, are binding upon their state.[36] They are also internationally protected persons;[37] if a crime were committed against any of them it would constitute a threat to the maintenance of normal international relations.

Such persons are completely immune from the jurisdiction of other states and inviolate whilst in office. A warrant should not be issued for the arrest of a high state official even if it is not intended to be executed until he has left office. The warrant should not be issued, rather than withdrawn when immunity is claimed. A state should consider immunity *ratione personae* of its own motion and should not wait for such immunity to be claimed.[38]

This immunity is afforded to an individual as a representative of the state. It is not the title which confers immunity, but the position which is held. A head of state can be either a monarch or a president or may be called by a different title. The head of state may be an individual or a group of people, and may or may not have political power. International law does not prescribe what sort of head a state should have, but howsoever constituted, that entity represents the state itself. To be entitled to immunity as a head of state the person afforded such immunity must be the representative of the sovereignty of the state.[39] The head of state is

---

[36] *Case concerning the Legal Status of Eastern Greenland (Denmark v Norway)*, (1933) PCIJ (ser. A/B) N. 53 (April 5). A recorded and minuted declaration made by Mr Ihlen, the Norwegian Foreign Minister, on 22 July 1919 informing the Danish Minister that the Norwegian government would not make any difficulties in the settlement of the recognition of Danish sovereignty over Eastern Greenland was binding upon Norway.

[37] Convention on Crimes Against Internationally Protected Persons 1973, Art. 1.

[38] *Arrest Warrant*, n. 6 above, para. 60, in which the court stated that the issuance of the warrant was a breach of an international obligation. See also Roman A. Kolodkin, Special Rapporteur, *ILC Third Report on Immunity of State Officials from Foreign Criminal Jurisdiction*, A/CN.4/646 (2011), para. 61(e): 'When a foreign Head of State, Head of Government or minister for foreign affairs is concerned, the State exercising criminal jurisdiction itself must consider the question of the immunity of the person concerned and determine its position regarding its further action within the framework of international law. In this case, it is appropriate perhaps to ask the official's State only about a waiver of immunity. Accordingly, the official's State in this case does not bear the burden of raising the issue of immunity with the authorities of the State exercising criminal jurisdiction'.

[39] See *United States v Noriega*, 746 F.Supp. 506 (1990), where the US courts refused to grant Manuel Noriega immunity as head of state on the grounds he had never been constitutional head of Panama; *Re Honecker* (1984) 80 ILR

a state official, but a very special one. He is the prime representative of the state. A head of state holds that position wherever he is, and at all times. As Oppenheim says: 'The highest organ of the state, representing it, within and without its borders, in the totality of its relations, is the Head of State'.[40]

The head of government is the second high state official granted immunity *ratione personae* by virtue of his office. Not all heads of state are also head of government, although some, such as the President of the United States are both head of state and head of government. In the United Kingdom, the Queen is the head of state, and as such she has a constitutional role; and the Prime Minister is the head of government. Other states use other titles for their head of government; again it is the role that matters, not the title. The head of government is completely immune from the jurisdiction of other states and inviolable whilst he is in office.

The third high state official entitled to immunity because of his position is the Foreign Minister. He can act internationally on behalf of his state. He is the head of the Ministry for Foreign Affairs, the department of a state which communicates with other states, and he is in charge of his state's ambassadors and consuls. Under Article 10 of the Vienna Convention on Diplomatic Relations, the Ministry of Foreign Affairs has to be notified of the appointment of members of diplomatic missions, their arrival and departure; and by Article 41.2, unless states agree otherwise, all official diplomatic business is conducted with the Foreign Ministry of the receiving state. The immunity of the Foreign Minister is now an established tenet of customary international law.

The ICJ in the *Arrest Warrant* case (at paragraph 51 of the judgment) said that there is a 'firmly established rule of customary international law that certain holders of high ranking office in a State, such as the head of State, head of government and minister for foreign affairs, enjoy immunities from the jurisdiction of other States, both civil and criminal'. By using the term 'such as', the ICJ was not limiting the high state officials entitled to immunity to those three offices, rather those three offices are quoted as examples of those to whom such immunity is granted.

---

365, where the courts of the then Federal Republic of Germany (West Germany) held that the Chairman of the Council of State of the German Democratic Republic (East Germany) was entitled to immunity from prosecution; *Re Gaddafi* (2001) 125 ILR 490, in which the French courts granted Colonel Gaddafi, President of the Command Council of the Revolution of Libya, immunity; *Re Robert Mugabe*, Bow Street Magistrates Court, 14 January 2004 (unreported).

[40]  Jennings and Watts, *Oppenheim*, n. 11 above, 1033 n. 17.

This could mean that the functions of these three high state officials may be undertaken by other officials or that other ministers of state are entitled to immunity.[41]

In *Khurts Bat v Secretary of State for Foreign Affairs*,[42] the High Court considered whether the Head of the Office of National Security of Mongolia was entitled to immunity *ratione personae*. Lord Justice Moses (at paragraph 59 of the judgment) said that the wording of the ICJ in the *Arrest Warrant* case:

> demonstrates that the paradigm of those entitled to such immunity is a Head of State or Head of Government. The words 'such as', whilst indicating that the list is not limited to those they identify, also carries with it the implication that in order to fall within that narrow circle it must be possible to attach to the individual in question a similar status.

The field of international relations changes, and the numbers of ministers of state and other state officials who are responsible for some aspect of international relations are increasing.[43] But ministers, other than Foreign Ministers, do not play a role which is primarily concerned with foreign affairs. Although some aspects of their responsibility may have an element of international relations, it is not their first concern. They do not represent their state at all times in the international arena. They do not need to travel freely in the way that a Foreign Minister does, as any delegations will be planned in advance with the agreement of the territory visited. A Foreign Minister has to be able to react to international

---

[41]   A Defence Minister and a Minister of Commerce were afforded immunity by District Judges in Courts of First Instance in 2004 and 2005: *Re Mofaz* (2004) 128 ILR 709 and *Re Bo Xilai* (2005) 129 ILR 713. In 2008, a Central African Republic minister resident in London was not afforded immunity: *Paris v Durbar*, City of Westminster Magistrates Court, 7 November 2008 (unreported).

[42]   *Khurts Bat*, n. 30 above.

[43]   In *Case concerning Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v Rwanda)* (2006) 145 ILM 562, ICJ, the Court, in considering whether a statement made by the Rwandan Minster of Justice was binding upon Rwanda, noted that in modern international relations, other persons representing a state, in specific fields, may be authorized by that state to bind it by their statements in respect of matters falling within their purview. The ICJ gave the example of holders of technical ministerial portfolios exercising powers in their field of competence in the area of foreign relations, and then said this was true 'even of certain officials'.

incidents as and when they develop, but this is not the case with other ministers.[44]

In 2013, the ILC adopted Draft Articles on the Immunity of State Officials from Foreign Criminal Jurisdiction. Paragraph 2 of Draft Article 3 relates to persons enjoying immunity *ratione personae*: 'Heads of State, Heads of Government and Ministers for Foreign Affairs enjoy immunity *ratione personae* from the exercise of foreign criminal jurisdiction'. It is respectfully suggested that the adoption of this Draft Article by such an august body crystallizes customary international law on this point. The future conduct of states and the development of customary international law will be influenced by this statement restricting state immunity to the head of state, head of government and Foreign Minister.

## 7.4   SPECIAL MISSIONS

Being a member of a special mission provides individuals with immunity from foreign jurisdiction as a matter of customary international law. A special mission is temporary mission sent by one state to another state with the consent of the latter state. The Convention on Special Missions was adopted by the General Assembly on 8 December 1969,[45] and it entered into force on 21 June 1985. The United Kingdom signed the Convention on 17 December 1970, and therefore should give effect to it even though it has not ratified it.

The convention is now considered to be declaratory of customary international law having been quoted with approval both in the *Pinochet* case, and in the *Arrest Warrant* case, as providing 'useful guidance on certain aspects of the question of immunities'.[46]

A special mission is sent by one state with consent to another state for the purpose of dealing with the second state on specific questions, or of performing, in relation to that second state, a specific task, and must not

---

[44]   In *Case concerning Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v France)*, n. 19 above, the ICJ stated that the Djibouti procureur general and Head of National Security were not immune from the criminal jurisdiction of France and could be summonsed to give evidence as persons implicated in an offence; and on 17 June 2003, the ICJ refused a request for provisional measures in *Case concerning Criminal Proceedings in France (Republic of the Congo v France)* [2003] ICJ Reports 102, where a warrant was issued in France for the arrest of the Inspector General of the Congolese Armed Forces, General Norbert Dabira.

[45]   GA Res. 2530 (XXIV).

[46]   *Arrest Warrant*, n. 6 above, para. 52.

have the character of a mission responsible for maintaining general diplomatic relations between states.[47] The mission must be of a temporary nature; it cannot be a permanent specialized mission, such as a trade mission.

The prior consent of the receiving state is required regarding all aspects of a special mission.[48] The functions of the mission are determined by mutual consent; the receiving state has to be informed of the size and composition of the special mission, and in particular the names and designations of the persons the sending state intends to appoint. The Foreign Ministry of the receiving state has to be informed of all arrangements made for the mission. The receiving state may decline to accept a special mission of an unreasonable size, and may, without giving reasons, decline to accept any person as a member of the mission, or may notify the sending state that a representative of the mission is *persona non grata*.

The members of a special mission are present on the territory of the receiving state, with the consent of that state, for the purpose of the mission. Whilst they are there, Article 29 of the Convention provides that they are inviolable, and are not liable to any form of arrest or detention, and Article 31 provides that they are immune from the jurisdiction of the receiving state.

Whether a person is a member of a special mission is a fact, and if the proceedings were in England, such facts come within the category that is within the knowledge of the Foreign and Commonwealth Office (FCO), and a certificate[49] can be issued. For examples of cases where such

---

[47] The Draft Articles provide that the term 'special mission' cannot be considered to include missions sent by political movements to establish contact with a particular state, or missions sent by states to establish contact with a political movement. A mission sent by the opposition party to establish contact with the government of another state, or missions sent by a local politician, such as the Mayor of London, would not come within the definition as they are not sent by a state.

[48] See *Tabatabai* (1983) 80 ILR 389 and *Syrian National Immunity* (1998) 127 ILR 88.

[49] The Foreign and Commonwealth Office may issue conclusive certificates or statements of fact which are conclusive evidence in English courts. This practice is accepted at common law. Diplomatic Privileges Act 1964, s. 4, provides that such a certificate is conclusive evidence of any fact relating to whether a person is entitled to any diplomatic privilege or immunity. State Immunity Act 1978, s. 21, provides that such a certificate is conclusive evidence of whether a country is a state, whether any territory is a constituent territory of a federal state, and as to the person or persons to be regarded as head or

certificates have been issued see *R v Governor of Pentonville Prison, ex parte Teja*[50] and *Khurts Bat v Investigating Judge of the German Federal Court*.[51] In the *Khurts Bat* case, the High Court explained that the consequences of the fact that the United Kingdom did not recognize the visit as a special mission is exclusively a matter for the court. Whether or not the UK government chose to consent to Khurts Bat's visit as a special mission was exclusively a matter for the government and not for the court.

## 7.5 CONTINUING IMMUNITY: IMMUNITY *RATIONE MATERIAE*

Some officials who have immunity *ratione personae* will continue to have immunity *ratione materiae* after they leave office in respect of official conduct. That is, they will have continuing immunity attaching to conduct they performed whilst they held office and were entitled to immunity *ratione personae*.[52] It is also known as subject matter immunity, or immunity for official acts, and is not time limited. Such an immunity probably has to be claimed by the state on behalf of its officials, rather than considered by the state exercising jurisdiction of its own motion.[53]

The ICJ in the *Arrest Warrant* case (in paragraph 61) outlined four situations in which an incumbent or former Foreign Minister would not enjoy immunity, and the third exception was that once the person ceased to hold office a court of a foreign state could prosecute him for acts committed before or after he took office, and for acts committed during

---

government of a state. On 6 October 2011, the Director of Public Prosecution, relying on a certificate that Tzipi Livni, the Israeli opposition leader, was visiting London as part of a special mission, refused to agree to the issue of a warrant for her arrest for alleged war crimes.

[50] [1971] 2 QB 274.

[51] *Khurts Bat*, n. 30 above.

[52] Vienna Convention on Diplomatic Relations 1961, Art. 39.2; Vienna Convention on Consular Relations 1963, Art. 43; Convention on Special Missions 1969, Art. 43.2.

[53] *Case concerning Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v France)*, n. 19 above. See also Kolodkin, n. 38 above: 'The state exercising jurisdiction is not obligated to raise and consider the issue of immunity *proprio motu*'.

his time in office in a private capacity.[54] This is defining the immunity by what it does not include, as opposed to what it does cover. This exclusionary description must mean that the continuing immunity is for actions performed during the time that the office is held, and for actions that are part of his official functions in whatever office is held. Thus a person entitled to immunity *ratione personae* can only be prosecuted for illegal private actions performed when in office, after they have left office.

This is recognized by the ILC Draft Articles on Immunity of State Officials from Foreign Criminal Jurisdiction. Draft Article 4 states that heads of state, heads of government and Ministers for Foreign Affairs enjoy immunity *ratione personae* only during their term of office; such immunity covers all acts performed, whether in a private or official capacity prior to or during their term of office; and the cessation of immunity *ratione personae* is without prejudice to the application of the rules of international law concerning immunity *ratione materiae*.

Does immunity *ratione materiae* also apply to officials of the state who have never been entitled to immunity *ratione personae*? Is an ordinary official immune from prosecution if they commit a crime on official business? If the purpose of immunity *ratione materiae* is to protect the state, then logically it should apply to all state officials carrying out state affairs.

Writers have asserted that state officials have continuing immunity *ratione materiae*. Lady Fox wrote:

> Broadly it would seem that, with the exception of certain international crimes, immunity continues for acts performed in the course of official functions. Criminal proceedings may be brought against the official on vacating office but the position in classical law is to declare such criminal liability of officials to be restricted to private acts and acts committed outside the course of their official functions.[55]

All seven judges in *Pinochet (No. 3)* were agreed that all state officials, even minor officials, have continuing immunity from prosecution, immunity *ratione materiae*, for acts performed in the exercise of their official functions; that is, for *acta jure imperii*. They were agreed that such immunity is enjoyed by state officials for all official conduct, except for Lord Phillips who thought that there was an exception in the case of

---

[54]  The other exceptions are that there is no immunity in the minister's own country; there is no immunity if the state which they represent decides to waive that immunity; and there is no immunity before certain international tribunals.

[55]  *Law of State Immunity* (2nd edn, 2008), p. 94.

criminal jurisdiction in relation to international crimes, and Lord Millett in relations to crimes in the forum state. The House of Lords did not examine state practice before coming to the conclusion that all state officials, regardless of their status, cannot be prosecuted in a foreign state for their actions if those actions are attributable to the state.

This is not the only case where the assertion that all state officials are immune in respect of official conduct has been accepted. This assertion was also accepted without a full analysis in *Blaškić Subpeona Duces Tecum*[56] before the Appeal Chamber of the International Criminal Tribunal for the former Yugoslavia (ICTY), where that court considered the individual liability of individuals, in the context of whether the Tribunal had the power to issue binding orders to state officials.

The Appeal Chamber (at paragraph 38 of the judgment) dismissed the possibility of the ICTY addressing subpoenas to state officials acting in their official capacity, saying that such officials are mere instruments of a state, and their official position can only be attributed to the state. They cannot be the subject of sanctions, or penalties, for conduct that is not private, but undertaken on behalf of a state. State officials cannot suffer the consequences of wrongful acts which are not attributable to them personally, but rather to the state on whose behalf they act; the Tribunal said such officials enjoy what is called 'functional immunity'. The Appeals Chamber stated that 'This is a well-established rule of customary international law going back to the eighteenth and nineteenth centuries restated many times since'.

The judgment refers, as examples, to the *Governor Collot* case in 1797,[57] the *McLeod* case in 1837,[58] the *Rainbow Warrior* case in 1985[59] and *Eichmann* in 1961.[60]

This author in Chapter 4 of her thesis and book[61] examined these authorities carefully and found that they do not support the assertion that state officials are entitled to immunity *ratione materiae* for criminal

---

[56] *Prosecutor v Tihomir Blaškić*, ICTY Appeals Chamber, Judgment of 29 October 1997 on the request of the Republic of Croatia for review of the decision of the Trial Chamber II of 18 July 1997, available at www.un.org/icty/blaskic/appeal/decision-e/71029JT3.html.

[57] J.B. Moore, *A Digest of International Law* (1906), vol. II, p. 23.

[58] British and Foreign State Papers, vol. 29, p. 1139.

[59] (1985) 74 ILR 241.

[60] *Attorney-General of the Government of Israel v Eichmann* (1961) 36 ILR 5, District Court of Jerusalem.

[61] *Immunity, Individuals and International Law: Which Individuals are Immune from the Jurisdiction of National Courts under International Law?* (LAP Lambert Academic Publishing), available at theses.lse.sc.uk/309/1/Franey.

conduct performed on behalf of a state. The *Governor Collot* case is a very old civil case, and is therefore not on point. *McLeod* concerned an incident in December 1837, when Canada was a British Colony. There was a rebellion and a ship, *The Caroline*, crewed by US citizens, assisted the rebel forces. British forces boarded *The Caroline*, and towed the ship into the river from where it descended Niagara Falls. Two people died, Amos Durfee and a cabin boy, little Billy, who was shot whilst trying to leave the ship. Alexander McLeod, a Canadian Deputy Sheriff, whilst in New York, boasted of taking part in the destruction of *The Caroline*. He was arrested and committed for trial. The British Minister, Mr Fox, wrote to the US Secretary of State, Mr Forsyth, asserting that the United States' national courts did not have jurisdiction to try individuals for involvement in *The Caroline* incident. Mr Forsyth replied that the Federal Executive had no power to intervene with the jurisdiction of the tribunals of the State of New York. In 1841, there was a change of administration in Washington and Mr Fox wrote to Mr Webster, who had replaced Mr Forsyth, demanding the release of Alexander McLeod, stating that:

> when a foreign power has redress to demand for a wrong done to it by any State of the Union, it is to the Federal Government, and not to the separate State, that such power must look for redress of that wrong. And such foreign Power cannot admit the plea that the separate State is an independent body over which the Federal Government has no control.[62]

Mr Webster wrote to the US Attorney-General, sending a copy to Mr Fox, stating:

> That an individual forming part of a public force, and acting under the authority of his Government, is not to be held answerable, as a private trespasser or malefactor, is a principle of public law sanctioned by the usages of all civilized nations, and which the Government of the United States has no inclination to dispute. But whether the process be criminal or civil, the fact of having acted under public authority, and in obedience to the orders of lawful superiors must be regarded as a valid defence; otherwise, individuals would be holden responsible for injuries resulting from the acts of Government, and even from the operations of public war.[63]

The British and US governments were not agreed about what should happen, and had different views on the process. The British position was that McLeod should not be tried, not that he should be acquitted, whereas

---

[62] Note of 12 March 1841, British and Foreign State Papers, vol. 29, p. 1126.

[63] *Ibid.* 1139.

the position of the US government was that he should be released by judicial process. The Supreme Court of New York refused leave to enter the *nolle prosequi*, and rejected an application for a writ of *habeas corpus*. It was proposed that there should be an appeal to the Federal Court, but Alexander McLeod demanded a trial, as he wanted no further delay. At the trial there was no evidence to show that he had been present at the destruction of *The Caroline*, and he was acquitted in October 1841, having been held in custody for almost a year.

The *McLeod*[64] case as an example of state practice is confusing. The US Department of State said one thing, the New York State officials did another, and the national government had no control over the federal officials. It is an old case from 1837, over 170 years ago, and international law has developed since that time. The restrictive doctrine has been accepted, statutes and conventions have been agreed, and the law relating to international crimes and individual responsibility has been formulated. The facts of this case were oversimplified in the *Blaškić* judgment in the ICTY. The attack, which involved British forces entering the territory of the United States, and attacking the ship without concern for civilians or property, would now be described as an armed attack. The death of little Billy, the cabin boy who was trying to leave the boat, would be wilful killing, as would probably be that of Amos Durfee, and therefore grave breaches of the Geneva Conventions. The destruction of the ship would probably also be a grave breach, as it was extensive destruction, and difficult therefore to justify as military necessity. It is not here being argued that the British soldiers involved in the expedition to destroy *The Caroline* should have been prosecuted. What is being suggested is that the facts of this case and the law applicable thereto are time specific. Customary international law changes to reflect the needs of the international community. It is only if state practice and *opinio juris* show that states continue to hold to the same tenets, that the law in the mid-nineteenth century can be quoted as the law now. The international community, and the consensus regarding international law, has changed so fundamentally since those events that the agreement of the British and US governments as to the law at that time indicates what the law was understood to be at that time, but further investigation is required before it can be stated to be the law now.

---

[64]    The facts and the quotes regarding this case are taken from the excellent article R.Y. Jennings, 'The Caroline and McLeod Cases' (1938) 32 *AJIL* 82.

The *Rainbow Warrior* case[65] involved French agents committing very serious criminal offences on New Zealand territory. A boat, the *Rainbow Warrior* owned and operated by Greenpeace, an international organization concerned with conservation and environmental matters, was blown up, without warning, using explosives, and a person was killed. The operation was pre-planned and carried out by agents of the Directorate General of External Security (DGSE), part of the French Ministry of Defence. The government of France subsequently admitted responsibility and two French agents, Major Mafart and Captain Prieur, pleaded guilty to manslaughter and causing wilful damage by explosions and were sentenced to substantial periods of imprisonment.[66] New Zealand requested restitution. The French said that no settlement was possible without the release of the agents who had been acting under orders, whereas the New Zealand government did not consider that this exempted the agents from personal responsibility for their criminal acts. The two states agreed to refer all outstanding disputes between them regarding the *Rainbow Warrior* affair to the UN Secretary General, and to accept his ruling as binding.[67] The Secretary General ordered that the prisoners should be transferred to French military custody, and that they should be incarcerated for three years. France breached the agreement and on 30 April 1990 the arbitration tribunal declared that France had committed a violation of its international obligations towards New Zealand.[68]

The ICTY in *Blaškić* reported France as saying the imprisonment of the agents was not justified. That is correct, but the state practice to be noted from this case is much more complicated than that. New Zealand never accepted that the French agents were not individually responsible; neither did the UN Secretary General. France did not assert that the French agents should not be prosecuted. France only asserted that the agents should not be punished in arbitration proceedings before the UN Secretary General, after they had been convicted and sentenced. Taken at its highest France's position was that the French agents should not be punished, not that they were not responsible, and not that they should not be prosecuted.

New Zealand prosecuted and it demonstrated *opinio juris* in declaring that it had the right to prosecute. This view was reinforced by the UN Secretary General who accepted that New Zealand had the right to

---

[65]   (1985) 74 ILR 241.
[66]   *R v Mafart and Prieur* (1985) 74 ILR 241.
[67]   (1985) 74 ILR 256.
[68]   (1990) 82 ILR 499.

prosecute and punish the French officers. The UN Secretary General is an international person whose actions are of international significance, and in this instance his assertions in this arbitration are evidence of customary international law.

The *Rainbow Warrior* case does not support the proposition that state officials have immunity from prosecution for criminal offences. It is state practice which demonstrates that state officials have individual criminal liability for offences which they commit on the territory of another state, at the behest of their state and whilst on duty. France did not intervene in the trial to assert immunity. New Zealand asserted jurisdiction and prosecuted, sentenced and imprisoned the agents. The fact that they were acting as state agents was considered to be mitigation of sentence. The UN Secretary General rejected the submission that the French officials were not individually responsible. The International Tribunal declared that France was in breach of its obligations towards New Zealand in not keeping the officers in custody as required.

The final case cited in the *Blaškić* case is that of Adolf Eichmann, who was tried in Israel, accused of crimes against humanity during the Second World War. Eichmann argued that the crimes were committed within the framework of the anti-Jewish decrees of the Nazi regime, and that he was acting in accordance with law, and that by the Act of State doctrine the court was precluded from looking behind those laws. The Act of State doctrine is that there are certain actions taken by a state, in its own territory, which a foreign court is not capable of adjudicating upon, and this includes foreign legislation. The *Eichmann* case decided that this doctrine was limited when applied to international crimes, as these were acts against the law of nations, for which there is individual responsibility. This has been followed in English courts, and there is a residual power which is to be exercised with 'caution and the greatest circumspection' to disregard a foreign law provision when to do otherwise would be an affront to basic principles of justice and fairness.[69] This is not a case about immunity.

On examination, these cases cited by the ICTY in the *Blaškić* case, to support the proposition that functional immunity for all state officials is a well established rule of customary international law, do not support that proposition in criminal prosecutions.

---

[69]   *Oppenheimer v Cattermole* [1976] AC 249, HL; *Kuwait Airways v Iraqi Airways Co.* [2002] UKHL 19, HL, per Lord Nicholls at para. 18.

This author undertook research into state practice to identify what conduct is official and imparts immunity.[70] Diplomats and consular officials have continuing immunity for official conduct,[71] and the small number of cases reported where such officials have been accused of criminal conduct and those where states have claimed, requested or waived immunity were analysed to assist in understanding what conduct is performed in the exercise of functions. Further, this author undertook extensive research into state practice from reports of cases where states arrested, prosecuted or issued warrants of the arrest of the agents of other states using the following criteria: the person arrested must clearly be a state actor, as opposed to a terrorist or a secessionist, or a person acting alone, or as part of a group for ideological reasons; the person must be a foreign national acting on behalf of a state, in what can only be described as state activity, in a second state.[72] The assertion of the state where the conduct took place that the activity was on behalf of another state was taken as sufficient. The understanding of the prosecuting state is of importance: Does the state prosecuting assert that the criminal conduct alleged was performed by and on behalf of a foreign state, and that there is the right to prosecute? The denial of the allegation by the foreign state does not affect the assertion of the right to prosecute. The person must have been arrested, charged and usually tried and sentenced. There is clearly no duty upon states to try foreign nationals who commit offences on their territory, and often states expel persons involved in undesirable conduct. The fact that they are not tried does not mean that states cannot try them; there are many reasons why a state may not wish to try a particular person such as lack of evidence, political embarrassment, or public interest immunity considerations. The cases identified and analysed included prosecutions for terrorism, terrorism by disguised members of armed forces, assassination, kidnapping, passport offences, trespassing and collecting information.

The analysis concluded that the cases show that state officials do not have immunity *ratione materiae* for criminal charges in respect of acts committed on the territory of the forum state, or the territory of a third state, unless that immunity is accorded by a special regime such as that

---

[70]   *Immunity, Individuals and International Law*, n. 61 above, ch. 4.
[71]   Vienna Convention on Diplomatic Relations 1961, Art. 39.2; Vienna Convention on Consular Relations, Art. 43.
[72]   Cases involving the drug trade or other criminal activity, and cases where missionaries or other religious figures were involved, were not included as the motivations of all involved are mixed, and cases where it is unclear on whose behalf a person is acting were also omitted from the analysis.

afforded diplomats and consuls, or by consent such as that accorded to special missions, or by ad hoc agreement. Only those state agents who have had immunity *ratione personae* are entitled to immunity for offences committed on the territory of a foreign state. State practice shows that agents are not only held responsible for what can be considered serious crimes of violence, such as murder, planting bombs and kidnapping, but they are also routinely arrested and prosecuted for trespassing and collecting information. State practice shows that states demonstrate *opinio juris* by arresting, charging and prosecuting the agents of other states, and by not objecting to their own agents being prosecuted. States demonstrate a responsibility towards their agents, and make great efforts to get their agents returned, they make representations and arrange exchanges, but they never assert immunity.

There is continuing immunity for those who have been entitled to immunity *ratione personae* for conduct performed in the exercise of their functions. This extends to conduct which is connected to functions such as parking offences, but it does not encompass serious crimes of violence such as bombing or kidnapping even if committed on behalf of the sending state. Other officials, not entitled to immunity *ratione personae* do not have immunity from prosecution for any offences on the territory of the receiving state.

This analysis was cited with approval in *Bat v Investigating Judge of the German Federal Court.*[73] Khurts Bat, the Head of the Mongolian Office of National Security, was arrested in the United Kingdom as his extradition was sought by Germany for an offence of kidnapping. It was alleged that Khurts Bat and other members of the Mongolian Secret Service kidnapped a Mongolian national in France and removed him to Germany and then Mongolia where the national was wanted on charges of involvement in the assassination of a Mongolian government minister.

The High Court held that Khurts Bat's did not benefit from immunity *ratione materiae*. There is an essential distinction between civil and criminal liability. State practice shows that an official of one state was not entitled to immunity for a criminal act performed on the territory of another state, especially where the second state had not consented to the presence of that official or to his engaging in conduct of that kind.

Roman Kolodkin, the first Special Rapporteur to the ILC in his second *Report on Immunity of State Officials* concluded (at paragraph 94):

> State officials enjoy immunity *ratione materiae* from foreign criminal juris-
> diction, ie immunity in respect of acts performed in an official capacity, since

---

[73]    *Khurts Bat*, n. 30 above.

these are acts of the State which they serve … A situation where criminal jurisdiction is exercised by a State in whose territory an alleged crime has taken place, and this State has not given its consent to the performance in its territory of the activity which led to the crime and to the presence in its territory of the foreign official who committed this alleged crime, stands also in this regard as a special case. It would appear that in such a situation there are sufficient grounds to talk of the absence of immunity.

The consent of the receiving state, not only to the discharge of the function, but to the presence of the foreign official in its territory, is crucial. Lord Justice Moses said (at paragraph 99) that he was persuaded 'by the full and cogent analysis of Dr Franey, supported by Special Rapporteur Koldkin, that the appellant does not enjoy immunity by reason of his conduct as an official of the Government of Mongolia from prosecution in Germany' and concluded that there is no customary international law affording Khurts Bat immunity *ratione materiae*. Offences committed on the territory of an official's own state are another question. Most crimes committed on the territory of one state are not justiciable on the territory of another state, as there would have to be extra-territorial jurisdiction to prosecute. One area where states have agreed to assert such jurisdiction is in relation to international crimes, such as genocide, war crimes, crimes against humanity and torture. In an effort to prevent the perpetrators of such crimes being able to evade justice states have signed conventions agreeing to prosecute such persons.

## 7.6 INTERNATIONAL CRIMES AND IMMUNITY

Is there a conflict in international law between the immunity enjoyed by high state officials for conduct which constitutes international crimes, and the individual responsibility which attaches to those offences? Have the two areas of international law developed separately and without reference to each other to the extent that they are incompatible? The purpose of this immunity is to protect the state and enable the individual to perform his or her functions. The purpose of individual responsibility for international crimes is to prevent the creation of safe havens for those committing such crimes, and thus to act as a deterrent to future offenders. If immunity provides protection from prosecution for an international crime such as genocide or torture, for which there is a duty to prosecute, then there are two conflicting obligations under international law. Does the immunity enjoyed by high state officials for conduct which constitutes international crimes conflict with the concept of individual responsibility, and the duty

to prosecute? Have the two areas of law developed separately to the extent that they are incompatible?

This conflict was at the heart of the *Pinochet* case. Pinochet was accused of using murder and torture to overthrow and defeat his political opponents, and then to maintain his power in Chile. To this end he used the institutions of his government: the police and the military. Spain asked for his extradition, and the extradition crime was official torture; that is torture as defined in the torture convention, torture 'inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity'. The definition of the crime of torture requires that the offence be committed as an action of the state, by a state official, and the governmental nature of the allegations raised the question of immunity from prosecution.

Professor Campbell McLachlan observed the independent development of the two areas of international law relating to immunity and human rights when he wrote:

> As those involved in the *Pinochet* litigation discovered, these two bodies of law had developed largely independently. Their potential incompatibility had not been resolved, despite the fact that many international conventions had been concluded during the latter half of the 20th Century, which provided for national court jurisdiction over international crimes.[74]

After the Second World War, the United Nations was created; the ILC and International Committee of the Red Cross (ICRC) developed international law to protect individuals from the excesses of government and for the protection of the victims of armed conflict. The resultant Conventions were designed to be multilateral treaties entered into by all states. The Conventions all take basically the same approach. A crime is stated to be of international concern; the crime is defined; individual responsibility is confirmed; the jurisdiction to be asserted is described; and the obligation to prosecute asserted. Within this framework the Conventions became progressively more sophisticated.

The General Assembly of the United Nations adopted the Universal Declaration of Human Rights in 1946[75] and the International Covenant on Civil and Political Rights in 1966.[76] These Resolutions recognized the

---

[74]   C. McLachlan, 'After Baghdad: Conflict or Coherence in International Law' (2003) 1 *NZJPIL* 25.

[75]   GAR 217A (III), 10 December 1946, which recognized 'the inherent dignity and the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world'.

[76]   GAR 2200 (XXI).

rights to life and the prohibition on torture which are now part of customary international law.

In 1946, the General Assembly declared that genocide is a crime under international law and that punishment of individuals for the crime is a matter of international concern,[77] and in 1948 adopted the Genocide Convention1948.[78] The Convention confirms that genocide is a crime, defines the offence, and provides that anyone committing the offence of genocide shall be punished regardless of their status. The Convention specifically refers to constitutionally responsible rulers, public officials and private individuals being punishable. It then goes on to provide for jurisdiction based on territory, or by an international penal tribunal, even though there was no international criminal tribunal at that time. The General Assembly invited the ILC to study the possibility of establishing an international court for the trial of persons charged with genocide, but there was not to be one for over 40 years.

The Genocide Convention does not refer to the immunity of individuals. The specific reference to the punishability of constitutionally responsible rulers, and public officials, implies that they are not entitled to immunity for the crime of genocide, but the treaty does not address immunity directly. Immunity was not an issue because the jurisdictional Article provides only for trial before the territorial court, where immunity would not be an issue if the alleged perpetrator was a citizen of that state, or before an international criminal tribunal where a state would consent to jurisdiction before surrendering its citizens.

There is a requirement in the Convention to extradite an offender in accordance with the laws and treaties in force, and genocide is not to be considered as a political crime for the purposes of extradition, but there was no consideration of immunity in the context of extradition. There is no responsibility to prosecute. Although the prohibition on genocide became *jus cogens*, the prosecution and punishment of those committing the crime of genocide was wishful thinking, as those in power who commit genocide did not give up their power and submit to prosecution.

On 12 August 1949, the text of the four Geneva Conventions was agreed. The Conventions deal with the wounded and sick in armed forces in the field; the wounded, sick and shipwrecked in armed forces at sea; prisoners of war; and civilians. The four Conventions have common principles and Articles, and created the concept of grave breaches of the

---

[77] GAR 96 (I), 11 December 1946.
[78] GAR 260 (III), 2 December 1948.

provisions of the Conventions, such breaches to be punishable by all states parties.

Each of the Conventions defines grave breaches by reference to particular acts 'if committed against persons or property protected by the Convention'. The states parties undertake to enact legislation necessary to provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave breaches. Each state party is under an obligation to search for persons alleged to have committed, or to have ordered to be committed, such grave breaches, and to bring such persons, regardless of their nationality, before its own courts. Such state party may, if it prefers, in accordance with the provisions of its own legislation, hand such persons over for trial to another state party, provided there is a prima facie case. There are also safeguards relating to fair trial.

These four Conventions created a scheme for the location, prosecution and punishment of war criminals. There is jurisdiction without a connection with territory or nationality, and there is an obligation to search for and prosecute persons present on a state's territory. The primary obligation is to prosecute, but a person may be extradited instead, if a requesting state can prove a prima facie case. Immunity is not referred to. All the alleged perpetrators would be state officials, in that they would be members of the armed forces.

In 1975, the General Assembly adopted the Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.[79] In 1985, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment was opened. Torture is defined as an offence which can only be committed in an official capacity.[80] The official character of the torture, the prohibition against which is *jus cogens*, is a fundamental element of the offence.

The aim of the Torture Convention is to create a system where no state is complicit in torture, and no torturer can evade justice. All states parties are required to take effective legislative, administrative, judicial or other

---

[79]   GAR 3452, 9 December 1975.

[80]   Torture Convention, Art. 1 defines torture as 'any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity'.

measures to prevent acts of torture in any territory under their juris-
diction. No exceptional circumstances whatsoever are allowed; war or the
threat of war, internal political instability or any other public emergency,
are not to be invoked as a justification of torture, nor can an order from
a superior officer or a public authority be invoked as a justification of
torture. No one is to be extradited, deported or returned by one state to
another state where there are substantial grounds for believing that the
person would be in danger of being subjected to torture. Each state party
must ensure that all acts of torture are offences under its criminal law,
including attempt, complicity or participation in torture. All states parties
agree to make these offences punishable by appropriate penalties which
take into account their grave nature.

Each state party must establish its jurisdiction[81] when the offences are
committed in any territory under its jurisdiction,[82] and where the alleged
offender is a national of that state. If the victim is a national of the state
then the state may take jurisdiction.

If an alleged offender is present in any territory under the jurisdiction
of a state and the state does not extradite him, then the state must
establish its jurisdiction, and submit the case to its competent authorities
for the purpose of prosecution. Any decision regarding prosecution is to
be taken in the same manner as in the case of any ordinary offence, of a
serious nature, under the law of that state. The standards of evidence
required for prosecution and conviction are in no way less stringent than
those for other cases, and there are provisions for taking an alleged
offender into custody, and guarantees as to fair trial.

States must take jurisdiction on the basis of territory, and of the
nationality of the offender, and jurisdiction may be taken on the basis of
the nationality of the alleged victim. These are the traditional agreed
bases of jurisdiction. Jurisdiction also has to be taken on the basis of the
presence of the offender on state territory; if the offender is not
extradited, then he is to be prosecuted if there is sufficient evidence. This
gives precedence to the territorial state, or state of nationality, but is
designed not to allow a perpetrator to escape because there is a bar to his
extradition. The immunity of an alleged offender is not considered at all.

The concept of individual responsibility for international crimes was
articulated in Article 7 of the Charter of the International Military
Tribunal for the trial of war criminals at Nuremburg, which provided that
'The official position of defendants, whether as heads of state or

---

[81]   *Ibid.* Art. 5.
[82]   This includes on board a ship or aircraft.

responsible officials in government departments, shall not be considered as freeing them from responsibility or mitigating punishment'.[83] The Tribunal emphasized this in its judgment, saying that immunity could not apply:

> The principle of international law which, under certain circumstances, protects the representatives of a state cannot be applied to acts condemned as criminal by international law. The authors of these acts cannot shelter themselves behind their official position to be freed from punishment.[84]

The Tribunal also stated that 'Crimes against international law are committed by men, not by abstract entities, and only by punishing individuals who commit such crimes can the provisions of international law be enforced'.

The General Assembly[85] unanimously affirmed the principles of international law recognized by the Charter of the Nuremburg Tribunal and the judgment of the Tribunal, and in 1950 accepted the Principles as formulated by the ILC.[86] Nuremberg Principle I provides that any person who commits an act which constitutes a crime under international law is responsible therefore and liable to punishment, and Nuremberg Principle III provides that the fact that a person acted as head of state or responsible government official does not relieve him of responsibility under international law.[87]

The (ICTY) and the International Criminal Tribunal for Rwanda (ICTR) were created by the Security Council under Chapter VII of the UN Charter in 1993 and 1994, with the power to prosecute persons for the most serious violations of international humanitarian law.[88] The Security Council did not purport to legislate: the International Tribunals

---

[83]   London, 8 August 1945, 82 UNTS 278, Art. 7: 'The official position of defendants, whether as Heads of State or responsible officials in Government Departments, shall not be considered as freeing them from responsibility or mitigating punishment'.

[84]   *The Trial of German Major War Criminals: Proceedings of the International Military Tribunal Sitting at Nuremberg in Germany* (London, HMSO, 1950), Pt 22.

[85]   GAR 95(1), 11 December 1946.

[86]   GAR 488 (V), 12 December 1950.

[87]   Principles of International Law Recognised in the Charter of the Nuremberg Tribunal and in the Judgment of the Tribunal 1950, reproduced in (1950) II *Yearbook of the ILC* para. 97.

[88]   SCR 827 (1993) and SCR 955 (1994).

apply existing international law.[89] Article 7 of the ICTY Statute and Article 6 of the ICTR Statute both provide for individual responsibility. The fact that an accused person acted pursuant to an order of a government or of a superior does not relieve him of criminal responsibility, but may be considered in mitigation of punishment if the International Tribunal determines that justice so requires. Article 27 of the Statute of the International Criminal Court (ICC) provides for individual responsibility. The official position of any person, including any head of state or government, does not exempt them from criminal responsibility nor does it mitigate punishment.

The creation of these International Tribunals, and the specific provisions in their Statutes that heads of state and government officials are not exempt from responsibility and can be tried by the Tribunals, rather than demonstrating that there is no state immunity for these acts, implies that there is such immunity. This immunity has been specifically excluded by these Statutes, and this is one of the reasons that the International Tribunals and the ICC have been established.

The first case in which the interaction of the duty to extradite, individual responsibility and immunity was considered was that of *Pinochet*, and the English courts struggled to reconcile the conflicting principles.

Pinochet was a former head of the state of Chile who was arrested in England because his extradition was requested by Spain for offences including torture. As a former head of state, customary international law required that he be granted immunity *ratione materiae*, that is, immunity for alleged criminal offences committed in his public capacity whilst he was head of state. He was accused, *inter alia*, of official torture in Chile, his own state, but the Torture Convention makes no mention of state immunity, despite the fact that jurisdiction is given to the national courts of other states.

It was submitted on behalf of Pinochet that as a former head of state he did not have immunity in respect of personal or private acts, but that he continued to enjoy immunity in respect of public acts performed by him as head of state, that is, in respect of the exercise by him of sovereign power in that capacity, and that the conduct alleged against him related not to his private or personal conduct, but to his conduct when exercising

---

[89] *Report of the UN Secretary General 3 May 1993 on the Legal Basis for the Establishment of the ICTY*, S/25704, para. 29, as requested in SCR 808 (1993), para. 2.

sovereign power as head of state of the Republic of Chile. The allegations were that he used the apparatus of the state to torture and murder. The proceedings were complicated, with the basis upon which Pinochet's extradition was requested changing, and there were three decisions by the House of Lords.[90]

On 25 November 1998, the House of Lords[91] gave judgment and found that Pinochet was not immune, but it was a close call with two of the five judges finding that he was entitled to immunity. All of the Law Lords were agreed that the crucial question was whether the acts alleged were done by Pinochet in the exercise of his functions as head of state. On 15 January 1998, the House of Lords[92] set aside the judgment of the 25 November 1998 on the grounds that the court was not properly constituted, and on the 24 March 1999, the House of Lords,[93] comprising seven different judges, gave a second and final judgment as to whether Pinochet was entitled to immunity from the criminal jurisdiction of the English courts.

The court considered whether Pinochet was entitled to immunity as an ex-head of state performing the conduct in the exercise of his official functions. Any date at which he lost immunity became of great importance, as the number of offences for which he could potentially be extradited were different depending upon which date was decided. In this context the dates upon which the countries ratified the Torture Convention became significant; Spain ratified the convention on 21 October 1987, Chile ratified on 30 October 1988, and the United Kingdom on 8 December 1988.

All seven of the judges gave separate reasons for their decision regarding whether Pinochet lost his immunity, and if he did the date at which he lost it. Six of the judges agreed that he was not immune, but the dates at which the immunity was lost differed. Lord Goff disagreed, and said that Pinochet was entitled to immunity for torture and conspiracy to torture; the fact that no mention was made of state immunity in the Convention was decisive – had it been intended to exclude state immunity, then the Torture Convention would have provided for that.

---

[90]    For a detailed explanation of the case and an analysis of the decisions see the author's thesis and book, *Immunity, Individuals and International Law*, n. 61 above.

[91]    *R v Bow Street Metropolitan Stipendiary Magistrate and others, ex parte Pinochet Ugarte (Amnesty International and others intervening)* [2000] 1 AC 61.

[92]    *R v Bow Street Metropolitan Stipendiary Magistrate and others, ex parte Pinochet Ugarte (No. 2)* [2000] 1 AC 119.

[93]    Pinochet (No. 3), n. 5 above.

Lord Browne-Wilkinson (at 204H to 206A) found that Pinochet lost his immunity on 8 December 1988, the date when all three states involved had ratified the Torture Convention. He reasoned that it cannot be an official function in international law to do something which international law criminalizes. It is an essential feature of the international crime of torture that it is committed by a state official. If immunity *ratione personae* applied then no case could be brought outside the forum state without a waiver by that state.

Lord Hope (at 247G, 262D and 263E) decided that immunity was lost on 30 October 1988. He said that there was no express waiver, nor an implied term in the Torture Convention, but that the obligations which were recognized by customary international law, in the case of allegations of systematic torture, by the date when Chile ratified the Convention, were so strong as to override any objection by it on the ground of immunity *ratione materiae*.

Lord Hutton (at 251C) stated that the prohibition of torture had acquired the status of *jus cogens*, and having regard to the provisions of the Torture Convention, acts of torture after 29 September 1988 were not a function of a head of state, and therefore Pinochet was not immune after 29 September 1988.

Lord Saville found that Pinochet's immunity ceased at 8 December 1988 as the terms of the Torture Convention expressly state that a former head of state, who allegedly resorts to torture for state purposes, falls within the terms of the Convention, and should be dealt with in accordance with them; and (at 267F) he found that the express and unequivocal terms of the Convention were a clear and unambiguous waiver of immunity.

Lord Millett found that Pinochet was not entitled to immunity for offences of torture, and conspiracy to torture; he stated (at 277A–278B) that the definition of torture is entirely inconsistent with the existence of a plea of immunity *ratione materiae*. The official or governmental nature of the act, which forms the basis of the immunity, is an essential ingredient of the offence, and that no rational system of criminal justice can allow an immunity which is coextensive with the offence.

Lord Phillips (at 290F) stated that Pinochet was not entitled to immunity for the offences of torture, and conspiracy to torture, as the Torture Convention is incompatible with immunity *ratione materiae*. In his view immunity *ratione materiae* cannot coexist with international crimes, and extra-territorial jurisdiction in relation to them, as the exercise of extra-territorial jurisdiction overrides the principle that one state will not intervene in the internal affairs of another.

All of the judges were struggling to reconcile the two strands of international law.

In conclusion the court found by six to one, Lord Millett dissenting, that torture was not an extradition crime until 29 September 1988, when torture became a crime under UK law; and secondly by six to one, Lord Goff dissenting, that Pinochet was not entitled to immunity for torture and conspiracy to torture. There were different decisions as to the date when immunity was lost. Three of the judges, Lord Browne-Wilkinson, Lord Hope and Lord Saville, found that it was when all three states involved had ratified the Torture Convention, that is, 8 December 1988. Lord Hutton found it was 19 September 1988 when torture became an offence in the United Kingdom; and two judges, Lord Phillips and Lord Millett, found that he was not entitled to immunity for the international crime of torture. Therefore the majority decided the date was 8 December 1988, and Pinochet was found to have lost his immunity as of that date.[94]

In 2006, the House of Lords again considered the question of state immunity in *Jones v Ministry of Interior*.[95] The House of Lords was considering whether state immunity applies to civil claims for torture committed by state officials abroad and decided unanimously that state immunity does apply to such claims and that the English courts have no jurisdiction to hear them. In coming to its conclusion, the House of Lords considered what was decided in the *Pinochet* case regarding immunity from prosecution for official torture. Lord Bingham (at paragraph 19 of the judgment) said that the essential ratio in the *Pinochet* case was that international law could not without absurdity require a state to prosecute and, at the same time, require immunity to be granted to those properly charged. Lord Hoffman (at paragraph 81) stated that the reason why General Pinochet did not enjoy immunity *ratione materiae* was because 'by necessary implication, international law had removed the immunity'.

The judges in all the *Pinochet* judgments and in the *Jones* case struggled to make sense of the system of criminal responsibility and accountability introduced by the Torture Convention, when no mention was specifically made regarding immunity. The only way to implement the Torture Convention, without allowing those most responsible for the most serious crimes to escape the regime, was to find that the Torture

---

[94]   The extradition proceedings then continued. The Secretary of State did not order Senator Pinochet's extradition on the grounds of ill health. On 2 March 2000, Senator Pinochet returned to Chile.

[95]   *Jones v Ministry of Interior Al-Mamlaka Al-Arabiya AS Sauduya (Kingdom of Saudi Arabia) and others* [2006] UKHL 26, 129 ILR 629, HL.

Convention removed immunity *ratione materiae*. This was reading something into the Convention which was not really there, and led to criticism of the extradition proceedings. There was no wholehearted approval of the *Pinochet* case, and that was because the Torture Convention does not address the issue.

On 14 February 2003, the ICJ in the *Arrest Warrant* case confirmed that serving heads of state, heads of government and Foreign Ministers are entitled to immunity *ratione personae*, including immunity from prosecution for international crimes, including official torture.

The Court held (at paragraph 59) that the rules governing the jurisdiction of national courts must be carefully distinguished from those governing jurisdictional immunities, as jurisdiction does not imply absence of immunity, while absence of immunity does not imply jurisdiction, and stated that an obligation under an international convention to extend criminal jurisdiction in no way affects immunities under international law:

> the rules governing the jurisdiction of national courts must be carefully distinguished from those governing jurisdictional immunities, as jurisdiction does not imply absence of immunity, while absence of immunity does not imply jurisdiction.

The Court emphasized (at paragraph 60) that immunity does not mean impunity and that immunity from criminal jurisdiction and individual criminal responsibility are quite separate concepts. The Court said that jurisdictional immunity is procedural in nature, whereas criminal responsibility is a question of substantive law. Jurisdictional immunity may well bar prosecution for a certain period or for certain offences, but it cannot exonerate the person to whom it applies from all criminal responsibility.

The Court (at paragraph 61) explained four ways in which a person who has immunity *ratione personae* may be prosecuted:

(1)   Such persons enjoy no criminal immunity under international law in their own countries, and may thus be tried by those countries' courts in accordance with the relevant rules of domestic law.
(2)   They will cease to enjoy immunity from foreign jurisdiction if the state which they represent or have represented decides to waive that immunity.
(3)   After a person ceases to hold office, he or she will no longer enjoy all of the immunities accorded by international law in other states. Provided that it has jurisdiction under international law, a court of

one state may try the former official of another state in respect of acts committed prior or subsequent to his or her period of office, as well as in respect of acts committed during that period of office in a private capacity.

(4)    An incumbent or former official may be subject to criminal proceedings before certain international criminal courts, where they have jurisdiction.

The probability of high state officials who commit such serious offences being tried in these circumstances is not high. Their own country is usually the one they are oppressing, and therefore there will be no national prosecution. Such a person will not surrender power; he is likely to grant an amnesty to himself before abdicating. He will not waive immunity, or voluntarily surrender to an international tribunal. Those who are capable of committing genocide, war crimes, crimes against humanity and torture, will not be concerned by the fact that, even though they cannot be tried, they have criminal responsibility.

This exception that a former high state official can be tried for actions committed, whilst in office in a private capacity, returns to the central question in the *Pinochet* case. Is torture by a state official an official action, is it *acta jure imperii* and therefore immune? Is the act, by its nature and not its purpose, a governmental act? Pinochet instigated torture to preserve his regime, is that not a governmental act? It is not the action of a human rights compliant government, but he was using the apparatus of the state to protect the government. As Lord Millett (at 268) said in *Pinochet (No. 3)*, this exception to immunity is not *acta jure gestionis*, rather it is 'a parallel and in some respects opposite development'.

The explanation of when a former high state official can be prosecuted was not necessary for the ICJ's decision in the *Arrest Warrant* case, and has been criticized. Hazel Fox[96] has stated that 'there is some questioning of this ruling which may be described as obiter dicta, since the facts on which the judgment was based concerned a minister while serving in office'. Steffen Wirth[97] has argued that the assertion that Foreign Ministers are immune for official acts, even when they are no longer in office, is *obiter dictum*, and also that it is not well reasoned, and difficult to reconcile with the existing law of state immunity. He went on:

---

[96]    'State Immunity and the International Crime of Torture' (2006) 2 *EHRLR* 142.

[97]    'Immunity for Core Crimes? The ICJ's Judgment in the Congo v Belgium Case' (2002) 13 *EURJIL* 877.

the Court hardly adduces any evidence for the existence of the rule which it asserts, and, what is more, there is a gap in its reasoning: whereas all arguments made by the Court in discussing the merits of the case relate only to incumbent Ministers of Foreign Affairs, the conclusion drawn in paragraph 61 of the decision then includes former Ministers of Foreign Affairs.

He has argued that once a high state official leaves office he should be protected only by immunity *ratione materiae*, which should be interpreted as providing no protection against prosecution for international crimes.

Andrea Bianchi[98] has also argued that no immunity should be granted with regard to prosecutions for international crimes, contending that:

the very notion of crimes of international law is inconsistent with the application of jurisdictional immunities … particularly as regards those crimes which by their very nature either presuppose or require state action. If immunity were granted to state officials … prosecution of such crimes would be impossible and the overall effectiveness of international criminal law irremediably undermined.

In their Joint Separate Opinion in the *Arrest Warrant* case,[99] Judges Higgins, Kooijmans and Buergenthal (at paragraph 85) quote Andrea Bianchi and note that it is claimed in the literature that serious international crimes cannot be regarded as official acts because they are not normal state functions nor functions that a state alone, in contrast to an individual, can perform, but this has not been followed by state practice. There have not been prosecutions by national courts of ex-high state officials of other states for international crimes. This also has not been followed by the House of Lords in *Jones v Ministry of the Interior*[100] and it is at odds with the principles of state responsibility. A state will incur responsibility in international law if one of its officials is acting under apparent authority even if the official exceeds his authority or contravenes his instructions: the question is whether he was acting with apparent authority.[101] If so, the state will be responsible for his actions,

---

[98]  'Denying State Immunity to Violators of Human Rights' (1994) 46 *Austrian Journal of Public and International Law* 227; 'Immunity Versus Human Rights: The Pinochet Case' (1999) 10 *EJIL* 237 at 277–8.

[99]  *Arrest Warrant*, n. 6 above.

[100]  [2007] 1 AC 270.

[101]  Articles on the Responsibility of States for Internationally Wrongful Acts, with commentaries, reproduced in (2001) II *Yearbook of the ILC* 31, para. 77, commentary to Art. 7 para. (8).

which are therefore official, albeit internationally wrongful, actions. Actions do not cease to be official because they are illegal.

A decision of the ICJ has no binding force except between the parties and in respect of that particular case,[102] but the ICJ was explaining customary international law in the *Arrest Warrant* case and these are influential pronouncements. The ICJ appears to be saying that the decision of the House of Lords in *Pinochet (No. 3)* was incorrect.[103]

Campbell McLachlan[104] has suggested that 'it would be preferable if international law were to admit of an exception to state immunity for the prosecution of individuals for international crimes, that such an exception develop as an independent head'. But he says '[w]hether such an exception is in truth developing as part of international law's "living and expanding code" is debateable', and '[a]lthough the ICJ's judgment should properly be limited to the specific issue, as to serving foreign ministers, which it decided, the conservatism at the core of the decision is bound to have a chill effect on national judicial activism on related immunity issues, and thus inhibit the further development of state practice'.

In the *Pinochet* case, the House of Lords decided that international law has to make sense and be internally consistent. The Torture Convention requires states to extradite or prosecute persons on their territory accused of crimes of torture, and the definition of the offence of torture requires that the person accused of the offence will have immunity *ratione materiae*, as the offence will have been committed as an official act. The House of Lords decided that the only coherent decision was that Pinochet was not immune, and that states parties to the Torture Convention must have meant that immunity did not apply. The House of Lords decided that immunity continues for the offences of murder and conspiracy to murder. It was not the seriousness of the offences, nor the abuses of human rights, which removed the immunity, but the absurdity which would prevail if Pinochet was found to be immune. As Lord Browne-Wilkinson (at 205E) said 'the whole elaborate structure of universal jurisdiction over torture committed by officials is rendered abortive'. The complicated reasons given by the judges for their decision, and the fact that no really sensible *ratio* can be deduced from the case, shows the difficulty which the judges had in making their decision, and what the judges did was to interpret the Torture Convention by reading into it a provision which was not there.

---

[102]   Statute of the ICJ 1945, Art. 59.
[103]   *Arrest Warrant*, n. 6 above, para. 59.
[104]   'Pinochet Revisited' (2002) 51(4) *ICLQ* 959.

The *Pinochet* case was about a former head of state and immunity *ratione materiae*, whereas the *Arrest Warrant* case before the ICJ was about the immunity of a serving Foreign Minister, that is, immunity *ratione personae*. The ICJ stated clearly that treaty provisions regarding jurisdiction cannot change the immunity of an individual under customary international law. This statement was unnecessary for the decision the Court came to, but it is a brave national court which would issue a warrant when the ICJ says that immunity prevails.

The ICJ also said that one way in which a person with immunity can be brought to justice is before an international tribunal. The International Tribunals have been successful in arresting and prosecuting individuals, and the International Criminal Court has been created since the *Pinochet* case. The principle of complementarity in the ICC Statute gives precedence to states with traditional bases of jurisdiction, territory and nationality, and only allows for prosecution if those states are unwilling or unable to prosecute.

As Lord Browne-Wilkinson said in *Pinochet (No. 3)* (at 190F):

> It may well be thought that the trial of Senator Pinochet in Spain for offences all of which related to the state of Chile and most of which occurred in Chile is not calculated to achieve the best justice.

Criminal offences should be prosecuted in a state with a proper connection to the offence, and if that is not possible because a person is so powerful, then it is submitted that the venue should be an international criminal tribunal, and not the domestic courts of another state.

## 7.7  INTERNATIONAL CRIMINAL COURT

There have been developments in this area of international law since the *Pinochet* case. The ICTY and the ICTR have demonstrated that international tribunals are an effective way to deal with alleged war criminals, internationalized domestic tribunals have been established in Sierra Leone, East Timor and Cambodia to assist national courts deal with the prosecution of those responsible for atrocities, and the International Criminal Court (ICC) has been created by treaty.

The ICC Statute[105] was adopted on 17 July 1998 and entered into force on 1 July 2002. In the Preamble, the states parties recognize that grave crimes threaten the peace, security and well-being of the world, and

---

[105]   2187 UNTS 3.

affirm that the most serious crimes of concern to the international community as a whole must not go unpunished, and that their effective prosecution must be ensured by taking measures at the national level, and by enhancing international cooperation. They say they are determined to put an end to impunity, and thus contribute to the prevention of such crimes. The ICC is complementary to national criminal jurisdictions. Finally, the states parties are resolved to guarantee lasting respect for, and the enforcement of, international justice.

The Court has jurisdiction over 'the most serious crimes of concern to the international community as a whole', that is, genocide, crimes against humanity and war crimes. It also has jurisdiction over the crime of aggression, once it is defined. Its jurisdiction is limited to crimes occurring after the Statute came into force on 1 July 2002. A state on becoming a party to the Statute accepts the jurisdiction of the Court. The primary jurisdiction of the ICC is by consent. States parties may refer a situation to the prosecutor for investigation on the basis of territory or nationality, or the prosecutor may initiate an investigation in those circumstances. A state which is not a party to the Statute may, by declaration, accept the exercise of jurisdiction of the Court, with respect to a specific crime.

The Court also has a non-consensual jurisdiction under Articles 13 to 15 of the Statute, whereby the Security Council acting under Chapter VII of the UN Charter may refer a situation, in which one or more crimes appear to have been committed, to the prosecutor.[106]

The complementarity principle is given effect by acknowledging that the domestic jurisdiction of a state takes precedence unless that state is unable or unwilling to prosecute.

The Statute of the ICC expressly considers immunity, not just in relation to the capacity of the Court, but also in relation to national courts. Persons who are wanted by the Court will be arrested, and appear before a national court, before being transferred to the ICC. The provisions relating to immunity are carefully considered.

A person who commits a crime within the jurisdiction of the ICC is individually responsible and liable for punishment,[107] and official capacity is irrelevant as the Statute applies equally to all persons without any distinction based on official capacity. In particular, official capacity as a head of state or government, a member of a government or parliament, an

---

[106]  SCR 1593, 31 March 2005, referred the situation in Darfur, Sudan since 1 July 2001 to the Prosecutor of the ICC.

[107]  Statute of the ICC, Art. 25.2.

elected representative or a government official does not exempt a person from criminal responsibility under the Statute. Immunities or special procedural rules which may attach to the official capacity of a person, whether under national or international law, do not bar the Court from exercising its jurisdiction over such a person.[108]

This applies to a person who is before the ICC accused of a crime, but if a person is before a national court, arrested on a warrant issued by the ICC, then:

(1) the Court may not proceed with a request for surrender or assistance which would require the requested state to act inconsistently with its obligations under international law with respect to the state or diplomatic immunity of a person or property of a third state, unless the Court can first obtain the cooperation of that third state for the waiver of the immunity;

(2) the Court may not proceed with a request for surrender which would require the requested state to act inconsistently with its obligations under international agreements pursuant to which the consent of a sending state is required to surrender a person of that state to the Court, unless the Court can first obtain the cooperation of the sending state for the giving of consent for the surrender.[109]

This provision acknowledges that states and national courts have an obligation under international law to recognize state and diplomatic immunity. The Article provides that the ICC may not proceed with a request which would require the requested state to act inconsistently with its obligations under international law. This implies that these obligations are a matter for the ICC to decide. It is submitted that this is too narrow a construction of the Article. International law is binding upon both the requested state and the ICC, both are required to abide by it. The requested state cannot surrender a person who is entitled to immunity, and the ICC cannot proceed with the request.

The English legislation deals with this by providing that such a decision be taken by the Secretary of State not the courts. International Criminal Court Act 2001, section 23, headed 'Provisions as to State or Diplomatic Immunity', provides that any state or diplomatic immunity attaching to a person by reason of a connection with a state party to the ICC Statute does not prevent proceedings. This includes immunity under

---

[108]  *Ibid.* Art. 27.
[109]  *Ibid.* Art. 98.

customary international law. Where immunity attaches to any person by reason of a connection with a state which is not a party to the ICC Statute, then if the ICC has obtained a waiver of that immunity in relation to a request for that person's surrender to the ICC, that waiver is treated as extending to the proceedings in the United Kingdom in connection with that request. A certificate by the Secretary of State that a state is or is not a state party, or that there has been a waiver, is conclusive. The Secretary of State may in any particular case after consultation with the ICC and the state concerned direct that proceedings, which would be prevented by state or diplomatic immunity if the state was not a party to the ICC, or a waiver, shall not be taken.

If the request is for the surrender of a person who has immunity because of a connection with a state not a party to the ICC, then the power under section 1 of the United Nations Act 1946 to make Orders in Council may be used. This power is to give immediate effect by Order in Council to UN Security Council Resolutions not involving the use of armed force. Orders in Council made under this section 'shall be laid before Parliament forthwith'. The procedure has been considered in *A and others v HM Treasury*,[110] in which the Court of Appeal decided that the fact that the Order in Council must be laid before Parliament, even though there is no procedure to enable Parliament to scrutinize or amend it, meant that it was not possible to challenge the lawfulness of the Orders on the ground they were *ultra vires*, as an individual Member could seek to initiate a debate if he or she felt that an Order was unsatisfactory. Sir Anthony Clarke MR said 'the likelihood of Parliamentary scrutiny seems more theoretical than real'.

The International Criminal Court Act 2001 therefore takes any decision regarding the immunity of an individual out of the hands of the national court.

## 7.8   CONCLUSION

State immunity is a principle of international law based upon the consent of states.

There are two different immunities which attach to individuals because they are state officials: immunity *ratione personae* and immunity *ratione materiae*. Immunity *ratione personae* is described as being immunity conferred because of the position held by an official in a state, or the

---

[110]   [2008] EWCA Civ 1187.

immunity granted because of the official's status. Immunity *ratione materiae* is accorded because of the activity undertaken by a state official, the immunity attaching to official acts. Although both of these immunities are accorded to individuals because they are state officials, and the immunity is that of the state inasmuch as it is the state that can waive the immunity, they are not the same. Immunity *ratione materiae* is simply an expression of the immunity of the state – if the state is not immune then neither is the official; whereas immunity *ratione personae* has a separate existence to the immunity of the state. A person is entitled to immunity *ratione personae* whether or not the state would be entitled to claim immunity in civil proceedings for the actions of the state official.

Immunity *ratione personae* protects the person of the most important state officials. Since the ILC adopted Draft Article 3 on the Immunity of State Officials from Foreign Criminal Jurisdiction, the indication is that international law is developing and immunity *ratione personae* is restricted to the head of state, head of government and Foreign Minister. It is an immunity afforded only to those officials of the highest status. It protects the dignity of the state by protecting the office held by the official, who is inviolable. It means that high state officials can go freely about their state business, enabling such officials to perform their functions without interference, or fear of interference, from other states. This immunity is all encompassing. It applies to all actions of the individual, whether in their own state, the forum state or a third state, both before and after taking office, and it includes all civil and criminal proceedings, including those alleging the most serious of international crimes. A foreign state has to accord a person entitled to immunity *ratione personae* of its own motion and not wait for it to be claimed.

There are also special regimes which give state officials immunity *ratione personae* for limited agreed periods of time. Diplomatic immunity, consular immunity and the immunity accorded to the members of special missions are all based upon the consent of states and are well established in international law. These regimes all accord immunity to specific state officials for particular periods of time by agreement between both states involved. The purpose of the immunity conferred under these regimes is to enable state officials to perform particular tasks or undertake specific roles on behalf of their state. This immunity *ratione personae* is all encompassing for the time agreed, usually the time the officials are present on the territory of the receiving state. An official who benefits from this immunity has an obligation to abide by the laws of the receiving state, and if he does not do so the sanction available to the receiving state is to expel the official.

The immunity accorded to members of special missions can cover visits by state officials for state business. This regime has the advantage of being agreed in advance, so that the sending and receiving states know the purpose of the special mission, and know who has immunity, and for how long.

What is less clear is whether there is continuing immunity *ratione materiae* accorded to those who have had immunity *ratione personae* once that immunity comes to an end; and also, whether there is immunity from prosecution for officials who perform official actions. Immunity *ratione materiae* is immunity attaching to conduct undertaken on behalf of a state and it is described as being for *acta jure imperii*, actions of an official nature.

The concept that the immunity of the state also covers the official has been developed in civil proceedings. The rationale for this immunity in civil cases is that if an individual is sued, then the state is sued by proxy, and the immunity of the state is thereby undermined. To allow the individual to be sued when the state is immune would be to circumvent the immunity provided to the state. There is only one entitlement in civil proceedings to compensation, and the responsibility is that of the state. If the conduct of an official is attributable to the state and the state is in international law responsible, then the state may claim immunity unless an established exception to immunity applies, and in these circumstances the state may also claim immunity for the individual state official. In a civil context, if a state is entitled to and claims immunity regarding conduct by its officials, then this immunity extends to all officials and ex-officials for this conduct, provided they were acting in an official capacity. Acting in an official capacity means the same here as it does in the context of the law of state responsibility.[111] So if a state claims immunity for its officials that state is accepting responsibility for their actions.[112]

The entitlement of individuals to immunity in civil cases is different to the entitlement to immunity in criminal cases. The responsibility of the individual and the state is not co-terminus when criminality is alleged, as a person who commits a crime is individually responsible for that crime, and can be punished. Individual responsibility for crimes under international law has been a principle of international law since the acceptance of the Nuremburg Principles after the Second World War. Individual

---

[111]   ILC Draft Articles on the Responsibility of States for Internationally Wrongful Acts 2001, Arts 4 and 7; *Case concerning Certain Questions of Mutual Assistance in Criminal Matters (Djibouti v France*, n. 19 above, para. 196.

[112]   *Jones v Ministry of the Interior*, n. 100 above, para. 12.

criminal responsibility is separate from and additional to any responsibility of the state. Associated with the concept of individual responsibility for offences are the ideas of the punishment and prevention of crime. A person who is responsible for a crime should be punished, and the possibility of prosecution and punishment should thereby act as a deterrent to others. There is nothing inconsistent in saying that the state is immune in respect of a particular act, but that an individual official can be prosecuted and punished for it.

The concept of immunity *ratione materiae* covering criminal liability was raised by the arrest of Pinochet, and in *Pinochet (No. 3)* the judges in the House of Lords were all agreed that all state officials are entitled to continuing immunity *ratione materiae*, but this premise was accepted without proper analysis or argument. There have been statements in cases such as *McLeod*[113] and *Blaškić*,[114] that officials should not be punished for acting on behalf of their state, but analysis shows these statements are not supported by state practice. The analysis of those cases, and the other cases referred to in the *Blaškić* judgment, do not support that conclusion. The analysis of state practice shows that states regularly prosecute state officials for actions performed on behalf of their states.

The place where the criminal conduct occurs has a bearing on whether immunity *ratione materiae* attaches to that conduct. The evidence of state practice analysed demonstrates that states have regularly prosecuted and punished officials of foreign states for acts committed on the territory of the forum state. This includes not only serious offences such as terrorism, assassination and kidnapping, but also less serious matters such as collecting information and trespassing. There is a marked contrast between the treatment of officials who have immunity *ratione personae*, such as diplomats, who are expelled, and other officials who are prosecuted, and often severely punished, for the same conduct. The analysis of state practice shows that only those state officials who are present on the territory of a foreign state with the consent of the second state and have immunity *ratione personae* are entitled to immunity *ratione materiae* from prosecution after they have left the territory or cease to hold office. They have immunity *ratione personae* for an agreed period, and thereafter they have continuing immunity *ratione materiae* for conduct legitimately performed in the exercise of their functions. This immunity extends to conduct which is connected to their functions but does not cover serious crimes of violence, even if committed on behalf of

---

[113]   British and Foreign State Papers, vol. 29, p. 1139.
[114]   *Prosecutor v Tihomir Blaškić*, n. 56 above.

the sending state. In the criminal context, acting in an official capacity does not include acts of violence on the territory of a foreign state. An official present on the territory of another state who does not have immunity *ratione personae* does not have immunity from prosecution for any offences committed on that territory.

The analysis of state practice demonstrates that immunity does not attach to conduct alone, for a person to have continuing immunity *ratione materiae* from prosecution for offences committed on the territory of a foreign state they must initially have had immunity *ratione personae*. The forum state must have agreed to the official being present on its territory, and agreed to the purpose of the visit. Those officials present on the territory of a foreign state, with the consent of that state, who have immunity *ratione personae*, have continuing immunity *ratione materiae* only for official conduct, *acta jure imperii*, with the proviso that the conduct must be part of the legitimate functions of the official. This does not extend to acts of violence.

There is the question regarding the extent of immunity for offences committed by an official on the territory of his own state in the exercise of his official functions. For the most part states do not have jurisdiction to prosecute crimes committed on the territory of another state and therefore the question does not arise. States have signed conventions undertaking to assert extra-territorial jurisdiction in relation to international crimes, and agreeing to extradite or prosecute alleged offenders present on their territory. Most states are party to the four Geneva Conventions 1949 and the Torture Convention 1984. These Conventions both require states parties to assume jurisdiction over alleged offenders present on their territory. All states parties have a duty to extradite a person alleged to have committed any offence as defined in the Conventions or to submit the case to its competent authorities for the purpose of prosecution. Grave breaches of the Geneva Conventions are most likely to be committed by soldiers and other state officials and the definition of torture in the Torture Convention requires that the offence is committed by officials acting under the guise of official authority. Therefore these offences are almost certain to be committed by persons acting in an official capacity. There is a tension between the principle of immunity and the obligation under international law to prosecute these crimes.

The ICJ in the *Arrest Warrant* case (at paragraph 61 of its judgment) said that after a person ceases to hold office a court of one state may try the former official of another state in respect of acts committed during that period of office in a private capacity. This was the central question in *Pinochet*: Is torture an offence that has to be committed by a state

official, an 'official act' in the sense that it carries immunity *ratione materiae*?

One way to reconcile these two decisions is to say, as the judges did in the *Pinochet* case, that official torture committed by a state official as defined in the Torture Convention cannot be an act which carries with it immunity *ratione materiae*. This would mean that the terms 'official act' and 'acts committed in a private capacity' have different meanings in different contexts. In civil proceedings, an official act means an act for which a state may claim immunity, an act for which it is in international law responsible. In criminal proceedings, an official act cannot include conduct prohibited by international law. This is saying that official torture does not carry immunity *ratione materiae* because it is official.

The ICJ also stated (at paragraph 59 of its judgment) that a treaty provision regarding jurisdiction cannot change the immunity of an individual under international law. It said that rules governing the jurisdiction of national courts must be carefully distinguished from those governing jurisdictional immunities, and that jurisdiction does not imply the absence of immunity while the absence of immunity does not imply jurisdiction. This is all very well, but if there is no jurisdiction for official torture, the Torture Convention is rendered meaningless. The ICJ continued that the obligations of prosecution or extradition imposed by Conventions for the prevention and punishment of serious crimes require states to extend their criminal jurisdiction, but that such extension of jurisdiction in no way affects immunities under customary international law, including the immunity of high state officials. The ICJ stated that those immunities remain opposable before the courts of foreign states even where those courts exercise such a jurisdiction under those Conventions.

The statements of the ICJ about the immunity of former state officials were not necessary for the decision of the Court, and they have been criticized. The *Arrest Warrant* case was about the immunity *ratione personae* of high state officials, whereas the *Pinochet* case was about immunity *ratione materiae* to be afforded to former high state officials for offences, and therefore the two cases are distinguishable. But the statements of the ICJ in the *Arrest Warrant* case are powerful and clear declarations of that Court's understanding of customary international law. Any national court issuing a warrant for the arrest of a former high state official of a foreign state for torture or grave breaches of the Geneva Conventions engages the responsibility of the state, and must expect the issuance of such a warrant to be challenged in higher courts and on the international plane.

The ICJ suggested that another exception to the immunity of former high state officials would be prosecution before an international criminal tribunal which has jurisdiction. The principle of complementarity in the ICC Statute gives precedence to prosecution by states with traditional bases of jurisdiction, territory and nationality, and only allows for prosecution before the ICC if those states are unwilling or unable to prosecute. It is submitted that the Statute of the ICC provides a coherent hierarchy and a clear decision-making process for deciding where the trials of former high state officials for international crimes should be held.

# EXHIBIT 4

# IMMUNITIES OF FOREIGN STATES

## HEARING

BEFORE THE

### SUBCOMMITTEE ON
### CLAIMS AND GOVERNMENTAL RELATIONS

OF THE

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

NINETY-THIRD CONGRESS

FIRST SESSION

ON

**H.R. 3493** *File Copy*

A BILL TO DEFINE THE CIRCUMSTANCES IN WHICH FOR-
EIGN STATES ARE IMMUNE FROM THE JURISDICTION OF
THE UNITED STATES COURTS AND IN WHICH EXECUTION
MAY NOT BE LEVIED ON THEIR ASSETS, AND FOR OTHER
PURPOSES

JUNE 7, 1973

Serial No. 10

Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE

98-116 O    WASHINGTON : 1973

*94th   PUBLIC LAW 583   Approved 10/21/76*

## COMMITTEE ON THE JUDICIARY

PETER W. RODINO, JR., New Jersey, *Chairman*

HAROLD D. DONOHUE, Massachusetts
JACK BROOKS, Texas
ROBERT W. KASTENMEIER, Wisconsin
DON EDWARDS, California
WILLIAM L. HUNGATE, Missouri
JOHN CONYERS, JR., Michigan
JOSHUA-EILBERG, Pennsylvania
JEROME R. WALDIE, California
WALTER FLOWERS, Alabama
JAMES R. MANN, South Carolina
PAUL S. SARBANES, Maryland
JOHN F. SEIBERLING, Ohio
GEORGE E. DANIELSON, California
ROBERT F. DRINAN, Massachusetts
CHARLES B. RANGEL, New York
BARBARA JORDAN, Texas
RAY THORNTON, Arkansas
ELIZABETH HOLTZMAN, New York
WAYNE OWENS, Utah
EDWARD MEZVINSKY, Iowa

EDWARD HUTCHINSON, Michigan
ROBERT McCLORY, Illinois
HENRY P. SMITH III, New York
CHARLES W. SANDMAN, JR., New Jersey
TOM RAILSBACK, Illinois
CHARLES E. WIGGINS, California
DAVID W. DENNIS, Indiana
HAMILTON FISH, JR., New York
WILEY MAYNE, Iowa
LAWRENCE J. HOGAN, Maryland
WILLIAM J. KEATING, Ohio
M. CALDWELL BUTLER, Virginia
WILLIAM S. COHEN, Maine
TRENT LOTT, Mississippi
HAROLD V. FROEHLICH, Wisconsin
CARLOS J. MOORHEAD, California
JOSEPH J. MARAZITI, New Jersey

JEROME M. ZEIFMAN, *General Counsel*
GARNER J. CLINE, *Associate General Counsel*
JOSEPH FISCHER, *Counsel*
HERBERT FUCHS, *Counsel*
HERBERT E. HOFFMAN, *Counsel*
WILLIAM P. SHATTUCK, *Counsel*
ALAN A. PARKER, *Counsel*
JAMES F. FALCO, *Counsel*
MAURICE A. BARBOZA, *Counsel*
DONALD G. BENN, *Counsel*
FRANKLIN G. POLK, *Counsel*
ROGER A. PAULEY, *Counsel*
THOMAS E. MOONEY, *Counsel*
PETER T. STRAUB, *Counsel*
MICHAEL W. BLOMMER, *Counsel*
ALEXANDER B. COOK, *Counsel*

---

### SUBCOMMITTEE ON CLAIMS AND GOVERNMENTAL RELATIONS

HAROLD D. DONOHUE, Massachusetts, *Chairman*

JAMES R. MANN, South Carolina
GEORGE E. DANIELSON, California
BARBARA JORDAN, Texas
RAY THORNTON, Arkansas

M. CALDWELL BUTLER, Virginia
HAROLD V. FROEHLICH, Wisconsin
CARLOS J. MOORHEAD, California
JOSEPH J. MARAZITI, New Jersey

WILLIAM P. SHATTUCK, *Counsel*
PETER T. STRAUB, *Associate Counsel*

(II)

# CONTENTS

Page

Text of H.R. 3493_____ 2
Statement of:
    Charles N. Brower, Acting Legal Adviser, Department of State_____ 14
    Bruno Ristau, Chief, Foreign Litigation Unit, Civil Division, Department of Justice_____ 28
Executive communication transmitted to the Speaker of the House of Representatives on January 16, 1973, by the Departments of State and Justice concerning the proposed legislation_____ 33
    Draft bill accompanying the communication_____ 35
    Section-by-section analysis accompanying the Communication_____ 38
Letter from the Acting Legal Advisor of the Department of State supplying information requested at the hearing_____ 49

(III)

# IMMUNITIES OF FOREIGN STATES

———————  •

## THURSDAY, JUNE 7, 1973

House of Representatives,
Subcommittee on Claims and
Governmental Relations of the
Committee on the Judiciary,
*Washington, D.C.*

The subcommittee met at 10:45 a.m., pursuant to call, in room 2226, Rayburn House Office Building, Hon. James R. Mann, presiding.

Present: Representatives Mann (presiding), Danielson, Jordan, Butler, Froehlich, Lott, and Moorhead.

Staff members present: William P. Shattuck, counsel; and Peter T. Straub, associate counsel.

Mr. Mann. The Subcommittee on Claims and Governmental Relations is hereby convened for the purpose of considering H.R. 3493 to define the circumstances in which foreign states are immune from the jurisdiction of U.S. courts and in which execution may not be levied on their assets, and for other purposes.

This morning we have a hearing open to the public and we have as witnesses today the Honorable Charles N. Brower, Legal Adviser, Department of State, and the Honorable Bruno Ristau, Chief, Foreign Litigation Unit, Civil Division, Department of Justice.

[H.R. 3493 follows:]

(1)

2

93D CONGRESS
1ST SESSION

# H. R. 3493

## IN THE HOUSE OF REPRESENTATIVES

JANUARY 31, 1973

Mr. RODINO (for himself and Mr. HUTCHINSON) introduced the following bill;
which was referred to the Committee on the Judiciary

# A BILL

To define the circumstances in which foreign states are immune
from the jurisdiction of United States courts and in which
execution may not be levied on their assets, and for other
purposes.

1    *Be it enacted by the Senate and House of Representa-*
2    *tives of the United States of America in Congress assembled,*
3    That title 28, United States Code, as amended—
4        (1) by inserting after chapter 95 the following new
5    Chapter:

I

3

2

1    "Chapter  97.—JURISDICTIONAL  IMMUNITIES  OF
2                   FOREIGN STATES

"Sec.
"1602. Findings and declaration of purpose.
"1603. Definitions.
"1604. Immunity of foreign states from jurisdiction.
"1605. General exceptions to the jurisdictional immunity of foreign states.
"1606. Immunity in cases relating to the public debt of a foreign state.
"1607. Counterclaims.
"1608. Service of process in United States district courts.
"1609. Immunity from execution and attachment of assets of foreign
        states.
"1610. Exceptions to the immunity from execution of assets of foreign
        states.
"1611. Certain types of assets immune from execution.

3    "§ 1602. Findings and declaration of purpose

4        "The Congress finds that the determination by United
5    States courts of the claims of foreign states to immunity
6    from the jurisdiction of such courts would serve the interests
7    of justice and would protect the rights of both foreign states
8    and litigants in United States courts. Under international
9    law, states are not immune from the jurisdiction of foreign
10   courts in so far as their commercial activities are concerned,
11   and their commercial property may be levied upon for the
12   satisfaction of judgments rendered against them in connection
13   with their commercial activities. Claims of foreign states
14   to immunity should henceforth be decided by United States
15   courts in conformity with these principles as set forth in
16   this chapter and other principles of international law.

17   "§ 1603. Definitions

18       "(a) For the purposes of this chapter, other than sec-

4

3

1   tions 1608 and 1610, a 'foreign state' includes a political

2   subdivision of that foreign state, or an agency or instrumen-

3   tality of such a state or subdivision.

4      "(b) For the purposes of this chapter, a 'commercial

5   activity' means either a regular course of commercial conduct

6   or a particular commercial transaction or act. The commer-

7   cial character of an activity shall be determined by reference

8   to the nature of the course of conduct or particular transaction

9   or act, rather than by reference to its purpose.

10  **"§ 1604. Immunity of foreign states from jurisdiction**

11     "Subject to existing and future international agreements

12  to which the United States is a party, a foreign state shall be

13  immune from the jurisdiction of the courts of the United

14  States and of the States except as provided in this chapter.

15  **"§ 1605. General exceptions to the jurisdictional immunity**

16        **of foreign states**

17     "A foreign state shall not be immune from the jurisdic-

18  tion of courts of the United States or of the States in any

19  case—

20        "(1) in which the foreign state has waived its im-

21     munity either explicitly or by implication, notwithstand-

22     ing any withdrawal of the waiver which the foreign

23     state may purport to effect after the claim arose;

24        "(2) in which the action is based upon a commer-

25     cial activity carried on in the United States by the for-

5

4

1    eign state; or upon an act performed in the United States

2    in connection with a commercial activity of the foreign

3    state elsewhere; or upon an act outside the territory of

4    the United States in connection with a commercial ac-

5    tivity of the foreign state elsewhere and that act has a

6    direct effect within the territory of the United States;

7        "(3) in which rights in property taken in viola-

8    tion of international law are in issue and that property

9    or any property exchanged for such property is present

10   in the United States in connection with a commercial ac-

11   tivity carried on in the United States by the foreign state

12   or that property or any property exchanged for such

13   property is owned or operated by an agency or instru-

14   mentality of the foreign state or of a political subdivision

15   of the foreign state and that agency or instrumentality is

16   engaged in a commercial activity in the United States;

17       "(4) in which rights in property in the United

18   States; acquired by succession or gift, or rights in im-

19   movable property situated in the United States are in

20   issue; or

21       "(5) in which money damages are sought against a

22   foreign state for personal injury or death, or damage to or

23   loss of property, caused by the negligent or wrongful

24   act or omission in the United States of that foreign state

25   or of any official or employee thereof except that a for-

6

5

1   eign state shall be immune in any case under this para-
2   graph in which a remedy is available under Article
3   VIII of the Agreement Between the Parties to the
4   North Atlantic Treaty Regarding the Status of Their
5   Forces.

6   **"§ 1606. Immunity in cases relating to the public debt of a**
7   **foreign state**

8   " (a) A foreign state shall be immune from the jurisdic-
9   tion of the courts of the United States and of the States in
10   any case relating to its public debt, except if—

11   " (1) the foreign state has waived its immunity ex-
12   plicitly, notwithstanding any withdrawal of the waiver
13   which the foreign state may purport to effect after the
14   claim arose; or

15   " (2) the case, whether or not falling within the
16   scope of section 1605, relates to the public debt of a
17   political subdivision of a foreign state, or of an agency
18   or instrumentality of such a state or subdivision.

19   " (b) Nothing in this chapter shall be construed as im-
20   pairing any remedy afforded under sections 77 (a) through
21   80 (b) –21 of Title 15, United States Code, as amended, or
22   any other statute which may hereafter be administered by the
23   United States Securities and Exchange Commission.

24   **"§ 1607. Counterclaims**

25   "In any action brought by a foreign state in a court of

7

6

1    the United States or of any State, the foreign state shall not

2    be accorded immunity with respect to—

3          "(1) any counterclaim arising out of the transac-

4          tion or occurrence that is the subject matter of the claim

5          of the foreign state; or

6          "(2) any other counterclaim that does not claim

7          relief exceeding in amount or differing in kind from that

8          sought by the foreign state.

9    **"§ 1608. Service of process in United States district courts**

10       "Service in the district courts shall be made upon a

11    foreign state or a political subdivision of a foreign state and

12    may be made upon an agency or instrumentality of such a

13    state or subdivision which agency or instrumentality is not a

14    citizen of the United States as defined in section 1332 (c)

15    and (d) of this title by delivering a copy of the summons

16    and complaint by registered or certified mail, to be addressed

17    and dispatched by the clerk of the court, to the ambassador

18    or chief of mission of the foreign state accredited to the Gov-

19    ernment of the United States, to the ambassador or chief of

20    mission of another state then acting as protecting power for

21    such foreign state, or in the case of service upon an agency

22    or instrumentality of a foreign state or political subdivision

23    to such other officer or agent as is authorized under the law

24    of the foreign state or of the United States to receive service

25    of process in the particular case, and, in each case, by also

8

7

1  sending two copies of the summons and of the complaint by

2  registered or certified mail to the Secretary of State at Wash-

3  ington, District of Columbia, who in turn shall transmit one

4  of these copies by a diplomatic note to the department of the

5  government of the foreign state charged with the conduct

6  of the foreign relations of that state.

7  **"§ 1609. Immunity from execution and attachment of**

8  **assets of foreign states**

9  "The assets in the United States of a foreign state shall

10  be immune from attachment and from execution, except as

11  provided in section 1610 of this chapter.

12  **"§ 1610. Exceptions to the immunity from execution of**

13  **assets of foreign states**

14  "(a) The assets in the United States of a foreign state

15  or political subdivision of a foreign state, to the extent that

16  they are used for a particular commercial activity in the

17  United States, shall not be immune from attachment for

18  purposes of execution or from execution of a judgment ren-

19  dered against that foreign state or political subdivision if—

20  "(1) such attachment or execution relates to a claim

21  which is based on that commercial activity or on rights

22  in property taken in violation of international law and

23  present in the United States in connection with that

24  activity, or

25  "(2) the foreign state or political subdivision has

9

8

1    waived its immunity from attachment for purposes of

2    execution or from execution of a judgment either ex-

3    plicitly or by implication, notwithstanding any pur-

4    ported withdrawal of the waiver after the claim arose.

5    "(b) The assets in the United States of an agency, or

6    instrumentality of a foreign state or of an agency or instru-

7    mentality of a political subdivision of a foreign state, which

8    is engaged in a commercial activity in the United States, or

9    does an act in the United States in connection with such a

10   commercial activity elsewhere, or does an act outside the

11   territory of the United States in connection with a commer-

12   cial activity elsewhere and the act has a direct effect within

13   the territory of the United States, shall not be immune from

14   attachment for purposes of execution or from execution of a

15   judgment rendered against that agency or instrumentality if—

16           "(1) such attachment or execution relates to a claim

17       which is based on a commercial activity in the United

18       States or such an act, or on rights in property taken in

19       violation of international law and present in the United

20       States in connection with such a commercial activity in

21       the United States, or on rights in property taken in

22       violation of international law and owned or operated by

23       an agency or instrumentality which is engaged in a com-

24       mercial activity in the United States; or

25           "(2) the agency or instrumentality or the foreign

10

9

1   state or political subdivision has waived its immunity

2   from attachment for purposes of execution or from execu-

3   tion of a judgment either explicitly or by implication,

4   notwithstanding any purported withdrawal of the waiver

5   after the claim arose.

6   **"§ 1611. Certain types of assets immune from execution**

7   "Notwithstanding the provisions of section 1610 of this

8   chapter, assets of a foreign state shall be immune from

9   attachment and from execution, if—

10      "(1) the assets are those of a foreign central bank

11   or monetary authority held for its own account; or

12      "(2) the assets are, or are intended to be, used in

13   connection with a military activity and

14          (a) are of a military character, or

15          (b) are under the control of a military author-

16   ity or defense agency."; and

17      (2) by inserting in the analysis of Part IV, "Juris-

18   diction and Venue," of that title after

"95. Customs Court.",

19   the following new item:

"97. Jurisdictional Immunities of Foreign States.".

20      SEC. 2. Chapter 85 of title 28, United States Code, is

21   amended—

22      (1) by inserting immediately before section 1331

23   the following new section:

11

10

1   **"§ 1330. Actions against foreign states**

2     "(a) The district courts shall have original jurisdiction

3 of all civil actions, regardless of the amount in controversy,

4 against foreign states or political subdivisions of foreign

5 states, or agencies or instrumentalities of such a state or sub-

6 division, other than agencies or instrumentalities which are

7 citizens of a State of the United States as defined in section

8 1332 (c) and (d) of this title.

9     "(b) This section does not affect the jurisdiction of the

10 district courts of the United States with respect to civil ac-

11 tions against agencies or instrumentalities of a foreign state

12 or political subdivision thereof which agencies or instrumen-

13 talities are citizens of a State of the United States, as defined

14 in section 1332 (c) and (d) of this title."; and

15       (2) by inserting in the chapter analysis of that

16     chapter before—

    "1331. Federal question; amount in controversy; costs."

17 the following new item:

    "1330. Actions against foreign states.".

18   SEC. 3. Section 1391 of title 28, United States Code, is

19 amended by adding a new subsection (f), to read as follows:

20     "(f) A civil action against a foreign state, or a political

21 subdivision of a foreign state, or an agency or instrumentality

22 of such a state or subdivision which agency or instrumentality

23 is not a citizen of a State of the United States as defined in

12

11

1   section 1332 (c) and (d) of this title may, except as
2   otherwise provided by law, be brought in a judicial dis-
3   trict where: (1) a substantial part of the events or omissions
4   giving rise to the claim occurred, or (2) a substantial
5   part of the property that is the subject of the action is
6   situated, or (3) the agency or instrumentality is licensed to
7   do business or is doing business, if the action is brought
8   against an agency or instrumentality, or (4) in the United
9   States District Court for the District of Columbia if the
10  action is brought against a foreign state or political sub-
11  division. Nothing in this subsection shall affect the venue of
12  actions against agencies or instrumentalities of a foreign
13  state or political subdivision thereof which agencies or in-
14  strumentalities are citizens of a State of the United States,
15  as defined in section 1332 (c) and (d) of this title."

16      SEC. 4. Section 1441 of title 28, United States Code, is
17  amended by adding a new subsection (d), to read as follows:

18      "(d) Any civil action brought in a State court against
19  a foreign state, or a political subdivision of a foreign state,
20  or an agency or instrumentality of such a state or subdivision
21  which agency or instrumentality is not a citizen of a State of
22  the United States as defined in section 1332 (c) and (d) of
23  this title, may be removed by the foreign state, subdivision,
24  agency or instrumentality to the district court of the United
25  States for the district and division embracing the place where

13

12

1 such action is pending. Nothing in this subsection shall affect

2 the removal of actions against agencies or instrumentalities of

3 a foreign state or political subdivision thereof which agencies

4 or instrumentalities are citizens of a State of the United

5 States, as defined in section 1332 (c) and (d) of this title."

6    SEC. 5. Section 1332 of title 28, United States Code, is

7 amended by striking subsections (a) (2) and (3) and sub-

8 stituting in their place the following:

9        "(2) citizens of a State and citizens or subjects of

10    a foreign state; and

11        "(3) citizens of different States and in which citi-

12    zens or subjects of a foreign state are additional parties."

Mr. MANN. I assume you will proceed first, Mr. Brower, and then Mr. Ristau.

Mr. BROWER. Thank you very much.

### STATEMENT OF HON. CHARLES N. BROWER, LEGAL ADVISER, DEPARTMENT OF STATE

Mr. BROWER. The bill, as introduced on January 31, 1973, by Chairman Rodino and Congressman Hutchinson, is identical to the one submitted to the Speaker of the House of Representatives on January 16, 1973, jointly by the Secretary of State and the Attorney General.

This legislation has been prepared and recommended by the administration because the current situation with respect to suits against foreign countries is unsatisfactory and is criticized by plaintiffs and foreign governments alike. There are several reasons for this:

First of all, there is no statutory procedure for service of process by which you may obtain personal jurisdiction over foreign states, so that plaintiffs frequently are compelled to resort to attachment of foreign government assets in the United States in order to gain quasi in rem jurisdiction. Jurisdiction thus can depend on the vagaries of the presence of such assets, and governments brought to court are subjected to the serious inconvenience of attachment, which I might add from personal experience results in considerable foreign relations problems in individual cases.

Second, under present law and practice the plaintiff who obtains a judgment against a foreign state normally cannot execute on the judgment, even in cases where assets of a commercial character have already been attached to establish jurisdiction.

Third, under the present system foreign governments claiming sovereign immunity from jurisdiction, attachment, or execution may request the Department of State to make a formal suggestion that is called a suggestion of immunity to the court, which is binding on the court. Now, while the courts treat these suggestions as binding in deference to the role of the executive branch in conducting our foreign relations and do not make independent findings of law or fact, the Department of State itself has attempted to deal with such requests on the basis of, at least in part, legal analysis, taking into account judicial precedents and the Department has established special adversary procedures intended to provide a fair hearing to all concerned. We at the Department of State are now persuaded—and may I say we have been for some time—that the foreign relations interests of the United States as well as the rights of litigants would be better served if these questions of law and fact were decided by the courts rather than by the executive branch. Questions of such moment should not be decided through administrative procedures when the nature of the decision appears particularly appropriate for resolution by the courts. Indeed, State Department involvement can be detrimental because some foreign states may be led to believe that since the decision can be made by the executive branch it should be strongly affected by foreign policy considerations. Consequently, foreign states are sometimes inclined to regard a decision by the State Department refusing to suggest immunity as a political decision unfavorable to them rather than a legal decision.

15

H.R. 3493 would deal with these problems as follows in four particular ways:

First of all, a means would be specified in the statute whereby process may be served on foreign states to obtain in personam jurisdiction. This is very significant because it would eliminate the need to attach assets and, thereby, eliminate the necessity of gaining quasi in rem jurisdiction.

Second, foreign states would no longer be accorded such broad immunity from execution on judgments as they now enjoy and their immunity from execution would conform more closely to their immunity from jurisdiction. So that, generally speaking, if you are able to gain jurisdiction and obtain a judgment you would have a reasonable chance of obtaining satisfaction of judgment.

Third, the task of determining whether a foreign state is entitled to immunity would be transferred to the courts, and the Department of State would no longer be in the business of making suggestions of sovereign immunity to the courts. Of course, its ability to make suggestions with respect to other questions would remain unimpaired. Transfer of the decisionmaking process to the courts, I think, will insure that sovereign immunity questions are decided on legal grounds under procedures guaranteeing due process. This in turn should better insure the consistency of decisions and reduce their foreign policy consequences.

Fourth, the restrictive theory of sovereign immunity from jurisdiction, which has been followed by the Department of State and the courts since it was articulated in the familiar letter of Acting Legal Adviser Jack B. Tate of May 19, 1952, would be incorporated into statutory law. This theory limits immunity to public acts, leaving so-called private acts subject to suit. The proposed legislation would make it clear that immunity cannot be claimed with respect to acts or transactions that are commercial in nature, regardless of their underlying purpose.

I would now like succinctly to review the basic provisions of the proposed legislation so that the committee can better appreciate exactly how these four suggested improvements are to be accomplished through statutory language.

Section 1603(a) defines the term "foreign state" to include all levels and subdivisions of government within that state, and their agencies and instrumentalities. It is quite comprehensive.

Section 1603(b) defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act." The commercial character of an activity is determined by the nature of the course of conduct or particular transaction or act, rather than by reference to the purpose of the conduct, transaction, or act. For example, a foreign government airline or trading corporation would constitute a "regular course of commercial conduct" and therefore would qualify as commercial activity. A single contract, if of the same character as a contract which might be made by private persons, would ordinarily constitute a "particular commercial transaction or act."

The fact that the goods or services to be procured through the contract are to be used for a public purpose is irrelevant. For example, there would be no immunity with respect to a contract to manufacture

army boots for a foreign government or the sale by a foreign government of a service or product. I realize the courts will have a good deal of latitude in determining what is a "commercial activity." It does seem unwise to attempt a precise definition in this Act, even if that were practicable.

Mr. DANIELSON. May I ask the gentleman a question at this point?

Mr. MANN. Yes.

Mr. DANIELSON. Could you give me an example of an activity by a foreign government corporation, such as you have just been talking about here, like a government-controlled airline, and under what circumstances could his conduct be regarded as a public function rather than a commercial function, for us to invoke an immunity? Can you give me one of those? The other side of the coin?

Mr. BROWER. That is pretty difficult for me to conceive of in the case of an airline, which, while it is controlled or perhaps fully owned by a foreign government, is fundamentally, if not wholly, in the business of transporting air passengers for commercial affairs, and——

Mr. DANIELSON. Well, let's assume, for a moment, that Lufthansa is a West German Government Corporation Airline and assume, further, Lufthansa carried Mr. Brandt over here to speak with Mr. Nixon and his entourage, would that be a public function or a commercial function?

Mr. BROWER. I think Mr. Ristau might have a more precise idea.

Mr. RISTAU. Congressman, in our judgment, the service performed by Lufthansa, the transportation of passengers, is the important facet of your question; the purpose being to transport the head of a state, would, under our formulation, be irrelevant, so that the important question is, what does the company in fact do? It transports passengers. Now we are not talking, Congressman, in terms of permitting suit against the Chancellor of the Federal Republic.

Mr. DANIELSON. Of course.

Mr. RISTAU. That is an altogether different question. We are merely talking now about whether when Lufthansa lands in this country, and the activity connected with the carriage of passengers injures a local citizen, whether the citizen should under these circumstances be able to obtain redress from the German Government through the instrumentality of our courts.

Mr. DANIELSON. To be specific, when such a plane did land at Dulles a month or two ago, suppose in taxiing it, it had brushed against, and severely damaged, a private aircraft sitting there and the owner of that private aircraft, it is contemplated, would then have a right to bring an action against Lufthansa for whatever damage it sustained?

Mr. RISTAU. Yes, Congressman, in the courts of this country because we feel that any damages arising out of that incident should be capable of being adjudicated in the courts of this country. It is here where the accident occurred. It is here where the plaintiff resides. Why should the plaintiff be required to go to Germany in order to litigate that accident, when all of the contacts are with the local forum.

Mr. DANIELSON. Therefore, following your explanation—for which I thank you—this would be true even though the carrier were German—let's assume this: A German Government corporation and it was at that time engaged in, I will call it, a diplomatic mission?

Mr. RISTAU. That is correct.

Mr. DANIELSON. Thank you very much.

Mr. FROELICH. Mr. Chairman, wouldn't that be the fact now? Wouldn't that airline have to submit to the CAB and FAA rules and, as a matter of fact, even without this bill being passed, wouldn't you be able to sue that under those rules in this country in our courts now?

Mr. RISTAU. Congressman, you are absolutely correct as far as airlines are concerned. They are already subject to the jurisdiction of the domestic courts by virtue of the FAA requirements that you have just mentioned, so that the airline perhaps was not the best possible example that we picked.

Mr. FROELICH. Even if it were a government-owned plane?

Mr. RISTAU. That is correct.

Mr. MANN. On the other hand, if it were not a Lufthansa, that would be another matter?

Mr. RISTAU. That is an altogether different matter.

Mr. DANIELSON. Thank you for the thought you have just put in my mind, if I may, Mr. Chairman.

Let's now reverse the coin. Let us suppose a group of Members of Congress were to make a trip to Germany in a U.S. Air Force aircraft and again in landing at the airport at Munich, for example, they brushed against an aircraft, a German aircraft, and damaged it. How would that matter be handled insofar as any claims of the German owner against the United States under present laws? Could you answer that? I am just trying to reverse the situation.

Mr. RISTAU. I most certainly would wish to answer your question precisely, Mr. Danielson. In the particular example that you visualize, I believe the United States at the present time has a treaty arrangement for settling this type of claim. As the committee probably knows, there presently is in existence the so-called North Atlantic Treaty—Status of Forces Agreement, and under that treaty claims against the U.S. Government which arise in Germany are asserted to begin with against the German Government—they adjudicate the claim.

Mr. DANIELSON. Oh, yes, this would be a SOFA arrangement.

Mr. RISTAU. This a SOFA arrangement. If the claimant is successful, we, the United States, then reimburse the Federal Republic for part of the judgment, or the compensation that they have to pay under the circumstances so, specifically, in this area, we do have a number of conventions, treaties, several treaty arrangements that govern this sort of situation.

Mr. DANIELSON. Is Turkey not a part of the SOFA?

Mr. RISTAU. Yes, it is.

Mr. DANIELSON. Can you give me a European country that does not belong to SOFA?

Mr. RISTAU. A what, please?

Mr. DANIELSON. I want to transfer the situs of this accident to a foreign state with which we do not have a Status of Forces Agreement.

Mr. RISTAU. Sweden.

Mr. DANIELSON. All right, Sweden. We land in Stockholm and did the same thing. Now what happens?

Mr. RISTAU. In my opinion, if it were a U.S. Air Force plane, the norms envisaged by this legislation would not govern since it is

essentially the operation of an aircraft belonging to the armed forces of a government and not a "commercial activity" within the purview of this statute.

Mr. DANIELSON. How would the claim of the Swedish national whose aircraft was damaged, how would it be handled?

Mr. RISTAU. Probably, Congressman, through diplomatic channels. That is the traditional means whereby claims of citizens against foreign governments have been adjudicated or settled.

Mr. DANIELSON. I will suspend my questioning here but what I am driving at—and I hope this is a matter on which we can get some information—is that I am interested in the extent to which the proposed legislation would find reciprocity in other countries. Thus if we were to grant certain rights to our citizens against foreign countries here and I would like to know what comparability and obligations exist with respect to our nationals and our properties in foreign countries.

Mr. RISTAU. I shall be pleased to address myself to that.

Mr. DANIELSON. Fine. Thank you for your help.

Mr. BROWER. If I may just answer in one sentence or give a partial answer to that point, the statute has been drafted keeping in mind what we believe to be the general state of the law internationally, so that we conform fairly closely, we believe, to our accepted international standards. So that it is unlikely that we would be subjected to more claims against the United States abroad than we permit in this country and it is also subject, of course, to existing and future international agreements. So that if we have existing treaties of friendship, commerce, and navigation with a country which touch the question of sovereignty, we include such agreements and, in the future, they would take precedent.

Mr. MANN. We hope it would be used as a model for future general international agreements.

Mr. BROWER. That is true. We have done this also conscious of the fact the Council of Europe has prepared and has had signed, I believe, by seven countries, a convention on sovereign immunity and how the question would be handled in countries which are part of it, and we do hope that we have something here in this statute before us that takes into account what is going on in the rest of the world and which could lead us to a broader and more precise agreement throughout the world.

Mr. DANIELSON. May I inquire?

Mr. BROWER. Yes.

Mr. DANIELSON. What is the Council of Europe? What is the present status of the Council of Europe? [1]

Mr. BROWER. I perhaps should submit a more precise statement for the record as to which countries belong to it. At the ministerial level, most West European countries are represented and in various forums, both in the Parliamentary Forum in Strasburg and through the Council of Ministers in various committees they do everything from discussing broader European cooperation in economic matters to very detailed questions like drafting of conventions for the protection of diplomats and on sovereign immunity.

---

[1] For information on the Council of Europe see State Department Letter on page 49.

Mr. DANIELSON. Is it a formally existing body, or is it a matter of simply cooperation?

Mr. BROWER. No; there is a treaty on the subject.

Mr. DANIELSON. Thank you.

Mr. FROELICH. Could I ask another question?

Mr. MANN. Mr. Froehlich?

Mr. FROELICH. You use as one of your examples, contracts for Army boots, which would be a commercial transaction under this statute?

Mr. BROWER. Yes.

Mr. FROELICH. How about a contract with a U.S. company for guns or specifically something that a government may use for its armed forces or may use for an Olympic team. Is the use of the article going to determine?

Mr. RISTAU. May I tentatively answer the Congressman? The statute is very specific on that in section 1603(b) in defining the term "commercial activity." The statute says, or the proposed statute says, "The commercial character of an activity shall be determined by reference to the nature of the course of conduct of the particular transaction or act, rather than by reference to its purpose."

We inquire only to the nature of the activity. The activity is entering into a contract and——

Mr. FROELICH. Thank you. You have answered my question.

Mr. BROWER. Then let me resume, Mr. Chairman.

Section 1604 establishes the general framework for judicial decision. A foreign state is immune from the jurisdiction of the courts of the United States except as otherwise provided in the statute or in existing and future international agreements to which the United States is party. I should note that the act applies to proceedings in State courts. Under present law, State as well as Federal courts are bound by State Department suggestions of sovereign immunity. Congress in cooperation with the Executive clearly has the constitutional power to establish rules binding on State courts in this area.

Section 1605 prescribes five exceptions to jurisdictional immunity of foreign countries. Since these five exceptions constitute the principal substance of the bill in terms of future legal issues, I should elaborate on them briefly:

First, a State is immune if it has waived its immunity either explicitly or by implication, and a foreign state cannot withdraw a waiver of immunity except within the provisions of the treaty or contract in which the waiver was first made.

Mr. MANN. Pardon me?

Do you intend to state in this section that a State is immune or a State is not immune?

Mr. BROWER. I am sorry. If it has waived it, it is not immune. It should read "not."

The second exception, which dealt generally with commercial activity, has several aspects. There is no immunity with respect to "a commercial activity carried on in the United States" by a foreign state, which could include a cause of action concerning an individual contract of an ordinary commercial character such as a breach of contract to make repairs on an Embassy building. Likewise exempt is an "Act performed in the United States in connection with a commercial activity of the foreign state elsewhere." There is also no immunity

20

if the case involves "An act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act has a direct effect within the territory of the United States." This exception would embrace extraterritorial conduct having effects within the United States such as an action for pollution of the air by a factory operated commercially by a foreign state. It is, in fact, a situation which we have had on our borders from time to time.

The third exemption covers cases "in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state or of a political subdivision of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." Thus, if property has been nationalized or expropriated without payment of compensation as required by international law it will not be immune with respect to actions in which rights in such property are in issue in our courts under the circumstances described. Since this draft bill deals solely with issues of immunity, it in no way affects existing law concerning the extent to which the "act of state" doctrine may be applicable in similar circumstances.

Mr. DANIELSON. Mr. Chairman?

Mr. MANN. Yes?

Mr. DANIELSON. This exception here on nationalized or expropriated property gives rise to a host of implications. This bill, as I understand it, would be to recognize the right of our courts to have jurisdiction over a foreign state under certain circumstances; therefore, it is procedural in nature, rather than substantive in nature, and my opinion is that it could have a retroactive effect. It would simply allow the litigant to come into court, which he is presently barred from doing.

Let's take the, oh, the Baltic States: Lithuania, Latvia, Estonia, within which many properties were expropriated and nationalized way back at the time of World War II. Your language here says: "Any property exchanged for such property," so let's assume that a person who was a national of Lithuania, and who had property in Lithuania was expropriated and nationalized by the powers which took over Lithuania in 1939 or 1940 or 1941—whenever it was and these properties have now been exchanged for some properties which are here. Would the former Lithuanian be able to bring an action in our American courts against the Soviet Union—I presume it would be—for the properties which are now resident here in the United States?

Mr. RISTAU. Congressman, the important question is, the entity which presently has custody over the property, is it engaged in trade with that property in the United States? In other words, are they trading?

Mr. DANIELSON. This ties back to the commercial nature?

Mr. RISTAU. Are they engaged in commerce in the United States with respect to that particular property? Yes.

21

Mr. BROWER. Under the statute either of several things need to apply, and you mentioned one; that it has to be present in the United States in connection with a commercial activity carried on in the United States by the foreign state and that means——

Mr. DANIELSON. Wait. How about a ship, a steamship, for example, which is now in New York Harbor with a cargo of something?

Mr. BROWER. I think your question illustrates the complexities of this area of the law, because you are now getting into the maritime area.

Mr. DANIELSON. Well, it brought over a cargo of railroad cars for instance, and those railroad cars are now present in New Jersey. That is no longer maritime, the cargo is now on land.

Mr. BROWER. Okay.

Mr. DANIELSON. I am going to make a suggestion. I think if we are going to have a law like this, we better provide that it is not retroactive, because this could open up a can of worms that you will never be able to close.

Mr. BROWER. Well, I think that is a problem. You are right. I think that certainly in many cases, the passage of a period of time as long as 30 years or more could certainly raise questions as to whether the property present in a country, was, in fact, transferred or exchanged.

Mr. DANIELSON. What about a work of art? It may exist hundreds of years. Hitler confiscated and nationalized unknown quantities of valuable artwork and some of them have shown up elsewhere. I mean, this is not just imagination, you know; it is real.

Mr. BROWER. No; I understand that. I think that is a real point because if, as we intend, one of the principal objects of the statute is to avoid undue foreign relations problems, then we want to be sure it is so drafted as to not raise new foreign relations problems. You put your finger on one that I think is particularly noteworthy. It is a concept, perhaps, behind the statute of limitations as well.

Mr. DANIELSON. I think most of our courts provide, however, that where a statute of limitations is tolled, where the proposed litigant is barred from asserting his remedy, due to a procedural problem——

Mr. BROWER. I see your point. I think we should explore it.

Mr. DANIELSON. I think we should simply provide that it not be retroactive and solve the whole problem.

Mr. BROWER. I think that is very true since the effect of a statute in this particular case is, in fact, not only procedural but substantive to some extent. I think we do need to be particularly careful on how it is drafted.

Now, this fourth exception permits litigation against a foreign state relating to rights in property in the United States acquired by succession or gift, or rights in immovable property situated in the United States.

I think this is a pretty clear exception for estate and real estate matters in this country, in keeping with the law at the present time.

The fifth and final exception is directed primarily to the problem of traffic accidents, but is cast in general terms, applying to all actions for damages—as distinguished from injunctive relief, for example—for personal injury or death, or damage to property or loss of property if the negligent or wrongful act took place in the United States and is

22

not one for which a remedy is already available; for example, under article VIII of the NATO Status of Forces Agreement.

Now I should draw your attention to section 1606 of the proposed legislation, which gives a foreign state immunity from jurisdiction in any case relating to its public debt, unless that foreign state has waived its immunity, or the complaint relates to the public debt of a political subdivision of a foreign state or of an agency or instrumentality of such a foreign state or subdivision. This exception is intended to facilitate the U.S. role as one of the principal capital markets of the world, which in some ways has dwindled during the past years. Many national governments are unwilling to issue their securities in a foreign country which subjects them to actions based on such securities. Of course, the question of waiver is nonetheless negotiated in most cases among the parties.

Section 1607 deals with compulsory and permissive counterclaims within the meaning of rule 13 (a) and (b) of the Federal Rules of Civil Procedure. It provides that when a foreign state brings an action in a court in the United States, that foreign state shall not be accorded immunity with respect to a counterclaim arising out of the same transaction that is the subject matter of the claim of the foreign state, regardless of amount and, furthermore, it shall not be accorded immunity with respect to any other counterclaim—you might call it permissive counterclaim—insofar as it does not exceed the relief sought by the foreign state. This is basically codification, I think, in statutory form of what we understand to be the existing law on the subject.

Section 1608 would fill a substantial gap in present law by establishing an orderly procedure for service of process in actions against foreign states, thus facilitating the jurisdiction of the court in cases in which sovereign immunity is not applicable. I might say that this has been one of the real problems in the area, inasmuch as under the Federal Rules of Civil Procedure foreign diplomatic and consular missions in this country have been held not to be managing agents of the foreign states, so there is habitually no one upon whom process can be served within a given jurisdiction. And this has, in many cases, been what has encouraged the establishing of quasi in rem jurisdiction through the attachment of assets presently located in one of our states, and these cases have most particularly caused us specially serious problems in our foreign relations from time to time.

The enactment of this section also, of course, would surely benefit the foreign state defendants themselves by ensuring that they would have prompt and adequate notice of all actions brought against them by eliminating the need to attach their property to establish jurisdiction.

Section 1609 prohibits execution and attachment concerning assets of a foreign state in the United States except as provided in section 1610, which specifies two exceptions. Subsection (a) provides in essence that the assets of a foreign state in the United States shall not be immune from execution to the extent that they are used for a particular commercial activity in the United States if the execution relates to a claim based on that commercial activity or on rights in property taken in violation of international law and present in the United States in connection with that activity, or if the foreign state has waived its immunity. Thus property used in commercial activities is available for the satisfaction of judgments rendered in connection with those

commercial activities, but there is no execution for Embassies, warships or other foreign government property used for noncommercial purposes.

Mr. BUTLER. Excuse me, we have in many of our States what we call a long-arm statute.

Mr. BROWER. Yes.

Mr. BUTLER. I had thought when I first approached this problem that you would endeavor in some extent to track the long-arm statute as it relates to our foreign relationships.

I see in this regard we are limited to particular commercial activities involved, so that if a person in the United States, for one reason or another, is treated poorly in his contractual negotiation with a foreign state, he is limited to finding commercial assets of the foreign state related to his activity for execution. So that if he is wrongly treated, he has to find commercial assets related to his activity before he can proceed with litigation. On the other hand, if that foreign state is engaged in unlimited commercial activity in this country and has assets all over the United States, this wronged American citizen has no remedy in this country. Now, am I correct in that?

Mr. BROWER. Well, the first part of your statement is fundamentally correct, I think. And I think that the assumption is that any foreign state or entity engaged in commercial operations in this country— doing something in this country which is likely to give rise to a claim—is almost certainly going to have some assets available in connection with that, that would be available for execution.

Mr. BUTLER. Let's assume they do not.

Mr. BROWER. Well, there are obvious exceptions, of course. The case of the painting of the Embassy.

Mr. BUTLER. Right.

Mr. BROWER. That is perhaps one. If you have a contract to paint the Embassy and there is a breach of contract, you cannot put a lien on the Embassy.

Mr. BUTLER. That is correct.

Mr. BROWER. Or if you contract to do work on a warship, you can't attach the warship. There will be some exceptions.

The second part of your question, I didn't hear.

Mr. BUTLER. That brings me to it.

Here is a man who has painted the Embassy and they refuse to pay him and here is the country that has all sorts of commercial activities in this country, and if it were anybody else they could levy on their assets but they can't do that in this case because this is not the particular commercial activity this gentleman was engaged in; am I correct, this legislation would leave him without remedy?

Mr. RISTAU. Congressman, may I please attempt to answer your question? To begin with, Congressman, your statement is right; the underlying theory of this statute is, in effect, a Federal long-arm statute permitting the bringing of suit, in personam action, which you cannot do now, against foreign governments who engage in certain activities in this country where there is a contact with the United States. That is, the traditional basis of the long-arm statutes, as they have been enacted in several states and, most recently in 1970, by the Congress with respect to the District of Columbia——

Mr. BUTLER. Of course.

24

Mr. RISTAU. Now, what the statute would do in your hypothetical case, it would at least allow the contractor, the painting contractor, to bring a personal action in the courts of this country and, if he prevails, to obtain a judgment against the government, which he cannot now do. He has no remedy at the present time unless in the unusual circumstance where he may be able to find some property of that Government that he may attempt to attach for purposes of obtaining jurisdiction in this one exceptional instance. But, otherwise—and most commonly—he has no means of getting the foreign government before the courts and to litigate his rights in the courts of this country. So, even though he may not be able in a variety of circumstances to obtain execution of the judgment, he will be able to obtain a judgment after having litigated the question fairly and squarely.

May I please also add this one thought: There is on occasion an underlying assumption that you must have the possibility to forcibly execute a judgment before you get something of real substance. I would respectfully question that basic assumption. Take the U.S. Government itself: Of course, you cannot have execution against property belonging to the U.S. Government; yet there are means and ways of obtaining prompt satisfaction of the final judgment which you have against the United States. I will, in a moment—when I have an opportunity—advert to what the U.S. Government does abroad when the shoe fits on the other foot, but I do not believe that we should approach the problem with the assumption that foreign states will not, in fact, satisfy judgments once they have been rendered after a full trial in this country.

Mr. BROWER. As a further background, Congressman, you might look at the slightly different problem that shows why it is important to require that assets to be executed on should be assets bearing a reasonable relationship to the activity on which the claim is based. An increasing number of countries in the world have state trading corporations or do business as we would term it through corporations which are controlled by the state, but which are under the legal regimes of those countries quite separate from each other in ways which are similar to the separation between corporations in our United States. And if, for example, you are dealing with Polish or Rumanian or Chilean or perhaps some African country, perhaps a Yugoslavian state trading corporation, and you have a contract with one, let's say it is for 5,000 pairs of shoes and that is the XYZ shoe foreign trading corporation of that country, it seems reasonable, under our system, that the ABC pocketbook manufacturing state trading corporation of the same country, which is operated by different management and has different assets and is reasonably separate, should not be subjected to liability for that party. I suppose that would be so, that we not encourage a trend whereby American companies or entities abroad would be lumped together. That really is the reason for that.

Mr. BUTLER. Am I correct; is this foreign trading corporation, this foreign state corporation, similar to what we call a corporation here in the States and is it created for a commercial activity? In other words, is that corporation presently immune from suit in this country?

Mr. BROWER. Under present law, in such a case the United States would not suggest that it is immune in the circumstances that you have described.

25

Mr. BUTLER. All right. Thank you.

Mr. BROWER. Coming back to the question of the possibility of execution on such properties as Embassies or warships, we believe that in the absence of a waiver, it would be inappropriate and probably in violation of international law to allow successful litigants to levy on such assets of a foreign state which are used for governmental and sovereign purposes. I am sure we would not wish our Embassies or our warships abroad executed on. The reason for limiting execution to assets employed in connection with the particular commercial activity out of which the claim arose is that—as I have attempted to describe—is that states, especially those with economies which are predominantly in the public sector and public in character, may engage in a great variety of commercial activities. And, as I have described, I think it would be anomalous under American practice for assets used in connection with a foreign state's program of importation of machine tools, for example, to be available to satisfy a judgment arising out of its commercial telecommunications business.

The second exception to immunity from execution, subsection (b) of section 1610, applies similar principles to execution of judgments against the assets in the United States of an agency or instrumentality of a foreign state or its subdivisions which is engaged in a commercial activity or act in the United States or which does an act outside the territory of the United States in connection with a commercial activity elsewhere but which act has a direct effect within the territory of the United States. Generally speaking, under subsection (b) with respect to subdivisions and agencies and instrumentalities, the rules are slightly looser with respect to what you can do in terms of execution.

Thus any assets of a foreign government agency or instrumentality in the United States may be used to satisfy judgments against that agency or instrumentality arising out of a commercial activity or acts having the specified connection with the United States.

The last section of the proposed legislation which I shall address today is section 1611, which provides and this relates to public debts, that "[n]otwithstanding the provisions" of section 1610 "assets of a foreign state shall be immune from attachment and from execution if (1) the assets are those of a foreign central bank or monetary authority held for its own account; or (2) the assets are, or are intended to be, used in connection with a military activity and (a) are of a military character, or (b) are under the control of a military authority or defense agency." The purpose of section 1611(1) is to prevent in all circumstances attachment of or levy of execution upon these two categories of property of foreign states, even if these relate to the commercial activities of a foreign state and would otherwise come within the scope of section 1610.

Now, I should point out also that the proposed legislation, in the last sections of it, establishes original jurisdiction in the Federal district courts of all civil actions against foreign states regardless of the amount in controversy. Venue is affixed principally in the District of Columbia but also in other districts which have substantial contacts with the matter, and there are appropriate provisions for removal to Federal court of actions commenced against foreign states in State courts.

I have attempted today simply to introduce the provisions of this legislation to the subcommittee. I know as our discussions within the department in preparation for this testimony have indicated and as the

questions asked already this morning clearly indicate, this legislation will require some discussion and some attention to detail. I know that various bar and other professional groups have studied this legislation intensively and they will in due course communicate their formal comments on this proposal to us and to you. We have already been receiving and we have been reviewing a number of informal comments and, undoubtedly, there will be some refinements in the text of this legislation which will be appropriate, and, in some cases, required.

I simply want to say that we will endeavor to work closely with the subcommittee in its consideration of this legislation. This legislation was very long in gestation in the executive branch and it quite clearly covers a very complicated and, in some respects, technical subject.

We stand ready, willing and able to do all in our power to assist you and to work with you so that, together, we can see that this legislation does get on the books.

Thank you very much.

Mr. Ristau might have something to say and we would be glad to answer any questions you have.

Mr. MANN. Thank you, Mr. Brower.

Mr. Moorhead?

Mr. MOORHEAD. I know a few minutes ago, you stated that most of the foreign governments pay their bills when there is a judgment against them but the extensive discussion in the explanation accompanying the communication indicates that there are many instances where they don't. What I am wondering is whether there is any procedure that can be followed when the particular activity that was involved, such as in the example of painting the Embassy, has no attachable or executionable item in connection with it? Whether there is any method these people can follow to collect.

Mr. BROWER. Well, there are lots of methods and I am not suggesting or wishing to suggest any which might interfere with our foreign relations in any particular case. The most obvious one is to raise it through diplomatic channels. In other words, they would come to us—probably to my office in the Department of State—and say, look, we have a $14,000 bill here for doing a first-rate remodeling or painting job on this Embassy, and they simply won't pay. There would be then quite numerous requests and discussions among attorneys. It would then be up to the United States to espouse that claim on behalf of the American national, assuming that it is an American national.

Mr. MOORHEAD. They do then actively get involved in that effort? You do get involved?

Mr. BROWER. Well, the claims of U.S. nationals against foreign governments are frequently taken up and espoused by the U.S. Government as, in effect, a diplomatic claim through diplomatic channels and sometimes they are paid. We have had numerous claims, agreements, with foreign countries in recent years; general claim settlements and such and, also, very specific cases. So that is an option which is a realistic one.

Mr. FROEHLICH. Mr. Chairman?

Mr. MANN. Mr. Froehlich?

Mr. FROEFLICH. Going back to your opening statement, under what authority is your suggestion of immunity constitutional?

Mr. BROWER. Fundamentally, I believe it reflects a judicial feeling that the separation of powers requires it; that the conduct of foreign

relations and diplomatic relations is peculiarly within the province of the executive branch, that when the executive branch says Country *x* is immune on such claim, that it is honored. That has been the case throughout a fairly long history, and I think that is the fundamental basis.

Mr. FROEHLICH. A citizen who disagrees with the recommendation or suggestion from the Department of State, then has no recourse? There is no way to appeal a decision?

Mr. BROWER. I should say, if I may go back to the first part of your statment: You say there is no recourse with respect to a decision by the Department of State. Of course, the Department of State has been making these decisions pursuant to an internal procedure which permits the litigant and the interested parties involved to have a hearing within the Department and they present written statements and sometimes come in and present oral statements.

Now, I would be less than frank if I were to say that I, as a lawyer, with a number of years in the private sphere and with practical experience, would say that that is the same as having been heard in a court. That is obviously a different kind of framework. And part of the reason for the bill is to get this into the courts so that there will be more due process in the hearing on the subject. The people are heard in the Department. Once the decision is made on the basis of the hearing, you are correct, there is no judicial recourse from it.

Mr. FROEHLICH. Do you have administrative rules and procedures as to the hearing process or is this a helter-skelter type thing?

Mr. BROWER. I would have to say that it is properly described as reasonably informal. When contacted on a case, we communicate with the attorneys, the parties on both sides, and we have a kind of generalized procedure of receiving written comments within a certain number of days and perhaps having oral hearings or oral presentations.

Mr. FROEHLICH. Sort of a pretrial conference, would you say?

Mr. BROWER. There are certain similarities.

Mr. MANN. What has been the frequency of the requests for immunity?

Mr. BROWER. I think it might be useful for us to supply it for the record, sir, to supply an accurate count. I can tell you that at any given time we are considering several. It goes on constantly. And there is at least one attorney in our office who spends virtually his full time handling these kinds of matters and they cut across other lawyers' areas, but it is quite a time-consuming proposition.

Mr. MANN. Mr. Danielson?

Mr. DANIELSON. Could the gentleman supply that and may it be made a part of the record?

Mr. BROWER. Yes, I will undertake to do that.

Mr. DANIELSON. I have a couple of questions here. One is probably technical. On pages 9 and 10 of the bill, H.R. 3493, it is difficult to follow the meaning of the numerical subdivisions.

Mr. BROWER. Congressman, the best explanation we are able to offer at the present time is that the (2) you see on line 17 on page 9 is meant to be the (2) following the (1) which appears on page 1 at line 4. In other words, it starts out: "Be it enacted," et cetera, "that title 28, United States Code, as amended," and then there is (1) and it states: "By inserting after" and then there is all of this new material up through line 17 on page 9——

28

Mr. DANIELSON. But on page 10 you do a similar thing with lines 14 and 15.

If there is an error, I think we should reprint the bill.

Mr. BROWER. It may be there is some other presentation. I could check it out——

Mr. DANIELSON. Mr. Chairman, if we conclude that there is an error, can we get a reprint?

Mr. SHATTUCK. Mr. Chairman, I believe Mr. Brower is correct on his analysis of how this occurred. The difficulty lies in the fact that there is no break or space in the bill. What you have is an amendment which adds a new section and then immediately following the new section the quotation marks close and there is a semicolon and there is an "and" and then there are these more or less technical amendments that are meant to put new headings in Code sections. So it is very difficult to see in a quick reading of the bill that is how it occurs.

Mr. DANIELSON. After careful reading, if it still is not clear, I just think we ought to correct it.

Mr. MANN. That can be taken care of.

Mr. Ristau?

Mr. RISTAU. If you like, I will proceed.

Mr. LOTT. Mr. Chairman, could I ask one question?

Mr. MANN. Mr. Lott?

Mr. LOTT. Before we leave Mr. Brower——

Mr. MANN. We will not leave Mr. Brower, but I think Mr. Ristau has a statement which is somewhat parallel.

## STATEMENT OF HON. BRUNO RISTAU, CHIEF, FOREIGN LITIGATION UNIT, CIVIL DIVISION, DEPARTMENT OF JUSTICE

Mr. RISTAU. Mr. Chairman and members of this honorable committee, my name is Bruno Ristau. I am in charge of the Foreign Litigation Office in the Department of Justice. I very much appreciate the opportunity to help explain, if I can, some of the provisions of this highly intricate bill.

My principal contribution, perhaps, could be this: I believe the members of the committee will be interested to know that in drafting this proposed legislation which, as Mr. Brower has said, has had a very long period of gestation, we have drawn very heavily on the experience of the United States as a litigant abroad. Perhaps the committee knows that, certainly since World War II, the U.S. Government and its various agencies and instrumentalities has been subjected to the jurisdiction of a great many foreign courts; in fact, I believe I am safe in representing to the committee that there probably is no other country that has been required to appear in so many foreign domestic courts in protecting its legal interests before those courts as has the Government of the United States.

At any given time for the past two decades, I would say, we have been engaged in litigation in literally dozens of countries.

I was asked by the Assistant Attorney General only the other day, in how many countries are we currently involved in litigation and the answer is, in 28 different countries. Now, you should also know that the Government does from time to time invoke the aid of the domestic courts of foreign countries, and the protection of its own rights and

interests. We thus appear at times as plaintiff but more frequently we appear as a defendant. As a result of these rather extensive litigation activities abroad, since the beginning of the early fifties, we have what I believe to be a rather unique experience in appearing as a sovereign government in foreign courts and, of course, we have certainly in the early days—when we first got involved in foreign litigation—frequently raised the defense of immunity from suit before foreign tribunals. And the essence of what is in this bill, Mr. Danielson, is in large measure based on our experience as a litigant abroad.

In consequence, perhaps in a partial answer to your earlier question, sir, as to what effect this proposed legislation would have in the converse situation, when the United States or one of its agencies appears as a litigant abroad, I would suggest to you that the effect that we attempt to bring about in the United States is really the reverse. We would like, based on our experience as a litigant abroad to subsume to the jurisdiction of our domestic courts foreign governments and foreign entities who engage in certain activities on our territory to the same extent that the U.S. Government is already at the present time subject to the jurisdiction of foreign courts, when it engages in certain activities on their soil.

Mr. MANN. We will now proceed in an orderly fashion with questions by members of the committee of both witnesses.

Mr. Danielson?

Mr. DANIELSON. Just carrying on from what you said, may I infer what you are really trying to do is to give our own nationals, our own citizens, the people on this side, at least to some measure, the same type of redress or recourse to their commercial interests of foreign states as is afforded to nationals and citizens against our States in the foreign countries?

Mr. RISTAU. That is correct, Congressman. We have certainly witnessed in the past decade abroad a very considerable restriction of the immunities which foreign countries afford not only to the United States but also to other sovereign states who engage in certain activities on their soil. Perhaps the one country that still in large measure adheres to the traditional so-called absolute immunity doctrine is the United Kingdom. There are, however, indications that even the United Kingdom is receding from the traditional 19th century rule, as we call it, the absolute sovereign immunity doctrine. You are absolutely right, Congressman, we would like to afford to our local citizens and entities who deal with foreign governments in the United States effective redress through the instrumentality of our courts. If a dispute arises as a result of an activity which a government carries on in this country, the most appropriate place to resolve such a dispute would be through the courts, which are, after all, designed to do just that: to resolve the dispute which has arisen here.

Mr. DANIELSON. Well, I am very pleased to hear that. I have been fearful for a long time that the balance is the other way around and I would like to see some of it come back this way. So I thank you for your comments there and it will make the bill far more interesting and important, as far as I am concerned.

Now, let's take Sweden, for example, where our diplomatic relations are, at least, sort of bent out of shape. Do the matters of litigation continue to be handled in much the same way as they were tradition-

ally or does a diplomatic situation similar between that of the United States and Sweden, have any impact or effect upon litigation?

Mr. RISTAU. Ideally, Congressman, it shouldn't have any impact, but rather a dispute arising out of a commercial activity ought to be divorced from any diplomatic overtones whatsoever and should be settled through the ordinary processes of the law. A dispute between a painting contractor, to use your own example, and the Government should in no way be affected by whatever the state of the diplomatic relations at any given moment might be. It should be totally divorced.

Mr. DANIELSON. As a practical matter, though, does it have an effect?

Mr. RISTAU. I will defer on that to my brother from the State Department.

Mr. DANIELSON. No; I was really interested in your first answer.

The last question I have has to do with jurisdiction as between Federal and State courts. This bill would apparently vest jurisdiction in the Federal district courts?

Mr. BROWER. Yes.

Mr. DANIELSON. There is a procedure provided for removal in the event action is commenced in a State court and there are a number of exceptions, but, anyway, I am trying to envision how could an action be commenced in a State court if the service or process is to be done by a summons issued by the clerk of the Federal court? How could that happen? How could the State court ever have jurisdiction that would require removal?

Mr. RISTAU. Congressman, may I be permitted to preface my answer with the following observations:

Mr. DANIELSON. Yes.

Mr. RISTAU. We do have a somewhat anomalous situation at the present time in this one respect. As you know, sir, foreign diplomatic personnel are suable only in the U.S. Supreme Court. The Supreme Court of the United States has original and exclusive jurisdiction in suits against foreign diplomats. A somewhat lower echelon of foreign governmental functionaries in this country; namely, consular officials of a foreign government can be sued only in the U.S. district courts. Now, there have been repeated attempts to subsume foreign sovereign governments to the jurisdiction of State courts and, on occasion, by means of attachment, litigants have succeeded in bringing suits in State courts. You do have in the reported cases quite a number of decisions from the courts of the State of New York and other jurisdictions, where a foreign government became a defendant in a State court.

Mr. DANIELSON. What we are simply doing here would be to try to provide a certainty that these can be removed at the request of the foreign state to the U.S. district court?

Mr. RISTAU. Yes, sir, we feel that the question of the suability of a foreign government in the courts of the United States is inextricably intertwined with one aspect of foreign relations. As a result of this, we feel and we are convinced that the Congress has absolute authority to legislate in this area.

Mr. DANIELSON. You have answered my question fully and I thank you.

Mr. BROWER. Excuse me, Congressman, but I thought your question had a different thrust, namely, when this statute is in force and an attachment is no longer available for establishing quasi in rem jurisdiction and since this statute addresses itself, as far as service of process is concerned, to the Federal courts but not to State courts, how then, when this is on the books, will the defendant get jurisdiction in the State courts and——

Mr. DANIELSON. Oh, I think it would be an idle act once this is a law, assuming it becomes law, it would be an idle act to sue them in the State courts, but at least the information that has just come forward makes it clear that any pending actions which are being currently filed, could be removed. But I think once it is law, there is no jurisdiction in the State court.

Mr. BROWER. It is like the old question, where the client asked his lawyer, can Smith sue me? Of course, he can sue you but whether he can properly sue you or not is another question. It seems to me it may be properly brought to the State court and I think the removing procedure would apply only to actions which might be pending at the time this act becomes effective.

Mr. MANN. As Mr. Brower indicated, you could choose the alternative of removal rather than dismissal, in other words?

Mr. BROWER. Right.

Ms. JORDAN. Mr. Chairman, may I just ask a question on this?

We have read recently of a big fertilizer deal between a local company and the Soviet Union. Now that deal sought the assent of the United States. It sought its stamp of approval. Now, if there is a violation on the part of that private corporation here, in failing to fulfill the terms of that contract where the United States has given a stamp of approval, does the action lie in any sense against the Government of the United States?

Mr. BROWER. Having some familiarity with the transaction in question, I trust the answer is no. The document to which you refer I think you could describe more in the nature of an endorsement or an expression of appreciation rather than legal instrument having the effect of entangling the U.S. Government in a legal sense in any potential claims.

The U.S. Government could be involved the other way around, so if there were a claim by the U.S. national involved against the Soviet Union foreign trading corporation, where, for some reason, there was difficulty in having that properly adjudicated. Of course, that potentially might be a claim, depending upon the circumstances. That could also be raised in diplomatic channels. But I don't see any situation in which the United States would be subject to liability for that transaction.

Mr. MANN. Mr. Lott?

Mr. LOTT. Thank you, Mr. Chairman.

As set out in sections 1604, 1605, and 1606, I wonder why a decision was made to start with general immunity and then create these exceptions that are set out, rather than start with no immunity and create the sections which grant immunity. Maybe Mr. Ristau would comment on that?

Mr. BROWER. I suppose you always have a choice in drafting as to which end you start at; whether you make the exceptions the rule or the rule the exceptions. Historically, you started out with absolute immunity and worked your way down to something less than that.

I think to some extent it is a matter of following a historical pattern. I think it also might be considered somewhat undiplomatic for the U.S. Government to pronounce fundamentally foreign governments are not immune. It might seem to them a little bit like saying one is guilty until proven innocent.

Mr. LOTT. In that connection, Mr. Ristau, is that the way it is done in foreign states?

Mr. RISTAU. Congressman, if I may add to what Mr. Brower said: We have considered in some of the original drafts approaching it positively rather than negatively. I think that was the core of your question. We had drawn in our preparatory work also in part on the restatement of the foreign relations law of the United States and the restatement approaches it in this fashion, by starting out with the general proposition of immunity and then listing a series of exceptions to that. It was a drafting choice, Congressman.

Mr. LOTT. One thing that worries me; will we be involved in the continued process of adding one more and then one more exception and so on down the line? I can certainly see problems.

Mr. RISTAU. Conceivably, Congressman, as the law develops and as the practice of states indicates that there should be jurisdiction in the local courts, it may very well then occur that additional exceptions to the general immunity might be carved out by codification.

Mr. BROWER. I think you would have the same problem if it were drafted the other way around, Congressman. In this case, it may be adding exceptions, but in the other case, it might be adding additional cases.

Mr. LOTT. But in the foreign states, generally, they have the absolute immunity?

Mr. RISTAU. No. Forgive me; foreign states generally by now adhere to the restrictive theory of immunity. As I indicated before, I believe the United Kingdom still adheres to some degree to the traditional absolute immunity doctrine but not so, however, on the continent of Europe; not so, however, in South America; and of recent years in Japan, the Philippines, Thailand. They have all gone over to the restrictive theory of immunity. I think by now it is safe to state that the majority of states adhere to the restrictive theory and have backed away from the absolute doctrine.

Mr. BROWER. And they also, I believe, follow our system, namely, that immunity exists unless there is an exception. However, it is incumbent upon the defendant to raise the defense of sovereign immunity rather than the plaintiff being required to establish lack of immunity.

Mr. RISTAU. I should perhaps add, Congressman, an additional answer to your question that, to be sure, I know of no single country that has legislation on the books as we propose in this bill. There is, as Mr. Brower indicated, the proposed multilateral treaty in Europe, the Council of Europe Treaty, which would comprehensively deal with the problem of the jurisdictional immunity of states between the member states of that Council.

33

This is, in a way, a rather unique proposal in that we are submitting to the Congress to codify as a matter of domestic U.S. law this area of the law. I believe you, sir, suggested earlier or inquired earlier, whether this would not be a fruitful area ultimately for a convention and, to be sure, the answer in my judgment is, yes, we would hope that ultimately this area might be covered by a multi-lateral treaty to make it absolutely uniform between the major states of the world.

Mr. DANIELSON. That would be useful.

Mr. RISTAU. But I believe the Congress can fulfill a unique task in advancing the science of law by codifying these principles as a matter of U.S. law.

Mr. MANN. Ms. Jordan?

Ms. JORDAN. No further questions.

Mr. MANN. Mr. Moorhead?

Mr. MOORHEAD. No questions.

Mr. MANN. Any further questions?

Well, thank you, gentlemen.

This concludes the hearing for today. It is adjourned subject to the call of the Chair.

[Whereupon, at 12 noon, the subcommittee adjourned subject to the call of the Chair.]

[The executive communication transmitted to the Speaker of the House on January 16, 1973, and the accompanying explanation is as follows:]

THE SECRETARY OF STATE,
*Washington, D.C., January 16, 1973.*

The SPEAKER,
*House of Representatives,*
*Washington, D.C.*

DEAR MR. SPEAKER: There is attached for your consideration and appropriate reference a draft bill, "To define the circumstances in which foreign states are immune from the jurisdiction of United States courts and in which execution may not be levied on their assets, and for other purposes," which is being submitted jointly by the Department of State and the Department of Justice.

At present the determination whether a foreign state which is sued in a court of the United States is entitled to sovereign immunity is made by the court in which the action is brought. However, the courts normally defer to the suggestion of the Department of State that immunity should be accorded and make their own determination of entitlement to immunity only when the Department of State makes no submission to the court.

The law which is applied both by the courts and by the Department of State is thus the result of the joint articulation of the law by the judiciary and the Department. The views expressed by the courts influence the Department of State, and the views expressed by the Department of State influence the courts. In the process of ascertaining and applying the law, both the Department and the courts rely on precedents and trends of decision in foreign as well as United States courts.

The policy of the Department of State, which has been given effect by the courts as well, was set forth in a letter of May 19, 1952 from the Acting Legal Adviser of the Department of State to the Acting Attorney General. The Department of State asserted that its policy would be thereafter "to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity." The letter stated,

"According to the newer or restrictive theory of sovereign immunity, the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imerii*) of a state, but not with respect to private acts (*jure gestionis*). There is agreement by proponents of both theories [i.e., of absolute and of restrictive immunity], supported by practice, that sovereign immunity should not be claimed or granted in actions with respect to real property (diplomatic and perhaps

34

consular property excepted) or with respect to the disposition of the property of
a deceased person even though a foreign sovereign is the beneficiary."
    The effect of the draft bill would be to accomplish four things:
        1. The task of determining whether a foreign state is entitled to immunity
    would be transferred wholly to the courts, and the Department of State would
    no longer express itself on requests for immunity directed to it by the courts
    or by foreign states.
        2. The restrictive theory of sovereign immunity would be further particu-
    larized in statutory form.
        3. Foreign states would no longer be accorded absolute immunity from
    execution on judgments rendered against them, as is now the case, and their
    immunity from execution would conform more closely to the restrictive theory
    of immunity from jurisdiction.
        4. The means whereby process may be served on foreign states would be
    specified.
    The central principle of the draft bill is to make the question of a foreign
state's entitlement to immunity an issue justiciable by the courts, without par-
ticipation by the Department of State. As the situation now stands, the courts
normally defer to the views of the Department of State, which puts the Depart-
ment in the difficult position of effectively determining whether the plaintiff will
have his day in court. If the Department suggests immunity, the court will
normally honor the suggestion, and the case will be dismissed for want of juris-
diction. If the Department does not suggest immunity, the court may either take
the silence of the Department as an indication that immunity is not appropriate
or will determine the question itself, with due regard for the policy of the Depart-
ment and the views expressed in the past by the courts. While the Department
has attempted to provide internal procedures which will give both the plaintiff
and the defendant foreign state a hearing, it is not satisfactory that a department,
acting through administrative procedures, should in the generality of cases deter-
mine whether the plaintiff will or will not be permitted to pursue his cause of
action. Questions of such moment appear particularly appropriate for resolution
by the courts, rather than by an executive department.
    The transfer of this function to the courts will also free the Department from
pressures by foreign states to suggest immunity and from any adverse conse-
quences resulting from the unwillingness of the Department to suggest immunity.
The Department would be in a position to assert that the question of immunity is
entirely one for the courts.
    Plaintiffs, the Department of State, and foreign states would thus benefit from
the removal of the issue of immunity from the realm of discretion and making it
a justiciable question.
    The draft bill would give appropriate guidance, grounded in the restrictive
theory of immunity, on the standards to be employed. These are consistent with
those applied in other developed legal systems. In brief, foreign states would not
be immune from the jurisdiction of United States courts when the foreign state
has waived its immunity, when the action is based on a commercial activity or
concerns property present in the United States in connection with a commercial
activity, when the action relates to immovables or to rights in property acquired
by succession or gift, or when an action is brought against a foreign state for
personal injury or death or damage to or loss of property occasioned by the
tortious act in the United States of a foreign state. Special provisions would be
made for counterclaims and for actions relating to the public debt of a foreign
state.
    Under the present law, a plaintiff who is able to bring his action against a foreign
state because it relates to a commercial act (*jure gestionis*) of that state may be
denied the fruits of his judgment against the foreign state. The immunity of a
foreign state from execution has remained absolute. The draft bill would permit
execution on the assets of a foreign state if the foreign state had waived its im-
munity from execution or if the assets were held for commercial purposes in the
United States. The plaintiff could thus recover against commercial accounts, but
not against those maintained for governmental purposes. The successful plaintiff
would also be precluded from levying on funds deposited in the United States in
connection with central banking activities and on military property.
    Finally, the draft bill would, in addition to specifying the respective jurisdictions
of State and Federal courts in actions against foreign states and venue require-

ments, clear up the question of how foreign states are to be served. Service would be made either on the ambassador or other person entitled to receive service, and a copy of the complaint, furnished to the Department of State, would in turn be transmitted to the department of the foreign state responsible for the conduct of foreign relations. The initiation of action through attachment would thus no longer be appropriate.

The ideal arrangement concerning the sovereign immunity of foreign states would be the regulation of the question through a general international agreement. The draft bill is looked upon as an arrangement to be applied until such time as a satisfactory convention is drawn up and the United States becomes a party to it.

The Department of State contemplates that if the draft bill should be enacted, it would propose that the United States file a declaration accepting the compulsory jurisdiction of the International Court of Justice, on condition of reciprocity, with respect to disputes concerning the immunity of foreign states. The resolution of disputed questions of sovereign immunity by the World Court would have the beneficial effect of assuring that the law and practice of this and other countries conform with international law and of imparting further precision to the law in areas where some measure of uncertainty now exists.

The Office of Management and Budget has advised that there is no objection to the enactment of this legislation from the standpoint of the Administration's program.

Sincerely,

RICHARD G. KLEINDIENST,
*Attorney General.*
WILLIAM P. ROGERS,
*Secretary of State.*

AN ACT To define the circumstances in which foreign states are immune from the jurisdiction of United States courts and in which execution may not be levied on their assets, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That title, 28, United States Code, is amended—
(1) by inserting after Chapter 95 the following new Chapter:

## "CHAPTER 97.—JURISDICTIONAL IMMUNITIES OF FOREIGN STATES

"Sec.
"1602. Findings and declaration of purpose.
"1603. Definitions.
"1604. Immunity of foreign states from jurisdiction.
"1605. General exceptions to the jurisdictional immunity of foreign states.
"1606. Immunity in cases relating to the public debt of a foreign state.
"1607. Counterclaims.
"1608. Service of process in United States district courts.
"1609. Immunity from execution and attachment of assets of foreign states.
"1610. Exceptions to the immunity from execution of assets of foreign states.
"1611. Certain types of assets immune from execution.

### "§ 1602. Findings and declaration of purpose

"The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts in so far as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by United States courts in conformity with these principles as set forth in this chapter and other principles of international law.

### "§ 1603. Definitions

"(a) For the purposes of this chapter, other than sections 1608 and 1610, a "foreign state" includes a political subdivision of that foreign state, or an agency or instrumentality of such a state or subdivision.

"(b) For the purposes of this chapter, a "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

## "§ 1604. Immunity of foreign states from jurisdiction

"Subject to existing and future international agreements to which the United States is a party, a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in this chapter.

## "§ 1605. General exceptions to the jurisdictional immunity of foreign states

"A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

"(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect after the claim arose;

"(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act has a direct effect within the territory of the United States;

"(3) in which rights in property taken in violation of international law are in issue and that property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state or that property is owned or operated by an agency or instrumentality of the foreign state or of a political subdivision of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

"(4) in which rights in property in the United States; acquired by succession or gift, or rights in immovable property situated in the United States are in issue; or

"(5) in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, caused by the negligent or wrongful act or omission in the United States of that foreign state or of any official or employee thereof except that a foreign state shall be immune in any case under this paragraph in which a remedy is available under Article VIII of the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces.

## "§ 1606. Immunity in cases relating to the public debt of a foreign state

"(a) A foreign state shall be immune from the jurisdiction of the courts of the United States and of the States in any case relating to its public debt, except if

"(1) the foreign state has waived its immunity explicitly, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect after the claim arose; or

"(2) the case, whether or not falling within the scope of section 1605, relates to the public debt of a political subdivision of a foreign state, or of an agency or instrumentality of such a state or subdivision.

"(b) Nothing in this chapter shall be construed as impairing any remedy afforded under sections 77(a) through 80(b)–21 of Title 15, United States Code, as amended, or any other statute which may hereafter be administered by the United States Securities and Exchange Commission.

## "§ 1607. Counterclaims

"In any action brought by a foreign state in a court of the United States or of any State, the foreign state shall not be accorded immunity with respect to—

"(1) any counterclaim arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or

"(2) any other counterclaim that does not claim relief exceeding in amount or differing in kind from that sought by the foreign state.

## "§ 1608. Service of process in United States district courts

"Service in the district courts shall be made upon a foreign state or a political subdivision of a foreign state and may be made upon an agency or instrumentality of such a state or subdivision which agency or instrumentality is not a citizen of the United States as defined in Section 1332(c) and (d) of this title by delivering a copy of the summons and complaint by registered or certified mail, to be addressed and dispatched by the clerk of the court, to the ambassador or chief of mission of the foreign state accredited to the Government of the United States, to the ambassador or chief of mission of another state then acting as protecting

power for such foreign state, or in the case of service upon an agency or instrumentality of a foreign state or political subdivision to such other officer or agent as is authorized under the law of the foreign state or of the United States to receive service of process in the particular case, and, in each case, by also sending two copies of the summons and of the complaint by registered or certified mail to the Secretary of State at Washington, District of Columbia, who in turn shall transmit one of these copies by a diplomatic note to the department of the government of the foreign state charged with the conduct of the foreign relations of that State.

**"§ 1609. Immunity from execution and attachment of assets of foreign states**

"The assets in the United States of a foreign state shall be immune from attachment and from execution, except as provided in section 1610 of this chapter.

**"§ 1610. Exceptions to the immunity from execution of assets of foreign states**

"(a) The assets in the United States of a foreign state or political subdivision of a foreign state, to the extent that they are used for a particular commercial activity in the United States, shall not be immune from attachment for purposes of execution or from execution of a judgment rendered against that foreign state or political subdivision if

"(1) such attachment or execution relates to a claim which is based on that commercial activity or on rights in property taken in violation of international law and present in the United States in connection with that activity, or

"(2) the foreign state or political subdivision has waived its immunity from attachment for purposes of execution or from execution of a judgment either explicitly or by implication, notwithstanding any purported withdrawal of the waiver after the claim arose.

"(b) The assets in the United States of an agency or instrumentality of a foreign state or of an agency or instrumentality of a political subdivision of a foreign state, which is engaged in a commercial activity in the United States, or does an act in the United States in connection with such a commerical activity elsewhere, or does an act outside the territory of the United States in connection with a commercial activity elsewhere and the act has a direct effect within the territory of the United States, shall not be immune from attachment for purposes of execution or from execution of a judgment rendered against that agency or instrumenttlity if—

"(1) such attachment or execution relates to a claim which is based on a commercial activity in the United States or such an act, or on rights in property taken in violation of international law and present in the United States in connection with such a commercial activity in the United States, or on rights in property taken in violation of international law and owned or operated by an agency or instrumentality which is engaged in a commercial activity in the United States; or

"(2) the agency or instrumentality or the foreign state or political subdivision has waived its immunity from attachment for purposes of execution or from execution of a judgment either explicitly or by implication, nothwithstanding any purported withdrawal of the waiver after the claim arose.

**"§ 1611. Certain types of assets immune from execution**

"Notwithstanding the provisions of section 1610 of this chapter, assets of a foreign state shall be immune from attachment and from execution, if—

"(1) the assets are those of a foreign central bank or monetary authority held for its own account; or

"(2) the assets are, or are intended to be, used in connection with a military activity and

(a) are of a military character, or

(b) are under the control of a military authority or defense agency.";

and

(2) by inserting in the analysis of Part IV, "Jurisdiction and Venue," of that title after

"95. Customs Court.",

the following new item:

"97. Jurisdictional Immunities of Foreign States.".

SEC. 2. Chapter 85 of title 28, United States Code, is amended—

(1) by inserting immediately before section 1331 the following new section:

**"§ 1330.  Actions against foreign states**

"(a)  The district courts shall have original jurisdiction of all civil actions, regardless of the amount in controversy, against foreign states or political subdivisions of foreign states, or agencies or instrumentalities of such a state or subdivision, other than agencies or instrumentalities which are citizens of a State of the United States as defined in section 1332 (c) and (d) of this title.

"(b)  This section does not affect the jurisdiction of the district courts of the United States with respect to civil actions against agencies or instrumentalities of a foreign state or political subdivision thereof which agencies or instrumentalities are citizens of a State of the United States, as defined in section 1332 (c) and (d) of this title."; and

"(2)  by inserting in the chapter analysis of that Chapter before—

"1331. Federal question; amount in controversy; costs."

the following new item:

"1330. Actions against foreign states."

SEC. 3. Section 1391 of title 28, United States Code, is amended by adding a new subsection (f), to read as follows:

"(f)  A civil action against a foreign state, or a political subdivision of a foreign state, or an agency or instrumentality of such a state or subdivision which agency or instrumentality is not a citizen of a State of the United States as defined in section 1332 (c) and (d) of this title may, except as otherwise provided by law, be brought in a judicial district where: (1) a substantial part of the events or omissions giving rise to the claim occurred, or (2) a substantial part of the property that is the subject of the action is situated, or (3) the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality, or (4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision. Nothing in this subsection shall affect the venue of actions against agencies or instrumentalities of a foreign state or political subdivision thereof which agencies or instrumentalities are citizens of a State of the United States, as defined in section 1332(c) and (d) of this title."

SEC. 4. Section 1441 of title 28, United States Code, is amended by adding a new subsection (d), to read as follows:

"(d)  Any civil action brought in a court of a State of the United States against a foreign state, or a political subdivision of a foreign state, or an agency or instrumentality of such a state or subdivision which agency or instrumentality is not a citizen of a State of the United States as defined in section 1332 (c) and (d) of this title, may be removed by the foreign state, subdivision, agency or instrumentality to the district court of the United States for the district and division embracing the place where such action is pending. Nothing in this subsection shall affect the removal of actions against agencies or instrumentalities or a foreign state or political subdivision thereof which agencies or instrumentalities are citizens of a State of the United States, as defined in section 1332 (c) and (d) of this title."

SEC. 5. Section 1332 of title 28, United States Code, is amended by striking subsections (a) (2) and (3) and substituting in their place the following:

"(2)  citizens of a State and citizens or subjects of a foreign state; and

"(3)  citizens or different States and in which citizens or subjects of a foreign state are additional parties.".

SECTION-BY-SECTION ANALYSIS

*Section 1*

Adds a new Chapter 97 to title 28, United States Code. The new Chapter incorporates and codifies international law with respect to the immunities of foreign states. Together with a new 28 U.S.C. § 1330 (Sec. 2) establishing original jurisdiction in the federal district courts in civil actions against foreign states, and amendments to 28 U.S.C. § 1391 (Sec. 3) and 28 U.S.C. § 1441 (Sec. 4) concerning venue and removal jurisdiction, the new Chapter establishes a coordinated regime for civil actions against foreign states and their political subdivisions and agencies and instrumentalities. It was felt preferable to bring together the provisions dealing with the immunities of foreign states in a clearly identified Chapter except where, in dealing with jurisdiction, venue and removal it would be clearer if the new provisions for actions against foreign states appeared with related provisions of title 28.

The Act has been drafted as an amendment to the present title 28. It has been influenced, however, by the American Law Institute Draft of the Federal Court

Jurisdiction Act of 1971 introduced in the 92d Congress as S. 1876, and is consistent with that bill. It would be relatively easy to integrate this Act into any new structure patterned after that bill.

### Section 1602. Findings and declaration of purpose

This section incorporates the central premises of the new Act, which are that decisions concerning claims of foreign states to immunity are best made by the judiciary on the basis of a statutory regime which incorporates the restrictive theory of sovereign immunity. It has never been clear to what extent the principle of international law governing the sovereign immunity of foreign states in national courts is left to be spelled out by national legislation and by the decisions of national courts. The general immunity seems to be a creation of international law; its further refinement seems to have been left very largely to national courts. There is, however, general acceptance of the restrictive principle of immunity. It is this principle that has been applied by the Department of State and by the courts since the "Tate Letter" of May 19, 1952, 26 *Department of State Bulletin* 984 (1952) and which is incorporated and codified in this Chapter.

The existing case law, both United States and foreign, could be drawn upon in aid of the interpretation and application of the provisions of this Act. As the law develops in other jurisdictions, that law may similarly be relied upon to elucidate the provisions of this Act.

### Section 1603. Definitions

This section defines two terms that are used throughout the new Chapter 97, except as the term "foreign state" is used in Sections 1608 and 1610.

Section 1603 (a) defines "foreign state" in terms of all levels of government within that state. The term thus extends from the central government down to the level of municipalities. The traditional view has been that immunity attaches only to the central government of a state and that other subordinate entities, such as states of a federation, provinces, cantons, countries, and municipalities, are not sovereign and are not entitled to immunity. The practice has not been consistent, however, and some courts have found it difficult to contend that purely governmental acts of governmental subdivisions should be subject to scrutiny by foreign courts. In other areas of international law, the central government is responsible for the acts of political subdivisions and they are considered as its own acts. There is no reason to treat these acts differently for purposes of immunity. If those acts are not in fact commercial, then immunity should be granted to exactly the same extent as it would be extended to the central government in the event those acts were directly attributable to it.

An "agency or instrumentality" of a state or of its political subdivision could assume a variety of forms—a state trading corporation, a transport organization such as a shipping line or airline, or a banking activity. The traditional rule was that such agencies and instrumentalities of a foreign government were entitled to the same immunities as the government itself especially if they engaged in clearly governmental activities.

When the principle of the absolute immunity of foreign governments was still dominant, the idea of the separability of certain governmental agencies or instrumentalities was used to exempt certain governmental activities from the rule of absolute immunity. If it could be proven that a particular activity was conducted by a separate entity, this enabled some courts to claim that this was not a governmental activity and that the entity in question was not entitled to immunity. When the trend shifted toward restricted immunity, some courts retained the old distinction as well, thus applying a double standard, namely that there is no immunity if an activity is commercial *or* if it is conducted by a separate entity. In a third category of instances, immunity was abolished only when the transaction was commercial and the entity was a separate one. Thus, a series of treaties of friendship, commerce, and navigation concluded by the United States with the Federal Republic of Germany, Greece, Iran, Ireland, Israel, Italy, Japan, Korea, the Netherlands, and Nicaragua abolished immunity only for government owned or controlled "enterprises" of one state which are engaged in "commercial, manufacturing, processing, shipping or other business activities" in the territory of the other state (6 Whiteman, *Digest of International Law* 582 (1968)).

It would seem proper to extend the immunity rules applicable to central governments on an equal basis, and subject to the same exceptions, to political subdivisions of a foreign state and to all agencies and instrumentalities not only of the foreign state but also of its political subdivisions. It is not likely that this extension of the basic rule would result in a large number of immunity cases, as

40

most foreign activities of such entities are likely to be commercial and will not be entitled to immunity.

Section 1603(b) defines a "commercial activity." If a foreign state, as defined in the Act (as including, for example, an agency or instrumentality of the state) carries on what is in effect a commercial enterprise—an airline or a trading corporation, for example—this constitutes a "regular course of commercial conduct" and therefore a "commercial activity," If an activity is customarily carried on for profit, its commercial character readily could be assumed. On the other hand, a single contract if of the same character as a contract which might be made by private persons, can constitute a "particular commercial transaction or act." The fact that the goods or services to be procured through the contract are to be used for a public purpose is irrelevant. Such a contract should be considered to be a commercial contract, even if its object is to assist in a public function.

The courts will have a good deal of latitude in determining what is a "commercial activity." It seems unwise to attempt a precise definition in this Act, even if that were practicable. It would include, however, such diverse activities as a contract to manufacture army boots for a foreign government or the sale by a foreign government of a service or product.

### Section 1604. Immunity of foreign states from jurisdiction

The new Chapter 97 starts from an assumption of immunity and then creates exceptions to the general principle. So long as the law develops in the form of stating when a foreign state is *not* immune in national courts, the codified law will have to be cast in this way. The articulation of the governing principle in terms of immunity will also protect foreign states in doubtful cases.

The immunity is extended to proceedings in both State and Federal courts. It lies within the powers of the Congress to stipulate that an immunity created under customary international law must be respected in State courts.

This Chapter is not intended to alter existing international agreements to which the United States is a party. The "existing . . . agreements to which the United States is a party" include treaties of friendship, commerce, and navigation and bilateral air transport agreements which contain provisions relating to the immunity of foreign states. If the agreement implicitly or explicitly establishes a higher or lower standard of immunity than that stipulated in this Act, or establishes a different basis for determining the liability of a foreign government, the treaty, whether prior to the enactment of the Act or subsequent to it, will prevail. The enactment of this Act might suggest renegotiation of certain of these provisions in order to bring them into conformity with the stipulations of this Act.

Nothing in this Act will in any way alter the rights or duties of the United States under the status of forces agreements for NATO or other countries having military forces in the United States or alter the provisions of commercial contracts calling for exclusive nonjudicial remedies through arbitration or other technique of dispute settlement.

### Section 1605. General exceptions to the jurisdictional immunities of foreign states

This section sets forth the circumstances in which a foreign state, as defined in Section 1603(a) is not entitled to immunity in United States courts.

Section 1605(l) deals with the case in which the foreign state has waived its immunity. It is generally recognized that whatever rule is followed with respect to the granting of immunity to a foreign state, that state may waive its immunity in whole or in part, explicitly or implicitly. A state may renounce its immunity by treaty, as has been done by the United States with respect to commercial and other activities in a series of treaties of friendship, commerce, and navigation, or a state may waive its immunity in a contract with a private party. In the latter instance, some courts have allowed later unilateral recission of such a waiver, but the more widely accepted view seems to be that a state which has enticed a private person into a contract by promising not to invoke its immunity cannot, when a dispute arises, hide behind its immunity and claim the right to revoke the waiver. Courts have also found an implicit waiver in cases where a foreign state agreed to arbitration in another country or where it was agreed that the law of a particular country should govern the contract.

The language "notwithstanding any withdrawal of the waiver which the foreign state may purport to effect after the claim arose" is designed to deal, out of an abundance of caution, with the eventuality that a state may attempt to withdraw its waiver of immunity when a dispute arises. A waiver of immunity, once made by treaty or contract, cannot be withdrawn except within the terms of the treaty or contract.

41

Section 1605(2) deals with the most important instance in which immunity is denied to foreign states, that in which the foreign state engages in commercial activity. "Commercial activity" is defined in Section 1603(b). The "commercial activity carried on in the United States by the foreign state" may thus be a regular course of business or an individual contract of an ordinary commercial character. Thus a foreign state would not be immune from the jurisdiction of United States courts with respect to an alleged breach of a contract to make repairs on an embassy building.

An "act performed in the United States in connection with a commercial activity of the foreign state elsewhere" looks to any conduct of the foreign state in connection with a regular course of business conducted elsewhere or a particular commercial contract concluded elsewhere. Examples of the causes of action involved would be an action for restitution based on unjust enrichment, a violation of securities regulations, or the wrongful discharge in the United States of an employee of a commercial activity carried on in some third country.

The third category of cases, "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act has a direct effect within the territory of the United States," would embrace conduct falling within the scope of Section 18 of the Restatement of the Law Second, Restatement of the Foreign Relations Law of the United States (1965), dealing with extraterritorial conduct having effects within the United States. Examples of the causes of action involved would be an action for pollution of the air by a factory operated commercially by a foreign state, an action arising out of restrictive trade practices by an agency or instrumentality of a foreign state, or an action for infringement of copyright by a commercial activity of the foreign state.

In each of these instances the conduct, transaction, or act of the foreign state must have a sufficient connection with the United States to justify the jurisdiction of United States courts over the matter. In this respect the jurisdictional standard is the same for the activities of a foreign state as for the activities of a foreign private enterprise.

Section 1605(3) provides that the foreign state will not be immune from jurisdiction in any case "in which rights in property taken in violation of international law are in issue and that property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state or that property is owned or operated by an agency or instrumentality of the foreign state or of a political subdivision of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." Thus, if property has been nationalized or expropriated without payment of compensation as required by international law it will not be immune when brought into the United States for sale or otherwise in connection with a commercial activity. Similarly, an agency or instrumentality which owns or operates such property and which is engaged in a commercial activity in the United States will not be immune with respect to actions in which rights in such property are in issue. Since this draft bill deals solely with issues of immunity, it in no way affects existing law concerning the extent to which, if at all, the "act of state" doctrine may be applicable in similar circumstances.

Section 1605(4) deals with litigation relating to immovables and to the property of decedents.

It is well established that, as set forth in the "Tate Letter" of 1952, sovereign immunity should not be granted "in actions with respect to real property (diplomatic and perhaps consular property excepted)." It does not matter whether a particular piece of property is used for commercial or public purposes. It is maintainable that the exception mentioned in the "Tate Letter" with respect to diplomatic and consular property is limited to questions of attachment and execution and does not apply to an adjudication of rights in that property. Thus the Vienna Convention on Diplomatic Relations, concluded in 1961, provides in Article 22 that the "premises of the mission, their furnishings and other property thereon and the means of transport of the mission are immune from search, requisition, attachment or execution." Actions short of attachment or execution seem to be permitted under the Convention, and a foreign state cannot deny to the local state the right to adjudicate on questions of ownership, rent, servitudes, and other similar matters, as long as the foreign state's possession of the premises is not disturbed.

There is general agreement that a foreign state may not claim immunity when the suit against it relates to rights in property, real or personal, obtained by gift or inherited by the state and situated or administered in the country where the

42

suit is brought. As stated in the "Tate Letter," immunity should not be granted "with respect to the disposition of the property of a deceased person even though a foreign sovereign is the beneficiary." The reason seems to be that in claiming rights in a decedent's estate or obtained by gift, the foreign state claims the same right which is enjoyed by private persons.

Section 1605(5) is directed primarily to the problem of traffic accidents but is cast in general terms as applying to all actions for damages (as distinguished from injunctive relief, for example) for personal injury or death or damage to or loss of property. The negligent or wrongful act must take place in the United States and must not be one for which a remedy is already available under Article VIII of the NATO Status of Forces Agreement.

While the Vienna Convention on Consular Relations of 1963 expressly abolishes the immunity of consular officers with respect to civil actions brought by a third party for "damage arising from an accident in the receiving State caused by a vehicle, vessel or aircraft," there is no such provision in the Vienna Convention on Diplomatic Relations of 1961. Consequently no case relating to a traffic accident can be brought against a member of a diplomatic mission or against the mission itself.

The effect of Section 1605(5) would be to permit the victim of a traffic accident who has been injured through the wrongful or negligent act of an official or employee of a foreign state to have an action against the foreign state to the extent otherwise provided by law.

This section applies only to torts that are not connected with the commercial activities of a foreign state. Under section 1605(2), no act of a foreign state, tortious or not, which is connected with the commercial activities of a foreign state would give rise to immunity if the act takes place in the United States or has a direct effect within the United States.

*Section 1606. Immunity in cases relating to the public debt of a foreign state*

Public debts do not fall within the scope of Section 1605. The immunity of foreign states in this respect should be maintained by the United States, in its role as one of the principal capital markets of the world. Many national governments are unwilling to issue their securities in a foreign country which subjects them to actions based on such securities. Where the managing underwriters regard immunity as detrimental to the success of the issue, the foreign government may consent to suit by an express waiver.

While there is no clear definition of "public debt," this concept seems to embrace not only direct bank loans but also governmental bonds and securities sold to the general public through bond markets and stock exchanges.

Section 1606(a)(2) recognizes a distinction which has been made between the public debt of the central government and the public debt of "a political subdivision of a foreign state, or of an agency or instrumentality of such a state or subdivision." It is generally accepted that the immunity of the central government is not shared by subordinate political entities or agencies or instrumentalities. Immunity is denied in these cases, whether or not the activity engaged in is of a commercial character or otherwise falls within the scope of Section 1605.

Section 1606(b) preserves any remedies under the federal securities laws applicable to foreign states.

*Section 1607. Counterclaims*

This section deals with compulsory and permissive counterclaims within the meaning of Rule 13(a) and (b) of the Federal Rules of Civil Procedure.

It is in no way intended to create immunity with respect to counterclaims which, if originally brought as actions against a foreign state, would not entitle the foreign state to immunity. It deals instead only with claims which would be barred by immunity unless brought as counterclaims under the rule of § 1607.

The state of the law in the United States is that a foreign state which brings an action in a United States court may not assert the defense of sovereign immunity as to a counterclaim not arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state to the extent that the counterclaim does not exceed the amount claimed by the plaintiff foreign state (National City Bank of New York v. Republic of China, 348 U.S. 356 (1955)). There is no square precedent on a counterclaim that *does* arise out of the transaction or occurrence that is the subject matter of the claim of the foreign state. Section 1607(1) is, however, based on the rule laid down in Restatement of the Law Second, Foreign Relations Law of the United States § 70(2) (1965). A foreign state that brings an action grounded in a particular transaction or occurrence should not, on principle,

43

be allowed to assert its immunity in such a way as to permit it to claim the benefit of the courts of the United States while denying that benefit to the defendant with respect to claims arising out ot the same transaction or occurrence. In the words of National City Bank of New York v. Republic of China, supra, "It (the foreign government) wants our law, like any other litigant, but it wants our law free from the claims of justice" (at 361–2).

"[A]ny counterclaim arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state" is the same terminology as that used in Rule 13(a) of the Federal Rules of Civil Procedure.

*Section 1608. Service of process in United States District Courts.*

This section is designed to give a foreign state prompt and adequate notice that an action has been brought against it and to provide a method of service of process on foreign states, political subdivisions of foreign states, and their agencies or instrumentalities which are not citizens of the United States.

Service under Section 1608 requires two methods of supplying notification. The first is that a copy of the summons and of the complaint be mailed by the clerk of the court to the ambassador (or if there be none at the time to the charge d'affaires or other chief of mission of that state). In the event of the suspension of diplomatic relations with a foreign state or their interruption in time of war, service may be made in the same way on the ambassador or chief of mission of the state which is then acting as the protecting power for the defendant foreign state. If service is made upon an agency or instrumentality it may sometimes be more appropriate to serve the officer or agent who is authorized to receive service under the law of the foreign state concerned. Accordingly, this method is provided as an alternative way of satisfying the first notification requirement in actions brought against agencies or instrumentalities. Similarly, if a law of the United States or of a State specifies what persons may receive service, service may likewise be made upon such a person in actions brought against agencies or instrumentalities.

The second and concurrent method of providing notification to the foreign state is the sending to the Secretary of State of copies of the summons and complaint. The Secretary of State will then transmit one of these to the ministry of foreign affairs of the defendant state by diplomatic note. In cases where there are no diplomatic relations with the foreign state, a protecting power or other intermediary might be employed to convey the note to the defendant state. This second method of notification will assure that the foreign state is notified even if through some error—such as the receipt of the mailed copy of a summons and complaint by a minor official who fails to bring it to the attention of the ambassador—the foreign state itself does not receive actual notice through the mail.

While both international law and United States law prohibit service of process by a marshal on a foreign ambassador without his consent, it was generally accepted during the drafting of the Vienna Convention on Diplomatic Relations that this prohibition does not apply to service effected by mail.

There has in the past been great uncertainty about the proper mode of service of process on foreign states. The Federal Rules of Civil Procedure contain no stipulation on this subject.

In some cases service has been allowed when the suit was brought in fact against a separate government enterprise. In other cases attempts were made to equate government agencies to separate enterprises and to apply to them the methods of service applicable to foreign corporations. In at least one case the court admitted that there was a gap in the rules and proceeded to fill it under Rule 83, which allows the District Courts in "all cases not provided for by rule" to "regulate their practice in any manner not inconsistent with these rules." Alternatively a district court can authorize a special method of service, as long as the method chosen is consonant with due process. Consequently service by ordinary mail to an office maintained in the United States might be permissible. It has also been suggested that the rules applicable to service abroad might by analogy be applied to foreign governments.

More recently, a number of plaintiffs have obtained jurisdiction over foreign states by attaching property of those states. The Department of State stated in 1959 (see Stephen v. Zivnostenska Banka National Corp., 22 N.Y.S.2d 128, 134 (App. Div. 1961)) that "where under international law a foreign government is not immune from suit, attachment of its property for the purpose of obtaining jurisdiction is not prohibited." The Department noted that in many cases "jurisdiction could probably not be obtained otherwise." It added, however, that property so attached cannot be retained to satisfy a judgment because "the

property of a foreign sovereign is immune from execution even in a case where the foreign sovereign is not immune from suit."

This statement led in several cases to the attachment of various properties of foreign states such as vessels or bank accounts, and to the acquisition by the courts of *quasi in rem* jurisdiction. In other cases a distinction has been made between those assets which are deemed to be subject to attachment because they are used for a commercial activity, even if that particular activity is unrelated to the activity which led to the attachment, and other assets which have been held to be public assets free from attachment. Consequently, difficult questions have been posed with respect to the line between property subject to attachment and that which is not.

It has also been contended that this method of acquiring jurisdiction suffers from a fatal logical flaw, as the very basis of *quasi in rem* jurisdiction is to enable the plaintiff to apply the attached property to the satisfaction of his claim if he prevails on the merits. But the inherent condition of the permission of the Department of State to attach was that such attachment should not lead to execution. This condition destroyed the original premise of this method of acquiring jurisdiction and made it seem nothing more than a technical procedural device with no basis in substance.

In some cases, plaintiffs have attached large sums in many banks, causing confusion and inflicting hardship on the foreign government concerned. Its procedures for payment of its debts may thus have been disrupted, difficulties may have been placed in the way of the functioning of its offices, and in some cases its monetary reserves may have been put in danger. The proceedings relating to the claim of immunity are often prolonged, and during the whole period the financial position of the foreign government is put in jeopardy. Unless the proceeding could be restricted to a temporary attachment which would be dissolved once jurisdiction had been acquired—another negation of the original function of this method—foreign governments might be compelled to remove their funds to other count ies where they would not be subject to attachment.

As this new procedure of attachment is not yet firmly embedded in practice, it should be brought to a halt. The procedure prescribed in this section is designed to replace the stopgaps and artificial devices that have been employed in the past.

The provision for service of process provided in section 1608 is mandatory for actions against foreign states or their political subdivisions and permissive for actions against agencies or instrumentalities of foreign states or political subdivisions which agencies or instrumentalities are not citizens of the United States as defined in section 1332 (c) and (d) of title 28. Actions against foreign states and political subdivisions may be particularly sensitive and this sensitivity suggests a uniform procedure for service of process. With respect to actions against agencies and instrumentalities not citizens of the United States these provisions create an alternate method of service of process.

Agencies or instrumentalities of a foreign state or political subdivision which are incorporated in the United States or elsewhere may be served pursuant to Rule 4 of the Federal Rules of Civil Procedure. Rule 4 provides in pertinent part:

"Service shall be made as follows: * * *

"(3) Upon a domestic or foreign corporation or upon a partnership or other uncorporated association which is subject to suit under a common name, by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process and, if the agent is one authorized by statute to receive service and the statute so requires, by also mailing a copy to the defendant."

It is not wholly clear under Rule 4 whether an unincorporated agency or instrumentality of a foreign state or political subdivision would always be an "unincorporated association which is subject to suit under a common name." It would seem desirable to interpret Rule 4 broadly to include such agencies or instrumentalities, particularly if they have their principal place of business in the United States and would thus be citizens of the United States under section 1332 (c) or (d) of title 28. Such agencies or instrumentalities would not be covered by the provisions of section 608 and as such should be brought under the existing Rule 4.

*Section 1609. Immunity from execution and attachment of assets of foreign states*

As in the case of Section 1604 with respect to jurisdiction, the matter of immunity is dealt with by an initial prohibition on execution and attachment in this section. The exceptions are then carved out in Section 1610.

45

*Section 1610. Exception to the immunity from execution of assets of foreign states*

The traditional view in the United States has been that the assets of foreign states are immune from execution (Dexter and Carpenter, Inc. v. Kunglig Jarnvagsstyvelsen, 43 F. 2d 705 (2d Cir. 1930)). Even after the "Tate Letter" of 1952, this continued to be the position of the Department of State and of the courts. The Department expressed the view "that under international law property of a foreign sovereign is immune from execution to satisfy even a judgment obtained in an action against a foreign sovereign where there is no immunity from suit" (Weilamann v. Chase Manhattan Bank, 21 Misc. 2d 1086, 192 N.Y.S. 2d 469–73 (Sup. Ct. 1959)). Thus, even after the Department of State and the courts espoused the restrictive theory of the immunity of foreign states from the jurisdiction of United States courts, a plaintiff who prevailed in his action against a foreign state could not levy execution on the assets of that state. This state of affairs led to assertions that the "Tate Letter," reflecting the changed position of the United States, was only an empty gesture.

Section 1610 is designed to meet this objection by partially lowering the barrier of immunity to execution of the assets of foreign states in order to make the law in this respect more consistent with that on immunity from jurisdiction. The governing principle, broadly stated, is that property held for commercial purposes should be available for the satisfaction of judgments rendered in connection with commercial activities. There is thus no question of execution on embassies, warships, or other foreign government property used for non-commercial purposes.

A distinction is made between, on the one hand, a foreign state or political subdivision thereof, and on the other, "an agency or instrumentality of a foreign state or of * * * a * * * political subdivision of a foreign state."

Under Section 1610(a) assets used by a foreign state or political subdivision for a particular commercial activity would be available to satisfy judgments arising out of that activity. It would be inappropriate, and probably in violation of international law, to allow the successful litigant to levy on any assets of a foreign state because these may be used for strictly governmental and sovereign purposes as well as commercial ones. Thus, absent a waiver of immunity if a judgment had been rendered against a foreign state or a political subdivision of that state on a commercial contract signed by an agency or instrumentality of the foreign state or its political subdivision (e.g., a state trading corporation), only the assets of the agency or instrumentality would be considered to have been "used for a particular commercial activity" and thus subject to execution. The reason for limiting execution to assets employed in connection with the particular commercial activity out of which the claim arose is that states, especially those with most of the economy in the public sector, may engage in a great variety of commercial activities. It would not be consistent with Section 1610(b) or with the principles obtaining in the American legal system for assets used in connection with a foreign state's program of importation of machine tools to be available to satisfy a judgment arising out of the commercial telecommunications business of that foreign state. All commercially used assets of a foreign state should no more be available for satisfaction of a judgment than all commercial assets of American firms operating in a foreign state should be available for satisfaction of a judgment against one American company. Indeed, allowing execution on assets of a foreign state attributable to an activity other than that out of which the claim arose could expose American enterprises abroad to like treatment.

There is no such problem in connection with assets of agencies or instrumentalities under Section 1610(b), as it can be expected that each such agency or instrumentality will have its own assets and will act as a separate entity, analogous to an American corporation. The standard of commercial activity in the United States which is used in Section 1610(b) is the same as that in Section 1605(2). If the action is one arising out of the "commercial activity" in the United States of an agency or instrumentality, as defined in Section 1603(b)—whether as a course of conduct or an individual transaction or act—then any assets of that agency or instrumentality may be used to satisfy judgments arising out of that activity. The normal situation would be one in which a state trading corporation carries on business in the United States and the claim arises out of that activity. If a commercial agency or instrumentality outside the United States has assets in the United States, these may be used to satisfy judgments arising out of acts occurring or having their impact in the United States, provided the judgments are rendered on actions arising out of the commercial activity of the agency or instrumentality.

Under both sections 1610(a) and 1610(b) property taken in violation of international law and present in the United States in connection with a commercial activity would also be subject to execution.

Sections 1610(a)(2) and 1610(b)(2) concern waivers of immunity from execution. Waivers are governed by the same principles that apply to waivers of immunity from jurisdiction under Section 1605(1). A waiver may result from the provisions of a treaty, a contract, or an official statement, or it may be inferred from certain steps taken by a foreign government in the proceedings leading to execution. Such wavier might be more easily presumed when the assets are used for both public and private purposes but only an explicit waiver would allow execution on property that is clearly public, such as an embassy building. In case of doubt, the question whether a waiver has actually been made is a question to be decided by the court which has jurisdiction over the assets subject to execution.

A waiver on behalf of an agency or instrumentality may be made either by that agency or instrumentality or by the foreign state itself under its powers with respect to the conduct of foreign relations.

There is no clear line of practice in foreign courts on the question of immunity of foreign states from execution, but opinion is not unanimously or predominantly in favor of absolute immunity. A number of treaties of friendship, commerce, and navigation concluded by the United States permit execution of judgments against foreign publicly owned commercial enterprises (e.g. Treaty with Japan, April 2, 1953, art. 18(2), 4 U.S.T. 2063, T.I.A.S. No. 2863). There has been widespread departure from the principle of absolute immunity in connection with the activities of state-owned vessels engaged in commercial activity  The widely ratified Brussels Convention for the Unification of Certain Rules relating to the Immunity of State-Owned Vessels, April 10, 1926, 176 L.N.T.S. 199, allows execution of judgments against public vessels engaged in commercial service in the same way as against privately owned vessels. Although the United States is not a party to this treaty, it follows a policy of not claiming immunity for its publicly owned or operated merchant vessels (6 Whiteman, Digest of International Law 570 (1968)). Articles 20 and 21 of the Geneva Convention on the Territorial Sea and the Contiguous Zone, April 29, 1958 (15 U.S.T. 1606, T.I.A.S. No. 5639), to which the United States is a party, recognize the liability to execution under appropriate circumstances of state-owned vessels used on commercial service.

*Section 1611. Certain types of assets immune from execution*

The purpose of Section 1611(1) is to prevent in all circumstances attachment of or levy of execution upon two categories of property of foreign states, even if these relate to the commercial activities of a foreign state and would otherwise come within the scope of Section 1610.

Section 1611(1) deals with funds of foreign states which are deposited in the United States, not in connection with purchases by the foreign state or other commercial activities but in connection with central banking activity. The purpose of the provision is to encourage the holding of dollars in the United States by foreign states, particularly in times when the United States has an adverse balance of payments. If execution could be levied on such assets, deposits of foreign funds in the United States might be discouraged, thus adversely affecting our balance of payments.

Section 1611(2) provides immunity from execution for assets which are, or are intended to be, used in connection with a military activity and which fulfill either of two conditions; either they are of a military character or they are under the control of a military authority or defense agency. Under the first condition property is of a military character if it consists of munitions in the broad sense—weapons, ammunition, military transport, warships, tanks, communications equipment, etc. Both the character and the function of the property must be military. The purpose of this condition is to avoid embarrassment to the United States in connection with purchases of military equipment and supplies in the United States by foreign governments. The second condition is intended to protect other military property, such as food, clothing, fuel and office equipment which, although not of a military character, is essential to military operations. "Control" is intended to include authority over disposition and use in addition to physical control and a "defense agency" is intended to mean a civilian defense organization such as the Defense Supply Agency in the United States Government. Each condition is subject to the overall condition that property will be protected only if its present or future use is military (e.g., surplus military equipment withdrawn

47

from military use would not be protected), and both conditions will avoid the possibility that a foreign state might permit execution on military property of the United States abroad under a reciprocal application of the Act.

*Section 2. Original jurisdiction of the district courts.*

This section would amend title 28 to add a new § 1330 giving the Federal district courts original jurisdiction over civil actions against foreign states or their political subdivisions, agencies or instrumentalities which are not citizens of the United States as defined in section 1332(c) and (d), regardless of the amount in controversy. Original jurisdiction is accorded to the federal courts because certain actions against foreign states, no longer possessed of absolute immunity, may be politically sensitive and may impinge in an important way on the conduct of foreign relations. Moreover, original jurisdiction in the federal courts should be conducive to uniformity of decision, and the federal courts may be expected to have a greater familiarity with international law and with the trend of decision in foreign states than would be true of courts of the States. The plaintiff, however, will have an election whether to proceed in a federal court or in a court of a State.

The present position is that district courts have original jurisdiction in civil actions between citizens of different States "and in which foreign states . . . are additional parties," provided the matter in controversy exceeds the sum or value of $10,000 (28 U.S.C. § 1332). The Federal courts now also have jurisdiction on the basis of a Federal question ("the matter . . . arises under the Constitution, laws, or treaties of the United States") provided the matter in controversy exceeds the sum or value of $10,000. The amount in controversy or other restrictions of these provisions will no longer be applicable in civil actions against foreign states.

An exception is made in the case of "agencies or instrumentalities of foreign states or of constituent units or political subdivisions of foreign states which are citizens of a State." This citizenship of a State would arise out of incorporation in that State or the possession of a "principal place of business" in that State under 28 U.S.C. § 1332(c). The sort of agency or instrumentality which might be expected to be locally incorporated in the United States would be a trading, banking, or transport corporation of a foreign state. If an agency or instrumentality has in effect been "naturalized" by local incorporation, it should be treated like any other citizen of the United States. It is a matter of accepting the burdens of local incorporation together with the benefits. If a foreign "agency or instrumentality" is incorporated in the United States, it is treated in exactly the same way as any other American corporation, incorporated or having its principal place of business in a State.

Section 1330(b) makes it clear that the section does not alter the existing law concerning such agencies or instrumentalities. Section 1330, of course, would also not alter the specialized jurisdictional regimes such as those established by § 1333 dealing with admiralty, maritime and prize cases or by § 1338 dealing with patent and copyright cases. Actions in such areas, even if against a foreign state, would continue to be governed by these special regimes.

It is contemplated that in actions brought in the federal district courts under this new § 1330 or removed to the federal courts under the new § 1391(f), whether state or federal law is to be applied will depend on the nature of the issue before the court. Under the *Erie* doctrine state substantive law, including choice of law rules, will be applied if the issue before the court is non-federal. On the other hand, federal law will be applied if the issue is a federal matter. Under the new Chapter 97 issues concerning sovereign immunity, of course, will be determined by federal law. Similarly, issues involving the foreign relations law of the United States, such as the act of state doctrine, should be determined by reference to federal law. Other issues which may arise in actions brought under the new §§ 1330 and 1391(f) may be determined by state law if the issue is one of state law. See IA *J. Moore, Moore's Federal Practice* 3052–57 (2d ed. 1972); Henkin, *The Foreign Affairs Power of the Federal Courts: Sabbatino*, 64 Col. L. Rev. 805, 820n.51 (1964). *Sec. 3. Venue.* This section would amend 28 U.S.C. § 1391, which deals with venue generally. As amended, venue would lie in any one of three districts in civil actions brought against foreign states, political subdivisions or their agencies or instrumentalities which are not citizens of the United States as defined in section 1332(c) and (d).

First, the action may be brought in the judicial district where "a substantial part of the events or omissions giving rise to the claim occurred." This provision is analogous to 28 U.S.C. § 1391(e), which allows an action against the United

48

States to be brought, *inter alia*, in any judicial district in which "the cause of action arose." The test adopted, however, is the newer test recommended by the ALI and incorporated in S. 1876, 92d Cong., which does not imply that there is only one such district applicable in each case.

Second, the action may be brought in the judicial district in which "a substantial part of the property that is the subject of the action is situated." No hardship would be caused to the foreign state if it is subject to suit where it has chosen to place the property that may be in dispute. As much of the property of foreign states is in New York, this provision would permit the submission of a large number of cases to the United States District Court for the Southern District of New York, where many immunity cases have arisen in the past and where a particular expertise in such cases is consequently to be found.

Third, if the action is brought against an agency or instrumentality which is not a citizen of the United States as defined in section 1332 (c) and (d) of this title, it may be brought in the judicial district where the agency or instrumentality is licensed to do business or is doing business. If, of course, an agency or instrumentality is incorporated in or has its principal place of business in the United States then it is a citizen of the United States and venue will be governed by other provisions of title 28. And if the action is brought against a foreign state or political subdivision it may be brought in the United States District Court for the District of Columbia. The District of Columbia provides a fallback venue for actions against foreign states and political subdivisions since it is difficult to say where they "reside" under the corporate standards of "incorporated or licensed to do business or is doing business" used in section 1391(c). Moreover, it is in the City of Washington that foreign states have diplomatic representatives and where it would be easiest for them to defend themselves.

Consistent with Section 2 on jurisdiction an exception is made as to foreign agencies or instrumentalities which are citizens of a State. Actions against such agencies or instrumentalities would, under the terms of the exception, be treated in the same way as actions against wholly domestic corporations.

Nothing in this provision is intended to in any way alter the statutory or common law doctrine of *forum non conveniens*. Thus, actions brought in a particular district under § 1391 could be moved to another district for the convenience of the parties and witnesses and in the interest of justice in accordance with § 1404 of Title 28. Similarly, if the convenience of the parties and witnesses or in the interest of justice would be better served by dismissing the action subject to a court in a foreign State taking jurisdiction the doctrine of *forum non conveniens*. would be available for that purpose. See *Vanity Fair Mills* v. *T. Eaton Co.*, 234 F. 2d 633 (Ct. App. 2d. Cir. 1956), *Prack* v. *Weissinger*, 276 F. 446 (Ct. App. 4th Cir. 1960), *Fitzgerald* v. *Westland Marine Corp.*, 369 F. 2d. 499 (Ct. App. 2d. Cir. 1966) and I *J. Moore, Moore's Federal Practice* 1788 (2d ed. 1972).

*Sec. 4.* This section amends section 28 U.S.C. § 1441 to provide for removal to a federal district court of civil actions brought against a foreign state in the courts of a State. In view of the potential sensitivity of actions against foreign states and the importance of developing a uniform body of law in this area, it is of great importance to give foreign states clear authority to remove to a federal forum actions brought against them in the State courts. This section provides such authority in any case which could have been brought originally in a federal district court under the new section 1330 (Sec. 2). It also makes clear that the election for removal may be exercised at the discretion of the foreign state even if there are multiple defendants and one chooses not to remove or is a citizen of the State in which such action is brought. This section, like the new provisions for jurisdiction (Sec. 2) and venue (Sec. 3) would not affect existing removal jurisdiction with respect to agencies or instrumentalities which are citizens of a State of the United States as defined in section 1332(c) and (d) of title 28.

*Section 5.*

This section amends 28 U.S.C. § 1332 (a)(2) and (3) by striking the phrase "foreign states" from both subsections. Suits against foreign states are comprehensively treated by the new § 1330 and the other provisions of this bill. Accordingly there is no reason to retain the jurisdictional basis of § 1332 in actions against foreign states and to do so may entail confusion as to whether the jurisdictional amount requirement of § 1332 would be applicable. As such, § 1332 has been amended to conform to the structure of the draft bill for actions against foreign states. This change would not affect the applicability of § 1332 to agencies or instrumentalities of a foreign state or subdivision which agencies or instrumentalities are citizens of a state of the United States as defined in section 1332 (c) and (d) of title 28.

49

[The following letter from the Honorable Charles N. Brower, Acting Legal Adviser of the Department of State, supplied additional information requested at the hearing on June 7, 1973.]

DEPARTMENT OF STATE,
*Washington, D.C., July 24, 1973.*

Subject: H.R. 3493.
Hon. HAROLD D. DONOHUE,
*Chairman, Subcommittee No. 2, Committee on the Judiciary, House of Representatives, Washington, D.C.*

DEAR MR. DONOHUE: In our hearings before your Committee on June 7, 1973, Congressman George E. Danielson asked how an action could be commenced in a state court under the provisions of H.R. 3493 when the bill provides that service of process shall emanate from the federal district court. Our Office would like to supplement the answers which were provided at that time by Mr. Ristau and myself by pointing out that Section 1608 of H.R. 3493 does not provide that service of process shall be exclusively in the federal courts: "Service in the district courts shall be made upon a foreign state . . . by delivering a copy of the summons and complaint by registered mail . . . ." Furthermore, the proposed amendments to Section 1441(d) of Title 28, United States Code, which are found in H.R. 3493, will permit a plaintiff to choose between proceeding in a federal or state court when suit is brought "against agencies or instrumentalities of a foreign state or political subdivision thereof which agencies or instrumentalities are citizens of a State of the United States as defined in Section 1332 (c) and (d). . . ." As the Section-by-Section analysis, which appears at 100 Cong. Rec. 1300 at 1304 (daily ed. Jan. 26, 1973), makes clear, the purpose of the amended Section 1441(d) is to ensure that such agencies or instrumentalities which have been "naturalized" by local incorporation are treated like any other citizen within that state.

As I suggested in my testimony, I am here forwarding a list of the countries which belong to the Council of Europe: Austria, Belgium, Cyprus, Denmark, France, the Federal Republic of Germany, Iceland, Ireland, Italy, Luxembourg, Malta, the Netherlands, Norway, Sweden, Switzerland, Turkey, and the United Kingdom.

During the hearing, Congressman James R. Mann, who was presiding, asked that I supply for the record information concerning the frequency with which foreign states make requests of the Department of State for suggestions of sovereign immunity in cases pending in courts within the United States. Our Office and the Department of Justice have conducted a review of the files concerning sovereign immunity since 1960. We discover that at any one time there are between six to twelve cases which are considered active in our sovereign immunity files. These cases may be in various stages ranging from the time of the initial inquiry to the period of decision making by the Department. (See Whiteman, 6 *Digest of International Law* 553 *passim*, for a discussion of the procedures of the Department of State.)

The great majority of these matters are settled out of court or otherwise disposed before the Department renders a decision. In a small minority of the cases, the Department formally responds to a request for sovereign immunity by making such a suggestion to the court, be declining to so suggest, by writing an amicus curiae letter or brief for the consideration of the court, or by some other action. Below you will find a list of the cases since 1960 in which the Department did receive a request or other communication and took a formal action of some kind. For convenience, the cases are annotated as follows:

> S—suggestion of immunity from suit,
> A—suggestion of immunity from attachment,
> E—suggestion of immunity from execution,
> N—no suggestion of immunity.

The list of cases, which may not be exhaustive, is as follows:

1. *Ovidio Manalich* v. *Compania Cubana de Aviacion, S. A.* Sup. Ct. N.Y., Kings Co., Index No. 13735 (1960) (A).
2. *In RE Grand Jury Investigation of the Shipping Industry,* 186 F. Supp. 298 (1960)(N).
3. *Banco Nacional de Cuba* v. *Steckel,* 134 So. 2d 23 (Fla. App. 3d Distr. 1961) (N).
4. *Rich* v. *Naviera Vacuba, S. A.,* 295 F. 2d 24 (C. A. 4 1961)(A).
5. *Dixie Paint & Varnish Co., Inc.* v. *Republic of Cuba,* 123 S.E. 2d 198 (Ga. Ct. App. 1961)(S).

6. *Arcade Building of Savannah, Inc.* v. *Republic of Cuba,* 123 S. E. 2d 453 (Ga. Ct. App. 1961) (S) (E).
7. *Harris & Company Advertising Inc.* v. *Republic of Cuba,* 127 So. 2d 687 (Fla. App. 2d Distr. 1961)(E).
8. *Cuban Air Force, F. A. R.* v. *Bergstresser,* 135 So. 2d 752 (Fla. App. 3d Distr. 1961)(E).
9. *Stephen v. Zivnostenska Banka,* 199 N.Y.S. 2d 797 (Sup. Ct. N. Y. Co. 1960), aff'd 15 App. Div. 2d 111, 222 N.Y.S. 2d 128 (1st Dept. 1961), aff'd 12 N.Y. 2d 781, 235 N.Y.S. 2d 1 (1962) (A) (E).
10. *Harry M. Johanson v. Dominican Republic et al,* Dade County, Florida, Chancery No. 62C13817 (1962)(N).
11. *National Institute of Agrarian Reform* v. *Deckle,* 137 So. 2d 581 (Fla. App. 3d Distr. (1962)) (E).
12. *United States and Republic of Cuba* v. *Harris & Company Advertising Inc.,* 149 So. 2d 384 (Fla. App. 3 Distr. 1963) (E).
13. *William A. Moulton* v. *Pan American Union,* D.C.D.C., Civ. Action No. 20776-63 (1963) (N).
14. *Philip J. Harty* v. *Corporacion Venezolana de Guayana* W.D. Penn. Civ. Action No. 63–325 (1963) (Diplomatic note dated October 23, 1963) (N).
15. *Mirabella v. Banco Industrial de la Republica Argentina,* 38 Misc. 2d 128, 237 N.Y.S. 2d 499 (1963), 62AL2d 937 (N).
16. *National Institute of Agrarian Reform* v. *Kane,* 153 So. 2d 40 (1963) (N).
17. *Thomas Melone et al.* v. *Republic of Chad, et al.,* Civ. Ct., Cty of N.Y., Index No. 1287/64 (1964) (S).
18. *Lee Better* v. *Government of Burundi,* Civ. Ct., Cty of N.Y., Index No. 51853/64 (1964) (A) (E).
19. *Cargo and Tankship Management Corp.* v. *India Supply Mission,* 336 F. 2d 416 (CA2 1964) (E).
20. *City of Rochelle* v. *Republic of Ghana,* 255 N.Y.S. 2d 178 (1964) (N).
21. *Flota Maritima Browning de Cuba* v. *Motor Vessel Ciudad,* 335 F. 2d 619 (1964) (N).
22. *Mayan Lines, S.A.* v. *Republic of Cuba,* D.C. Canal Z., Civ. Actions Nos. 2712 and 2713 (1965) (E).
23. *Kendall* v. *Kingdom of Saudi Arabia,* D.C.S.D.N.Y., 65 Adm. 855 (1965) (S).
24. *Victory Transport Inc.* v. *Comisaria General,* 336 F. 2d 354 (1964), cert. den 381 US 934, (1965) (N).
25. *Petrol Shipping Corp.* v. *Kingdom of Greece,* 360 F. 2d 103 (1966) cert. den. 385 US 931 (1966) (N).
26. *Chemical Natural Resources, Inc.* v. *Republic of Venezuela,* 420 Pa. 134, 215 A.2d 864 (1966), cert. den., 385 U.S. 822 (1966) (S).
27. *Hellenic Lines, Limited* v. *Embassy of South Vietnam,* 275 F. Supp. 860 (S.D.N.Y. 1967) (A).
28. *Ocean Transport Co., Inc.* v. *The Govt of the Republic of Ivory Coast,* 269 F. Supp. 703 (1967) (N).
29. *Carpets by Certified, Inc.* v. *Permanent Mission of Ghana,* Civ. Ct., Cty of N.Y., Index No. 50301–68 (1968) (E).
30. *Caribbean Maritime Co., Ltd.* v. *Directorate General of Commerce, Saigon,* D.C.S.D.N.Y., 68 Civ. 801 (1968) (E).
31. *Pruitt* v. *M/V Patgnies* (Diplomatic note dated July 18, 1968) (N).
32. *Clement Cole et al* v. *William Heidlman et al* (Diplomatic note dated January 5, 1968) (N).
33. *Orcor Transportation Co.* v. *Embassy of Pakistan* (Diplomatic note dated January 5, 1968) (N).
34. *Worldwide Carriers* v. *National Bank of Egypt* (Diplomatic note dated October 31, 1968) (N).
35. *French v. Banco Nacional de Cuba,* 295 N.Y.S. 2d 433, 23 N.Y. 2d 46, 242NE2d 704 (1968) (N).
36. *New York World's Fair* v. *Rep. of Guinea,* 63 *American Journal of International Law,* 343 (1969) (N).
37. *Leona Towsley* v. *Mexican National Tourist Council, et al.,* Circ. Ct., Cook Co., Ill., No. 69 L 2170 (1969) (N).
38. *Compania Domin. De Avia.* v. *Caribbean Merc. Exp. Corp.,* 218 So. 2d 523 (Fla. App. 3d Distr. 1969) (E).
39. *Pan American Tankers Corp.* v. *Republic of Vietnam,* 291 F. Supp. 49 (1968), 296 F. Supp. 361 (1969) (N).

51

40. *Morrison, Inc.* v. *Servicio Autonomo Nacional de Acueductos y Alcantarillados* (Diplomatic note dated May 2, 1969) (N).
41. *AMIKOR Corp.* v. *Bank of Korea*, 298 F. Supp. 143 (1969) 25 A L3d 322 (N).
42. *Venore Transportation Co.* v. *President of India* (Diplomatic note dated March 19, 1970) (N).
43. *Isbrandsen Tankers, Inc.* v. *President of India*, 446 F. 2d 1198 (C.A. 2 1971) (S).
44. *Shirley S. Laszlo* v. *Republic of Cyprus*, Sup. Ct. N.Y., N.Y. Co., Index No. 1542/72 '(1972) (A).
45. *Heaney v. Government of Spain*, 445 F. 2d 501 (1971) (N).
46. *Premier Steamship Co.* v. *Embassy of Algeria*, 336 F. Supp. 507 (1971) (N).
47. *Bermuda Shipping Corp.* v. *Govt of Pakistan* (Diplomatic note dated December 21, 1972) (N).
48. *Losquardos* v. *Trinidad Mission to the UN*, S.D.N.Y. No. Re 404828 (1972) (N).

It should be noted that in the cases of *New York World's Fair, Orcor Transportation*, and *Heaney* sovereign immunity was recognized even though the Department did not forward to the court through the Department of Justice a binding suggestion to that effect. Also I wish to point out that the above list could be enlarged to include other cases, such as *Hellenic Lines Limited* v. *Moore*, 345 F. 2d 978 (1965), which involved service of process issues, where the Departments of State and Justice became involved in litigation which is somewhat peripherial to that contained in a request for sovereign immunity from a narrow definitional point of view. Passage of H.R. 3493 should facilitate the resolution of such cases by our courts as well.

We hope that you will find the above information helpful in evaluating H.R. 3493.

Sincerely yours,

CHARLES N. BROWER,
*Acting Legal Adviser.*

O

# EXHIBIT 5

# CLAIMS AGAINST FOREIGN STATES—
# A PROPOSAL FOR REFORM OF
# UNITED STATES LAW

ANDREAS F. LOWENFELD*

*The law in the United States concerning claims by private persons against foreign governments is, according to the author, in an advanced state of confusion. Paralleling recent developments in the area of conflict of laws, the United States law of sovereign immunity has moved from certainty at the frequent expense of justice, to uncertainty, with no precise criteria being offered to assure either justice or predictability. In the process, both the relationship between national and international law, and the relations between the Executive Branch and the Judiciary have become strained. The author traces the development of the United States law of sovereign immunity, and then proposes a solution and a new statute to implement it.*

THE law applied in the United States to claims against foreign states is at present an amalgam of judicial decisions, Executive Branch policies, some uncertain notions of international law and wholly inadequate procedure. As governments increasingly engage in activities that bring them into contact with private parties in the United States and elsewhere, the defects of current United States law and practice concerning claims brought in this country against foreign states become more and more apparent and important.

In theory, the admissibility of claims against foreign states brought in American courts is today dependent on whether the activity giving rise to the claim is "public" or "private"—*de jure imperii* or *de jure gestionis*. In practice, however, this distinction has been difficult to establish or to justify. All acts by or on behalf

---

* Professor of Law, New York University School of Law. A.B., 1951, LL.B., 1955, Harvard. The author served in the Department of State from 1961 to 1966, holding the position of Deputy Legal Adviser from 1964 to 1966. In September, 1966, following a series of discussions with Mr. Bruno A. Ristau, Chief, Foreign Litigation, Department of Justice and Mr. Murray J. Belman, then Assistant, and later Deputy, Legal Adviser, Department of State, the author wrote a memorandum to the Legal Adviser of the State Department suggesting a new approach to sovereign immunity cases. After leaving the Department, the author was commissioned to prepare a study elaborating on the initial proposal. This article is an adaptation of that study. The article does not necessarily represent the views of the Department of State or the Department of Justice. In particular, the draft statute attached to this article is in several respects different from the draft under discussion within the present administration. As of this writing (October 1969), no decision has been made within the United States Government with respect to the proposals offered here. The author wishes to thank Mr. Ristau for his many valuable suggestions concerning the manuscript.

of a government are in a real sense public acts. Moreover, neither the governments concerned nor outsiders coming in contact with state instrumentalities can be sure whether the activity in question will be characterized as public or private. Often the answer will depend on whether emphasis is placed on the function of the activity—for example buying shoes—or on the purpose of the activity—in the same example equipping the army. Neither governments nor outsiders can predict in advance who will draw the distinctions or where the lines will be drawn.

In addition to the substantive inadequacies of sovereign immunity law, the procedure for obtaining jurisdiction over foreign states is also seriously deficient. Service of process on foreign states is generally not permitted, and attempts to obtain jurisdiction by seizure of foreign state property in the United States have rarely succeeded. Thus, even claims which would not be entitled to immunity in the United States by any standard are often defeated without a hearing on the merits.

In short, the present state of the law of sovereign immunity in the United States falls far short of a satisfactory solution:

—Foreign governments have no assurance as to the scope of the immunity of their activities in the United States; conversely, Americans have no certainty regarding the opportunity for judicial review of dealings with foreign governments.

—Foreign governments are from time to time subjected to litigation in the United States because of activities having little relation with this country. Such litigation is generally unsuccessful, but in the process the parties, as well as the foreign relations of the United States, are subjected to unnecessary tension.

—Residents of the United States are often denied the opportunity to secure adjudication of claims arising out of everyday activities in the United States, such as automobile accidents or disputes about contracts or leases, solely because the opposite party happens to be a foreign state. In the reverse situation, where the foreign state is the complaining party in cases arising out of accidents or contract disputes, there is no restraint against its bringing suit against private persons in the United States.

The purpose of this article is to propose a new approach to this confused situation, designed to be implemented by federal statute. The substance of the proposal would make foreign states answerable in the courts of the United States for activities carried on in the United States or having a direct effect in this country in the same manner that private persons or firms are answerable

for such activities. The proposal would make foreign states subject to suit in two general classes of cases: (1) those based on express or implied contracts entered into, to be performed or arising out of transactions in the United States; and (2) those based upon claims for personal injury, death or damage to property caused by an act or omission of any officer, agent or employee of the foreign state while acting within the scope of his office, agency or employment within the United States. All other types of claims, and in particular those relating to political acts of foreign states or to activities occurring outside the jurisdiction of the United States, would be barred.

In addition, and perhaps most important, the proposed statute would simplify the problem of obtaining jurisdiction over foreign governments in actions coming within the above categories, by divorcing the problem of jurisdiction from the twin obstacles of personal service and attachment of property. As a direct consequence, it would be possible to eliminate completely the participation of the Executive Branch of the United States Government from the process of adjudication of claims against foreign states. Jurisdiction of such claims would be reserved exclusively to the federal courts. Commencement of actions against foreign states would be by the simple means of the clerk of court serving a summons and complaint by registered mail upon the foreign state's embassy or other representation in the United States. Just as the property of the United States Government is not subject to attachment or execution, so property of foreign states would remain immune from execution. With full opportunity to litigate on the merits, however, and with the prospect of continued diplomatic and commercial activity in the United States, foreign states would be expected to pay such money judgments as might be rendered against them. If an attempt were made under the proposed statute to bring an action against a foreign state on the basis of a claim other than those specified, the foreign state could move to dismiss without having its assets tied up during costly litigation.

## I

### Development of United States Sovereign Immunity Law

#### A. *The Classical Rule*

The traditional rule concerning the immunity of a foreign sovereign to civil suit was stated by Chief Justice Marshall more than 150 years ago in *The Schooner Exchange v. McFaddon*.[1] In

---

[1] 11 U.S. (7 Cranch) 116 (1812).

that case, plaintiffs sought to reclaim a vessel that they alleged belonged to them but had been seized on the high seas by agents of Napoleon. The Supreme Court, starting from the point of view that the dignity of the sovereign—typically a king or prince—must not be degraded, concluded that public armed vessels of the sovereign were immune from the jurisdiction of a friendly sovereign state—even when the issue in the case involved title to the very property against which the suit was brought.

*The Schooner Exchange* by its terms applied only to warships of a foreign sovereign; however, first English and then American cases extended the rule of immunity to other vessels owned by a foreign sovereign, and eventually, by implication, to other kinds of property as well.[2] In *Berizzi Brothers Co. v. S.S. Pesaro*[3] the United States Supreme Court had before it an ordinary commercial claim, based on the failure of a merchant vessel to deliver a cargo accepted in Italy for carriage to New York. The Court upheld dismissal of the action, however, on the sole ground that the vessel was owned by the government of Italy:

> We think the principles [stated in *The Schooner Exchange*] are applicable alike to all ships held and used by a government for a public purpose, and that when, for the purpose of advancing the trade of its people or providing revenues for its Treasury, a government acquires, mans, and operates ships in the carrying of trade, they are public ships in the same sense that warships are. We know of no international usage which regards the maintenance and advancement of the economic welfare of a people in time of peace as any less a public purpose than the maintenance and training of a Naval force.[4]

The *Pesaro* case rested entirely on the Supreme Court's understanding of international law and precedent, without any reference to considerations of foreign policy or the desires of the United States Government. Indeed, in the *Pesaro* case itself, the State Department argued that immunity should not be granted to a commercial vessel in a claim arising out of a commercial transaction, but the Justice Department disagreed and declined to submit the State Department's opinion to the Court.[5]

The issue of immunity of merchant vessels in cases arising out of commercial claims came before the Supreme Court again in 1943. In *Ex parte Peru*[6] the Court affirmed its prior holding

---

2 The Parlement Belge [1880] 5 P.D. 197; The Porto Alexandre [1920] p. 30; Oliver American Trading Co. v. Mexico, 5 F.2d 659 (2d Cir. 1924).

3 271 U.S. 562 (1926).

4 Id. at 574.

5 The Pesaro, 277 F. 473, 479-80 n.3 (1921); 2 Hackworth Digest of International Law 429-30, 438-39 (1941).

6 318 U.S. 578 (1943).

that vessels owned by a foreign government were immune from suit in the United States, even if both vessel and claim were commercial. This time, however, the State Department had formally "recognized and allowed" the claim of immunity on behalf of the Government of Peru, and the Court rested its decision upon that determination. Thus the Court dismissed the claim and granted immunity not on the basis of its understanding of formal principles of international law, but solely on the basis that the State Department's certificate and request "must be accepted by the courts as a conclusive determination by the political arm of the government that the continued retention of the vessel interferes with the proper conduct of our foreign relations."[7]

Two years later, in *Republic of Mexico v. Hoffman*,[8] the Supreme Court denied immunity to a merchant vessel belonging to the Mexican Government. Though Mexico owned the ship, it appeared to be "in the possession, operation and control of a private company under a contract with the government." Further, and apparently more important, the State Department had declined to express any opinion as to the claim of immunity on the basis of ownership without possession:

> It is . . . not for the courts to deny an immunity which our government has seen fit to allow, or to allow an immunity on new grounds which the government has not seen fit to recognize. The judicial seizure of property of a friendly state may be regarded as such an affront to its dignity and so may affect our relations with it, that it is an accepted rule of substantive law governing the exercise of the jurisdiction of the courts that they accept and follow the Executive determination that the vessel shall be treated as immune. But recognition by the courts of an immunity upon principles which the political department of government has not sanctioned may be equally embarrassing to it in securing the protection of our international interests and for recognition by other nations.[9]

### B.  The Tate Letter

On the basis of the Supreme Court's statements in *Ex parte Peru* and *Mexico v. Hoffman*, the State Department considered that it had a substantial amount of leeway both in enunciating the doctrine of immunity to be applied in United States courts, and in deciding particular cases. There were obvious defects and injustices in a theory which depended upon such tenuous concepts as the distinction between ownership and possession of a vessel.[10]

[7] Id. at 589.
[8] 324 U.S. 30 (1943).
[9] Id. at 35-36.
[10] Id. at 38-42 (Frankfurter, J., concurring).

*NEW YORK UNIVERSITY LAW REVIEW*          [Vol. 44:901

Even more compelling, there seemed little justification for extending to foreign governments choosing to do business in the same way as private enterprises an immunity from suit that had been based on an earlier conception of the dignity of the sovereign. After several years of study of the relevant practice, both in the United States and abroad, the State Department came to the conclusion in 1952 that immunity from suit should not be granted in cases involving what it called "private" or "non-public" acts as contrasted with "sovereign acts."

In a letter to the Acting Attorney General of May 19, 1952, the Acting Legal Adviser of the Department of State, Jack B. Tate, wrote:

> According to the newer or restrictive theory of sovereign immunity, the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*).
>
> . . . .
>
> [T]he Department feels that the widespread and increasing practice on the part of governments of engaging in commercial activities makes necessary a practice which will enable persons doing business with them to have their rights determined in the courts. For these reasons it will hereafter be the Department's policy to follow the restrictive theory of sovereign immunity in the consideration of requests of foreign governments for a grant of sovereign immunity.

The Tate letter concluded:

> It is realized that a shift in policy by the executive cannot control the courts but it is felt that the courts are less likely to allow a plea of sovereign immunity where the executive had declined to do so. There have been indications that at least some Justices of the Supreme Court feel that in this matter courts should follow the branch of the Government charged with responsibility for the conduct of foreign relations. . . .[11]

### C. *The Tate Letter in Practice*

The Tate letter, as far as it went, was a partial success. It placed the United States on the side of those jurisdictions which refused to grant immunity to governments simply because they were governments, without inquiring into the basis of the claim. At the same time, the Tate doctrine was sufficiently in accord with prevailing international practice so that there was no serious protest from foreign nations. Most countries, with the exception of Great Britain, some of the Commonwealth countries, and the Communist states, had already imposed some kind of limitation on

---

[11] 26 Dep't State Bull. 984 (1952).

the granting of sovereign immunity. The Tate letter, however, did not and could not really succeed in establishing a workable and effective law governing claims against foreign states.

First, the Tate letter made no attempt to define the distinction between the activity of a state *jure imperii* and activity *jure gestionis*. One of the difficulties with the Tate letter has always been to decide how such a distinction should be worked out in practice. For example, is the purchase of grain by a government for distribution to needy persons a private or governmental act? What if the grain, instead of being distributed gratis, is resold by the government at a profit? Or what if the grain is purchased from the United States Government pursuant to one of the surplus agricultural disposal programs? It is apparent that while the basic distinction of the Tate letter is sound, modern states are engaged in a great many activities not contemplated when the sovereign immunity doctrine was developed. Not only is the articulation of the distinction between governmental and private acts difficult, the distinction often seems irrelevant in deciding the actual claim. For instance, in the example above concerning the purchase of grain by a foreign government, why should the conditions under which the defendant vessel is carrying its own cargo make any difference to a person claiming injury as the result of a collision at sea?[12]

A second, equally vexing problem arising out of the Tate letter combined with the Supreme Court's views in *Ex parte Peru* and *Hoffman,* is who should make the difficult determination called for by the *jure gestionis, jure imperii* distinction. The Supreme Court had suggested that the State Department's decision was to be conclusive on the courts. But the new policy appeared to depend less on political judgment regarding the effect of litigation on foreign relations than on a detailed analysis of particular facts bearing on the classification of the activity on which the claim was based. Determination of whether an activity was *jure gestionis* or *jure imperii* seemed, under the Tate approach, to be more a judicial than a State Department function, yet the State Department apparently was free to decide these issues, at least in those cases where the foreign government so desired.

A third difficulty with the Tate doctrine was that even where the activity on which the claim was based was clearly one not

---

[12] The American Law Institute's Restatement of the Foreign Relations Law of the United States (1965) like the Tate letter avoids any clues as to how this distinction is to be drawn. It points out, however, that a different result can be achieved according to whether the point of view is the nature or the purpose of the transaction (Section 69, Comment a).

entitled to immunity under the restrictive theory, it was not clear
how a suit against a foreign sovereign was to be initiated. Personal
service of process on ambassadors or public ministers has been
void and, indeed, subject to criminal penalty since 1790.[13] All of
the Supreme Court sovereign immunity cases had arisen out of
claims against vessels. According to the Tate letter, if a plaintiff
could find and libel a government-owned ship against which he
had a claim, such libel would, assuming the immunity plea was
defeated, be effective to confer jurisdiction on the court to adjudi-
cate the claim. But if the plaintiff could not find the vessel in
question in a United States port, or if his claim did not involve
a ship, the Tate letter might well avail him nothing unless
property of the defendant state could be attached.[14]

The question then arose whether jurisdiction can be obtained
over a foreign sovereign by attaching unrelated property—so-called
"quasi in rem" jurisdiction. In the first case to raise the issue, *New
York & Cuba Mail S.S. Co. v. Republic of Korea*,[15] the court, fol-
lowing the suggestion of the State Department, held that property of
the Republic of Korea was immune from attachment and that at-
tachment of Korean Government bank deposits in New York must
fail, even though the underlying claim was one arising out of a
commercial activity. Subsequently, the Department modified this
position, and drew a distinction between attachment for purposes
of obtaining jurisdiction and attachment for purposes of execution
of judgments.[16] It might have been argued that this distinction
carried within itself a fatal contradiction, since the basis of quasi
in rem jurisdiction is the possibility that plaintiff, if successful on
the merits, will apply the thing attached (in which he has no par-
ticular interest) to the satisfaction of his claim against the defen-
dant.[17] But so far as this writer knows, that argument was never
made.[18] A further refinement made by the State Department,
though not formally announced, was that the property to be at-
tached, even for purposes of jurisdiction, must itself be put to the

---

[13] Currently, 22 U.S.C. §§ 252-53 (1964). See text at 921.
[14] See text at 921-24.
[15] 132 F. Supp. 684 (S.D.N.Y. 1955).
[16] See, e.g., letter from Legal Adviser to Attorney General in Weilamann v.
Chase Manhattan Bank, 21 Misc. 2d 1036, 192 N.Y.S.2d 469 (Sup. Ct. 1959),
quoted in 6 Whiteman, Digest of International Law 709 (1968). See also Stephen
v. Zivnostenska Banka, Nat'l Corp., 15 App. Div. 2d 111, 116, 222 N.Y.S.2d 128,
134 (1st Dep't 1961), aff'd 12 N.Y.2d 781, 186 N.E.2d 676, 235 N.Y.S.2d 1 (1962).
[17] See Restatement of Judgments §§ 32, 34 (1942).
[18] Compare Carrington, The Modern Utility of Quasi in Rem Jurisdiction,
76 Harv. L. Rev. 303, 306 (1962): "In the light of emerging concept of personal
jurisdiction, the quasi in rem procedure is rarely useful to plaintiffs except in
cases in which the defendant should not be asked to defend in the forum chosen
by the plaintiffs."

test of whether it is "governmental" (in which case it is immune) or "commercial" (in which case it may be attached). This further distinction has run into difficulty, however, because properties, and particularly money, can have a variety of uses. For example, a commercial bank account used for purchasing supplies has generally not been considered immune from attachment. A number of countries, however, maintain a single bank account used both for a state purchasing mission and, for instance, for paying the salaries of embassy personnel.[19]

In sum the restrictive theory of immunity has to some extent made it easier for plaintiffs to litigate against foreign governments in the United States. For instance, in *Victory Transport, Inc. v. Comisaria General*,[20] the leading case upholding the Tate letter, a ship owner was allowed to enforce an arbitration clause against a foreign agency on the ground that the activity which gave rise to the claim—transport of wheat purchased under the P.L. 480 Program—was not one of the activities entitled to immunity under the restrictive theory. But the problem of obtaining jurisdiction over foreign sovereigns remains formidable even under the restrictive theory. The problems of interpretation have multiplied under the Tate doctrine placing an increased strain on relations between the Executive and Judicial Branches of the government. Finally, there is still a substantial element of uncertainty as to the validity of the Tate doctrine. As pointed out by Judge Bryan, dissenting in a 1964 case which held sovereign immunity had been waived,[21] the Supreme Court has not reversed the *Pesaro* case, and it declined to grant certiorari in *Victory Transport*. Thus, in the absence of legislation or of pronouncement by the Supreme Court, the Tate doctrine cannot now be said to be conclusive upon the courts of this country.

## II

### The Process of Decision in Sovereign Immunity Cases

#### A. *Who Decides?*

As suggested earlier, the relationship of the courts to the Executive Branch in the area of sovereign immunity has had a

---

[19] See, e.g., Hellenic Lines, Ltd. v. Embassy of South Vietnam, 275 F. Supp. 860 (S.D.N.Y. 1967), where a shipping line attempted unsuccessfully to bring a claim arising out of delays in the port of Saigon by attaching the account of the South Vietnamese Embassy at the First National City Bank of New York.

[20] Victory Transp., Inc. v. Comisaria General de Abastecimientos y Transportes, 336 F.2d 354 (2d Cir. 1964), cert. denied, 381 U.S. 134 (1965), discussed in text at 924-25.

[21] Flota Maritima Browning de Cuba, S. A. v. Motor Vessel Ciudad de la Habana, 335 F.2d 619, 627 (1965).

checkered history. In *Schooner Exchange v. McFaddon*,[22] the United States Attorney, at the insistence of the Executive Branch of the Government, filed a suggestion of immunity, but the Court, while accepting the Government's arguments on the merits, apparently did not consider itself bound by the Executive Branch determination. In *Berizzi Brothers Co. v. S.S. Pesaro*,[23] the State Department and Justice Department disagreed, and the opinion does not indicate that the Court took account of either Executive Branch view. In *Compania Espanola v. The Navemar*,[24] the Supreme Court said that "[i]f a claim is recognized and allowed by the Executive Branch of the government, it is the duty of the court to [grant the immunity] upon appropriate suggestion by the Attorney General . . .," but that if the State Department declined to intercede on behalf of the foreign government, the issue was then open for judicial inquiry. In *Ex parte Peru*,[25] the Supreme Court reiterated this view, holding that Executive recognition and allowance constitutes a "conclusive determination." In *Republic of Mexico v. Hoffman*,[26] the Supreme Court did not quite say that the courts should decline to grant immunity if the State Department declined to suggest it, but it did declare that "[i]t is . . . not for the courts . . . to allow an immunity on new grounds which the government has not seen fit to recognize."

Subsequently, courts in the United States have split on the effect to be given to suggestions of immunity by the State Department or to the failure of the Department to suggest immunity, and lawyers have often been perplexed as to how to proceed. The majority of courts have considered themselves bound by Executive suggestions of immunity, even where they had some doubts as to the wisdom of the suggestion or its consistency with prior policy such as the Tate letter.[27] Other courts have declined for a variety of reasons to give effect to State Department suggestions of immunity,[28] while still others have been puzzled about the inference to be drawn from the State Department's failure to

---

[22] 11 U.S. (7 Cranch) 116 (1812).

[23] 271 U.S. 562 (1926).

[24] Compania Espanola de Navegacion Maritima, S.A. v. The Navemar, 303 U.S. 68, 74 (1938).

[25] 318 U.S. 578 (1943).

[26] 324 U.S. 30, 35 (1945).

[27] Rich v. Naviera Vacuba, S.A., 197 F. Supp. 710 (E.D. Va. 1961), aff'd, 295 F.2d 24 (4th Cir. 1961); Chemical Natural Resources, Inc. v. Republic of Venezuela, 420 Pa. 134, 215 A.2d 864 (1964).

[28] See, e.g., Stephen v. Zivnostenska Banka Nat'l Corp., 15 App. Div. 2d 111, 222 N.Y.S.2d 128 (1st Dep't 1961), aff'd, 12 N.Y.2d 781, 186 N.E.2d 676, 235 N.Y.S.2d 1 (1962); Republic of Cuba v. Arcade Bldg. of Savannah, Inc., 104 Ga. App. 848, 123 S.E.2d 453 (1961).

suggest immunity from suit (or attachment) upon request, as contrasted with a situation where the defendant has chosen not to make such a request through diplomatic channels but decides to rely on pleadings in the litigation itself.[29]

## B. Reliance by Litigants

In a number of cases counsel, thinking that the State Department might well apply the restrictive theory to a particular case, have advised against requesting a suggestion of immunity. Evidently they thought that they had a better chance of persuading the court directly either that the restrictive theory should not be applied at all or that it did not fit their case. Refusal by the State Department to recognize and allow a request for immunity is probably not conclusive on the courts in the same way as an affirmative suggestion for immunity, since foreign relations will presumably not be disturbed if a country is granted immunity even without State Department intercession. Nevertheless, it has been considered, both by counsel and by the courts, that it is better not to ask the Department for immunity than to ask and be turned down.[30]

One result of these differences in procedure has been that in a substantial number of cases the State Department has had no

---

[29] Compare, e.g., Victory Transp., Inc. v. Comisaria General de Abastecimientos y Transportes, 336 F.2d 354, 358-59 (2d Cir. 1964), cert. denied, 381 U.S. 134 (1965), where there was no evidence of the State Department's views, with Petrol Shipping Corp. v. Kingdom of Greece, 326 F.2d 117 (2d Cir.), rehearing, 332 F.2d 370 (1964), 360 F.2d 103, 110 (2d Cir. 1966). In *Petrol Shipping*, the court first accepted the plea of immunity by the Greek Ambassador, then vacated the judgment of dismissal and directed further inquiry as to the facts relevant to immunity, and finally denied immunity, in part on the ground that the State Department had declined the request from the Greek Ambassador that it file a suggestion of immunity with the court. In Pan American Tankers Corp. v. Republic of Vietnam, 291 F. Supp. 49 (S.D.N.Y. 1968), 296 F. Supp. 361 (S.D.N.Y. 1969), the court declined to stay an action pending receipt of the State Department's views, on the ground that the Department would not speak until asked, and asking the Department was under the control of defendant. The court declined to ask the Department itself, but allowed defendant an additional 20 days from the first decision to support its immunity plea. Thereafter, on the basis of documents and arguments introduced by the Government of the Republic of Vietnam but without any help from the State Department, the court decided what it conceded to be a close question, the burden being on the government seeking to avoid jurisdiction.

[30] Formerly the State Department sometimes resorted to a middle position, neither "recognizing and allowing" the claim to immunity nor formally denying it, but simply forwarding the foreign state's communications to the court through the Justice Department without the magic words "recognize and allow." However, this practice proved confusing and is no longer followed. Usually when the Department is considering an immunity plea, it notifies the other party. Thus the fact of an unsuccessful approach to the State Department is likely to be made known to the court by the plaintiff.

opportunity to make its views known. This fact is not necessarily undesirable,[31] but it has largely defeated the objective of achieving a uniform standard for granting or denying immunity based on consistent interpretation of the distinctions between claims *jure gestionis* and *jure imperii*.

### C. Hearing in the State Department

When governments, usually through their embassies, do ask for support from the Executive Branch in the form of a suggestion of immunity, the State Department practice has generally been to afford both parties an opportunity to be heard in a kind of semi-judicial hearing. The purpose of the hearing is to aid the Department in establishing facts relevant to such questions as (1) the characterization of the property attached as commercial or public, (2) the characterization of the claim as *jure gestionis* or *jure imperii*, (3) the issue of waiver of immunity by word or action and (4) the ownership or possession of the property in question. The informal proceedings, generally before the State Department's Legal Adviser or one of his deputies, have assisted the Department in making as fair and reasonable a decision as it could. They have also gone a long way to meet complaints that if the Department was, in effect, deciding the outcome of law suits, the parties should be given a chance to be heard.[32]

The practice of holding hearings in immunity cases in the Legal Office of the State Department is, however, open to a number of criticisms. Some governments have considered the idea that State Department lawyers should, in effect, sit in judgment on their requests for immunity offensive, and have instructed their representatives—legal as well as diplomatic—not to appear at such hearings. Also, State Department officers, without subpoena or oath taking powers, cannot effectively conduct hearings involving disputed questions of fact. Finally, and most important, if the issues determining whether immunity from suit is to be granted are indeed legal issues, the idea that they should be decided by the State Department, albeit by its legal officers, and without any opportunity for appeal, seems to run counter to the concepts of separation of powers and judicial process.[33]

---

[31] See text at 913.

[32] See, e.g., Cardozo, Sovereign Immunity: The Plaintiff Deserves a Day in Court, 67 Harv. L. Rev. 608 (1954).

[33] The State Department has never issued any opinion as a result of a sovereign immunity hearing. The result of a hearing is simply a communication to the government, and if affirmative to the Justice Department for communication to the court, to the effect that the State Department does or does not "recognize and allow" the claim of immunity. In some instances there has been certain additional

Moreover—and perhaps this is another way of stating the same thought—to the extent these issues are legal in nature and not political, the rationale of judicial deference to the Executive Branch as set forth in *Ex parte Peru* and *Republic of Mexico v. Hoffman* would seem to disappear. On the other hand, if considerations of foreign policy not disclosable to courts go into the decision by the State Department, then the hearings, while assisting Department officials in reaching a decision, do not really afford the litigants the kind of "day in court" that they are led to expect.

### D. Impact on Foreign Relations

The uncertainty about just what it is that the State Department decides in an immunity hearing points up the practical political consequences of present immunity law and practice. In theory, the grant of sovereign immunity is designed to facilitate relations between foreign states by relieving the sovereign from the indignity of being subjected to a domestic adjudication. In fact, however, adjudication of a foreign government's pleas of sovereign immunity by the State Department—particularly where the criteria are uncertain and the principles unclear—may well be more of an irritant in day-to-day relations between the United States and foreign countries than a withdrawal by the State Department from this field would be. For example, a statement by the Department that immunity cannot be granted to country X in a particular law suit because of "applicable legal principles" is likely to sound less convincing than would a formal adjudication by a court. Action by the State Department in such a case is much more likely to be subject to various forms of interpretation or misinterpretation in the context of the political events of the day than is action by a court. Indeed, a State Department decision might even provoke retaliation, a most unlikely consequence of action by a court *on the merits* of a case—i.e., not on an immunity plea. If there were nothing in the claims themselves that could give offense to foreign sovereigns, the foreign relations of the United States would probably be better off if the State Department were completely eliminated from the process of adjudicating sovereign immunity pleas. It is worth adding that the United States appears to be the only country in which the foreign ministry takes an active and formal part in adjudication of sovereign immunity cases.[34]

language by way of disclaimers, to the effect that the Department takes no position on whether there was an effective waiver of immunity, or whether a prior lien exists on the property in question.

[34] See Remarks by Bruno A. Ristau, Proceedings, American Society of International Law, 1969.

## III

THE PROPER SCOPE OF DOMESTIC SUITS AGAINST FOREIGN STATES

### A. Search for New Criteria

As indicated in Part I, the distinction between claims (or property) connected with public activity and claims connected with non-public or commercial activity has not been satisfactory. On the one hand, any act done by a government is in some sense a public act.[35] On the other hand, the rights of the other party to a transaction ought not to depend on a judgment of whether the transaction did or did not come within some definition—possibly based on standards quite different from our own—of the proper scope of governmental activity. A better test of justiciability is suggested by recent developments in the law of jurisdiction over non-resident individuals and corporations within the United States.[36] The question should not be "Is Defendant 'X' (here Government 'X') subject to suit in New Jersey?," but rather, "Does a given transaction—contractual or delictual—have sufficient relation to New Jersey to allow a claim arising out of that transaction to be triable in New Jersey?" Further, the question should not depend on who is plaintiff and who is defendant. And in classifying the transaction, only those factors relevant to the claim should be taken into account.

To take the simplest example, a case arising out of an automobile collision on the New Jersey Turnpike should be triable in New Jersey, regardless of whose automobiles were involved or what they were doing on the Turnpike. It should not matter whether the Ford or the Cadillac turns out to be plaintiff's car, and it should not matter whether the Cadillac was carrying a foreign ambassador from Washington to a meeting at the United Nations, or whether his chauffeur, having delivered the Ambassador, was sneaking off to see a girl friend. The issues of fault, contributory negligence, ownership of the vehicle and respondeat superior can all be raised in court. None of them is relevant to the issue of whether this case should be heard in a New Jersey court.

Similarly, a contract for the manufacture of merchandise at a plant in Newark, or for delivery of a shipment at a pier in Hoboken is, in our system, the type of transaction giving rise to

---

[35] Compare the opinions of Justice Frankfurter in Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 383 (1947); Indian Towing Co. v. United States, 350 U.S. 61, 67 (1955).

[36] See, e.g., Reese & Galston, Doing an Act or Causing Consequences as Bases of Judicial Jurisdiction, 44 Iowa L. Rev. 249 (1959).

liability in New Jersey. Today, this is normally true for either party to the contract.[37] Even if such a contract involves a foreign government—whether as buyer, seller, consignee or guarantor—the transaction, and its potential for creating liability, has not changed. Nor is this conclusion altered, whatever may be the substantive consequences, by a contractual term stating "Not accepted until signed by Minister of Commerce in X," any more than a Minnesota insurance company can escape the consequences of contracting in New Jersey by stating on its policies that they are not effective until approved by the manager in St. Paul.

The point is that in the contractual example as in the automobile accident, two parties, one of which happens to be a government, have taken steps engaging them both in a judicial system. Accordingly, any dispute arising under the contract or resulting from the accident should be settled within that system. If either party objects to subjecting itself to the judicial system obtaining, in our example, in New Jersey, it can try to provide for an alternative, at least in the contractual situation. For example, a foreign government can propose an arbitration clause naming a foreign city as situs, or a choice of forum clause designating a foreign jurisdiction. But if such a proposal is accepted, it will not be immunity of the foreign state that prevents a United States claimant from securing a hearing on his claim in this country; rather, it will be a contractual stipulation, presumably bargained for, and available to any contracting party, private as well as governmental.

With these thoughts in mind, subsection (b) of the proposed statute[38] provides that foreign states, their agencies and instrumentalities, shall be subject to the jurisdiction of United States courts in actions founded either:

(1) upon an express or implied contract entered into, to be performed, or arising out of transactions in the United States; or

(2) upon a claim for personal injury or death or damage to property caused by an act or omission of any officer, agent, or employee of such foreign state while acting within the scope of his office, agency, or employment within the United States, its territories or possessions,

under circumstances where the foreign state, if a private person, would be subject to suit in accordance with the laws of the place where the action is brought.

Subsection (a) provides for exclusive jurisdiction in the federal courts, regardless of amount, in order to establish and preserve a uniform and simple means of service of process, that can be

---

[37] See Restatement (Second) of Conflict of Laws §§ 36-37 (P.O.D. 1967).
[38] See text at 936-38 for complete text of the statute.

explained to all foreign states maintaining representation in the United States. Though the action would be based on federal question jurisdiction as created by the statute, the substantive law to be applied would be the relevant state or federal law that would be applicable if the defendant were a private person or firm. Thus the draft makes no special provision regarding liability, damages, responsibility of principals for servants or agents, periods of limitations or the like. Whether an action is within the stated categories—for example, whether a contract signed abroad arose out of a transaction or course of conduct in the United States—could be tested by the defendant in a motion to dismiss. Since, as we shall see,[39] there would be no possibility of tying up a foreign government's assets while the scope of permitted claims was being litigated, there would be no incentive to bring actions to harass or "get even" with foreign governments for governmental acts not related to activity within the United States.

### B.  *Effect on Possible Claims against Governments*

We have already seen that the typical tort or contract action where one of the parties is a foreign state but a substantial element of the transaction is centered in the United States would be permitted under the proposed statute. If effective, this would constitute a significant opening of the door to suits against foreign governments. Some other types of cases—those not centered in the United States—would be barred, and it is worth pausing to examine to what extent this really represents a closing of the door to suit by United States claimants.

The major class of claims that would be barred, as spelled out in subsection (e), would be claims arising out of sovereign acts carried out by a government where it is sovereign. For example, the proposed statute would not permit suit in the United States by an owner of property in state X seeking compensation, damages, or return of property allegedly confiscated by state X. The proposal thus runs counter, in effect, to the so-called "Sabbatino Amendment" to the Foreign Assistance Act,[40] which sought to reverse the decision of the Supreme Court in *Banco Nacional de Cuba v. Sabbatino*[41] and open the door of United States courts to such claims, at least in cases where a violation of international law was alleged. But the Sabbatino Amendment has

---

[39] See text at 925-26, 927-29.
[40] 22 U.S.C. § 2370 (e)(2) (Supp. III, 1968).
[41] 376 U.S. 398 (1964).

largely been ineffective anyway,[42] precisely because of the present
sovereign immunity rule. Except in cases like *Sabbatino* itself,
where the property in suit is in possession of a court functionary,[43]
or in cases where the claim based on sovereign acts performed
abroad is raised defensively in an action brought by the sovereign,[44]
so that sovereign immunity would not be involved in any event,[45]
the issue of whether a court should decline to hear a case on the
merits for reasons discussed in *Sabbatino* would never arise,
because jurisdiction over the foreign state could not be obtained.
Thus, though the proposal goes against the intent of the Congress
in the Sabbatino Amendment, it does not deprive any litigant in
the United States of a currently available day in court.[46] Similarly,
the proposal would not permit, for example, a disgruntled applicant
for a visa to state X to bring an action against a foreign govern-
ment or one of its officials alleging arbitrary action or misrepresen-
tation by the visa officer, although the alleged abuse of discretion,
misrepresentation, or violation of the laws of X took place in the
United States. The activity of visa officers and the like would, as
at present, be considered activity related to the foreign country,
not manifesting any engagement in the judicial system of the
United States.[47] In this respect the proposal would make no change
in existing law. But both of these situations are within our initial
theoretical framework. Neither the owner of property in country

[42] For an elaboration of this point, see Lowenfeld, The Sabbatino Amend-
ment—International Law Meets Civil Procedure, 59 Am. J. Int'l L. 899 (1965).

[43] For the effect of the amendment in *Sabbatino* itself, see Banco Nacional
de Cuba v. Farr, 272 F. Supp. 836 (S.D.N.Y. 1965), aff'd, 383 F.2d 166 (2d Cir.
1967), cert. denied, 390 U.S. 956 (1968).

[44] See, e.g., Banco Nacional de Cuba v. First Nat'l City Bank of New York,
270 F. Supp. 1004 (S.D.N.Y. 1967).

[45] See National City Bank of New York v. Republic of China, 348 U.S. 356
(1955).

[46] It is worth adding that according to the New York Court of Appeals, the
Sabbatino Amendment did not give potential plaintiffs a remedy in every case
arising out of foreign sovereign acts taken abroad, but only gave a remedy in cases
of claims to property actually present in the United States. French v. Banco Na-
cional de Cuba, 23 N.Y.2d 46, 242 N.E.2d 704, 295 N.Y.S.2d 433 (1968). Judge
Keating, a Senator at the time the amendment was adopted, disagreed with the
Court on this point. 23 N.Y.2d at 76-87, 242 N.E.2d at 723-30, 295 N.Y.S.2d at
460-70.

[47] See, e.g., Waltier v. Thomson, 189 F. Supp. 319 (S.D.N.Y. 1960). A sur-
geon alleged he had been lured to Canada by misrepresentation on the part of
Canadian Immigration officers concerning professional opportunities in that coun-
try. Once it became clear that the alleged misrepresentation had been made in the
course of official duties, the complaint was dismissed on grounds of sovereign im-
munity. For a harder case, which the court itself called "off-beat" but which may
be explained on the grounds that the foreign country itself started the proceedings,
see Wacker v. Bisson, 348 F.2d 602 (5th Cir. 1965).

X nor the applicant for a visa to X would expect to be a defendant in the United States in a suit brought by X relating to the property or the visa application. Accordingly, neither should have the right to be plaintiff in the United States on the basis of either of these situations. The parties did not, to repeat our previous phrase, engage themselves in the judicial system of the United States.

### C. The New Criteria and the Tate Letter

As we saw earlier, the State Department attempted in 1952 to effect a substantial reduction in the scope of foreign sovereign immunity.[48] Though the technique proposed here is somewhat different, the basic concepts are similar. The Tate letter did not succeed very well partly because of the difficulty in commencing suit against foreign states (discussed in Part IV) and partly because the distinction between activities *de jure imperii* and activities *de jure gestionis* is very difficult to draw. The Tate letter itself did not attempt to spell out the distinction. In the most authoritative effort to explain and implement the Tate doctrine, *Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes*,[49] the Court of Appeals for the Second Circuit listed the kinds of claims it considered exempt from suit in the United States:

1. Internal administrative acts, such as the expulsion of an alien;
2. Legislative acts, such as nationalization;
3. Acts concerning the Armed Forces;
4. Acts concerning diplomatic activity;
5. Public loans.

In substance, these exclusions would be preserved under the present proposal. As the court stated in *Victory Transport*, these are the "categories of strictly political or public acts about which sovereigns have traditionally been quite sensitive."[50] In practical terms, however, the focus of the new proposal is not on the proper scope of governmental activity, as seems to be the inference of the Tate letter, but rather on the proper scope of judicial review. Thus, all express or implied contracts entered into, to be performed, or arising out of transactions *within the United States,* and all claims for personal injuries, death, or damage to property caused by act or omission of a foreign government, its officers and agents *within the United States,* are defined as being cognizable by the courts

[48] See text at 905-06.
[49] 336 F.2d 354 (2d Cir. 1964), cert. denied, 381 U.S. 934 (1965).
[50] Id. at 360.

of the United States. One further point should be noted. There may be intermediate situations between government activity centered abroad and engagements in the United States. For example, a foreign government may wish to sell bonds in the New York market for a harbor improvement program. The government may well discover that in order to sell the bonds at an acceptable price, it must consent to be sued on these bonds in New York or appoint a banking house in New York as its financial agent. In the past, the courts have had difficulty deciding whether the bank in such a situation is agent for the bondholder and therefore subject to suit, or agent for the foreign government and hence immune.[51] The present proposal would solve this problem by barring actions based on the public debt of a foreign state, but expressly permitting consent to such suit by the foreign government. While there have been cases casting doubt upon the future effectiveness of a general prior waiver of immunity[52] the view adopted in the proposed statute (subsection (f)) is that an express and specific waiver, for example incorporated in the documents constituting the bond issue, is to be given effect. This is consistent both with the criteria set forth in *Victory Transport,* and with the basic emphasis on asking whether there has been an engagement in the United States judicial system.

### D.  *Effect of the Proposed Statute on International Relations*

Chief Justice Marshall in *The Schooner Exchange* gave as the principal rationale for sovereign immunity the possibility of an "affront to the dignity" of foreign sovereigns resulting from domestic litigation. But any such affront or interference with friendly international relations must depend to a large degree on the nature of the claim sought to be adjudicated.

Surely this is true for the United States as a defendant. If a pedestrian in Vienna is injured by an automobile belonging to the United States Embassy, it may or may not be relevant to the ensuing litigation whether the driver was authorized to use the

---

[51] Compare Frazier v. Hanover Bank, 204 Misc. 922, 119 N.Y.S.2d 319 (Sup. Ct.), aff'd, 281 App. Div. 861, 119 N.Y.S.2d 918 (1st Dep't 1953), with Lamont v. Travelers Ins. Co., 281 N.Y. 362, 24 N.E.2d 81 (1939).

[52] See Rich v. Naviera Vacuba, S.A., 197 F. Supp. 710, 720-23 (E.D. Va.), aff'd, 295 F.2d 24, 26 (4th Cir. 1961). It should be noted that in both courts the waiver issue was not really decided but rather was held to be subordinated to the State Department's suggestion of immunity, which would, of course, be eliminated by the present proposal. For a case upholding a consent to jurisdiction, as well as declining immunity on other grounds, see Pacific Molasses Co. v. Comite de Ventas de Mieles de la Republica Dominicana, 219 N.Y.S.2d 1018 (Sup. Ct. 1961).

vehicle, whether he was on official duty, and what that duty consisted of. But provided the United States Government is given the right to be heard in the same manner as any other litigant, whatever disposition the Austrian court makes of the case can have no effect on the relations between the United States and Austria.[53] It is presumably part of the expectation of maintaining an embassy with staff and motor vehicles that there will from time to time be accidents for which damages may have to be paid. While a procedure could be established whereby claims against embassy automobiles go through diplomatic channels with a claims commission, such a procedure would probably not be worth the effort, and would in any event be no particular contribution to good foreign relations.[54] Making the United States Embassy defend the motor vehicle claim in the Austrian court and perhaps pay a judgment would not be considered an affront to the United States. If, however, an Austrian citizen were to seek in an Austrian court to challenge the validity of the Model Cities Program or the school desegration guidelines, the United States would protest vigorously, and properly so. Similarly, the United States would object if an Austrian court took jurisdiction over a claim by one of its citizens for the return of property seized by the United States during World War II.[55] It is not and ought not to be one of the costs of maintaining an embassy in Vienna to be subject in Austria to judicial challenge for such governmental acts.

Correspondingly, when a foreign government decides to maintain an embassy, operate a purchasing mission or keep foreign exchange reserves in the United States—all activities that the United States encourages as a matter of national policy—it can reasonably expect to answer for the acts of its agents connected with these activities, whether the problem be an automobile accident, a contract claim, or the payment of rent. In calculating whether to do these things in the United States, the foreign government does not, however, expect to assume the risk of defending challenges to political decisions taken in its own territory.

---

[53] Compare Holoubek v. United States, 2 Ob. 243.60, 84 Juristische Blätter 43 (Sup. Ct. of Austria 1961).

[54] This situation is, of course, to be distinguished from a situation where large numbers of military forces are present in a foreign country and extraordinary procedures may well be justified. See, e.g., NATO Status of Forces Agreement, June 19, 1951, [1959] 4 U.S.T. 1792, T.I.A.S. No. 2846.

[55] Compare Bank voor Handel v. Union Banking Corp. and Kennedy, Judgment of Dec. 8, 1964, 4 Int'l Legal Materials 257 (Dist. Ct., 6th Chamber, Rotterdam), aff'd Court of Appeal, Hague, May 24, 1968, rev'd sub nom. United States v. Bank voor Handel en Scheepvaart, Supreme Court of the Netherlands, Oct. 17, 1969.

Imaged with the Permission of N.Y.U. Law Review

The critical issue, then, from the point of view of foreign relations, is not that foreign governments must be able to avoid jurisdiction of courts in the United States. The important point is that if foreign governments are held liable in the same manner as other enterprises doing business in this country, they need not fear that they will become answerable in United States courts for activities not connected with this country.

## IV

### COMMENCEMENT OF SUIT AGAINST FOREIGN STATES

The commencement of an action against a foreign sovereign or one of its agencies has, under present practice, been literally a "catch as catch can" proposition. Several techniques have been tried to meet the basic jurisdictional requirements of Anglo-American law without running afoul of either sovereign or diplomatic immunity. But all of these techniques have been haphazard and unsatisfactory. The difficulty of commencing an action has therefore significantly diminished the effect of the Tate letter and the efforts to liberalize the doctrine of sovereign immunity.

### *A. Service of Process on Foreign Ambassadors or Ministers*

22 U.S.C. Sec. 252 (1964) reads:

> Whenever any writ or process is sued out or prosecuted by any person in any court of the United States, or of a State, or by any judge or justice, whereby the person of any ambassador or public minister of any foreign prince or State, authorized and received as such by the President, or any domestic or domestic servant of any such minister, is arrested or imprisoned, or his goods or chattels are distrained, seized, or attached, such writ or process shall be deemed void.

This statute, though speaking in terms of arrest, imprisonment or seizure of property, has been held by the Supreme Court to be declarative of international law and to cover all forms of judicial process.[56] From time to time, attempts have been made to argue that section 252 did not prevent service upon an ambassador or consul *as agent* of the foreign sovereign—i.e., suit not against the ambassador but against the state. But all such attempts have been unsuccessful, either on the basis of construction of the statute by the courts, or on what were deemed to be principles of the laws of nations. For example, in *Oster v. Dominion of Canada,*[57]

---

[56] In re Baiz, 135 U.S. 403, 420 (1890).

[57] 144 F. Supp. 746 (N.D.N.Y.), aff'd, 238 F.2d 400 (2d Cir. 1956), cert. denied, 353 U.S. 936 (1957).

plaintiffs sought to bring an action against the Canadian Government on the basis of alleged damage to their homes resulting from construction of a dam by Canada. The action was commenced by service of summons and complaint upon the Consul General of Canada in New York. The court declined to pass on the issue of sovereign immunity, holding that there was in any event no jurisdiction since the Consul was not authorized to receive service, and was in no sense a "managing agent" of the defendant government of Canada. Accordingly, service upon the Consul could not confer jurisdiction of the court over the Dominion of Canada.

Again, in *Purdy Co. v. Argentina*,[58] plaintiff had a claim for funds allegedly owed under a contract for sale and delivery of steel scrap to a military factory said to belong to the Argentine Government. Plaintiff argued that such a claim was commercial in nature and that under the Tate letter was not entitled to immunity. He attempted to proceed by service upon the Argentine Consul in Chicago, arguing that unless he could proceed in this manner the doctrine of restrictive immunity embodied in the Tate letter would be rendered meaningless. The court, however, perceived "no relevance of the doctrine of restrictive immunity to the issue here involved." The Consul was not an agent of the government of Argentina for the purpose of service of process, and, therefore, service upon him was not effective to obtain jurisdiction over that government. The action therefore had to be dismissed, before ever reaching the issue of whether the purchase of steel for the army was or was not an activity entitled to immunity.

In the most recent case in point, *Hellenic Lines Ltd. v. Moore*, an effort was made to compel the United States Marshal for the District of Columbia to serve a summons and complaint upon the Ambassador of Tunisia.[59] The thrust of the complaint was that the Republic of Tunisia had failed to live up to its obligation to unload plaintiff's vessel pursuant to an ordinary contract of carriage. When the United States Marshal, after consultation with the State and Justice Departments, declined to serve the papers upon the Ambassador, plaintiff sought to obtain a court order directing the Marshal to do so. The court held that under accepted principles of international law, as restated most recently in the Vienna Convention on Diplomatic Relations,[60] the Ambassador was not

[58] 333 F.2d 95 (7th Cir. 1964), cert. denied, 379 U.S. 962 (1965).
[59] 345 F.2d 978 (D.C. Cir. 1965).
[60] The Vienna Convention is not yet in force with respect to the United States, pending passage of certain implementing legislation. Advice and consent to ratification was given by the Senate on September 14, 1965, 111 Cong. Rec. 23783 (1965). For most purposes, the Convention is considered declaratory of interna-

subject to service of process, whether the process was directed against him personally or against his country. Accordingly, the suit against the Marshal was dismissed and action against Tunisia could not be begun.

### B.  Attachment of a Foreign Sovereign's Property

A second method for attempting to obtain jurisdiction against a foreign sovereign or one of its instrumentalities has been the seizure of property belonging to the foreign country. But this too is subject to a great many difficulties. The method succeeds from time to time in maritime matters, where the claim itself is against the ship attached. We have seen that all the Supreme Court sovereign immunity cases involved claims against ships.[61] In each case, the issue was whether the ship was entitled to immunity, and there was no separate issue as to the validity of service of process.

But, of course, many countries do not own vessels that call on United States ports, and even attachment of a vessel may not avail the plaintiff if his claim is not one cognizable in admiralty. For example, in *American Hawaiian Ventures, Inc. v. M.V.J. Latuharhary*, plaintiff sought to bring a claim against the Republic of Indonesia for alleged conversion of a rubber plantation and related property. Two courts, one in California and one in New Jersey, dismissed the action commenced by libeling a government-owned vessel, on the ground that plaintiff's grievances did not arise from any maritime tort relationship.[62]

Attachment of other kinds of property, such as bank accounts, may or may not confer quasi in rem jurisdiction over a defendant government. In *New York & Cuba Mail S.S. Co. v. Republic of Korea*,[63] for instance, even a claim arising out of maritime operation was defeated, not because the foreign sovereign was entitled to immunity from suit, but because the property attached for purposes of obtaining jurisdiction was held to be immune. As noted earlier, the *Cuba Mail* case has been somewhat modified in subsequent State Department practice[64] so that not all

---

tional law. See Restatement (Second) of Foreign Relations Law of the United States §§ 72-93 (1965).

[61] See text at 903-05.

[62] American Hawaiian Ventures Inc. v. M. V. J. Latuharhary and Djakarta Lloyd Lines, Admiralty No. 65-687-WB (S.D. Cal., May 13, 1965); American Hawaiian Ventures Inc. v. M. V. J. Latuharhary, 257 F. Supp. 622 (D.N.J. 1966). The result in these cases is consistent with Professor Carrington's argument supra note 18, though expressed in terms of admiralty, and not quasi in rem, jurisdiction.

[63] 132 F. Supp. 684 (S.D.N.Y. 1955).

[64] See Weilamann v. Chase Manhattan Bank, 221 Misc. 2d 1086, 192 N.Y.S.2d 469 (Sup. Ct. 1959) ; cf. text accompanying note 18 supra.

924          *NEW YORK UNIVERSITY LAW REVIEW*          [Vol. 44:901

state-owned property is now considered immune from attachment
for purposes of jurisdiction. Still, commencement of a suit through
attachment of property currently requires not only that the claim
be one for which no immunity will be granted, but that the prop-
erty to be attached also be considered "commercial" as contrasted
to "governmental." Very few cases—none in the federal courts—
have resulted in successful pursuit of a claim on the basis of an
attachment of property unrelated to the claim itself.

### C.  *Jurisdiction Without Personal Service in the District*

Ever since the first non-resident motorist statutes, we have
become accustomed to substituted forms of service that do not
involve catching the defendant or his property in the jurisdiction.
Various fictions such as implied consent or presence have been
used to defend such expanded jurisdiction. In candor, however,
it is fair to say that what really happens is that jurisdiction is
based on the liability-creating activity or engagement, while
service of process is relegated to the only function it should have,
giving notice to the defendant.[65]

Two recent cases in the Second Circuit, while not quite as-
serting that service of process and jurisdiction are entirely separate
issues, went far to achieving that result in the sovereign immunity
area, and point the way to the solution adopted in the present
proposal. Both cases grew out of agreements to arbitrate in New
York embodied in maritime charters between a private shipping
firm and a foreign government. In *Victory Transport v. Comisaria
General Abastecimientos y Transportes*,[66] an agreement to arbi-
trate in New York was held to constitue consent to jurisdiction in
personam of the court sitting in New York in an action to compel
arbitration. Accordingly, service of process by registered mail to
the defendant's home office in Spain was held sufficient, since the
only purpose of such process was to give notice. In *Petrol Shipping
Corp. v. Kingdom of Greece*,[67] the court reached the same conclu-
sion, though it felt compelled to fill in what it regarded as a gap in
the Federal Rules of Civil Procedure relating to parties who might
be served.[68]

---

[65] This, typically, is the civil law view. See, e.g., de Vries and Lowenfeld,
Jurisdiction in Personal Actions—A Comparison of Civil Law Views, 44 Iowa L.
Rev. 306 (1959).

[66] 336 F.2d 354 (2d Cir. 1964), cert. denied, 381 U.S. 934 (1965).

[67] 360 F.2d 103 (2d Cir.), cert. denied, 385 U.S. 931 (1966).

[68] Fed. R. Civ. P. 4 (d)(7), authorizes service on any class referred to in
Fed. R. Civ. P. 4 (d)(1) or (3) inter alia in the manner prescribed in the state in
which the action is brought. Neither the New York statute nor Fed. R. Civ. P.
4 (d)(3), relating to entities subject to service, had expressly provided for service

These two cases seem to be a sound development in the implementation of the restrictive theory of immunity in the United States. The Second Circuit held that it is essentially fair that a claim concerning a clause in a contract reading "arbitration in New York," be heard in the court sitting in New York, provided proper notice is given.[69] This is basically the same reasoning as that underlying the present proposal. But *Victory Transport* and *Petrol Shipping* depended on a particular imputation to the foreign sovereign of consent to jurisdiction, based on several prior decisions holding that an arbitration clause with a stated place for arbitration implied consent to an action in such place to enforce the arbitration clause under The Federal Arbitration Act.[70] If in *Victory Transport* or *Petrol Shipping* the claim had arisen out of a nonarbitrable dispute—for example, if the suit had been brought by a third party—there would apparently have been no jurisdiction under present law, although the suit involved the same contract, signed and to be performed in the same places, and despite the fact that New York agents of the foreign shipping departments had been served with process. While a court might hold that implied consent to the jurisdiction had been given in other situations, such as by driving on the public highways, such a holding in regard to foreign states would seem quite unlikely without express statutory authorization. No American case is known in which service by mail upon the sovereign, or personal service abroad, has been sustained to confer jurisdiction upon a court in the United States.[71]

Subsection (c)(1) of the proposed statute provides for service of process on foreign states in those cases falling under subsection (a). It states that service of process may be made in such actions by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the embassy of the foreign state, or to such other officer or agency of the foreign

---

upon foreign governmental bodies, as distinguished from foreign corporations or unincorporated associations. The court filled in this "gap" in accordance with its general rule-making authority as set forth in Fed. R. Civ. P. 83.

[69] For a recent case apparently following *Petrol Shipping* on the issue of service by mail to the foreign embassy in Washington and to the Ministry in the foreign state's capital, see Pan American Tankers Corp. v. Republic of Vietnam, 291 F. Supp. 49 (S.D.N.Y. 1968).

[70] United States Arbitration Act, 9 U.S.C. § 4 (1964); see Orion S. & T. Co. v. Eastern States Petroleum Corp. of Panama, 284 F.2d 419 (2d Cir. 1960); Farr & Co. v. Cia Intercontinental de Navegacion, 243 F.2d 342 (2d Cir. 1957).

[71] In Purdy Co. v. Argentina, 333 F.2d 95 (7th Cir. 1964), discussed in text accompanying footnote 58, the Argentine agency was served by mail in Buenos Aires, under Fed. R. Civ. P. 4 (d)(7) and the Illinois "long arm" statute. The court held that this did not establish jurisdiction.

state as is authorized under the laws of that state to receive service of process. Subsection (c) thus follows the pattern set in the amended Federal Rules of Civil Procedure with regard to service outside the district where the court is sitting.[72] The subsection states simply that proof of service shall include a receipt signed by the addressee or other evidence of delivery satisfactory to the court.[73]

Since in many cases embassies served with complaints will wish to notify and receive instructions from their governments before answering, subsection (c)(2) provides that there shall be sixty days between the time of service of the complaint and the time for answer. This is the same period granted under the Federal Rules when the United States is involved as defendant.[74] A possible additional provision, not here advocated but worth considering, would require serving a copy of the summons and complaint on the United States State Department for information purposes only. The purpose of this suggestion would be to make sure that the foreign government, particularly if it is new and inexperienced, would be informed in general of the significance of commencement of a law suit and could be advised to retain a lawyer. The disadvantage of this suggestion would, of course, be that it runs counter to the main purpose of keeping the State Department out of claims in United States courts between private citizens and foreign governments.

## V

### ENFORCEMENT OF JUDGMENTS

#### A. *Present Law*

The Tate letter has never been extended to include execution of judgments. Thus, under present practice, even where jurisdiction is founded on attachment of property not entitled to immunity for purposes of jurisdiction, that property cannot be

---

[72] Fed. R. Civ. P. 4(d)(3), 4(i).

[73] Professor Arthur R. Miller, co-author with Charles Alan Wright of the most recent treatise on Federal Practice and Procedure (1969), is opposed to a statutory solution of the problem of service, preferring to handle the problem like other problems arising under Rule 4. Miller, Service of Process on State, Local, and Foreign Governments under Rule 4, Federal Rules of Civil Procedure—Some Unfinished Business for the Rulemakers, 46 F.R.D. 101, 139 n.6 (1969). It seems that a complete solution of the sovereign immunity problem in one statute is preferable to waiting for the next round of Federal Rules amendments. Miller and this author agree that procedural reform is necessary; the difference between us is simply how this reform should be achieved.

[74] Fed. R. Civ. P. 12(a).

used to satisfy the judgment.[75] That this is an anomaly has been pointed out by numerous critics.[76] In normal civil actions not involving sovereigns, where the plaintiff is permitted to proceed by attachment of property (with or without personal service or personal appearance by defendant), the property (or a bond) remains under custody of the court as security for any judgment that may eventually be obtained.[77] Nevertheless, the State Department has in the past believed that prevailing rules of international law and considerations of national interest preclude "dropping the other shoe" by permitting execution as well as jurisdiction in cases of claims *jure gestionis*. Whether the courts would follow an executive change in this direction in the absence of a statute is not clear. In *Dexter & Carpenter, Inc. v. Kunglig Jarnvagesstyrelsen*,[78] the court permitted a plea of immunity from execution even though the defendant sovereign was held to have consented to suit. The American Law Institute Restatement of Foreign Relations Law "expresses no opinion" as to whether property of a foreign state connected with a commercial activity of that state may be subjected to execution in satisfaction of a judgment resulting from a quasi in rem proceeding.[79] The Restatement says only that there is no bar to execution in an in rem proceeding, i.e., a possessory action or certain kinds of maritime proceedings where there is a direct claim on the property subject to attachment. If there has been no attachment it appears that no steps are permitted in American law to collect on the judgment against an unwilling foreign sovereign.

## B.  *A Problem of Choice*

Perhaps the most difficult decision in connection with the present proposal is whether to couple the expansion of jurisdiction over foreign states with the possibility of forcible executions, or to maintain the present United States rule concerning immunity of state property from compulsory execution. On the one hand, it might be said that without compulsory execution, a judgment has no value. On the other hand, the idea of a sheriff or marshall

---

[75] See discussion in text at 907-09.

[76] See, e.g., Note, Sovereign Immunity of States Engaged in Commercial Activities, 65 Colum. L. Rev. 1086, 1090-91 (1965); Note, The First Decade of the Tate Letter Policy, 60 Mich. L. Rev. 1142, 1150-53 (1962).

[77] See, e.g., N.Y.C.P.L.R. Art. 62, especially §§ 6201, 6218, 6226 (McKinney 1963); Fed. R. Civ. P. 64; Barron & Holtzoff, Federal Practice and Procedures, §§ 1421-23 (Wright ed. 1958 and 1968 Supp.).

[78] 43 F.2d 705 (2d Cir. 1930).

[79] Restatement (Second) of Foreign Relations Law of the United States, caveat to § 69 (1965).

Imaged with the Permission of N.Y.U. Law Review

actually impounding a foreign state's property really does affront
conceptions of friendly intercourse among states. This is particu-
larly true since property of both the federal government and in-
dividual states in this country is immune from the execution of
judgments.[80] In general, the present proposal seeks to treat for-
eign governments engaged in activities in the same manner as the
United States Government is treated. Indeed, the words of sub-
section (b) are taken directly from the Federal Tort Claims
Act.[81] To depart in one respect from this parallelism, and deny
to foreign governments an immunity that the United States grants
to itself, would seem to be an unnecessary and undesirable provo-
cation.

The whole scheme proposed here would not come apart if
the choice were made to permit compulsory execution on foreign
state property. The scheme would, however, have to be made sub-
stantially more complicated, with the addition once again of diffi-
cult classifications of property, in order to distinguish for instance
between the embassy's house, presumably not subject to execu-
tion; the embassy's car, somewhat harder; a bank account, still
harder if it is not clearly identified, and so on. Moreover, as will
be discussed further below, one hoped for advantage in the pro-
posal made here is to get the State Department out of the busi-
ness of deciding court cases. If execution on foreign state property
were to become a real possibility, the pressure would be great to
preserve the opportunity for the State Department (or the Presi-
dent) to intervene in litigation, possibly at the very end of the
process.

Without complete confidence in the choice, the vote here is
to limit the proposal to establishment of a simple form of service
based on notice and adequate opportunity for reply, without the
threat of compulsory execution.

Foreign governments engaged in borrowing, purchasing,
chartering ships and trading can and often do resist litigation
arising out of these activities. But once a judgment is obtained—
at present a rarity for all of the reasons previously stated—it
seems likely that the governments will pay, rather than default
on a final judgment.[82] A combination of commercial and diplo-

[80] Buchanan v. Alexander, 45 U.S. (4 How.) 19 (1846). Cf. Glidden Co. v.
Zdanok, 370 U.S. 530, 570 (1962); Federal Housing Administration v. Burr, 309
U.S. 242, 250-51 (1940). For the way judgments against the United States are
dealt with, see 31 U.S.C. § 724(a) (Supp. IV 1968); 28 U.S.C. §§ 2414, 2517(a),
2518 (1964).
[81] 28 U.S.C. § 1346(d) (1964).
[82] In Et Ve Balik Kurumu v. B.N.S. Int'l Sales Corp., 25 Misc. 2d

matic pressure would probably induce governments that have an interest in maintaining good commercial reputations in the United States and good diplomatic relations with this country to pay judgments that have become final after due notice and full opportunity to contest on the merits. Those countries that do not care about their commercial reputation in the United States and have no diplomatic good will to preserve—e.g., the Castro government of Cuba—are not likely to be caught by an attachment of property either, except on a highly sporadic basis.

It should be added that it attachment of foreign state property ever became possible on a large scale, there would be a substantial risk that foreign states, even those otherwise quite prepared to assume liabilities and pay judgments rendered against them, would reconsider their policies with regard to purchasing missions and foreign exchange reserves in the United States. The magnitude of this danger is very difficult to discover. But the amounts involved are so great, in comparison with the small potential advantage accruing to successful plaintiffs in the United States, that widening the scope of judicial review and then relying on foreign governments' enlightened self-interest concerning the collection process seems the wiser course. Proposed subsection (d) therefore eliminates all compulsory process against foreign state property, whether for purposes of jurisdiction or for purposes of satisfying a judgment.

### C. *Withdrawal of State Department from Sovereign Immunity Cases*

To return briefly to the underlying rationale of the doctrine of sovereign immunity, a principal concern has always been that the acts of private litigants ought not to interfere with the sovereign functions of sovereign states. Civil actions today are no longer conceived of as "indignities." But seizure of property—be it a ship, or a bank account, or a vehicle—can severely disrupt governmental activity. The result may well be bad feelings between countries or even retaliation. To take an extreme case, in *Rich v. Naviera Vacuba*[83] a Cuban merchant vessel was brought into Norfolk harbor by mutineering crewmen, and was immediately attached by various United States creditors, just after delicate

---

299, 307, 204 N.Y.S.2d 971, 980 (Sup. Ct. 1960), aff'd, 17 App. Div. 939, 233 N.Y.S.2d 1013 (1962), it was suggested that an affirmative judgment on a counterclaim against plaintiff, an agency of the Turkish Government, should not be issued, since such a judgment could not be collected. The court said "I would not be impressed with such a contention, were it presented."

[83] 295 F.2d 24 (4th Cir. 1961).

negotiations had resulted in return by Cuba of a hijacked United States airliner that had been detained in Cuba for three weeks.[84] So long as attachment and execution remain a possibility, it would seem prudent for the Executive Branch to seek to maintain some control over litigation, perhaps by reserving the right to file a suggestion of immunity. But if attachment and execution are no longer permitted, there would seem to be no need for the Executive Branch to intervene in the judicial process. As we saw earlier, this would have two distinct advantages. It would eliminate the State Department from an adjudicatory function it is ill equipped to perform, and it would remove from the Department the irritation (not to say prejudice) to foreign relations inevitable in its current place in the middle between court and foreign state.

## VI

### INTERNATIONAL LAW

#### A. *The International Standard*

It may seem strange that up to now the discussion of immunity of foreign states has made scarcely any mention of international law. Obviously the concept of sovereign immunity derives from international law. Indeed the Latin motto embodying the rationale for the sovereign immunity doctrine, *"par in parem non habet imperium"* seems to have originated with one of the first writers on international law, the Italian Bartolus, writing 250 years before Grotius.[85] Nevertheless, it seems fair to say that the scope of possible variation within the contemporary international legal system in the area of sovereign immunity is so wide as to cast doubt on whether there are any restraints on the choice made by states. In the words of the Italian Court of Cassation (Supreme Court) the Latin maxim quoted above has been joined by another, *"Princeps in alterius territorio privatus."*[86] The decision on where to draw the line, if at all, between immune and non-immune activities, claims, and properties, is for each state

---

[84] For a detailed discussion of the facts surrounding this case, see A. Chayes, T. Ehrlich, and A. Lowenfeld, International Legal Process 87-144 (1968).

[85] Bartolus de Saxoferrato, Tractatus Represaliarum (1354), Quaestio 1/3 § 10, quoted in A. Verdross, Völkerrecht 169 (4th ed. 1959). The complete phrase, in English, reads: "For no state (civitas) can make law over another, because an equal does not have control (imperium) over an equal." (Author's translation).

[86] "The prince is a private citizen in the territory of another." Tani v. Rappresentanza Commerziale U.R.S.S., 71 Foro Ital. 855, 858, [1948] Ann. Dig. Int'l Law. 141, 144. (Court of Cassation 1947).

Case 4:11-cr-00573-JSW   Document 1295-3   Filed 11/30/21   Page 204 of 211

to make on its own, whether by statute, rule of court, or foreign office policy.[87]

With respect to the antecedent of the present proposal, the restrictive theory of immunity as advocated in the Tate letter, the United States State Department conducted a thorough investigation of the practice of states and the opinion of writers before making its decision in 1952. The Department concluded that there were basically two views of state immunity, the absolute and the restrictive, that both had substantial supporters, that the trend was clearly away from the absolute theory, and that there was no inhibition in international law to a change to the restrictive theory.[88] Moreover, neither at the time of the Tate letter nor subsequently, has there been any protest or complaint from other states (including those adhering to the absolute theory of immunity, suggesting that international law compels a wider grant of immunity than the Executive Branch of the United States Government has been prepared to recommend.[89]

There is no general treaty concerning sovereign immunity, and in view of the substantial split between adherents of broad and narrow immunity, there is not likely to be one for some time.[90] The writers in the area all say substantially the following:

> Foreign sovereigns and the governments of foreign States enjoy immunity from the jurisdiction of municipal courts. However, the extent of the immunity actually accorded them varies greatly, and the most that can be said of customary international law is that it enjoins immunity from the judicial process only in respect of governmental activities that pertain to administration, and does not compel it in respect of other activities which are more truly commercial than administrative.[91]

---

[87] See, e.g., Lauterpacht, The Problem of Jurisdictional Immunities of Foreign States, 28 Brit. Y.B. Int'l L. 220, 248 (1951).

[88] 26 Dep't State Bull. 984 (1952). This conclusion was later elaborately documented in a study prepared for the State Department. See J. Sweeney, The International Law of Sovereign Immunity (1963).

[89] There have, of course, been complaints concerning the interpretation given by the State Department to particular activities, claims, or property.

[90] Cf. C. de Visscher, Theory and Reality in Public International Law 246 (1968): "There are few questions on which national tribunals differ so widely and so persistently as upon the double immunity of foreign States from suit and from execution." There are, however, a number of bilateral treaties waiving sovereign immunities for specific entities, for example for the trade delegations of the Soviet Union.

[91] 2 D. O'Connell, International Law 913 (1965). O'Connell is from Australia. For other, similar views, see, e.g., A. Verdross, Völkerrecht 168-70 (4th ed. 1959) (Austria); G. Schwarzenberger, A Manual of International Law 102-04 (5th ed. 1967) (Great Britain); C. de Visscher, supra note 90, at 303-07 (Belgium); M. Sorensen, Manual of Public International Law 424-45 (1968) (Sweden and contributions from various other countries).

Imaged with the Permission of N.Y.U. Law Review

Perhaps the most thorough judicial examination by a court of the prevailing rules of international law on the subject was made recently by the Constitutional Court of the Federal Republic of Germany.[92] Under the German Constitution (as under the Italian), "the general rules of International Law are components of the law of the Federation and produce rights and duties directly for the residents of the territory of the Republic;"[93] whenever issues possibly involving a rule of international law come up in a legal dispute, the court hearing the case must suspend its procedures and submit the question to the Constitutional Court.[94]

The case involved repairs to the heating system of the Iranian Embassy building in Cologne. The heating contractor demanded payment for its work, the Embassy refused to pay until all the repairs to the building had been completed to its satisfaction, and the contractor brought suit. When the contractor demanded a hearing in the local court, the Embassy pleaded sovereign immunity, and the court declined to summon the Embassy representatives. Plaintiff appealed, and the case was submitted to the Constitutional Court. Under the *jus gestionis—jus imperii* distinction as understood in the United States, this would be a very close case. On the one hand the dispute involved a simple contract for building repairs; on the other hand, the building in question was the embassy itself, and adequate heating is essential for its maintenance. The German Constitutional Court likewise considered the case difficult, and undertook a survey of the practice of nineteen different states, the reports of a variety of international organizations, public and private, and the opinions of numerous writers. Its first conclusion, important because of the formulation of Article 25 of the Constitution, was that

> There is no general rule of international law according to which domestic jurisdiction over complaints against a foreign state with respect to its non-sovereign acts is excluded.[95]

As to whether a particular act is or is not a sovereign act, the

---

For a selection of specific discussions of sovereign immunity see, e.g., Lauterpacht, supra note 87; Lalive, L'Immunité de Juridiction des Etats et des Organisations Internationales, 84 Recueil des Cours, Académie de Droit International 209 (1953); Garcia-Mora, The Doctrine of Sovereign Immunity of Foreign States and its Recent Modifications, 42 Va. L. Rev. 335 (1956); Schmitthoff, The Claim of Sovereign Immunity in the Law of International Trade, 7 Int'l & Comp. L.Q. 452 (1958).

[92] "X" v. Kaiserreich Iran, 16 Entscheidungen des Bundesverfassungsgerichts [Ent. B. v. G.] 27 (Const. Ct., 2d Sen., April 30, 1963).

[93] Grundgesetz (Organic Law) Art. 25.

[94] Id., Article 100 (II).

[95] 16 Ent. B. v. G. at 33.

Court said this decision must be made by the forum according to national law, since international law does not contain criteria for drawing the distinction.[96] On this basis, it rejected a test based on the purpose of the act—here maintenance of the Embassy—and concentrated on what it called the juridical relation (Rechtsverhältnis) on which the suit was based. Accordingly (and contrary to the recommendation of the German Ministry of Justice), the Court denied immunity to the Iranian Embassy. Perhaps, it suggested, its analysis had not yet achieved sufficient recognition to be considered a rule of international law within the German constitutional sense. But any grant of immunity beyond that which the court would grant "can no longer be looked upon as required by international law."[97]

As noted above, it is hard to say how a court (or the State Department) would decide this case in the United States at present. Under the proposal made in this paper, the case is very easy. The Embassy could have sued the contractor for breach of the repair contract; likewise the contractor could sue the Embassy for breach on its part. Thus, the proposal made here is not a new departure in international law, but rather a new and more reliable way to arrive at a result already reached in many countries.

What is new in the proposal is provision for a simple way to commence an action against foreign sovereigns, without the need for attachment of property or personal service. Jurisdiction is defined by subject matter on the basis of certain activities carried out or having impact in the United States. The need for this innovation is, as we have seen, peculiar to the Anglo-American system, where jurisdiction and service of process have traditionally been considered together. In the civil law countries the issue of jurisdiction, dependent on subject matter, or on liability-creating activity, has traditionally been considered separately from the issue of service of process, whose only function is to give notice. The only international standard of due process is the assurance of adequate notice and an opportunity to be heard. This test is clearly met by the present proposal.

### B. The Vienna Convention

A separate issue might be raised by the method to be used to give notice of an action to the foreign state. Under accepted international law principles, as embodied in Article 31 of the

---

[96] Id. at 62.
[97] Id. at 64.

Vienna Convention on Diplomatic Relations,[98] ambassadors and other diplomatic agents are entitled to immunity (with certain exceptions) from the civil jurisdiction of a receiving state. This is "diplomatic" as contrasted with "sovereign" immunity, for it pertains to the person of the foreign official, and not to the foreign state itself. Nothing in the present proposal abridges this personal immunity of diplomatic agents. No personal service would be made on diplomats and no attempt would be made to subject them personally to the jurisdiction of a United States court. Similarly, the premises of diplomatic missions would remain inviolable, as required by Article 22 of the Vienna Convention. The only contact with the personnel of a foreign mission or its premises would be that some mission officer—and which one would be of no consequence—would receive (and sign acknowledgement of receipt of) a piece of mail containing the summons and complaint addressed to the foreign state.

Nothing in the Vienna Convention or in customary international law prevents the use of the mail to notify a foreign state that it is required to answer a summons and complaint. Indeed, the International Law Commission in its report on the draft which formed the basis for the Vienna Convention stated—

> A special application of this principle [the inviolability of a diplomatic mission] is the rule that no writ may be served within the premises of the mission, and that no summons to appear before a court may be served in the premises by a process server. Even if process servers do not enter the premises but carry out their duty at the door, such an action would constitute an infringement of the respect due to the mission. The service of documents should be effected in some other way. In some countries, the person concerned may apply to the Minister for Foreign Affairs of the receiving state. *There is nothing to prevent service through the post if it can be effected in that way.* . . . (Emphasis supplied).[99]

### C. The United States in Foreign Courts

It may be asked how the proposal made here compares with the treatment accorded to the United States in other countries,

---

[98] 500 UNTS 95 (1964). Not yet in force for the United States. See note 60 supra.

[99] Report of the International Law Commission covering its 10th Session, 1958, 13 G.A.O.R. Supp. 9 at 17, U.N. Doc. A/3859 (1958). A proposal was made at Vienna to expressly authorize service by mail, but the proposal was withdrawn after the sponsoring state, Japan, was satisfied that "discussion within the Committee had established a unanimous consensus that service could be effected by mail," U.N. Doc. A/Conf. 20/C 1 S.R. 22 at 13 (1961). See Kerley, Some Aspects of the Vienna Conference on Diplomatic Intercourse and Immunities, 56 Am. J. Int'l L. 88, 102 (1962).

and whether the present proposal might subject the United States to retaliation in foreign states. The answer is that by and large, with the exception of countries of the British Commonwealth and the Communist countries, foreign countries at present subject the United States to civil suit in just the types of cases that would be opened to suit in the United States under the present proposal. Even on causes of actions that under the *jus gestionis-jus imperii* distinction would be classified as governmental acts, foreign countries have generally held the United States liable to suit when the claim arose out of an activity normally expected to create liability. For instance, in a case previously alluded to, the Austrian Supreme Court held that a person whose car was damaged by an automobile belonging to the United States Embassy could bring suit against the United States Government, even though the car was being used to pick up official diplomatic mail at the airport. The mail was, presumably, immune from search or seizure,[100] but there was no reason, either under Austrian law or under international law, to give immunity to the vehicle for an accident claim arising on the public streets. As the Austrian court pointed out, this was an activity that other persons besides governments could carry on, and therefore all should be equally liable for the consequences of such activity.

The Court of Cassation (Supreme Court) of Italy held that the United States Government could be sued in connection with a dispute arising out of a contract for construction of sewers, even though the contracting party was the United States Army and even though the contract itself provided for an Army claims procedure.[101] Similarly, the Court of Cassation of Italy held the United States subject to civil jurisdiction in a suit brought by a kitchen assistant at a United States Army post who claimed severance pay in accordance with Italian labor law.[102] While the activities of the United States Army in connection with its assignments under NATO were clearly of a public character, the court could not find any public character in service performed by the plaintiff in the base kitchen.

Not all foreign countries that follow the restrictive theory go as far as Italy in declaring public activities subject to civil jurisdiction. For example, the Court of Appeals of Paris upheld the immunity of the United States in a claim based on a contract

[100] Vienna Convention on Diplomatic Relations, Art. 25.
[101] Governo degli Stati Uniti d'America v. S.r.l. IRSA, No. 1178, 86 Il Foro Ital. 1405 (Court of Cassation 1963).
[102] Governo degli Stati Uniti d'America v. Bellotto, No. 467, 88 I Foro Ital. 91 (Court of Cassation 1964).

for construction of United States Army housing, very similar to the contract in the Italian sewer case.[103] A reported case in the same court permitting suit against the United States on a guarantee for the payment of rent in plaintiff's houses built for United States personnel was subsequently withdrawn.[104] Evidently, other countries, too, have had difficulty with the *jus imperii, jus gestionis* distinction. But it could not reasonably be claimed that the United States would be endeavoring to assert its jurisdiction against foreign states in circumstances where it is not itself subject to jurisdiction abroad. Indeed, in the great majority of claims arising from the manifold activity of the United States abroad, pleas of sovereign immunity are no longer made—first, because as a matter of policy it is good sense for the United States to stand behind its actions, defend them on the merits, and pay where it is found to be liable; and, second, because, as we have seen, in most countries today immunity pleas are not likely to succeed.

## VII

### Conclusion

No one would contend that the jurisdiction of domestic courts of the United States over claims against foreign states is one of the great problems of the day. But even minor problems call for solutions. If we can solve this problem—by a simple statute providing for a day in court for claimants who should have one, for service of process on states where jurisdiction is appropriate, and for immunity from suit where it belongs—perhaps our confidence will be strengthened in approaching greater problems in both of the fields touched by the present proposal—judicial administration in the United States and the role of law in the community of nations.

### APPENDIX

#### The Proposed Statute*

##### An Act

To Permit Suit Against Foreign States, Their Agencies And Instrumentalities In Contract And In Tort.

---

[103] Soc. Enterprise Perignon et autres v. Etats Unis d'Amérique, Cour de Cassation 1st Ch. Civ., Dec. 8, 1964, 85 Gazette du Palais 177 (1965).

[104] Soc. Imm. Cites Fleuries Lafayette v. Etats Unis d'Amérique, Court of Appeal, Paris, March 16, 1960, 89 Journal du Droit International 132 (1962), withdrawn Nov. 22, 1961.

* This is the present author's draft. It reflects some but not all of the changes growing out of discussion of the proposal within the United States Government and with outside advisers. So far as this writer knows, none of the variations among the several drafts that have circulated informally involves any basic departure from the proposal.

Imaged with the Permission of N.Y.U. Law Review

*be it enacted by the senate and House of Representatives of the United States of America, in Congress assembled,* That Title 28 of the United States Code is amended by adding the following new section:

Section 0000.  **Action against Foreign States, their Agencies and Instrumentalities.**

(a) The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action, regardless of the amount in controversy, against a foreign state, or an agency or instrumentality of a foreign state.

(b) Action may be brought pursuant to subsection (a) against a foreign state, or an agency or instrumentality of a foreign state only upon

(1) an express or implied contract entered into, to be performed, or arising out of transactions in the United States; or

(2) a claim for personal injury or death or damage to property caused by an act or omission of any officer, agent, or employee of such foreign state while acting within the scope of his office, agency, or employment within the United States, its territories or possessions,

under circumstances where the foreign state, agency, or instrumentality, if a private person, would be subject to suit in accordance with the law of the place where the action is brought.

(c) (1) Service of process may be made in such action by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the embassy of the foreign state duly accredited to the Government of the United States, or to such other officer or agency of the foreign state as is authorized under the laws of that state to receive service of process. Proof of service shall include a receipt signed by or on behalf of the addressee or other evidence of delivery to the addressee, satisfactory to the court.

(2) A foreign state, or an agency or instrumentality of such state, shall serve an answer within sixty (60) days after service of process in the manner described in paragraph (1) of this subsection.

(d) (1) No attachment, injunction, garnishment, or other similar process, mesne, or final, shall be issued against a foreign state, its agencies, or instrumentalities, nor shall the property of a foreign state or that of its agencies or instrumentalities, be subjected to execution of final judgment unless that state, agency or instrumentality has expressly consented to such execution.

(2) As used in this section, an agency or instrumentality of a foreign state shall not include any corporation, partnership, or other entity having a stated capital or limited liability regardless of the ownership or control of such entity by the foreign state and no claim of foreign state immunity shall be allowed in an action against such corporation, partnership, or other entity.

(e) Nothing in this section shall authorize the maintenance of an action without consent against a foreign state, or an agency or instrumentality of that state

(1) based upon legislation, decrees, or orders of that state,

(2) calling into question the legislation, decrees, or orders of that state,

(3) based upon a claim arising out of an act or omission of an officer, agent, or employee of that state in the execution of a public law, regulation, decree, or order, or the exercise or performance of a discretionary function or duty,

(4) based upon a public debt of the foreign state.

(f) (1) Nothing in this section shall prevent a foreign state, or any agency or instrumentality of a foreign state, from consenting to be sued in the United States upon claims in addition to those authorized herein.

(2) Nothing in this section shall prevent a foreign state, or any agency or instrumentality of a foreign state, from consenting to execution of final judgment, either generally, or upon particular claims.

(g) Actions under this section may be brought in the Federal district court for the District of Columbia or

(1) in the case of an action of the kind described in subsection (b) (1), in the judicial district where the contract was entered into or where it was to be performed; and

(2) in the case of an action of the kind described in subsection (b) (2), in the judicial district in which the act or omission took place.